# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation* <br><br> This Document Relates to: <br><br> ALL ACTIONS | Case No. 1:24-md-03119-MLG-LF <br><br> Judge Matthew L. Garcia |

**DEFENDANT DIAMONDBACK ENERGY, INC.'S
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

                                                                          **Page**

I.     The Complaint allegations show that Diamondback did not make output decisions in parallel with its competitors and increased its production throughout the alleged conspiracy period. ................................................................................................................ 2

II.    Plaintiffs' remaining allegations about Diamondback do nothing to salvage their conspiracy claim. ............................................................................................................... 6

III.   The claims against Diamondback should be dismissed with prejudice. ............................ 10

CONCLUSION ............................................................................................................................ 10

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Aragón v. De Baca Cnty. Sheriff's Dep't*,
    157 F. Supp. 3d 1039 (D.N.M. 2015) ....................................................................................4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................2, 6

*Carrete v. N.M. Racing Comm'n*,
    2021 WL 6072581 (D.N.M. Dec. 23, 2021) ........................................................................10

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) .................................................................................................10

*D'Augusta v. Am. Petrol. Inst.*,
    117 F.4th 1094 (9th Cir. 2024) ..............................................................................................5

*In re DRAM Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) .................................................................................................4, 5

*In re German Auto. Mfrs. Antitrust Litig.*,
    392 F. Supp. 3d 1059 (N.D. Cal. 2019) .................................................................................9

*Hinds County v. Wachovia Bank N.A.*,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010) ....................................................................................2

*Int'l Constr. Prods. LLC v. Ring Power Corp.*,
    2021 WL 6755717 (N.D. Fla. Dec. 23, 2021) .......................................................................7

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ..........................................................................................2, 4

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ...............................................................................................8

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) .................................................................................................3

*Plant Oil Powered Diesel Fuel Sys. v. ExxonMobil Corp.*,
    801 F. Supp. 2d 1163 (D.N.M. 2011) ....................................................................................8

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) .............................................................................................9

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 26(a)(1)(A)(ii) ........................................................................................................8

Diamondback Energy, Inc. ("Diamondback") is an independent oil and natural gas company recognized as a leading innovator in the shale oil industry, known for its strategic growth, technological advancements, and commitment to sustainable practices. Plaintiffs claim that Diamondback conspired with the Organization of Petroleum Exporting Countries ("OPEC") and several of its domestic competitors to reduce shale oil production. For the reasons articulated in Defendants' joint motion to dismiss—which Diamondback joins in full[1]—Plaintiffs' entire Consolidated Complaint (the "Complaint") should be dismissed with prejudice for lack of subject matter jurisdiction and failure to state a claim. But the Complaint's allegations are particularly deficient with respect to Diamondback. As such, even if it could be argued that Plaintiffs have adequately alleged the existence of a supply reduction conspiracy, Plaintiffs have not plausibly alleged that Diamondback was a participant in that conspiracy.

As Plaintiffs are forced to admit, Diamondback actually *increased* its production of shale oil by a rate of 19% during the alleged conspiracy period. And the Complaint, as well as the sources it cites, demonstrate that Diamondback did not make production decisions in parallel with its competitors, but rather pursuant to a unilateral and economically rational strategy driven by market factors and the directives issued by Diamondback's core shareholders. Plaintiffs attempt to circumvent this reality by accusing Diamondback of participating in two publicly reported meetings with OPEC officials and other Defendants and attributing inflammatory statements to an unnamed former Diamondback employee. Neither tactic rescues Plaintiffs' claims. The only two meetings Diamondback is alleged to have attended led to nothing more than high-level discussions about industry conditions. Black-letter antitrust law establishes that there is nothing conspiratorial

---

[1] Diamondback similarly incorporates the "Statement of Facts" provided in Defendants' joint motion to dismiss.

1

about these kinds of exchanges. Similarly, the inclusion of an anonymous statement from a former Diamondback "lease operator," expressing confusion regarding the company's production strategy, is no lifeline for Plaintiffs' deficient claims. The Complaint does not offer any facts to indicate that this former "lease operator" would have been privy to Diamondback's high-level production strategy, and in any event this anonymous opinion says nothing to suggest that this strategy was not in the unilateral business interest of Diamondback and it investors.

