UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation* | Case No. 1:24-md-03119-MLG-LF |
| This Document Relates to: | Judge Matthew L. Garcia |
| ALL ACTIONS | |

## OCCIDENTAL PETROLEUM CORPORATION'S MOTION TO DISMISS

The core of Plaintiffs' Complaint is that Defendants hatched a global plot with OPEC to fix shale oil production in the United States in 2021 when Defendants abruptly changed their behavior and began constricting output. But the Complaint's own allegations refute that story as to Occidental. In fact, the Complaint demonstrates that Occidental's production growth rate during the alleged conspiracy period was entirely in line with the growth rate Occidental repeatedly and publicly embraced *before* the alleged conspiracy ever began in 2021. It makes no sense to infer that Occidental was acting pursuant to a conspiracy when it executed on a growth strategy that it publicly adopted at a time when Plaintiffs concede there was no conspiracy at all.

In the face of that contradiction, the most Plaintiffs can allege is that Occidental's CEO attended two dinners and a public conference where OPEC representatives were present and may have attended unspecified industry events at unknown times and place. Those allegations are plainly insufficient. Tellingly, the conference and one dinner took place in 2019—two years *before* Defendants purportedly reached their agreement to limit shale oil production. The other dinner took place in 2023—two years *after* the Plaintiffs claim Defendants began conspiring. And the allegations about other industry events say nothing specific about anyone from Occidental attending any particular events. Nor are there allegations that Occidental engaged in parallel conduct with other Defendants. Far from it. Unlike allegations about other Defendants, there are no allegations that the FTC found evidence that Occidental conspired with OPEC or

that Occidental removed its hedge positions because it allegedly had advance knowledge and coordination on production levels. Even if there were parallel conduct, Plaintiffs' defendant-specific alleged "plus factors" that purportedly support their claim of collusion do not apply to Occidental given the limited overlap in its major shareholders compared to other Defendants. The Complaint's few, sparse references concerning Occidental do not allege a conspiracy or come close to excluding the possibility that Occidental acted independently in deciding how much shale oil to produce. That is fatal under *Twombly*.

## STATEMENT OF FACTS[1]

### I. Occidental's Publicly Stated Production Strategy Predated the Alleged Conspiracy.

From 2021 to the present (the "Class Period"), Plaintiffs allege that Defendants "depart[ed] from their historical practice" by not increasing "their domestic shale production growth" to capture all "excess capacity" necessary to take advantage of then-higher oil prices. (Compl. ¶¶ 14, 210, 248.) Plaintiffs contend this alleged departure evidences a conspiracy. (*Id.* ¶¶ 14, 80, 210.)

Occidental, however, never departed from its historical oil production strategy. Before the Class Period—that is, at a time when Occidental was acting entirely independently according to Plaintiffs—Occidental consistently emphasized, through a litany of public pronouncements to investors, that it had decided to target "long term production growth of 5-8+%," so it could prioritize return of cash to investors in the form of dividend payments.[2] Even the Complaint

---

[1] Occidental joins the concurrently-filed Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint, filed on behalf of all Defendants. Occidental also incorporates the "Statement of Facts" provided in Defendants' Joint Motion to Dismiss. Pursuant to N.M.LR-Civ. 7, counsel for Plaintiffs were contacted and oppose the motions.

[2] Declaration of Allie Wendell, Ex. 1, 4Q2018 Earnings Conference Call Presentation, Occidental Petroleum Corporation (Feb. 13, 2019), at 18; *see also id.* ("[t]argeting a return of over $3.1 B[illion] in cash to shareholders in 2019"); *id.* at 5 ("value based cash flow growth"), attached hereto as Ex. A. The Court may take judicial notice of publicly filed SEC filings, earnings call transcripts and investor presentations. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1114 & n.7 (10th Cir. 2015) (considering investor call transcripts in affirming district court's order on motion to dismiss); *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) (holding

2

references Occidental CEO Vicki Hollub's participation on a panel in 2019, *two years* before Plaintiffs allege any conspiracy began, where she explained that Occidental was a moderate-growth company that sought "five-to-eight percent [growth]."³  (Compl. ¶¶ 129-30.)