For these reasons, and for the additional points articulated in Defendants' joint motion to dismiss, all claims against Diamondback should be dismissed with prejudice.

**I.    The Complaint allegations show that Diamondback did not make output decisions in parallel with its competitors and *increased* its production throughout the alleged conspiracy period.**

At its core, the Complaint accuses Diamondback of "coordinat[ing]" and "collectively agree[ing]" with its competitors "not to increase"—"and ultimately [to] constrain"—its "shale oil production." Compl. ¶¶ 1, 9. In order for these claims against Diamondback to survive dismissal, Plaintiffs must allege "enough factual matter (taken as true)" to establish that it is "plausible"—not merely "possib[le]"—that "an agreement was made" between Diamondback and the other Defendants to reduce production. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). A "conspiracy is not plausible if in light of common economic experience the alleged conduct is equally likely to result from independent action." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1175 (10th Cir. 2019). Moreover, even if it could be argued that the Complaint adequately alleges the existence of a conspiracy, Plaintiffs still must sufficiently plead facts showing that *Diamondback* was a participant in that conspiracy. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (holding that a complaint must "specify how [each] defendant[] [is] involved in the alleged conspiracy"); *Hinds County v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348,

2

362 (S.D.N.Y. 2010) ("Plaintiffs must allege a factual connection between each Defendant and the alleged conspiracy . . . .").

Plaintiffs' claims against Diamondback crumble under this standard. Even when all allegations in the Complaint are accepted as true, they do not plausibly suggest that Diamondback coordinated or agreed with its competitors to constrain its output of shale oil. As articulated in Defendants' joint motion to dismiss, the Complaint *concedes* that Diamondback did not make output decisions in parallel with the other Defendants. Indeed, the Complaint reflects that, during the alleged conspiracy period, Defendants pursued widely varying production strategies in comparison to the production strategy of Diamondback. Compl. ¶ 160 & Table 1. This lack of parallel conduct dooms Plaintiffs' conclusory assertions that Diamondback "coordinated" its output with its competitors, and independently necessitates the dismissal of the conspiracy claims against Diamondback, *irrespective* of the Complaint's allegations regarding purported "plus factors." *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (dismissing a Section 1 conspiracy claim because the plaintiff "fail[ed] to plausibly plead parallel conduct" by the defendants and explaining that because of this failure, "no discussion of any 'plus factors' [was] necessary").

Plaintiffs' allegation that Diamondback entered into a supply reduction conspiracy with the other Defendants is made all the more implausible by the fact that *Diamondback is not even alleged to have constrained or reduced its production*. To the contrary, Plaintiffs admit that Diamondback *increased* its production by 19% during the alleged conspiracy period, which was the third-highest growth rate of all Defendants. Compl. ¶ 160 & Table 1. Unable to claim that Diamondback reduced its production, Plaintiffs resort to insinuating that it was somehow indicative of a conspiracy for Diamondback to *further* increase its production by 19% from 2021 through 2023

3

after increasing its output at a blistering (and unsustainable) rate of 220% from 2017 through 2019. *Id.* But it is well established that a company "reduc[ing] its" rate of "supply growth" can be an "economically rational"—and non-conspiratorial—response to changing market conditions or changes in a company's internal financial conditions. *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 50 (9th Cir. 2022). And Plaintiffs' own allegations reveal a litany of significant events and shifts in the global market for crude oil from 2021 through 2023 that would justify Diamondback's independent decision to pursue a more modest production increase during that time. For example, at various points in the Complaint, Plaintiffs acknowledge the impact on the oil industry of consumer demand slowly returning to normal after the depths of the COVID-19 pandemic (Compl. ¶ 138); market volatility and uncertainty in the aftermath of Russia's invasion of Ukraine in 2022 (*id.* ¶¶ 146–148); and the looming threat that OPEC would take harmful retaliatory measures in response to rapid increases in American shale oil production (*id.* ¶ 143(d)). Diamondback's response to these market developments—to proceed with some degree of caution, while still meaningfully *increasing* its production levels—was just as likely a "result [of] independent action" as it was the result of an unlawful agreement, which renders Plaintiffs' conspiracy claims against Diamondback implausible. *Llacua*, 930 F.3d at 1175.