Occidental's publicly stated commitment to moderate production growth only increased after Occidental acquired Anadarko Petroleum Corporation ("Anadarko"), a shale producer, in 2019.  Because that acquisition saddled Occidental with $33.7 billion in additional debt, Occidental publicly committed to prioritize "[d]ebt reduction … over growth capital."⁴

The Complaint demonstrates that during the Class Period, *i.e.*, after the alleged conspiracy began, Occidental executed on its pre-conspiracy, moderate-growth strategy.  The Complaint alleges that from 2021 to 2023, Occidental had an average domestic oil-production growth rate of 8%—in line with the production growth plan Occidental publicly embraced before any purported conspiracy allegedly began.  (Compl. ¶ 160 Tbl. 1.)

## II. The Complaint Distorts Occidental's Production Growth.

To support their allegation of an overarching conspiracy among all Defendants, Plaintiffs primarily rely on a table that purports to show Defendants slowing their domestic oil production after the alleged conspiracy began in 2021.  (Compl. ¶ 160 Tbl. 1.)  The table alleges that

---

that contents of an administrative agency's publicly available files qualify for judicial notice); *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1216-19 (D.N.M. 2013) (taking judicial notice, on a motion to dismiss, of (i) company reports filed with the SEC; (ii) public statements made by company executives during interviews that the complaint referenced; and (iii) "news publications" regarding financial markets); *Alms v. Luminar Techs.*, 2024 WL 2803261, at *6 & n.6 (M.D. Fla. May 31, 2024) (taking judicial notice of investor presentations).

³ Compl. ¶¶ 129-30.  The Complaint cites an article quoting Hollub's statements made on a panel at the 2019 World Economic Forum.  The Court "may look to the contents of a referenced document itself rather than solely what the complaint alleges the contents to be," *Emps. Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018), including listening to the complete recording of an interview the Complaint references.  *Goldstone*, 952 F. Supp. 2d at 1219.  That 2019 panel was recorded and is available online.  *See* World Economic Forum, *Davos 2019 - The New Energy Equation* (hereinafter "New Energy Equation"), at 17:41–18:30, YouTube (Feb. 10, 2019), https://www.youtube.com/watch?v=Pz6fpKHlFwc.

⁴ Ex. 2, 2Q2019 Earnings Conference Call Presentation, at 21 (Aug. 1, 2019); *see* Ex. 3, Occidental, 2019 Form 10-K (Feb. 28, 2020), at 40 (reporting that Occidental received $21.8 billion in debt financing to finance the acquisition and assumed $11.9 billion of Anadarko's debt).

Occidental's average domestic oil production growth rate was "89%" from 2017 to 2019 as compared to "8%" during the Class Period, which purportedly reveals a shift in Occidental's production practice. (*Id.*) Plaintiffs' use of these "averages" distorts Occidental's true growth rate. As described above, in mid-2019, Occidental acquired Anadarko for more than $30 billion, an extremely significant acquisition that resulted in an immediate oil-production capacity increase of 92% for 2019, which artificially inflates Occidental's pre-Class Period average.[5]

### III.   Occidental's Largest Shareholders are Berkshire Hathaway and Dodge & Cox.

The Complaint alleges that Defendants' "core shareholders overlap substantially" and that this "common investor ownership" facilitated Defendants' conspiracy to restrict output. (Compl. ¶¶ 197-98.) But the Complaint omits that, unlike other Defendants, Occidental's two largest shareholders are Berkshire Hathaway and Dodge & Cox, which have amassed holdings of roughly 34% and 10.6% of Occidental, respectively.[6] Plaintiffs do not allege that either Berkshire Hathaway or Dodge & Cox holds any ownership interests in the other Defendants. The Complaint also alleges that Occidental has only three institutional investors in common with other Defendants—fewer common investors than any other Defendant, each of whom has between four and six large investors in common. (*Id.*) The only investors with overlapping interests in Occidental are BlackRock Inc., State Street Corp., and Vanguard Group Inc. (*Id.*) Combined, those investors own only 17.8% of Occidental, which pales in comparison to Berkshire Hathaway's and Dodge & Cox's combined stakes.