The sources Plaintiffs cite in their Complaint only bolster the conclusion that Diamondback's production strategy served Diamondback's own unilateral interests and thus was not indicative of conspiracy. For example, the article Plaintiffs cite covering statements made by Diamondback's Chairman and CEO, Travis Stice, during a February 2022 earnings call provides

4

critical context for Diamondback's unilateral output decisions.[2] Plaintiffs misleadingly cherry-pick very small snippets of Mr. Stice's comments—indicating that Diamondback would "continue to be disciplined" and had "no reason to put growth before returns"—to try to imply that Diamondback's production strategy was irrational and the product of collusion. Compl. ¶ 149(c). But that argument cannot be squared with the portions of Mr. Stice's statements that Plaintiffs omit from their Complaint. The full quotation from Mr. Stice explains that Diamondback pursued this production strategy not as part of any alleged collusion, but at the behest of Diamondback's "shareholders, the owners of [the] company." *Id.* Following the directives of shareholders is a non-conspiratorial, "obvious alternative explanation" for the challenged conduct, which negates "an inference of an agreement." *D'Augusta v. Am. Petrol. Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024). In any event, allegations of Mr. Stice making general statements about market conditions or corporate strategy on an earnings call are insufficient to plausibly establish that Diamondback participated in the claimed conspiracy. As the Ninth Circuit has explained, even in the absence of a conspiracy, high-level executives are "likely [to] make . . . public statements about their observations, predictions, and strategies for the future, particularly in response to investor and analyst questions." *In re DRAM*, 28 F.4th at 50.

The cited article also reflects that Mr. Stice's discussion about Diamondback's 2022 production strategy was coming on the heels of a year where Diamondback had suffered losses of

---

[2] *See* Compl. ¶ 149(c) (citing Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22). By citing and relying on this article in their Complaint, Plaintiffs have incorporated it into the pleadings by reference, and the Court may thus consider it when ruling on Diamondback's motion to dismiss. *See Aragón v. De Baca Cnty. Sheriff's Dep't*, 157 F. Supp. 3d 1039, 1042 (D.N.M. 2015) ("In addition to the facts alleged in the complaint, a court reviewing a motion to dismiss may consider documents in the public record or incorporated by reference into the complaint.").

*$739 million*, largely due to the effects of the COVID-19 pandemic.[3] Diamondback indicated it was concerned at that time about how its individual production levels would fit in with "the global balance" between supply and demand, particularly since "Iran [was] expected to bring hundreds of thousands of barrels per day to market later [that] year," and domestic production was poised "to increase" as well. *Id.* Contrary to any alleged agreement by Diamondback to constrain its output, Mr. Stice announced during this same earnings call that Diamondback "planned to spend *$1.75–1.9 billion* on capital projects" that year—a $400 million increase in Diamondback's capital investments from 2021. *Id.* (emphasis added). These capital investments were aimed at increasing—not reducing—Diamondback's production capacity, including the construction of between 270 and 290 new oil wells. *Id.* *Such conduct is not plausible evidence* of a firm constrained by an agreement to reduce supply. Rather, it is conduct indicative of a company rationally pursuing its own individual interests—the opposite of conspiratorial behavior.

**II.     Plaintiffs' remaining allegations about Diamondback do nothing to salvage their conspiracy claim.**

Even if it could be argued that Plaintiffs have plausibly alleged that Diamondback constrained its production, and even if it could be argued that Plaintiffs have plausibly alleged that Diamondback did so in parallel with the other Defendants (and the Complaint does not plausibly allege *either* of these points), Plaintiffs *still* must adequately plead "plus factors" that "raise[] a suggestion of a preceding agreement" involving Diamondback, as opposed to "merely parallel conduct that could just as well [have been] independent action." *Twombly*, 550 U.S. at 553, 557. None of the Complaint's few remaining allegations specific to Diamondback constitute plus factors raising an inference of a conspiracy involving Diamondback. First, Plaintiffs attempt to connect Diamondback to the purported conspiracy by claiming that Mr. Stice participated in

---

[3] De Lombaerde, *supra* note 2.