---

[5] Ex. 3, 2019 Form 10-K, Occidental Petroleum Corp., at 35 (Feb. 28, 2020) ("Average daily production volumes from ongoing operations increased in 2019 compared to 2018 primarily due to 264 [thousand barrels of oil equivalent/day] in acquired production from the Acquisition.").

[6] Ex. 4, Schedule 14A, 2024 Proxy Statement, Occidental Petroleum Corp, at 74 (Mar. 21, 2024); *see also* Ex. 5, Schedule 14A, 2022 Proxy Statement, Occidental Petroleum Corp., at 72 (Mar. 25, 2022) (stating that Berkshire Hathaway (Warren Buffet) and Dodge & Cox had a combined 33.2% in the Company). The Court can take judicial notice of "proxy statements [Occidental] publicly filed with the SEC." *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1310 n.9 (10th Cir. 2020).

**LEGAL STANDARD**

Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies that are unreasonable in restraint of trade.[7] 15 U.S.C. § 1; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). Allegations of facts that could just as easily suggest rational business behavior as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179-80 (10th Cir. 2019).

If a complaint is asserted against multiple defendants, each claim must be plausibly stated as to each defendant; it cannot simply lump defendants together and level accusations indiscriminately against the group. *See Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). That means Plaintiffs must plausibly show "that each individual defendant joined the conspiracy and played some role in it." *In re Cal. Title Ins. Antitrust Litig.*, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009).

**ARGUMENT**

Plaintiffs wholly fail to plead facts—whether direct or circumstantial—plausibly tying Occidental to any agreement to restrain oil production. The only Occidental-specific allegations are that its CEO attended two dinners and a public conference where OPEC representatives were present that occurred two years before and two years after the conspiracy allegedly began, she possibly attended other unspecified industry events, she made a handful of public comments about Occidental's production strategy and the reasons that strategy made sense for Occidental, and that Occidental's production growth rate purportedly decreased during the Class Period. Those vague allegations are far from direct evidence of Occidental's involvement in a conspiracy. And Plaintiffs fail to plausibly allege that Occidental acted in parallel with other

---

[7] Plaintiffs' state law claims are largely derivative of their Sherman Act claim and thus fail for the same reasons. *See* Defendants' Joint Motion to Dismiss, § 2(C)(1).

5

Defendants or any of the "plus factors"—which are the twin elements necessary for Plaintiffs to plead an antitrust conspiracy by circumstantial evidence.

**I.    Plaintiffs Do Not Plead Direct Evidence that Occidental Entered a Conspiracy**.

The Complaint lacks any allegation of direct evidence that Occidental participated in a conspiracy.  To plead direct evidence, Plaintiffs must assert "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Llacua*, 930 F.3d at 1177 (quotation omitted).  Such evidence, for example, may take the "form of a written contract" that states the date and terms of the agreement.  *Id.* at 1174 n.24.  But Plaintiffs do not allege when Occidental entered into a conspiracy, and do not allege the existence of any facts defining the conspiracy's terms.  *Twombly*, 550 U.S. at 556-57 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). Plaintiffs instead ask the Court to infer Occidental conspired with Defendants based solely on a few public statements, its oil production numbers, and its CEO's attendance at two dinners, a public conference and other possible industry events.  Such allegations amount to "classic . . . circumstantial evidence," subject to *Twombly*'s heightened scrutiny.  *Llacua*, 930 F.3d at 1178.

**II.   Plaintiffs Fail to Plead Circumstantial Evidence that Occidental Conspired**.

Pleading an antitrust conspiracy by circumstantial facts presents a high hurdle that Plaintiffs fail to overcome.  To start, the Supreme Court "has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial."  *Id.* at 1179.  That is even more true in a "concentrated market," where allegations of parallel conduct amongst competitors may naturally be "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Quality Auto Painting Ctr. Of Roselle v. State Farm Indem. Co.*, 917 F.3d 1249, 1261 (11th Cir. 2019) (*en banc*).

Thus, to plead an antitrust claim by circumstantial evidence, Plaintiffs (1) must show parallel conduct amongst Defendants, and then (2) must plead facts that "tend[] to exclude the possibility of independent action." *Twombly*, 550 U.S. at 554. Said differently, Plaintiffs must allege something more than conduct merely consistent with an agreement to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570. Here, Plaintiffs fail at both steps—they fail to plead that Occidental acted in parallel with the other Defendants, and they fail to plead facts that plausibly show that Occidental's conduct is more consistent with conspiracy than with independent, profit-maximizing behavior.