6

meetings with OPEC officials and executives from other Defendants. But of all the meetings between OPEC and Defendants from 2017 through 2023 identified in the Complaint, Diamondback is only alleged to have attended two: a dinner during the March 2019 CERAWeek Conference, and a second dinner during the March 2023 CERAWeek Conference. Compl. ¶¶ 134, 152(b). In other words, Diamondback's only alleged connection to OPEC—the linchpin of the entire alleged conspiracy—is one dinner two years *before* Defendants allegedly "[a]ctualize[d] [t]heir [a]greement with OPEC" in 2021 (*id.* at 45), and a second dinner two years *after* that agreement was supposedly struck. If the numerous alleged meetings between Defendants and OPEC from 2017 through 2023 are where the alleged agreement was purportedly entered into, Diamondback was not a participant. *See Int'l Constr. Prods. LLC v. Ring Power Corp.*, 2021 WL 6755717, at *8 (N.D. Fla. Dec. 23, 2021) (emphasizing that "[t]he timing of the communications" was not indicative of participation in a conspiracy).

Furthermore, the March 2023 dinner allegedly attended by Mr. Stice was also attended by representatives of numerous American shale oil producers who are *not* alleged to have been part of the conspiracy. Compl. ¶ 152(b) (identifying "about two dozen U.S. shale executives" in attendance) (cleaned up). In fact, according to the article Plaintiffs cite, "[t]wo officials from the US Department of Energy were also present" at the March 2023 dinner.[4] It is implausible that Diamondback, the other Defendants, and OPEC would convene a meeting in furtherance of their supply reduction conspiracy and invite representatives from the federal government to attend.

---

[4] Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now That OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9. By citing and relying on this article in their Complaint, Plaintiffs have incorporated it into the pleadings by reference.

In any event, the Complaint's characterization of the communications during the March 2019 and March 2023 dinners amounts to nothing more than a general discussion of industry trends among market participants who were convened in Houston for the CERAWeek energy conference. *See, e.g.*, Compl. ¶ 134 (describing the March 2019 dinner as "a friendly conversation on current industry issues and the immediate prospects and challenges for all" (internal quotations omitted)). It is not alleged that either of these two dinners included any discussion about Diamondback's production plans—much less an agreement that Diamondback would constrain its production. Diamondback's alleged participation in such industry meetings, by itself, does not plausibly support Plaintiffs' conspiracy claims against Diamondback. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[P]articipation in trade organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *Plant Oil Powered Diesel Fuel Sys. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1194 (D.N.M. 2011) (adopting the Seventh Circuit's analysis that "a trade association is not by its nature a walking conspiracy" (internal quotations omitted)).

The only other allegations in the Complaint related to Diamondback consist of statements supposedly made by an anonymous "former Senior Lease Operator" at the company. Plaintiffs did not identify this former Diamondback employee in their initial disclosures, thereby indicating that they do not view him as an "individual likely to have discoverable information" that Plaintiffs "may use to support [their] claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). It is easy to see why. According to Plaintiffs, this unnamed former lease operator "found it somewhat weird" that Diamondback "always maintained flat production and flat oil sales" from 2021 through 2023 despite "multiple acquisitions and growth" (Compl. ¶ 151(a) (cleaned up))—a statement that is completely undermined by the Complaint's concession that Diamondback increased its production

by 19% during that period (*id.* ¶ 160 & Table 1). This former employee also purportedly stated that he "was confused by this strategy," reasoning that Diamondback "make[s] money by selling oil" and thus should have been "ripping [] things open" when oil prices were high. *Id.* ¶ 151(a). But just because this former (non-executive) employee allegedly did not understand Diamondback's production strategy does not mean that Diamondback's strategy was collusive. The Complaint offers no facts about what job functions fall within the purview of this alleged senior lease operator, let alone any facts to suggest that this former employee had any insight into the multitude of factors *other* than the price of oil that drive Diamondback's output decisions, such as domestic and global supply trends and directives from the company's core investors. Simply put, there are no facts pled in the Complaint to suggest that the alleged views of this former employee about Diamondback's production strategy were based on anything other than speculation and conjecture.