### A. Occidental's Production Decisions Did Not Move in Parallel with Other Defendants.

In their attempt to plead parallel conduct, Plaintiffs allege that Defendants, during the Class Period, acted in unison by abruptly reducing their rates of domestic oil production growth, which Plaintiffs assert was a departure from their historical practices. (Compl. ¶¶ 14, 210.) When it comes to Occidental, Plaintiffs have just two substantive allegations, barely amounting to a quarter-of-a-page of its 155-page Complaint, that relate to Occidental's historic practices.

*First*, Plaintiffs point to CEO Vicki Hollub's statements in January 2019—two years before the alleged conspiracy even began—at the World Economic Forum in Davos. (Compl. ¶¶ 129-30.) During that panel, Hollub emphasized that Occidental is a "moderate growth" company that aims for "five-to-eight percent growth."[8] Occidental publicly reiterated this growth target repeatedly and consistently throughout the pre-conspiracy period in its investor presentations and earnings calls.[9] So, before the Class Period, Occidental had a "long-standing commitment to capital discipline." (Ex. 6, 4Q2019 Earnings Call Transcript, at 5.)

---

[8] Compl. ¶¶ 129-30; *See New Energy Equation*, at 17:41 – 18:30.

[9] Ex. 1, 4Q2018 Earnings Conference Call Presentation at 6 (Feb. 13, 2019) (targeting 9-11% production growth for 2019); *id.* at 18 ("Long-Term Production Growth of 5-8+% while Targeting a Return of over $3.1B in Cash to

7

Entirely consistent with Occidental's pre-Class Period statements, Occidental's domestic oil production growth rate, during the Class Period, was "8%." (Compl. ¶ 160 Tbl. 1.) And the Complaint underscores that Occidental's executives continued to emphasize capital discipline during the Class Period, as they did before the Class Period. (*See id.* ¶¶ 149(e) 143(c).)

Occidental's judicially noticeable public statements directly contradict Plaintiffs' "parallel conduct" allegations as to Occidental. It is demonstrably false that in 2021, Occidental joined the other Defendants in "suddenly (and in near-unison) preaching supply 'discipline' for the first time in the history of U.S. shale." (Compl. ¶ 143.) Occidental had been preaching—and practicing—supply discipline for years before the alleged conspiracy even began. There is no basis for inferring that Occidental's Class-Period statements are evidence of any change in its conduct, let alone a parallel change. That is fatal to Plaintiffs' claims as to Occidental. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409-10 (3d Cir. 2015) ("For a change in conduct to create an inference of conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from industry's business practices.")*; see also In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("Plaintiffs' allegations also fail to show that [Defendants'] behavior was 'historically unprecedented' because they make scant allegations of pricing behavior that came *before* the alleged conspiracy.").

*Second*, Plaintiffs allege that, from 2017-2019, Occidental's pre-Class Period domestic production average growth rate was "89%," and that the Class Period rate of 8% was a substantial deviation from the norm. (Compl. ¶ 160 Tbl. 1.) But, as explained above, the Complaint grossly distorts Occidental's average by including increased production capacity from the Anadarko acquisition in 2019 to inflate Occidental's pre-Class Period production growth

---

Shareholders in 2019."); Ex. 7, 3Q2019 Earnings Conference Call Presentation (Nov. 5, 2019), at 9 ("Capital reduction target achieved through moderating production growth from 10% to 5% and assert divestitures.").

8

while conceding it would be improper to include similar acquisition-related growth for another Defendant.[10] Plaintiffs cannot selectively manipulate the data so acquisition-related production is only included when it purportedly bolsters their claims. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict such a properly considered document are not well-pleaded facts."). Plaintiffs' allegation of Occidental's pre-Class Period growth rate does not withstand scrutiny even on the deferential motion to dismiss standard.