Plaintiffs also allege that this same former Diamondback employee has stated that Diamondback "often collaborated with other Shale Oil producers, like Pioneer, to share water supplies." *Id.* ¶ 195(d). But such allegations have nothing to do with the alleged supply reduction conspiracy, and the Complaint does not even attempt to explain how Diamondback sharing "water supplies" with another company would be indicative of an agreement to reduce the supply of shale oil. In fact, this type of alleged "collaboration among competitors can 'reduce costs, facilitate innovation, eliminate duplication of efforts and assets, and share risks that no individual member would be willing to undertake alone.'" *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1070 (N.D. Cal. 2019) (quoting *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010)). This is thus yet another example of Plaintiffs' deficient pleadings failing to plausibly state a conspiracy claim against Diamondback.

9

Other than the deficient allegations pertaining to the March 2019 and March 2023 CERAWeek dinners and the supposed former "senior lease operator" at Diamondback, Plaintiffs' remaining allegations of interfirm communications do not specifically identify Diamondback. Rather, Plaintiffs routinely make improper and generalized allegations against "Defendants" and unnamed "shale executives." *E.g.*, Compl. ¶¶ 112, 115–117, 122. "This failure to identify the involvement" of Diamondback *in particular* within "the alleged conspiracy" is "a basic pleading defect" that does not move Plaintiffs any closer to stating a plausible claim against Diamondback. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396 (2d Cir. 2024).

### III.  The claims against Diamondback should be dismissed with prejudice.

All claims against Diamondback should be dismissed with prejudice because it would be futile to allow Plaintiffs an opportunity to amend the Complaint. *See Carrete v. N.M. Racing Comm'n*, 2021 WL 6072581, at *3 (D.N.M. Dec. 23, 2021) (dismissing the plaintiff's "claims with prejudice" because amendment of those claims would have been "futile"). In addition to the fatal deficiencies in the Complaint identified in Defendants' joint motion to dismiss, the claims against Diamondback are inherently flawed because they rest on the wholly conclusory assertion that Diamondback entered into a supply reduction conspiracy, even though Diamondback *increased* production during the alleged conspiracy period. No amendment of the Complaint could fix this fundamental defect. Accordingly, Plaintiffs' claims against Diamondback should be dismissed with prejudice.

### CONCLUSION

For all the foregoing reasons, and for the reasons articulated in Defendants' joint motion to dismiss, all claims against Diamondback should be dismissed with prejudice.

Dated: February 24, 2025

Respectfully submitted,

*/s/ Benjamin Allison*
Benjamin Allison
Billy Trabaudo
BARDACKE ALLISON MILLER LLP
P.O. Box 1808
141 E. Palace Avenue
Santa Fe, NM 87501
Tel.: (505) 995-8000
ben@bardackeallison.com
billy@bardackeallison.com

Jeffrey L. Kessler
Jeffrey J. Amato
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-6700
jkessler@winston.com
jamato@winston.com

Thomas M. Melsheimer
Thomas B. Walsh, IV
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Tel.: (212) 294-6700
tmelsheimer@winston.com
twalsh@winston.com

*Attorneys for Defendant*
*DIAMONDBACK ENERGY, INC.*

## CERTIFICATE OF SERVICE

I, Benjamin Allison, hereby certify that on February 24, 2025, I caused the foregoing **Defendant Diamondback Energy, Inc.'s Motion to Dismiss the Consolidated Complaint** to be filed electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means.

*/s/ Benjamin Allison*
Benjamin Allison
Billy Trabaudo
BARDACKE ALLISON MILLER LLP
P.O. Box 1808
141 E. Palace Avenue
Santa Fe, NM 87501
Tel.: (505) 995-8000
ben@bardackeallison.com
billy@bardackeallison.com