Stripped of that outlier, Plaintiffs have no plausible allegation that Occidental's Class Period growth rate significantly departed from its pre-Class Period growth rate. And Plaintiffs' own allegations reveal that Defendants' alleged production growth rates, during the Class Period when Defendants were allegedly conspiring to restrict growth, span the spectrum. While Occidental grew domestic production by 8%, Centennial, Continental, and Diamondback grew by 56%, 42%, and 19%, respectively. At the same time, Chesapeake and Hess decreased by 63% and 6%, respectively. Given this divergence in production, "the facts alleged" undermine any inference that Occidental "gave up control" over its production decisions by acting in parallel with other companies pursuant to a conspiracy. *Llacua*, 930 F.3d at 1179. Further, the conspiracy is implausible since Plaintiffs allege that Occidental agreed to settle for 8% growth while "lock[ing] in substantial advantages" for its competitor Centennial who enjoyed a 56% surge in production. *Id.* at 1181.

The Complaint's allegations against the other Defendants highlight the lack of plausible "parallel conduct" allegations against Occidental. For instance, the Complaint alleges that two Defendants "pulled back the hedge positions," which was an alleged "break from past practice,"

---

[10] Plaintiffs excluded Centennial's 2022 and 2023 growth rates (following the years it acquired Colgate Energy), which would have inflated Centennial's oil-production growth during the Class Period, contradicting Plaintiffs' allegations that Centennial's production decreased. (*See* Compl. ¶ 160 n.149.)

9

as it would leave both companies vulnerable to "downward oil price movements." (Compl. ¶¶ 156-58.) There is no similar allegation that Occidental acted in parallel by altering its hedge positions or otherwise acted inconsistently with its longstanding commercial strategy.

Similarly, Pioneer, Hess, and Occidental were each subject to an FTC regulatory review of their separate mergers, all of which were consummated in 2024. (Compl. ¶¶ 179, 187, Ex. 8, Form 8-K, Occidental (Jan. 19, 2024).) That review required each Defendant to submit "millions of documents" to the FTC so the Commission could investigate the mergers' "possible anticompetitive effects." (Compl. ¶ 181.) Following this extensive review, the Complaint alleges the FTC filed administrative complaints in connection with the Pioneer and Hess transactions. (*Id.* ¶¶ 179, 187.) The FTC—after similarly reviewing Occidental's internal files and communications—brought no such action. That circumstance further demonstrates that Plaintiffs have not plausibly "rule[d] out the possibility" that Occidental was acting independently, which requires dismissal. *Twombly*, 550 U.S. at 553-54.

### B. None of Plaintiffs' "Plus Factor" Allegations Raises an Inference of Conspiracy as to Occidental.

Even if Plaintiffs had pleaded parallel conduct, the Complaint still fails to allege facts demonstrating that Occidental's actions were inconsistent with unilateral conduct, which dooms the Complaint. *Llacua*, 930 F.3d at 1180; *see also Brooke Grp. Ltd. v. Brown and Williamson Tobacco Corp.*, 509 U.S. 209, 236 (1993) ("[I]t would be unreasonable to draw conclusions about the existence of tacit coordination" solely from data reflecting "list prices."). Plaintiffs allege "plus factors" of (1) market conditions; (2) opportunities to collude; (3) common ownership; and (4) actions against self-interest. (Compl. ¶¶ 189-223.) None of these generic factors "exclude the possibility" that Occidental acted independently. *Llacua*, 930 F.3d at 1179.

10

*First*, Plaintiffs allege that the "top-heavy" shale-oil market was primed for collusion because, according to an anonymous Occidental analyst, Defendants "always knew which oil company was buying from who." (Compl. ¶ 192.) The fact that "[c]ompetitors in concentrated markets watch each other like hawks" does not suggest collusion. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015). At most, courts have explained that "market concentration" is a neutral factor, because it "also makes conscious [legal] parallel behavior more likely." *In re DRAM Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022).

*Second*, Plaintiffs allege that "Defendants" generally met "during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their cooperation with each other and the collective cooperation with OPEC." (Compl. ¶ 194.) But although the Complaint points to a few Defendants' purported statements during those meetings, which were overheard by anonymous former employees (*id.* ¶ 195), the Complaint includes no specific allegations about Occidental's attendance at industry events or communications with competitors. In total, Plaintiffs allege that Occidental CEO Hollub attended two dinners and a conference panel where representatives of OPEC and other Defendants were present—a conference and a dinner in 2019 and another dinner in 2023. (*Id.* ¶¶ 134, 152(b).) Plaintiffs, however, do not even attempt to allege that Occidental agreed to curtail its production at these events. Nor could they, given that the first dinner and conference were *two years* before Defendants purportedly conspired to reduce oil growth, and the second dinner was *two years* after Defendants purportedly did so. Finally, to the extent Plaintiffs allege that other Defendants solicited Occidental to reduce oil output at these meetings (*id.* ¶ 182), an allegation of one party inviting another to collude is insufficient to infer agreement. *See Rsrv. Supply Corp. v. Owens Corning Fiberglas*, 971 F.2d 37, 50 n.9 (7th Cir. 1992).

11

*Third*, Plaintiffs allege that Defendants' "common ownership" incentivized Defendants to fix oil production, as their common shareholders "had no interest in any particular Defendant winning market share." (Compl. ¶¶ 197-203.) Those allegations collapse when compared to Occidental's capital structure. As explained above, unlike other Defendants, Occidental's largest shareholders, by far, are Berkshire Hathaway, managed by Warren Buffett, and Dodge & Cox. Given that both stockholders have no pleaded ownership interest in the other Defendants, these stockholders—by Plaintiffs' logic—incentivized Occidental to compete vigorously against its competitors, not to collude with them. *See Llacua*, 930 F.3d at 1181 (implausible to allege defendant participated in conspiracy "lock[ing] in substantial advantages for the[] competition").

*Finally*, Plaintiffs allege generally that Defendants' 2021-2023 production growth rates were economically irrational without an agreement. (Compl. ¶¶ 162-73.) That allegation is entirely implausible as to Occidental, because, as explained above, Occidental repeatedly and publicly stated—before the Class Period—that it had decided to prioritize "five-to-eight percent" growth. This only became more important in 2019 when Occidental needed to pay down its debt from the Anadarko acquisition. Plaintiffs allege that Occidental's 2021-2023 growth rate was 8% (Compl. ¶ 160 Tbl. 1)—exactly what Occidental said it was going to be. There is no plausible basis to infer a conspiracy from Occidental's execution of a plan it publicly embraced years before the conspiracy even allegedly began. In a similar case concerning alleged production restraint, the Ninth Circuit emphasized that a business's decision to "focus … on profitability rather than increasing volume" is "largely consistent with independent business conduct," especially, like here, when the company announced it would do so prior to the alleged conspiracy. *In re DRAM*, 28 F.4th at 51. The same result should follow here.

## CONCLUSION

The Court should dismiss all claims against Occidental with prejudice.

Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS
   & SISK, P.A.

By: */s/ Earl E. DeBrine, Jr.*
   Earl E. DeBrine, Jr.
   Post Office Box 2168
   500 Fourth Street NW, Suite 1000
   Albuquerque, New Mexico 87103-2168
   Telephone: 505-848-1800
   earl.debrine@modrall.com

   Devora W. Allon
   *Admitted pro hac vice*
   Brandon Hanley
   *Admitted pro hac vice*
   Kevin Neylan
   *Admitted pro hac vice*
   KIRKLAND & ELLIS LLP
   601 Lexington Avenue
   New York, NY 10022
   Telephone: 212-446-5967
   devora.allon@kirkland.com
   Telephone: 212-341-7831
   brandon.hanley@kirkland.com
   Telephone: 212-390-4614
   kevin.neylan@kirkland.com

   Jeffrey J. Zeiger
   *Admitted pro hac vice*
   KIRKLAND & ELLIS LLP
   333 West Wolf Point Plaza
   Chicago, IL 60654
   Telephone: 312-862-3237
   jzeiger@kirkland.com

   ***Attorneys for Defendant***
   ***OCCIDENTAL PETROLEUM CORPORATION***

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY on this 24th day of February, 2025, I filed the foregoing electronically through the CM/ECF system, which caused the all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By: */s/ Earl E. DeBrine, Jr.*
    Earl E. DeBrine, Jr.

W5294483.DOCX