# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN RE: SHALE OIL ANTITRUST LITIGATION<br><br>This Document Relates to All Actions | Case No. 1:24-md-03119-MLG-LF |

## **DEFENDANTS' JOINT MOTION TO DISMISS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT....................................................................................................1

PLAINTIFFS' ALLEGATIONS ..............................................................................................3

    A.    Crude Oil, Its Derivative Products, and the Multi-Tiered Distribution Chain .........................................................................................................3

    B.    OPEC's Alleged Control of Crude Oil and Reaction to U.S. Shale Growth ..........4

    C.    OPEC's Alleged Outreach to U.S. Shale Oil Producers .........................................5

    D.    The Conspiracy Among Defendants and OPEC Allegedly Began as the World Emerged From the COVID Pandemic .........................................................6

ARGUMENT ...........................................................................................................................10

I.    UNDER BOTH THE POLITICAL QUESTION AND THE ACT OF STATE DOCTRINES, THIS COURT LACKS SUBJECT MATTER JURISDICTION ..............10

    A.    The Political Question Doctrine Bars Plaintiffs' Claims .......................................10

    B.    The Act of State Doctrine Also Bars Plaintiffs' Claims........................................16

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF ...................................18

    A.    Plaintiffs Fail to Plead Facts That, if Proven, Would Establish the Alleged Conspiracy .............................................................................................18

        1.    Plaintiffs Plead No Direct Evidence of the Alleged Conspiracy ...............19

        2.    Plaintiffs Do Not Plausibly Plead Circumstantial Evidence of the Alleged Conspiracy.................................................................................20

            a.    Plaintiffs Fail to Plead Parallel Conduct ......................................22

            b.    Plaintiffs' Claimed "Plus Factors" Are Irrelevant And Do Not Plausibly Suggest the Alleged Conspiracy .............................25

    B.    Plaintiffs Fail to Plead Facts to Show That They Have Antitrust Standing ..........32

    C.    Plaintiffs' Various State Law Claims Fail for Additional Reasons .......................38

        1.    All of Plaintiffs' State Law Claims (Counts 2-54) Fail With Their Sherman Act Claim ...................................................................................38

2.    Plaintiffs Lack Article III Standing to Assert  Claims Under West Virginia Law (Count 53) ............................................................39

3.    Indirect Purchasers Are Barred From Bringing Class Action Antitrust and/or Consumer Protection Claims Under the Laws of Illinois, Montana, and South Carolina (Counts 15, 16, 29, and 47) ..........39

4.    State-Specific Deficiencies That Bar Individual State Antitrust Claims ......................................................................................40

    a.    Indirect Purchaser Actions Are Barred in Part In Colorado and New Jersey (Counts 8 and 36) .................................................40

    b.    Plaintiffs Fail to Allege In-State Conduct or  Injury Sufficient to State a Claim Under the  Alabama, Mississippi, or West Virginia Antitrust Laws (Counts 3, 27, and 53) .......................................................................41

    c.    Plaintiffs Have Not Complied With Statutory Notice Prerequisites to File an Antitrust Suit in Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, or Utah (Counts 4, 8, 10, 14, 32, 39, 45, and 51) ..............................42

5.    State-Specific Deficiencies That Bar Individual State Consumer Protection Claims...........................................................................43

    a.    Plaintiffs Who Made Purchases for Business or Commercial Purposes Are Not Proper Plaintiffs Under the Consumer Protection Statutes of the District of Columbia, Maryland, Minnesota, Missouri, Montana, Nevada, and Oregon (Counts 12, 21, 26, 28, 29, 33, and 43)............................43

    b.    Indirect Purchaser Actions Are Barred Under the Consumer Protection Laws of Arkansas,  Missouri, and South Carolina (Counts 2, 28, and 47)......................................44

    c.    Indirect Purchaser Plaintiffs Who Made Purchases for Business or Commercial Purposes Are Not Proper Plaintiffs Under the Massachusetts Consumer Protection Act (Count 22) ...........................................................................45

d.      Price-Fixing Claims Are Not Cognizable Consumer
        Protection Claims in the District of Columbia, Arkansas,
        Illinois, Maryland, Michigan, New Mexico, Oregon,
        Pennsylvania, Rhode Island, South Carolina, or South
        Dakota (Counts 2, 12, 16, 21, 24, 38, 43, 44, 46, 47, and
        49) .................................................................................................46

e.      Plaintiffs' Failure to Allege In-State Conduct Compels
        Dismissal of Plaintiffs' Illinois and New Hampshire
        Consumer Protection Claims (Counts 16 and 35) .........................48

f.      Plaintiffs Do Not Meet Rule 9(b)'s Heightened Pleading
        Standard for Claims Sounding in Fraud as Required Under
        the Consumer Protection Statutes of Florida, Michigan, and
        Pennsylvania (Counts 13, 24, and 44) ...........................................48

g.      Plaintiffs Fail to Allege Reliance as Required By the
        Consumer Protection Statutes of Arkansas, Maryland, and
        Pennsylvania (Counts 2, 21, and 44) .............................................49

h.      Plaintiffs Fail to Allege That They Are Elderly or Disabled
        Under Nevada Law (Count 33) ......................................................50

CONCLUSION ......................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Durrett*,
746 So. 2d 316 (Ala. 1999) ................................................................41

*Abraham v. Intermountain Health Care Inc.*,
461 F.3d 1249 (10th Cir. 2006) .........................................................19

*In re Aggrenox Antitrust Litigation*,
No. 3:14-md-2516 (SRU), 2016 WL 4204478 (D. Conn. Aug. 9, 2016) ...................45, 47

*Allegheny General Hospital v. Philip Morris, Inc.*,
228 F.3d 429 (3d Cir. 2000) ...............................................................36

*In re Allergan ERISA Litigation*,
975 F.3d 348 (3d Cir. 2020) ...............................................................30

*In re Aluminum Warehousing Antitrust Litigation*,
No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833
F.3d 151 (2d Cir. 2016) .....................................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................19

*Associated General Contractors of California, Inc. v. California State Council of
Carpenters*,
459 U.S. 519 (1983) ...........................................3, 18, 32, 33, 34, 36

*Association of Surgical Assistants v. National Board of Surgical Technology & Surgical
Assisting*,
No. 23-1344, 2025 WL 249387 (10th Cir. Jan. 21, 2025) ..............38

*Avenue Lofts Condominiums Owners' Ass'n v. Victaulic Co.*,
24 F. Supp. 3d 1010 (D. Or. 2014) ....................................................44

*Avery v. State Farm Mutual Automobile Insurance Co.*,
835 N.E.2d 801 (Ill. 2005) ................................................................48

*Baar v. Jaguar Land Rover North America, LLC*,
295 F. Supp. 3d 460 (D.N.J. 2018) ....................................................38

*Baker v. Carr*,
369 U.S. 186 (1962) ..........................................................................11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................2, 18, 19, 21, 25, 27, 29, 30

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) ....................................................................25

*In re Broiler Chicken Antitrust Litigation*,
    No. 16 C 8637, 2023 WL 5227130 (N.D. Ill. Aug. 15, 2023)............................43

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).........................................................................................21

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011).............................................................................22

*In re Cast Iron Soil Pipe & Fittings Antitrust Litigation*,
    No. 1:14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015)...................42, 44, 46

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    MDL No. 1917, Case No. 07-5944 SC, 2012 WL 12914681 (N.D. Cal. Nov. 16,
    2012) .................................................................................................................31

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    MDL No. 1917, Master File No. 3:07-cv-5944 JST, 2016 WL 721680 (N.D. Cal.
    Jan. 28, 2016), *report and recommendation adopted in part*, MDL No. 1917, Case
    No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016) .....................31

*In re Chocolate Confectionary Antitrust Litigation*,
    749 F. Supp. 2d 224 (M.D. Pa. 2010) ..............................................................50

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) .........................................................................28

*City of Moundridge v. Exxon Mobil Corp.*,
    No. 04-940 (RWR), 2009 WL 5385975 (D.D.C. Sept. 30, 2009), *aff'd*, 409 F.
    App'x 362 (D.C. Cir. 2011) ..............................................................................24

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
    92 F.4th 381 (2d Cir. 2024) .............................................................................23

*Compliance Marketing, Inc. v. Drugtest, Inc.*,
    Civil Action No. 09-cv-01241-JLK, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ...........38

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*,
    691 F.2d 1335 (9th Cir. 1982) .........................................................................35

*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) ...........................................................................11

*Cox v. Phelps Dodge Corp.*,
    43 F.3d 1345 (10th Cir. 1994) .........................................................................31

*Custer County Action Ass'n v. Garvey*,
  256 F.3d 1024 (10th Cir. 2001) ............................................................... 11

*CVB, Inc. v. Corsicana Mattress Co.*,
  No. 1:20-cv-00144-DBB, 2024 WL 4505044 (D. Utah Oct. 16, 2024) ............................ 28

*D&G Flooring, LLC v. Home Depot U.S.A., Inc.*,
  346 F. Supp. 2d 818 (D. Md. 2004) ............................................................ 43

*D'Augusta v. American Petroleum Institute*,
  No. 22-cv-01979-JSW, 2023 WL 137474 (N.D. Cal. Jan. 9, 2023), *aff'd*, 117
  F.4th 1094 (9th Cir. 2024), *petition for cert. docketed*, No. 24-800, (U.S. Jan. 27,
  2025) ....................................................................................... 12, 15

*D'Augusta v. American Petroleum Institute*,
  117 F.4th 1094 (9th Cir. 2024) .................................................... 12, 13, 14, 17

*Davis v. AT&T Wireless Services Inc.*,
  No. CV 11-02674 DDP (RZx), Docket No. 54, 2012 WL 692413 (C.D. Cal. Mar.
  1, 2012), *aff'd*, 570 F. App'x 652 (9th Cir. 2014) ........................................... 38

*In re Dealer Management Systems Antitrust Litigation*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019) ........................................................ 41

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ............................................... 34, 43, 46

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*,
  28 F.4th 42 (9th Cir. 2022) .................................................................. 23

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) .......................................................................... 20

*In re Effexor Antitrust Litigation*,
  357 F. Supp. 3d 363 (D.N.J. 2018) ........................................................... 42

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust
  Litigation*,
  336 F. Supp. 3d 1256 (D. Kan. 2018) ......................................................... 39

*Estate of Pilgrim v. General Motors LLC*,
  344 F.R.D. 381 (E.D. Mich. 2023) ............................................................ 40

*In re Express Scripts, Inc., Pharmacy Benefits Management Litigation*,
  MDL No. 1672, 2006 WL 2632328 (E.D. Mo. Sept. 13, 2006) ...................................... 43

*First National City Bank v. Banco Nacional de Cuba*,
  406 U.S. 759 (1972) .......................................................................... 16

*Florida Cement & Concrete Antitrust Litigation*,
746 F. Supp. 2d 1291 (S.D. Fla. 2010) ...........................................................24

*Gaebler v. New Mexico Potash Corp.*,
285 Ill. App. 3d 542 (Ill. App. Ct. 1996) .......................................................46

*In re German Automotive Manufacturers Antitrust Litigation*,
392 F. Supp. 3d 1059 (N.D. Cal. 2019) .........................................................38

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) ........................................................................36

*In re Graphics Processing Units Antitrust Litigation*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................24, 30, 46, 47

*Habyarimana v. Kagame*,
696 F.3d 1029 (10th Cir. 2012) ......................................................................12

*In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*,
Case No. 19-md-02918-MMC, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021)...............47

*Hoffman v. Stamper*,
843 A.2d 153 (Md. Ct. Spec. App. 2004), *aff'd in relevant part on other grounds,*
*rev'd in part on other grounds*, 867 A.2d 276, 294-95 (Md. 2005) .................................50

*In re Humira (Adalimumab) Antitrust Litigation*,
465 F. Supp. 3d 811 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of*
*Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022)........................................38, 39, 40

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)......................................................................................9, 45

*Independence County v. Pfizer, Inc.*,
534 F. Supp. 2d 882 (E.D. Ark. 2008), *aff'd sub nom. Ashley County v. Pfizer,*
*Inc.*, 552 F.3d 659 (8th Cir. 2009) .................................................................44

*In re Insurance Brokerage Antitrust Litigation*,
618 F.3d 300 (3d Cir. 2010)......................................................................20, 25

*International Ass'n of Machinists & Aerospace Workers v. OPEC*,
649 F.2d 1354 (9th Cir. 1981) ........................................................................16

*Jones v. Micron Technology Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) ......................................................26, 39

*JSW Steel (USA) Inc. v. Nucor Corp.*,
586 F. Supp. 3d 585 (S.D. Tex. 2022) ............................................................28

*In re K-Dur Antitrust Litigation*,
Civil Action No. 01-1652 (JAG), MDL Docket No. 1419, 2008 WL 2660778
(D.N.J. Feb. 25, 2008)...........................................................................................46

*Kelsey K. v. NFL Enterprises, LLC*,
254 F. Supp. 3d 1140 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018),
*aff'd*, 757 F. App'x 524 (9th Cir. 2018)..............................................................24

*Kerr v. Polis*,
20 F.4th 686 (10th Cir. 2021) ...............................................................................11

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
383 F. Supp. 3d 187 ..............................................................................................42

*In re Lithium Ion Batteries Antitrust Litigation*,
Case No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ....................48

*Llacua v. Western Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019) ...........................................................19, 21, 27, 29

*In re Loestrin 24 FE Antitrust Litigation*,
410 F. Supp. 3d 352 (D.R.I. 2019)...................................................................40, 45

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).........................................................................................21, 27

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)...................................................................................20

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
714 F. Supp. 3d 209 (W.D.N.Y. 2024), *appeal filed*, No. 24-598 (2d Cir. Mar. 4,
2024) ......................................................................................................................24

*In re Musical Instruments & Equipment Antitrust Litigation*,
798 F.3d 1186 (9th Cir. 2015) .........................................................21, 22, 27, 29

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
350 F. Supp. 2d 160 (D. Me. 2004) ...............................................................46, 49

*Oliver v. SD-3C LLC*,
No. 11-CV-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) .........................23

*Pacamor Bearings, Inc. v. Minebea Co.*,
918 F. Supp. 491 (D.N.H. 1996).............................................................................48

*In re Packaged Ice Antitrust Litigation*,
779 F. Supp. 2d 642 (E.D. Mich. 2011)..................................................................49

*In re Packaged Seafood Products Antitrust Litigation*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017)...................................................................49

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ...................................................................22, 25

*Persian Gulf Inc. v. BP West Coast Products LLC*,
    No. 3:15-CV-01749-L-BGS, 2016 WL 4574357 (S.D. Cal. July 14, 2016) ...................26

*In re Plasma-Derivative Protein Therapies Antitrust Litigation*,
    MDL No. 2109, 09 C 7666, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012).............................34

*In re Refrigerant Compressors Antitrust Litigation*,
    No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)................................43

*In re Santa Fe Natural Tobacco Co. Marketing & Sales Practices & Products Liability Litigation*,
    288 F. Supp. 3d 1087 (D.N.M. 2017) ...............................................................42

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    899 F.3d 1064 (9th Cir. 2018) ............................................................16, 17, 18

*Sharp v. United Airlines, Inc.*,
    967 F.2d 404 (10th Cir. 1992) ..................................................32, 33, 35, 36, 37

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) ....................................2, 11, 12, 13, 14, 15, 16, 17

*State ex rel. Fitch v. Yazaki North America, Inc.*,
    294 So. 3d 1178 (Miss. 2020)...........................................................................41

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ..............................................................45

*Superior Offshore International, Inc. v. Bristow Group Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010), *order amended on reconsideration*, No. 1:09-CV-00438-LDD, 2010 WL 11470613 (D. Del. Dec. 1, 2010) ...........................................30

*Supreme Auto Transport LLC v. Arcelor Mittal*,
    238 F. Supp. 3d 1032 (N.D. Ill. 2017), *aff'd sub nom. Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735 (7th Cir. 2018) ...................................34, 37

*In re TD Bank, N.A. Debit Card Overdraft Fee Litigation*,
    150 F. Supp. 3d 593 (D.S.C 2015)....................................................................40

*In re Text Messaging Antitrust Litigation*,
    782 F.3d 867 (7th Cir. 2015) ........................................................................26

*Thomas v. Metropolitan Life Insurance Co.*,
    631 F.3d 1153 (10th Cir. 2011) ....................................................39

*Toy v. Metropolitan Life Insurance Co.*,
    928 A.2d 186 (Pa. 2007) .............................................................50

*United States ex rel. Lacy v. New Horizons, Inc.*,
    348 F. App'x 421 (10th Cir. 2009) ..............................................49

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) ................................................................2, 16

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965) ...................................................................20

*United States v. Oregon State Medical Society*,
    343 U.S. 326 (1952) ...................................................................31

*Washington County Health Care Authority, Inc. v. Baxter International Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) .........................................30

*WrestlemaniaReunion, LLC v. Live Nation Television Holdings, Inc.*,
    No. 8:07-cv-2093-JDW-MSS, 2008 WL 3048859 (M.D. Fla. Aug. 4, 2008)..................48

*Young v. Tesla, Inc.*,
    No. 1:21-CV-00917-JB-SCY, 2022 WL 3355832 (D.N.M. Aug. 15, 2022)......................9

*Zivotofsky ex rel. Zivotovsky v. Clinton*,
    566 U.S. 189 (2012) ...................................................................11

**STATUTES**

Ark. Code Ann. § 4-88-107(a) ............................................................47

Ark. Code Ann. § 4-88-113(f)(1)(A) ...................................................49

Colo. Rev. Stat. Ann. § 6-4-115 ..........................................................41

D.C. Code § 28-3904 ..........................................................................47

Fed. R. Civ. P. 9(b)......................................................................48, 49

Fed. R. Civ. P. 12(b)(1)................................................................10, 17

Fed. R. Civ. P. 12(b)(6)................................................................17, 18

Mont. Code Ann § 30-14-133(1)(a) ....................................................40

N.J. Stat. Ann. § 56:9-12 ....................................................................41

N.M. Stat. Ann. § 57-12-3 ...................................................................................47

Nev. Rev. Stat. § 598.0903 ................................................................................50

Nev. Rev. Stat. § 598.0977 ................................................................................50

Or. Rev. Stat. § 646.608(1) ................................................................................46

Or. Rev. Stat. § 646.608(4) ................................................................................46

S.C. Code Ann. § 39-5-140(a) ...........................................................................40

**OTHER AUTHORITIES**

Chevron Corp., Docket No. C-4814 (FTC Jan. 16, 2025),
    https://www.ftc.gov/system/files/ftc_gov/pdf/2410008c4814chevronhessorder.pdf ........30

Exxon Mobil Corp., Docket No. C-4815 (FTC Jan. 16, 2025),
    https://www.ftc.gov/system/files/ftc_gov/pdf/2410004-c4815-
    exxonpioneerfinalorderpublic.pdf .......................................................................30

House Bill 23-1192 § 7, 74th General Assembly, First Regular Session (Colo. 2023) ................41

House Bill 96-1556 § 5, 220th Legislature, First Annual Session (N.J. 2022) ............................41

Mamdouh G. Salameh, *OPEC is an Important* Energy *Policy Tool to Keep Oil Markets
    Stable*, 28 I.A.E.E. ENERGY FORUM at 19 (Feb. 2019),
    https://www.iaee.org/documents/ 2019EnergyForum1qtr....................................................9

US Energy Information Administration, *What is OPEC+ and how is it different from
    OPEC* (Dec. 18, 2023), https://www.eia.gov/todayinenergy/detail.php
    ?id=61102#:~:text=OPEC%20meetings%20and%20coordinated%20production,A
    pril%20Short%2DTerm%20Energy%20Outlook...............................................................5

## PRELIMINARY STATEMENT

Plaintiffs allege that eight independent American oil producers,[1] collectively accounting for <u>less than 2% of the world's crude oil production</u>, conspired with the fifteen sovereign nations of the Organization of Petroleum Exporting Countries ("OPEC") and the ten other sovereign oil-producing nations comprising OPEC+ to raise the price of oil worldwide.[2]  According to plaintiffs, this alleged agreement to restrict production inflated the prices for oil sold to refineries, which in turn inflated the prices charged by refiners to various middlemen along the multi-tiered distribution chain.  Plaintiffs allege that these increased prices eventually were passed along to retailers of refined petroleum products and then ultimately to consumers.  Plaintiffs do not allege that they bought anything from defendants, but assert that they paid inflated prices for the gasoline, heating oil, diesel fuel, marine fuel, and jet fuel that they have purchased from third-party retailers since January 1, 2021.  Plaintiffs claim that defendants' alleged conspiracy violates Section 1 of the Sherman Act, the antitrust laws of thirty states and the District of Columbia, and the consumer protection laws of twenty-one states and the District of Columbia.

All of plaintiffs' claims fail and should be dismissed for multiple independent reasons.

As a threshold matter, plaintiffs' consolidated complaint (ECF No. 86 ("complaint" or "Compl.")) should be dismissed in its entirety pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Under the political question and act of state doctrines, this Court lacks subject

---

[1] The eight shale oil producer defendants are Permian Resources Corporation; Expand Energy Corporation f/k/a Chesapeake Energy Corporation; Continental Resources, Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; and Pioneer Natural Resources Company.  The two individual defendants named in the complaint are Scott D. Sheffield, former CEO of Pioneer, and John B. Hess, CEO of Hess.

[2] Unless otherwise specified, all references to OPEC in this memorandum encompass both OPEC and OPEC+.

matter jurisdiction to adjudicate the lawfulness of a conspiracy allegedly orchestrated by the sovereign nation members of OPEC to influence world oil prices. To adjudicate the merits of this case, this Court would be required "to recast what are foreign policy and national security questions of great import in antitrust law terms." *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 952 (5th Cir. 2011). Because the "Sherman and Clayton Acts are decidedly inadequate to provide judicially manageable standards for resolving such momentous foreign policy questions," *id.*, the political question doctrine bars this Court from exercising subject matter jurisdiction. Likewise, for more than a century, application of the act of state doctrine has compelled the conclusion that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). Accordingly, under either of these doctrines, this Court should dismiss plaintiffs' complaint for lack of subject matter jurisdiction.

The complaint also should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>First</u>, all of plaintiffs' claims should be dismissed because the complaint does not plead facts that would support a plausible antitrust conspiracy claim, as required under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Plaintiffs plead no direct evidence of a conspiracy. They also fail to plead the prerequisites of circumstantial evidence of a conspiracy: that defendants engaged in parallel conduct <u>and</u> "plus factors" rendering a conspiracy plausible. To the contrary, the complaint alleges that defendants' shale oil production decisions were not parallel, with many of these producers expanding production during the alleged conspiracy. Plaintiffs plead that the eight shale oil producer defendants followed vastly different production trajectories during the claimed class period. And far from plausibly alleging "plus factors" supporting a conspiracy claim, plaintiffs' allegations suggest alternative reasons why each

defendant would unilaterally—and independently—choose to increase its shale oil production with caution after 2021, including the world's emergence from the throes of the COVID-19 pandemic, market volatility following Russia's military invasion of Ukraine, and the threat of another OPEC price war (the first of which occurred from 2014-16 and bankrupted many U.S. shale oil producers). <u>Second</u>, plaintiffs fail to plead facts to show that they have antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). Plaintiffs' allegations demonstrate that they cannot trace any allegedly artificial price increase in the refined petroleum products that they purchased from third-party retailers to any alleged reduction in defendants' shale oil production. For this independent reason, plaintiffs' claims should be dismissed. <u>Finally</u>, plaintiffs' claims under the various state antitrust and consumer protection laws cannot survive dismissal because they are premised upon the same conduct as their deficient Sherman Act claim. The state law claims also suffer from myriad additional deficiencies and should be dismissed. (*See* Appendix A.)

For these reasons, and as further described below, defendants respectfully request that the Court dismiss all of plaintiffs' claims with prejudice.

## PLAINTIFFS' ALLEGATIONS[3]

### A.    Crude Oil, Its Derivative Products, and the Multi-Tiered Distribution Chain

Crude oil is the primary input used to derive a variety of end-user products, including gasoline, heating oil, diesel fuel, marine fuel, and jet fuel. (Compl. ¶¶ 1, 5.) Shale oil is a high-quality crude oil that can be extracted by fracturing the rock formations that contain the layer of oil in a process known as "fracking." (*Id.* ¶¶ 2-3.) Fracking was introduced in the early twenty-

---

[3] For purposes of this motion to dismiss only, defendants assume the truth of plaintiffs' factual allegations, though not of plaintiffs' conclusory assertions, unsubstantiated speculation, and allegations that conflict with the documents on which plaintiffs rely in the complaint.

first century and, according to plaintiffs, its use grew rapidly between 2008 and 2015. (*Id.* ¶ 97.)

"Shale oil, along with other crude oil, is sold to refineries." (*Id.* ¶ 5.) "Refineries co-mingle shale oil produced by [d]efendants with other shale oil, as well as with crude oil extracted via traditional drilling methods, then refine that oil into gasoline and other petroleum-based products." (*Id.*) Those refined products are shipped to bulk storage and blending facilities, where they are then blended and combined with other refined products to be shipped to retailers across the country for eventual sale to consumers like plaintiffs. (*Id.* ¶ 234 & fig. 16.) Plaintiffs do not allege, nor could they allege, that the refined petroleum products that they purchased were derived from crude oil that defendants produced.

**B.     OPEC's Alleged Control of Crude Oil and Reaction to U.S. Shale Growth**

Plaintiffs allege that, for decades, world crude oil production and prices have been controlled by the sovereign nation members of OPEC. (*Id.* ¶ 93.) OPEC, an intergovernmental organization of fifteen sovereign nations, controls close to 40% of the world's crude oil production. (*Id.*) Beginning in about 2014, OPEC's control over global crude oil production and prices was threatened by the emergence of shale oil production in the United States. (*Id.* ¶ 96.)

Despite a global oversupply of crude oil caused by the entry of American shale oil producers into the market, in mid-2014, OPEC decided to maintain, rather than reduce, its production levels "to push oil prices to a level that would render U.S. shale oil no longer economically viable." (*Id.* ¶ 105.) For two years, the oil industry was engaged in this so-called "OPEC Price War." (*Id.* ¶¶ 103-08.) The OPEC Price War caused dozens of shale oil producers in the United States to fail. (*Id.* ¶ 108.)

But the price war did not bring the U.S. shale oil industry to heel. In December 2016, OPEC changed tactics and struck deals with ten other oil-producing nations to expand its alleged cartel and to form what is known as OPEC+. (*Id.* ¶¶ 95, 109.) The twenty-five sovereign nation

4

members of OPEC+ control production and pricing of approximately 60% of the world's crude oil.[4]

### C.    OPEC's Alleged Outreach to U.S. Shale Oil Producers

Plaintiffs allege that, having consolidated control of most of the world's oil production with the OPEC+ agreements, OPEC then began a "years-long campaign" to convince U.S. shale oil producers to join the alleged cartel. (*Id.* ¶ 110.) To that end, OPEC officials allegedly began in March 2017 to reach out to U.S. shale oil producers at the CERAWeek Conference, a global energy conference held annually in Houston. (*Id.* ¶ 112.) According to plaintiffs, U.S. shale oil executives dined with OPEC's then-Secretary General at that conference and exchanged information about the oil industry. (*Id.* ¶ 113.) After the meeting, OPEC and U.S. shale oil producers reportedly agreed "in principle" that lower production levels would be beneficial, but that U.S. producers were not prepared to agree to reduce their own production levels. (*Id.* ¶ 115.) Saudi Arabia's Energy Minister allegedly warned U.S. producers that if they wanted to collaborate with OPEC, there would be no "free rides" on OPEC's production cuts and that U.S. producers must be ready to restrict their own production as well. (*Id.*)

OPEC's outreach allegedly continued in 2018. At the 2018 CERAWeek Conference, OPEC officials and U.S. shale oil executives allegedly met again and purportedly shared information about the oil industry. (*Id.* ¶¶ 119-25.) According to plaintiffs, the Nigerian Oil Minister expressed OPEC's view that it was time for U.S. firms to "take some responsibility in terms of stability of oil prices." (*Id.* ¶ 122.) Nonetheless, throughout 2018, U.S. shale oil producers continued to increase their production by more than two million barrels per day. (*Id.* ¶

---

[4] US Energy Information Admin., *What is OPEC+ and how is it different from OPEC* (Dec. 18, 2023), https://www.eia.gov/todayinenergy/detail.php?id=61102#:~:text=OPEC%20meetings%20 and%20coordinated%20production,April%20Short%2DTerm%20Energy%20Outlook.

136 & fig. 2.)

OPEC's efforts allegedly continued without success in 2019.  In January 2019, OPEC
members enacted new production cuts, agreeing among themselves to reduce production by 1.2
million barrels per day.  (*Id.* ¶ 135.)  In March 2019, OPEC officials again met with U.S. shale
oil executives at the CERAWeek Conference and allegedly shared information about oil industry
issues.  (*Id.* ¶¶ 132-34.)  But, while one U.S. executive called the meeting a "very good session"
featuring an "open dialog on some of the things that are going on in the U.S. shale revolution,
U.S. oil production and the associated balance of what's going on in our industry" (*id.* ¶ 134), the
complaint alleges that shale oil production in the United States continued to increase by as much
as four million barrels per day (*id.* ¶ 136 & fig. 2).

"In the early days of the COVID-19 pandemic, gasoline and other crude oil derivative
fuel product demand dropped precipitously, sending a shockwave through the oil supply chain."
(Id. ¶ 12.)  "In early 2020, lockdowns associated with the COVID-19 pandemic cratered gasoline
and other crude oil derivative fuel product demand, sending multiple shocks through the world
oil markets.  Worldwide oil production fell, and the U.S. shale oil industry consolidated and
suffered as production fell and smaller U.S. Shale Producers went bankrupt."  (*Id.* ¶ 138.)
Plaintiffs allege that in July 2020, in the middle of the pandemic lockdowns and with crude oil
production and prices low, OPEC's Secretary General made clear that OPEC could inflate and
sustain high crude oil prices if U.S. producers followed OPEC's lead.  (*Id.* ¶ 139.)

**D.**    **The Conspiracy Among Defendants and OPEC Allegedly**
        <u>**Began as the World Emerged From the COVID Pandemic**</u>

Plaintiffs allege that since January 1, 2021, defendants have "collectively agreed not to
increase their U.S. shale oil production," and to "cooperat[e] and collud[e] with" OPEC "to
coordinate their collective oil output."  (*Id.* ¶¶ 9-11.)  Plaintiffs do not plead any direct evidence

6

of this alleged conspiracy. They claim that defendants "actualize[d] their agreement with OPEC" at some point in 2021, but otherwise do not allege the details of the purported agreement, where and when it was formed, or which individuals participated in forming it. (*Id.* ¶ 136.)

According to the complaint, in early 2021, as the world emerged from the pandemic, and as gasoline demand surged and crude oil prices increased, OPEC countries collectively declined to increase production, thereby pushing prices up further. (*Id.* ¶ 142.) Plaintiffs allege that, between January and October 2021, certain defendants publicly stated on earnings calls with investors and to news outlets like Reuters, Bloomberg, CNBC, and the Financial Times, that their companies would not increase production despite rising crude oil prices. (*Id.* ¶ 143.)

In 2022, Russia invaded Ukraine, and global oil prices purportedly spiked as a result of the boycott of Russian oil from world markets, increasing to more than $120/barrel by mid-2022. (*Id.* ¶¶ 146-47.) In October 2022, as crude oil prices began to "normalize from their near-record highs," OPEC announced that it was cutting oil production by two million barrels per day, allegedly in an effort to "stabilize the recent fall in global prices." (*Id.* ¶ 148.) Plaintiffs allege that defendants met with OPEC ministers again at the CERAWeek Conferences in March 2022 and March 2023 (*id.* ¶ 152), and between February 2022 and March 2023, several U.S. oil executives stated on investor calls and to news outlets that their companies would limit annual production growth to focus on profitability and shareholder returns (*id.* ¶ 149).

The complaint pleads that, following the global oil market collapse during the COVID-19 pandemic, the eight producer defendants pursued divergent (not parallel) U.S. oil production strategies between 2021 and 2023, as reflected in the chart below:

| Defendant | 2017-2019 U.S. Oil Production Growth Rate | 2021-2023 U.S. Oil Production Growth Rate |
|---|---|---|
| Centennial/Permian[149] | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

(*Id.* ¶ 160 table 1.)

Contrary to the premise of a conspiracy to reduce output, plaintiffs allege that six of the eight producer defendants <u>increased</u> their U.S. oil production after 2021 and did so at vastly different rates: Centennial/Permian by 56%; Continental by 42%; Diamondback by 19%; Occidental by 8%; EOG by 6%; and Pioneer by 3%. For one defendant, Continental, plaintiffs allege that its growth rate remained practically unchanged before and during the alleged conspiracy. Only two defendants allegedly reduced their U.S. production after 2021: Chesapeake, which emerged from Chapter 11 bankruptcy in February 2021,[5] by 63% and Hess by 6%. (*Id.*) In addition, plaintiffs allege that U.S. oil companies other than defendants, including several vertically integrated "supermajors" (such as Exxon Mobil Corporation and

---

[5] Jennifer Hiller, *Chesapeake Energy emerges from bankruptcy and shifts back to natural gas*, Reuters (Feb. 9, 2021), https://www.reuters.com/article/business/chesapeake-energy-emerges-from-bankruptcy-and-shifts-back-to-natural-gas-idUSKBN2A92Z6/.

Chevron Corporation)—which are far larger than defendants—and many small, privately owned "independents," also increased shale oil production since 2021.  (*Id.* ¶¶ 165-66.)

The complaint alleges that production of crude oil in the United States remains highly fragmented.  According to the complaint, 247 companies operate oil rigs in the United States.  (*Id.* ¶ 167.)  This group includes both supermajors like ExxonMobil and Chevron and scores of smaller independent firms, including firms that primarily focus on the exploration, development, and production of domestic shale resources.  (*Id.*)

The United States accounts for 12% of the world's crude oil production,[6] and defendants allegedly account for approximately 16.2% of total U.S. crude oil production (*id.* ¶ 167), meaning that, according to plaintiffs, defendants collectively account for only 1.9% of the world's crude oil production.  Nevertheless, plaintiffs allege that global crude oil prices would have been lower by some unspecified amount since January 1, 2021, if the eight producer defendants, with their tiny share of the global crude oil market, had increased their production more than they actually did.  (*Id.* ¶ 228.)

Plaintiffs bring this action under Section 1 of the Sherman Act, the antitrust laws of thirty states and the District of Columbia, and the consumer protection laws of twenty-one states and the District of Columbia.  Because plaintiffs did not purchase anything directly from defendants, they cannot recover damages for their federal antitrust claim.  *Illinois Brick Co. v. Illinois*, 431

---

[6] Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, 28 I.A.E.E. ENERGY FORUM at 19 (Feb. 2019), https://www.iaee.org/documents/ 2019EnergyForum1qtr.  Plaintiffs rely on this article throughout their complaint (*see, e.g.*, Compl. ¶ 93 n.6) and thus have incorporated it by reference.  *Young v. Tesla, Inc.*, No. 1:21-CV-00917-JB-SCY, 2022 WL 3355832, at *10 n.6 (D.N.M. Aug. 15, 2022) ("[A] court may consider documents referred to in the complaint without converting a motion to dismiss into a motion for summary judgment 'if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'") (quoting *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018)).

U.S. 720 (1977).  For that reason, plaintiffs have limited the relief they seek for their federal

claim to injunctive relief only.  They seek damages and injunctive relief for their fifty-three state

law claims.

<u>**ARGUMENT**</u>

I.      **UNDER BOTH THE POLITICAL QUESTION AND THE ACT OF STATE**
<u>**DOCTRINES, THIS COURT LACKS SUBJECT MATTER JURISDICTION**</u>

This Court lacks jurisdiction to adjudicate the legality of an alleged agreement involving

the twenty-five sovereign nation members of OPEC+ to influence global oil markets.  As several

courts have recognized, the United States' relationship with the OPEC member states is

constitutionally delegated to the foreign policy responsibilities of the executive branch, to be

carried out through diplomacy, rather than litigation.  Individual judicial decisions could disrupt

the stability of global oil markets, threaten national security, and undermine international

cooperation efforts on issues like counterterrorism and nuclear nonproliferation.

Courts have developed two doctrines—the political question doctrine and the act of state

doctrine—to guide courts facing a challenge to the sovereign conduct of foreign countries.  The

political question doctrine bars courts from deciding questions that the Constitution commits to

the political branches of government.  The act of state doctrine declares that a U.S. court may not

adjudicate the legality of the sovereign act of a foreign state.  Each of these doctrines precludes

this Court from adjudicating the lawfulness of an alleged agreement orchestrated by OPEC to

stabilize world oil prices.  Accordingly, this Court should dismiss plaintiffs' case in its entirety

for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).

A.      <u>**The Political Question Doctrine Bars Plaintiffs' Claims**</u>

"At its core, the political question doctrine 'excludes from judicial review those

controversies which revolve around policy choices and value determinations constitutionally

committed for resolution to the halls of Congress or the confines of the Executive Branch.'"

*Spectrum Stores*, 632 F.3d at 949 (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S.

221, 230 (1986)).  Simply put, "[f]ederal courts lack jurisdiction to hear cases that involve a

political question."  *Kerr v. Polis*, 20 F.4th 686, 705 (10th Cir. 2021); *accord Corrie v.*

*Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007).

    More than sixty years ago, the Supreme Court established the seminal test for

determining whether a claim presents a political question.  In *Baker v. Carr*, 369 U.S. 186

(1962), the Court identified six factors for consideration, any one of which is sufficient to

indicate the presence of a nonjusticiable political question.  A claim involves a nonjusticiable

political question when there is:

> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding
> without an initial policy determination of a kind clearly for nonjudicial
> discretion; or [4] the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate branches of
> government; or [5] an unusual need for unquestioning adherence to a political
> decision already made; or [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one question.

*Id.* at 217; *see also Zivotofsky ex rel. Zivotovsky v. Clinton*, 566 U.S. 189, 195 (2012) (under

political question doctrine, a court "lacks the authority to decide the dispute before it" when a

case involves a "textually demonstrable constitutional commitment of the issue to a coordinate

political department; or a lack of judicially discoverable and manageable standards for resolving

it" (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993))).

    Applying the *Baker* factors, the Tenth Circuit has repeatedly held that cases raising

foreign relations issues (like those implicated with respect to OPEC here) present nonjusticiable

political questions.  *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1031 (10th Cir.

2001) ("Matters closely related to foreign policy and national security . . . are rarely proper subjects for judicial intervention." (internal quotation marks and citation omitted)); *cf. Habyarimana v. Kagame*, 696 F.3d 1029, 1032-33 (10th Cir. 2012) ("The executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary. Perhaps more importantly, in the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves.").

Consistent with these principles, "[i]t is well-established that allegations of a conspiracy among American corporations and foreign sovereigns raise non-justiciable political questions." *D'Augusta v. Am. Petroleum Inst.*, No. 22-cv-01979-JSW, 2023 WL 137474, at *3 (N.D. Cal. Jan. 9, 2023) (citing *Spectrum Stores*, 632 F.3d at 950), *aff'd*, 117 F.4th 1094 (9th Cir. 2024), *petition for cert. docketed*, No. 24-800, (U.S. Jan. 27, 2025). Indeed, the very theory of a conspiracy involving OPEC that plaintiffs assert here has been previously dismissed for lack of subject matter jurisdiction under the political question doctrine. In *Spectrum Stores*, the plaintiffs were gasoline retailers that sued more than a dozen oil producers (some of which were owned in whole or in part by OPEC member nations and others of which were not), alleging that the defendant oil producers had conspired with OPEC member nations to fix the price of crude oil in violation of federal antitrust laws. *Spectrum Stores*, 632 F.3d at 942, 951. The Fifth Circuit affirmed the district court's conclusion that the case involved a nonjusticiable political question over which courts lack subject matter jurisdiction, explaining:

> We must analyze this claim as it would be tried, and as we have already observed, a trial on Appellants' conspiracy claims requires an inquiry into whether Appellees entered into an agreement with OPEC member nations to fix prices. A pronouncement either way on the legality of other sovereigns' actions falls within the realm of delicate foreign policy questions committed to the political branches. By adjudicating this case, the panel would be reexamining critical foreign policy decisions, including the Executive Branch's longstanding approach of managing relations with foreign oil-producing states

> through diplomacy rather than private litigation . . . .  Any merits ruling in this
> case, whether it vindicates or condemns the acts of OPEC member nations,
> would reflect a value judgment on their decisions and actions—a diplomatic
> determination textually committed to the political branches.

*Id.* at 951 (internal quotation marks and citation omitted).

Importantly, the *Spectrum Stores* court identified a number of political objectives critical to U.S. national security that are constitutionally committed to the political branches of government and would be frustrated by the court's adjudication of an antitrust challenge to an alleged conspiracy involving OPEC members.  *Id.* at 952.  The damaging consequences of proceeding with the litigation included the likely immediate disruption of oil imports into the United States, the undermining of relations with OPEC nations on issues such as counterterrorism and nuclear nonproliferation, and the undermining of relationships with non-OPEC nations that have a stake in those same issues.  *Id.*  Further, a disruption in the flow of petroleum products could adversely affect the U.S. military and national defense infrastructure. *Id.*  Persuaded that deciding the merits of the case would "require a court to recast what are foreign policy and national security questions of great import in antitrust law terms," and that the "Sherman and Clayton Acts are decidedly inadequate to provide judicially manageable standards for resolving such momentous foreign policy questions," the court concluded that the political question doctrine stripped the court of subject matter jurisdiction over the plaintiffs' claims.  *Id.* at 952-53.

More recently, in *D'Augusta v. American Petroleum Institute*, 117 F.4th 1094 (9th Cir. 2024), the Ninth Circuit affirmed the dismissal of an antitrust case brought by gasoline consumers alleging that defendant oil companies conspired with OPEC to reduce crude oil production and thereby increase oil prices, holding that the court lacked subject matter jurisdiction under both the political question and act of state doctrines.  Addressing the political

question doctrine, the court wrote:

> Plaintiffs seek to disrupt the power of OPEC and decouple our country's oil markets from the decisions of foreign nations, some of which have national interests adverse to our own. But [the Sherman and Clayton] Acts do not provide judicially manageable standards that do not intricately implicate monumental foreign policy questions. By recasting the conduct of foreign relations and national security interests into antitrust terms, we are still being asked to evaluate foreign relations decisions of sovereign nations, including our own. And oil plays a crucial role in our country's economic and national security interests, increasing the complexity of the foreign relations implications. . . . [O]ur antitrust laws [were not] designed to handle such difficult questions on areas of statecraft.

*Id.* at 1102.

Critically, the political question doctrine applies even when plaintiffs have not named OPEC members or U.S. government officials as defendants. To try this case, this Court would be required to examine the conduct of OPEC members—defendants' alleged "unnamed co-conspirators" (Compl. ¶ 85)—to assess whether that conduct complied with federal and state antitrust laws. "Any merits ruling in this case" as to the lawfulness of the alleged conspiracy, "whether it vindicates or condemns the acts of OPEC member nations, would reflect a value judgment on their decisions and actions—a diplomatic determination textually committed to the political branches." *Spectrum Stores*, 632 F.3d at 951. For that reason, although OPEC and its members were not named as defendants in *D'Augusta*, the political question doctrine nevertheless stripped the court of subject matter jurisdiction. And even though no U.S. government officials were named as defendants in *Spectrum Stores*, the court was "simply unable to ignore the involvement of foreign nations in the [alleged] conspiracy." *Spectrum Stores*, 632 F.3d at 947. The political question doctrine, therefore, stripped the court of subject matter jurisdiction. *Id.*; *see also D'Augusta*, 117 F.4th at 1103 (observing with approval that, in *Spectrum Stores*, the Fifth Circuit "relied on the political question doctrine to reject more

generalized allegations of collusion between American oil companies and OPEC—with no Presidential or executive action" (citation omitted)).

Plaintiffs here similarly allege a conspiracy involving "the members of OPEC and OPEC+" as "unnamed co-conspirators" to raise crude oil prices. (Compl. ¶ 85.) Plaintiffs cannot escape the political question doctrine by claiming that defendants formed an agreement among themselves separate from an alleged agreement with OPEC. The complaint does not allege any such separate conspiracy without OPEC's participation. Nor could it. Representing less than two percent of global crude oil production, defendants alone could not plausibly conspire to inflate global crude oil prices. Rather, throughout the complaint, plaintiffs allege that defendants "cooperat[ed] and collud[ed]"—and indeed, "actualiz[ed] [an] agreement"—with OPEC, their alleged "co-conspirators," to effectuate a global stabilization of oil prices. (*Id.* ¶¶ 10, 85, 136; *see also id.* ¶ 153 ("Early in 2023, Defendants removed all doubt that they were coordinating with OPEC.").) Plaintiffs allege that it was OPEC—and not defendants—that initiated the efforts to "add [defendants] to the cartel" (*id.* ¶ 110), and that it unsuccessfully pursued those efforts for several years by meeting with defendants at CERAWeek conferences (*id.* ¶¶ 113-35). The conduct of OPEC is central to plaintiffs' conspiracy case, and the lawfulness of an alleged conspiracy involving the actions of foreign sovereigns cannot be adjudicated under the political question doctrine. *See D'Augusta*, 2023 WL 137474, at *4 (rejecting the plaintiffs' argument that they had "alleged an independent and completely domestic conspiracy" because "the actual allegations in the complaint confirm a purported global, not just private or domestic[,] agreement . . . to cut production of oil").

Accordingly, this case presents political questions that are just as nonjusticiable as those in *Spectrum Stores* and *D'Augusta*, requiring dismissal for lack of subject matter jurisdiction.

### B.     The Act of State Doctrine Also Bars Plaintiffs' Claims

Plaintiffs' challenge to an alleged conspiracy orchestrated by OPEC member nations is also barred by the act of state doctrine.  Under that doctrine, "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill*, 168 U.S. at 252.  "For act of state (as opposed to sovereign immunity) purposes, the relevant acts are not merely those of the named defendants, but <u>any</u> governmental acts whose validity would be called into question by adjudication of the suit."  *Spectrum Stores*, 632 F.3d at 954 (quoting *Callejo v. Bancomer*, 764 F.2d 1101, 1115-16 (5th Cir. 1985)).  "[A] private litigant may raise the act of state doctrine, even when no sovereign state is a party to the action." *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1072 n.3 (9th Cir. 2018) (citation omitted).

The act of state doctrine reflects the principle that "juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government."  *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765 (1972).  The act of state doctrine "overlaps in many respects with the political question doctrine, as it is rooted in constitutional separation-of-powers concerns."  *Spectrum Stores*, 632 F.3d at 954 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964)).  It recognizes "the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of [U.S.] foreign policy."  *First Nat'l City Bank*, 406 U.S. at 769.

In *Spectrum Stores*, the court held that the plaintiffs' claim of a price-fixing conspiracy involving OPEC member states "would necessarily call into question the acts of foreign governments with respect to exploitation of their natural resources."  632 F.3d at 954; *see also Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1360-61 (9th Cir.

1981) ("OPEC's 'price-fixing' activity has a significant sovereign component," and adjudication of the case would interfere with a foreign sovereign's "chosen means of allocating and profiting from its own valuable natural resources"); *D'Augusta*, 117 F.4th at 1103 (where plaintiff pleaded that OPEC members were unnamed co-conspirators that demanded defendants' cooperation as a "quid pro quo" to end price war, plaintiffs' claims were "covered by the act of state doctrine because they [sought] to litigate the petroleum policy of foreign nations"). "Recognizing that the judiciary is neither competent nor authorized to frustrate the longstanding foreign policy of the political branches by wading so brazenly into the sphere of foreign relations," the Fifth Circuit "decline[d] to sit in judgment of the acts of the foreign states that comprise OPEC." *Spectrum Stores*, 632 F.3d at 955-56.

This Court too should decline to sit in judgment of the acts of the foreign governments that comprise OPEC.[7]  Like the plaintiffs in *Spectrum Stores*, plaintiffs here allege that defendants conspired with the OPEC member states to limit global crude oil production, thereby stabilizing crude oil prices—and prices for refined petroleum products—at artificially elevated levels.  Trial of this case would necessarily require the participation of the sovereign OPEC nations, though they are not named as defendants, and call into question their acts with respect to the production and sale of oil within their territories.  The act of state doctrine thus applies.

Plaintiffs cannot avoid the act of state doctrine by arguing that their complaint falls within a purported "commercial exception" to the doctrine.  As the Ninth Circuit has explained, a commercial exception to the act of state doctrine has never been recognized by a majority of the Supreme Court. *Sea Breeze Salt*, 899 F.3d at 1074.  Nor has such an exception been recognized

---

[7] To the extent that the act of state doctrine raises prudential, as opposed to jurisdictional, barriers to the Court hearing this case, the doctrine would then compel dismissal of plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1).

by the Tenth Circuit. *See id.* Two circuit courts of appeal have rejected any commercial exception outright, and only one, the D.C. Circuit, "has arguably adopted the exception." *Id.* Moreover, even if this Court were to assume the existence of a commercial exception to the act of state doctrine, it would not apply here. Where it is recognized, the commercial exception does not apply to acts that involve the exercise of "the kind of powers that are 'peculiar to sovereigns,'" such as "decisions about the exploitation and distribution en masse of [a country's] sovereign natural resources." *Id.* at 1075 (emphasis omitted). The alleged agreement at issue in this case—an OPEC-led agreement regarding the production of crude oil worldwide—implicates precisely the kind of powers that are peculiar to sovereigns, and thus outside the scope of any commercial exception to the act of state doctrine.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

Plaintiffs' complaint should be dismissed on the independent ground that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). <u>First</u>, plaintiffs have failed to plead facts that, if proven, would plausibly establish the existence of the alleged conspiracy, as required by *Twombly*. <u>Second</u>, plaintiffs have failed to plead facts to show that they have antitrust standing under *AGC*. <u>Finally</u>, plaintiffs' various state law claims fail for myriad additional reasons grounded in the specific provisions of those state laws.

### A.    Plaintiffs Fail to Plead Facts That, if <u>Proven, Would Establish the Alleged Conspiracy</u>

Plaintiffs' single federal antitrust cause of action and each of their fifty-three state law causes of action are based on plaintiffs' assertion that defendants conspired with each other and with the members of OPEC to restrict global crude oil production. But plaintiffs have not pleaded facts—as opposed to speculative and conclusory assertions—that, if true, would plausibly establish the existence of any such conspiracy.

18

To withstand dismissal, plaintiffs' complaint must contain "enough <u>factual</u> matter (taken as true) to suggest that an <u>agreement</u> was made." *Twombly*, 550 U.S. at 556 (emphases added). A plaintiff's obligation to provide the factual allegations showing his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* A complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

"[T]he crucial question" under Section 1 is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (citation omitted). "[U]nilateral conduct, regardless of its anti-competitive effects, is not prohibited by [Section 1] of the Sherman Act." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006) (citation omitted).

To meet its pleading burden, a plaintiff may allege either direct evidence or circumstantial evidence of the alleged conspiracy. *See*, *e.g.*, *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177, 1179 (10th Cir. 2019). Because plaintiffs here do not meet either burden, they fail to state a claim.

### 1.    <u>Plaintiffs Plead No Direct Evidence of the Alleged Conspiracy</u>

Plaintiffs do not purport to plead direct evidence of the alleged conspiracy. Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being

19

asserted." *Id.* at 1177. To qualify as direct evidence, an allegation must amount to a "smoking gun," like a "document or conversation explicitly manifesting the existence of the agreement." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (direct evidence is a "smoking gun" such as "a recorded phone call in which two competitors agreed to fix prices at a certain level").

Plaintiffs' allegations that certain defendants purportedly made public statements to investors on earnings calls and to news outlets like Reuters, Bloomberg, CNBC, and the Financial Times about focusing on shareholder returns following the pandemic (*e.g.*, Compl. ¶¶ 143, 149, 154) do not constitute direct evidence of the alleged conspiracy. These alleged statements are entirely consistent with each defendant's unilateral response to pressures in the marketplace, and nothing in these allegations suggests that defendants agreed among themselves to restrict production. Nor does plaintiffs' assertion concerning defendant Pioneer's April 2020 support of production regulation before the Texas Railroad Commission (*id.* ¶ 141)—conduct that is fully protected by the First Amendment, *see United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961)—suggest an unlawful conspiracy to reduce production and control global oil prices.

Because plaintiffs plead no "smoking gun" facts explicitly manifesting the existence of the alleged unlawful agreement, they do not allege direct evidence of the purported conspiracy.

### 2.     Plaintiffs Do Not Plausibly Plead Circumstantial Evidence of the Alleged Conspiracy

"The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial." *Llacua*, 930 F.3d at 1179 (citing *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors. And because of this mutual awareness, two firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

Because firms in an industry often react similarly, but independently, to events in the marketplace and to each other, parallel behavior—even consciously parallel—is "not in itself unlawful." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). As the *Twombly* Court explained, parallel conduct is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." 550 U.S. at 554. Accordingly, "mere allegations of parallel conduct, absent additional contextual facts, fail to state a plausible conspiracy claim." *Llacua*, 930 F.3d at 1174-75.

To state a plausible conspiracy claim, allegations of parallel conduct are insufficient. Such allegations must be accompanied by additional circumstances, known as "plus factors," that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 553, 557. These additional "plus factors" serve to distinguish permissible parallel behavior from unlawful conspiracies. *See*, *e.g.*, *Musical Instruments*, 798 F.3d at 1194; *Llacua*, 930 F.3d at 1178.

In the instant case, plaintiffs fail to plead that defendants engaged in parallel conduct. Because pleading parallel conduct among defendants is essential to plead a plausible circumstantial conspiracy claim, the absence of such alleged facts compels dismissal. Plaintiffs also fail to plead cognizable plus factors. This failure, too, independently requires dismissal.

### a.  Plaintiffs Fail to Plead Parallel Conduct

To plead parallel conduct, plaintiffs must allege facts showing that defendants contemporaneously engaged in conduct so similar that a conspiracy can be inferred—for instance, that "competitors adopt[ed] similar policies around the same time." *Musical Instruments*, 798 F.3d at 1193.  By contrast, courts routinely conclude that gradual or "slow adoption of similar policies does not raise the specter of collusion." *Id.* at 1196; *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (holding that plaintiffs failed to plead parallel conduct because alleged actions took place six months apart).  A complaint's "allegations fall far short of demonstrating parallel behavior" when a defendant allegedly acts contrary to the purported conspiracy.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (plaintiffs claiming that defendants conspired to deny plaintiff credit failed to allege parallel conduct because they pleaded that one defendant "extend[ed] at least some credit" to plaintiff).

Plaintiffs fail to allege any parallel conduct.  While plaintiffs claim that defendants "collectively agreed not to increase their U.S. shale oil production" after January 1, 2021 (Compl. ¶ 9), the factual allegations in the complaint do not support that conclusory assertion. Plaintiffs plead that six of the eight defendants increased their U.S. oil production after 2021, and did so at vastly different rates:  Centennial/Permian by 56%; Continental by 42%; Diamondback by 19%; Occidental by 8%; EOG by 6%; and Pioneer by 3%.  (*Id.* ¶ 160 table 1.)  Indeed, one defendant (Continental) allegedly increased its post-COVID production by nearly the same rate as its pre-COVID production:  a 42% increase from 2021-23, following a 43% increase from 2017-19.  (*Id.*)  Only two defendants allegedly reduced their U.S. production after 2021, also at vastly different rates:  Chesapeake, which publicly announced after emerging from bankruptcy in

early 2021 that it would refocus its business on natural gas and away from shale oil production,[8]

by 63% and Hess by 6%.  (*Id.*)  Plaintiffs simply cannot plead that the producer defendants

engaged in parallel conduct when Centennial/Permian, for instance, allegedly <u>increased</u> its

production by 56%, while Chesapeake allegedly <u>decreased</u> its production by 63%.[9]

Moreover, plaintiffs' reliance on each defendant's alleged three-year (2021-2023) oil

production growth rate (*id.*) cannot establish parallel conduct as a matter of law.  Conduct

occurring anytime within a three-year period is not parallel.  For instance, a production shift by

one defendant in, for example, January 2021 is not parallel with even a similar production shift

by another defendant in June 2022 or in September 2023.  Courts require defendants' conduct to

be closer in time than within three years to be considered parallel.  *See City of Pontiac Police &*

*Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 400 (2d Cir. 2024) (plaintiffs' reliance

on three-year averages are insufficient to plausibly allege parallel conduct because such averages

can "'flatten or hide trends that might tell a different story,' and they can be finessed by shifting

the time periods being averaged" (citation omitted)); *In re Dynamic Random Access Memory*

*(DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49 (9th Cir. 2022) (two defendants

reducing production in "the next quarter" after another defendant is not "indicative of . . . an

advance agreement"); *Oliver v. SD-3C LLC*, No. 11-CV-01260-JSW, 2016 WL 5950345, at *7

(N.D. Cal. Sept. 30, 2016) (statistics that are "aggregated by year . . . do[] not show whether

changes in prices occurred simultaneously or at different times").

---

[8] Jennifer Hiller, *Chesapeake Energy emerges from bankruptcy and shifts back to natural gas*, Reuters (Feb. 9, 2021), https://www.reuters.com/article/business/chesapeake-energy-emerges-from-bankruptcy-and-shifts-back-to-natural-gas-idUSKBN2A92Z6/.

[9] As explained in their separately filed motions to dismiss, Centennial/Permian and Hess actually expanded production <u>more</u> during the alleged conspiracy than they did from 2017-19, conduct that is utterly inconsistent with the purported conspiracy.

At best, plaintiffs allege that defendants' three-year average post-pandemic oil production growth rates were smaller than their three-year average pre-pandemic growth rates, which themselves varied widely.  (*Id.*)  But even that assertion is belied by plaintiffs' factual allegations, which, if true, would establish that the <u>post-pandemic</u> production growth rates of defendants Centennial/Permian and Continental exceeded the <u>pre-pandemic</u> growth rates of defendants Chesapeake, EOG, Hess, and Pioneer.  (*Id.*)

Nothing about the complaint's pleading of oil production growth rates demonstrates parallel behavior among the eight producer defendants.  Because the producer defendants allegedly pursued distinct oil production strategies both before and after the COVID-19 pandemic, the complaint fails to allege parallel conduct and should be dismissed on this basis alone.  *See, e.g.*, *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 221 (W.D.N.Y. 2024) (no parallel conduct because "the data cited by [p]laintiffs shows significant variation in the reduction of [defendants'] sales"), *appeal filed*, No. 24-598 (2d Cir. Mar. 4, 2024); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) (no parallel conduct where "four examples" showed "difference[s] in price[s]"), *aff'd*, 757 F. App'x 524 (9th Cir. 2018); *Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309-10 (S.D. Fla. 2010) (discounting parallel conduct allegations because "the amounts [of the price increases] sometimes differed"); *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940 (RWR), 2009 WL 5385975, at *7 (D.D.C. Sept. 30, 2009) ("Evidence that ConocoPhillips and Shell increased their [natural gas] production levels in a given year while Exxon Mobil and BP America's production levels decreased suggests no conspiracy occurred."), *aff'd*, 409 F. App'x 362 (D.C. Cir. 2011); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022-23 (N.D. Cal. 2007) (no parallel conduct where defendants' prices differed by $20).

24

### b.     Plaintiffs' Claimed "Plus Factors" Are Irrelevant And Do Not Plausibly Suggest the Alleged Conspiracy

Plaintiffs' alleged "plus factors" cannot salvage their deficient conspiracy claim.  As an initial matter, because plaintiffs fail to plead parallel conduct, "plus factors" are, by definition, irrelevant.  *See*, *e.g.*, *Park Irmat*, 911 F.3d at 517 ("[N]o discussion of any 'plus factors' is necessary" where, as here, plaintiffs have not plausibly alleged parallel conduct); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants.").

In addition to their irrelevance, plaintiffs' putative plus factors are inadequate.  They fail to distinguish unilateral, economically rational conduct from conduct that could plausibly be attributed to the alleged conspiracy.  Plus factors must suggest circumstances so unusual that they create the inference that "parallel behavior . . . would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding."  *Twombly*, 550 U.S. at 556 n.4.  Crucially, a complaint, like the instant one, that identifies "obvious alternative explanations" for the allegedly parallel conduct must be dismissed.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322-23, 350.

As putative plus factors, plaintiffs allege that (i) demand for crude oil and refined petroleum products is highly inelastic (Compl. ¶¶ 190-91), (ii) the U.S. shale oil industry is highly fragmented (*id.* ¶ 192), (iii) defendants shared information about the oil industry with one another and with OPEC executives during trade association gatherings like the annual CERAWeek Conference and other high-level meetings (*id.* ¶¶ 194-96), (iv) six investment firms allegedly own unspecified interests in more than one defendant (*id.* ¶¶ 197-203), and (v) defendants' decisions after 2021 not to increase shale oil production levels more than they actually did was against their individual self-interests (*id.* ¶¶ 204-13).  Plaintiffs also allege that

the FTC investigations into ExxonMobil's acquisition of defendant Pioneer and Chevron's pending acquisition of defendant Hess, which resulted in consent decrees barring former Pioneer CEO Scott Sheffield from joining ExxonMobil's board and Hess CEO John Hess from joining Chevron's board, support a plausible inference that defendants have conspired to limit shale oil production. (*Id.* ¶¶ 175-88.) As explained below, these allegations suggest only that each defendant's post-pandemic shale oil production level was the product of that defendant's unilateral response to common events and pressures affecting the market for crude oil.

First, plaintiffs' assertion that demand for crude oil and refined petroleum products is highly inelastic does not constitute a plus factor that makes the existence of a conspiracy plausible. In *Persian Gulf Inc. v. BP West Coast Products LLC*, No. 3:15-CV-01749-L-BGS, 2016 WL 4574357 (S.D. Cal. July 14, 2016), the court dismissed the plaintiff gasoline retailer's antitrust lawsuit against several oil companies, rejecting the plaintiff's assertion that the highly inelastic demand for gasoline constituted a plus factor in support of its conspiracy claim. The court held that, while a market characterized by high concentration, high entry barriers, and an inelastic demand for the product might be susceptible to conspiracy, such market characteristics do "not necessarily suggest an illegal agreement, because the structure of the market could also have contributed to permissible parallel conduct." *Id.* at *5.

Second, contrary to plaintiffs' allegations, the highly fragmented nature of the shale oil industry does not favor collusion—it does the opposite. As a matter of basic economics, high market fragmentation renders collusion underline less likely. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015) ("It is true that if a small number of competitors dominates a market, they will find it safer and easier to fix prices than if there are many competitors of more or less equal size."); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019)

("Common sense teaches that an oligopolistic market could facilitate unlawful anticompetitive behavior: maintaining fealty to an agreement is easier with a small number of competitors than with a large number.")  Plaintiffs acknowledge that there are hundreds of smaller producers and that entry into, or expansion in, shale oil production is relatively fast and easy, with smaller startup capital commitments and comparably quick time to drill and bring wells online.  (Compl. ¶¶ 98, 165-67.)  With relatively low barriers to entry and expansion, and with hundreds of existing producers both large and small, producers other than the eight producer defendants could—if market conditions warranted—increase production, thwarting defendants' alleged conspiracy.  *See Matsushita*, 475 U.S. at 590 (noting the inherent challenges in maintaining a conspiracy and the fact that the success of the conspiracy is further complicated by independent actors in the market).  Indeed, plaintiffs acknowledge that, in addition to six of the defendants, other producers have increased their production since the pandemic.  (Compl. ¶¶ 165-66.)

Third, plaintiffs' allegations that defendants shared information about the oil industry with each other and OPEC executives during trade association gatherings like the annual CERAWeek Conference do not "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  It is well-settled that mere participation in trade associations and other professional events, including the exchange of industry information at those events, does not suffice to infer the existence of a conspiracy.  *See Llacua*, 930 F.3d at 1178 ("Not every action by a trade association is concerted action by the association's members. Indeed, even though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a walking conspiracy." (quoting *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018))); *Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is

exchanged and strategies are advocated does not suggest an illegal agreement."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("Gathering information about pricing and competition in the industry is standard fare for trade associations. If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action.").[10] Plaintiffs' allegations regarding the annual CERAWeek meetings (and public information about those meetings) fail to identify anything that would distinguish the information allegedly shared from "standard fare for trade associations." *Citric Acid*, 191 F.3d at 1098.

        <u>Fourth</u>, the fact that six investment firms allegedly owned shares of some of the defendants does not constitute a plus factor that would make plaintiffs' purported conspiracy plausible. The court in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016), rejected the argument that common ownership of the London Metal Exchange by several investment firms constituted a plus factor when the complaint did not plead any facts to suggest that individuals at the investment firms conspired with each other or with other defendants. *Id.* at *31. Here, plaintiffs do not plead facts to show that individuals at the six investment firms communicated with each other about shale oil production levels. Nor do plaintiffs plead any facts to suggest that the investment firms, either individually or collectively, held controlling interests in any defendant, participated on the board of any defendant, or conspired to influence

---

[10] *See also CVB, Inc. v. Corsicana Mattress Co.*, No. 1:20-cv-00144-DBB, 2024 WL 4505044, at *6 (D. Utah Oct. 16, 2024) (holding that allegations that trade association issued press release and hosted a conference panel did not plausibly allege a "conscious commitment to illegally restrain trade"); *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 597 (S.D. Tex. 2022) ("[C]ommon attendance at trade association meetings is insufficient to infer a conspiracy."), *appeal filed*, No. 22-20149 (5th Cir. Mar. 21, 2022).

the defendants' shale production levels or their competitive behavior generally.  Plaintiffs'

allegation that investment firms owned some unspecified number of shares of stock in the

various defendants is not a plus factor that makes collusion among defendants plausible.

      <u>Fifth</u>, plaintiffs' assertion that defendants' decisions about whether and, if so, by how

much to increase their individual shale oil production volumes after 2021 were against their

individual self-interests is wholly conclusory and thus insufficient to raise an inference of

conspiracy.  Plaintiffs' own <u>factual</u> allegations—as opposed to conclusory assertions—indicate

that shale oil industry participants had ample non-conspiratorial reasons to exercise caution

before expanding production, including the world's slow emergence from the throes of the

pandemic (Compl. ¶ 138), market volatility following Russia's military invasion of Ukraine (*id.*

¶¶ 146-48), and the threat of another OPEC price war (the first of which caused dozens of U.S.

shale oil producers to fail (*id.* ¶ 108)) if U.S. shale oil producers returned to their pre-pandemic

"breakneck production growth" (*id.* ¶ 143(d)).  Moreover, plaintiffs' allegation that each

producer defendant's post-pandemic production growth rate differed widely from that of the

other producer defendants (*id.* ¶ 160 table 1), if proven, would confirm that each defendant

calculated the risks of post-pandemic production growth independently and reached widely

varying conclusions regarding how much to grow.  *See Llacua*, 930 F.3d at 1175 ("[W]hen the

antitrust claim relies solely on circumstantial facts of parallel behavior, the conspiracy is not

plausible if in light of common economic experience the alleged conduct is equally likely to

result from independent action.").[11]

---

[11] *See also Twombly*, 550 U.S. at 566 ("[N]othing in the complaint intimates that the [defendants'] resistance to the [new market entrants] was anything more than the natural, unilateral reaction of each [defendant] intent on keeping its regional dominance."); *Musical Instruments*, 798 F.3d at 1196 ("Even assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar

Finally, plaintiffs' reference to the FTC's investigations of ExxonMobil's acquisition of defendant Pioneer and Chevron's pending acquisition of defendant Hess (Compl. ¶¶ 175-88) does not support an inference of conspiracy or render plaintiffs' conspiracy claim plausible. Courts routinely treat the existence of a government investigation as a "non-factor" that "carries no weight in pleading an antitrust conspiracy claim," particularly when the investigation may be "broader or narrower than the allegations at issue" or yield "nothing at all." *In re Graphics Processing*, 527 F. Supp. 2d at 1024; *see also Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) (DOJ investigation did not "permit a reasonable inference that any Defendant committed an antitrust violation because proof of the mere occurrence of the DOJ's investigation is equally consistent with Defendants' innocence"), *order amended on reconsideration*, No. 1:09-CV-00438-LDD, 2010 WL 11470613 (D. Del. Dec. 1, 2010).[12]  Here, the FTC investigations concerned acquisitions of two defendants, not the conspiracy that plaintiffs allege.  None of the parties to the FTC consent decrees admitted to a violation of law.[13]  The FTC did not determine that plaintiffs' conspiracy allegations are true, and the mere existence of the FTC investigations and consent decrees does not permit a reasonable inference that defendants engaged in any conspiracy.

---

reaction to similar pressures within an interdependent market, or conscious parallelism. . . . The manufacturers' similar response to this market pressure is a hallmark of independent parallel conduct—not collusion.").

[12] *See also In re Allergan ERISA Litig.*, 975 F.3d 348, 354 (3d Cir. 2020) (DOJ investigation did not suggest existence of an agreement); *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 n.16 (N.D. Ill. 2018) ("[T]he purpose of an investigation is to determine whether there is evidence of unlawful conduct; its existence does not therefore signal that there must be such conduct.").

[13] Chevron Corp., Docket No. C-4814 (FTC Jan. 16, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/2410008c4814chevronhessorder.pdf; Exxon Mobil Corp., Docket No. C-4815 (FTC Jan. 16, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/2410004-c4815-exxonpioneerfinalorderpublic.pdf.

Indeed, plaintiffs' pleading demonstrates that there is no basis for injunctive relief in this case because ExxonMobil's acquisition of Pioneer and Chevron's pending acquisition of Hess effectively moot the threat of any theoretical continuation of the alleged conspiracy, particularly given plaintiffs' allegations that ExxonMobil and Chevron have promised to expand shale oil production. (Compl. ¶ 165.) Plaintiffs must allege an ongoing conspiracy in restraint of trade to sustain claims for injunctive relief. Courts consistently dismiss injunctive relief claims where, as here, plaintiffs plead only historical conduct, not current actions, to support their claims of an ongoing antitrust violation. *See, e.g.*, *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333-34 (1952) (affirming dismissal of injunctive relief claim and stating that "[t]he sole function of an action for injunction is to forestall future violations" which requires "a real threat of future violation or a contemporary violation of a nature likely to continue or recur" where the court could not find "the slightest reason to doubt the genuineness, good faith or permanence of the changed attitude and strategy of these defendant[s]"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Master File No. 3:07-cv-5944 JST, 2016 WL 721680, at *23 (N.D. Cal. Jan. 28, 2016) (noting that "an antitrust injunction would have been difficult to obtain since IPPs could not show a likelihood of future harm"), *report and recommendation adopted in part*, MDL No. 1917, Case No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, Case No. 07-5944 SC, 2012 WL 12914681, at *2 (N.D. Cal. Nov. 16, 2012) (dismissing claim for injunctive relief because the alleged conspiracy "allegedly occurred years ago, and . . . there is little or no danger of a reoccurring violation"). As the Tenth Circuit explained in *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345 (10th Cir. 1994), "Article III's requirement that federal courts adjudicate only cases and controversies necessitates that courts decline to exercise jurisdiction where the award of any requested relief

31

would be moot—i.e. where the controversy is no longer live and ongoing." *Id.* at 1348 (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)).

*        *        *

In sum, plaintiffs' complaint fails to plead sufficient facts to show that each defendant's decision as to the appropriate level of its shale oil production was anything other than that defendant's unilateral response to common market events and pressures. Plaintiffs have not pleaded facts to nudge their claims across the line from conceivable to plausible. Because their single federal cause of action and all fifty-three of their state law causes of action are premised on their alleged conspiracy claim, the complaint should be dismissed in its entirety.

**B.     Plaintiffs Fail to Plead Facts to Show That They Have Antitrust Standing**

Plaintiffs' complaint should be dismissed on the additional ground that they lack antitrust standing to pursue their claims. Antitrust standing—which is distinct from Article III standing—is an essential element of an antitrust claim; without it, the claim must be dismissed. *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406 (10th Cir. 1992). The Supreme Court has recognized a number of judge-made rules that limit antitrust standing—doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract. *AGC*, 459 U.S. at 532-33. When plaintiffs' alleged injury is only indirectly linked to the defendants' challenged conduct, plaintiffs lack antitrust standing.

The complaint here pleads that crude oil producers, including defendants and the hundreds of other crude oil producers responsible for the remaining more than 98% of global crude oil production, sell their crude oil to refineries that "co-mingle" the crude oil of multiple producers and, using chemical separation and reaction processes, convert the crude oil into gasoline, heating oil, diesel fuel, marine fuel, jet fuel, and other petroleum-based feedstocks. (Compl. ¶¶ 5, 234.) Those refined products are combined in refinery storage facilities and then

shipped through pipelines and by barge and railway to bulk terminal storage and blending

facilities, where they are then blended and combined with other similar domestic and imported

refined products to be shipped by tanker trucks to retailers across the country for eventual sale to

consumers like plaintiffs.  (*Id.* ¶ 234 & fig. 16.)  Where, as here, no factfinder could possibly

trace any artificial increase in the prices that plaintiffs allegedly paid third-party retailers for

refined petroleum products to any alleged artificial decrease in defendants' shale oil production,

plaintiffs cannot establish that they have antitrust standing to bring their claims.

In *AGC*, the Supreme Court identified multiple factors to guide the analysis of antitrust

standing, noting that "Congress did not intend the antitrust laws to provide a remedy in damages

for all injuries that might conceivably be traced to an antitrust violation."  *AGC*, 459 U.S. at 534.

The Tenth Circuit has distilled the *AGC* factors to six:

> (1) the causal connection between the antitrust violation and the plaintiff's
> injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's
> injury—i.e., whether it is one intended to be redressed by the antitrust laws; (4)
> the directness or the indirectness of the connection between the plaintiff's
> injury and the market restraint resulting from the alleged antitrust violation; (5)
> the speculative nature of the damages sought; and (6) the risk of duplicative
> recoveries or complex damages apportionment.

*Sharp*, 967 F.2d at 406-07.  The *AGC* analysis applies equally to plaintiffs' federal and state law

claims because the states on whose laws plaintiffs base their claims have adopted *AGC* or a

similar analysis.  (*See* Appendix B.)  Moreover, the *AGC* analysis for determining plaintiffs'

standing to bring injunctive relief claims is "effectively the same" as for damages claims.  *In re*

*Plasma-Derivative Protein Therapies Antitrust Litig.*, MDL No. 2109, 09 C 7666, 2012 WL

39766, at *8-9 (N.D. Ill. Jan. 9, 2012) (dismissing injunctive claims given "the causal connection

between the violation and the harm, and the directness of the injury" (citation omitted)).

Here, the *AGC* factors weigh decidedly in favor of dismissal.

33

First, the causal connection between the alleged antitrust violation—defendants'

purported agreement not to increase their shale oil production as much as they might otherwise

have—and plaintiffs' alleged injury is so attenuated that it compels dismissal for lack of

standing.  As the Supreme Court explained, a plaintiff lacks standing when only "vaguely

defined links" separate defendants' alleged conduct from plaintiffs' alleged injury.  *AGC*, 459

U.S. at 540.  That is clearly the case here.  The eight producer defendants account for less than

2% of global crude oil production.  Plaintiffs do not allege that they bought anything from

defendants, nor do they plead that any of the refined petroleum products that they bought were

derived from the relatively small amount of crude oil that defendants produced.  Plaintiffs fail to

trace the purportedly elevated prices of defendants' shale oil through the vast and complex

manufacturing and distribution supply chain to the prices that plaintiffs ultimately paid to third-

party retail merchants for refined petroleum products.  Plaintiffs' allegations require speculation

about pricing decisions made by many independent, intermediate non-conspirators along the

global supply chain from the extraction of crude oil to the retail sale of refined petroleum

products.  Those allegations cannot support standing.  *See, e.g.*, *Supreme Auto Transp. LLC v.*

*Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) (dismissing indirect purchaser

claims given "the presence of many intermediate parties along the supply chain," the

"commingling of [allegedly price-fixed products] with other materials," and "the absence of

plausible evidence of any link" to defendants), *aff'd*, 902 F.3d 735 (7th Cir. 2018); *In re*

*Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D.

Cal. 2007) (dismissing indirect purchaser claims because many factors "collectively determine

the final price actually paid" for a "final product" containing allegedly price-fixed components).

Plaintiffs cannot avoid this conclusion by arguing an "umbrella" theory of damages,

pursuant to which plaintiffs would argue that the price of crude oil from non-conspiring producers was artificially increased under the umbrella of the alleged conspirators' prices. That theory is unavailable where, as here, plaintiffs' purchases from third-party non-conspirators occurred several steps along a multi-tiered distribution chain from the alleged conspirators' pricing decisions. (*See* Compl. ¶¶ 214-17.)

In *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 691 F.2d 1335 (9th Cir. 1982), the Ninth Circuit rejected the umbrella damages theory in a case remarkably like the instant case. There, retail purchasers of gasoline alleged that several oil refineries had conspired to raise the price of refined petroleum products, resulting in an increase in the price of all gasoline. The court held that the plaintiffs' umbrella theory was unavailable because the "multi-tiered" chain of distribution was so attenuated that the pricing decisions of numerous non-conspirators would have to be evaluated to determine whether the plaintiffs had in fact been injured by the defendants' alleged conspiracy and to ascertain damages, if any, with any reasonable certainty. *Id.* at 1340-41 (describing these "obstacles to intelligent inquiry" that were "nearly insurmountable"). The umbrella damages theory is unavailable here for the same reason.

Second, plaintiffs plead no facts to suggest that each defendant's decision about the level of its oil production was motivated by an intent to harm plaintiffs by raising retail prices for refined petroleum products. There are no allegations even to suggest that defendants considered the retail prices charged by third-party vendors of refined petroleum products.

Third, plaintiffs fail to plead that they have suffered antitrust injury, which is a necessary element of standing. *Sharp*, 967 F.2d at 406 ("standing cannot be established without an antitrust injury" (citation omitted)). Plaintiffs have not pleaded—because they cannot plead—

that the refined petroleum products that they purchased were derived from crude oil that

defendants produced.  Nor can plaintiffs plead anything beyond speculation to trace the retail

prices of the products they purchased to defendants' allegedly restricted production.  Such

speculation is insufficient to plead antitrust injury or to establish plaintiffs' standing to pursue

their claims.  *See*, *e.g.*, *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) ("any

antitrust injury" to beer consumer plaintiffs would be "speculative and localized" where beer was

sold through a complex distribution system).

Fourth, plaintiffs' alleged injury is so indirect as to compel the conclusion that plaintiffs

lack standing to pursue their claims.  Plaintiffs concede that they are several distribution steps

removed from defendants in the supply chain that begins with shale oil extraction and ends with

the retail purchase of gasoline, heating oil, diesel fuel, marine fuel, and jet fuel.  Where, as here,

plaintiffs' injuries "are at most indirect," plaintiffs lack standing.  *Sharp*, 967 F.2d at 409; *accord*

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 440-41 (3d Cir. 2000) (standing

denied because plaintiffs' purported injuries were "derivative" of others that transacted more

directly with defendants).  Indeed, "[t]he existence of an identifiable class of persons whose self-

interest would normally motivate them" to sue—e.g., defendants' direct crude oil customers—

defeats any "justification for allowing a more remote party" to assert a claim.  *AGC*, 459 U.S. at

542.  As the Tenth Circuit observed in a case where the plaintiffs were only indirectly impacted

by the defendants' alleged conduct, "[w]ere we to permit standing in this case, there would be no

principled way to cut off a myriad of other indirect claimants."  *Sharp*, 967 F.2d at 409.

Fifth, plaintiffs' alleged damages are entirely speculative, and this, too, compels the

conclusion that plaintiffs lack standing.  *Id.*  Plaintiffs plead no facts from which to establish the

amount of any alleged overcharge on the retail prices of the refined petroleum products that they

36

purchased.  Instead, plaintiffs simply speculate that defendants' production decisions—made in the face of numerous external pressures—artificially increased defendants' crude oil prices by some unspecified amount (despite their tiny collective share of the crude oil market), which in turn caused refineries to increase (by some unspecified amount) the prices they charged for their refined petroleum products, which in turn increased (by some unspecified amount) the myriad prices that various middlemen that purchased the refined products charged each other, which in turn increased (by some unspecified amount) the various prices that retail dealers charged to consumers like plaintiffs.  Such transitive conjecture is inadequate to permit a factfinder to calculate plaintiffs' damages with any degree of reasonable certainty.  *Id.* at 409-10.  Courts frequently dismiss cases at the pleading stage when, as here, the alleged damages are speculative.  *See id.*; *see also Supreme Auto Transp. LLC*, 238 F. Supp. 3d at 1041.

Sixth, it is clear that "there is a risk of duplicative recoveries or the necessity of apportioning damages if plaintiffs are allowed standing."  *Sharp*, 967 F.2d at 410.  When there are many market participants that dealt more directly with defendants, all of which might make a claim for damages caused by defendants' alleged conduct, there is a risk either that defendants would be subjected to duplicative damages or that the Court would need to engage in the complex process of apportioning damages among potential plaintiffs at different levels of the distribution chain.  Courts often dismiss cases at the pleading stage when the case presents a risk of duplicative recovery or requires the apportionment of damages among multiple claimants at different levels of a multi-tiered distribution chain.  *See id.*; *see also Supreme Auto Transp. LLC*, 238 F. Supp. 3d at 1040-41.

For all of the foregoing reasons, plaintiffs lack standing under *AGC* and its progeny, and their complaint should be dismissed in its entirety.

**C.**    **Plaintiffs' Various State Law Claims Fail for Additional Reasons**

      **1.**    **All of Plaintiffs' State Law**
              **Claims (Counts 2-54) Fail With Their Sherman Act Claim**

The failure of plaintiffs' federal antitrust claim also defeats their state antitrust and consumer protection claims because "[t]he factual bases and theories of injury for these claims are the same as those for [plaintiffs'] Sherman Act claims." *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1073 (N.D. Cal. 2019) (dismissing state antitrust and consumer protection claims because Sherman Act claims were deficient). Courts routinely dismiss parallel state claims when the complaint fails to state a federal antitrust claim.[14] Indeed, through statutory or common law harmonization rules, the antitrust statutes of the thirty states and the District of Columbia on which plaintiffs rely are expressly intended to mirror federal antitrust law and to be construed consistently with the Sherman Act. (*See* Appendix C.) Because plaintiffs simply append their state law claims—supported only by the same conclusory factual allegations that underpin their federal antitrust claim and references to the elements of state

---

[14] *See, e.g., Ass'n of Surgical Assistants v. Nat'l Bd. Of Surgical Tech. & Surgical Assisting*, No. 23-1344, 2025 WL 249387, at *6 n.11 (10th Cir. Jan. 21, 2025) (Colorado antitrust claims "fail[ed] for the same reason [as the] federal claims"); *Compliance Mktg., Inc. v. Drugtest, Inc.*, Civil Action No. 09-cv-01241-JLK, 2010 WL 1416823, at *17 (D. Colo. Apr. 7, 2010) (dismissing California, Colorado, Louisiana, Oklahoma, and Texas state antitrust claims because "these claims [were] predicated on the same alleged conduct as Plaintiffs' federal antitrust claims"); *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 848 (N.D. Ill. 2020) (dismissing companion state antitrust and consumer protection claims because plaintiffs failed to state a federal claim), *aff'd sub nom. Mayor & City Council of Balt. v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022); *Davis v. AT&T Wireless Servs. Inc.*, No. CV 11-02674 DDP (RZx), Docket No. 54, 2012 WL 692413, at *2 (C.D. Cal. Mar. 1, 2012) (holding that if state law claims are "entirely dependent" on plaintiffs' federal antitrust claims, and plaintiffs fail to allege plausible antitrust claims, plaintiffs' state law claims must also fail), *aff'd*, 570 F. App'x 652 (9th Cir. 2014); *Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 467 (D.N.J. 2018) (dismissing 24 state antitrust claims and 26 state consumer protection claims because plaintiff's "state antitrust and consumer protection claims fail[ed] for the same reasons that [its] federal antitrust claims fail[ed]").

statutes—their state law claims fail alongside the core price-fixing claim they duplicate for the reasons explained above. *See In re Humira*, 465 F. Supp. 3d at 848 ("[B]ecause the complaint is shaped by its antitrust theories, once those theories fall out of the case it becomes difficult to assess how the allegations satisfy the unfair or unconscionable standards of various states' laws.").

### 2. Plaintiffs Lack Article III Standing to Assert Claims Under West Virginia Law (Count 53)

Plaintiffs in a putative class action lack standing to assert claims under the laws of states other than those where a plaintiff resides or was injured. *See Jones*, 400 F. Supp. 3d at 908. To have standing under Article III to bring a state-law antitrust or related consumer protection claim in a price-fixing class action, a named plaintiff must "reside[] in, do[] business in, or ha[ve] some other connection to that state." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1310 (D. Kan. 2018) (citation omitted). "Prior to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole—that unnamed plaintiffs might have a case or controversy is irrelevant." *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1159 (10th Cir. 2011). Here, plaintiffs assert a claim under the West Virginia Antitrust Act, even though no named plaintiff allegedly resides in or made purchases in West Virginia. Accordingly, plaintiffs lack standing to assert their West Virginia claim, and Count 53 should be dismissed on this independent ground.

### 3. Indirect Purchasers Are Barred From Bringing Class Action Antitrust and/or Consumer Protection Claims Under the Laws of Illinois, Montana, and South Carolina (Counts 15, 16, 29, and 47)

Plaintiffs are barred from bringing antitrust or consumer protection class action suits under the laws of Illinois, Montana, and South Carolina. *See, e.g.*, *In re Humira*, 465 F. Supp. 3d at 850 (N.D. Ill. 2020) (explaining that while Illinois permits indirect purchasers to sue for

antitrust money damages, it prohibits class action antitrust claims brought by indirect

purchasers); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 372 (D.R.I. 2019)

(dismissing Illinois class action antitrust claims and Illinois class action consumer protection

claim, explaining that indirect purchasers "do not have standing to maintain what is in essence an

antitrust claim by another name under the Illinois Consumer Fraud and Deceptive Business

Practices Act"); Mont. Code Ann. § 30-14-133(1)(a) ("[A] consumer who suffers any

ascertainable loss of money or property, real or personal, as a result of the use or employment by

another person of a method, act, or practice declared unlawful . . . may bring an individual but

not a class action."); *Estate of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 406 (E.D. Mich.

2023) (finding that "the class-action prohibition [like the one contained in the Montana

Consumer Protection Act] is a substantive limitation and not merely a procedural one"); S.C.

Code Ann. § 39-5-140(a) ("Any person who suffers any ascertainable loss of money or property,

real or personal," as a result of unfair, deceptive, or unlawful trade practices, "may bring an

action individually, but not in a representative capacity, to recover actual damages."); *In re TD

Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F. Supp. 3d 593, 635 (D.S.C 2015) ("[C]lass

actions are not permissible under the [South Carolina Unfair Trade Practices Act].").

Accordingly, Counts 15, 16, 29, and 47 should be dismissed.

### 4.    State-Specific Deficiencies That Bar Individual State Antitrust Claims

#### a.    Indirect Purchaser Actions Are Barred in Part In Colorado and New Jersey (Counts 8 and 36)

Plaintiffs' claims under Colorado and New Jersey antitrust law fail in part because those

states only recently began to permit indirect purchaser antitrust claims.  Plaintiffs' claims that

predate the adoption of the Colorado and New Jersey indirect purchaser amendments are not

cognizable under those states' antitrust acts and should therefore be dismissed.

40

Colorado amended its antitrust statute to allow indirect purchaser actions on June 7, 2023. *See* Colo. Rev. Stat. Ann. § 6-4-115. When the legislature revised the statute, the bill explicitly noted that the amendment "applie[d] to conduct occurring on or after the effective date of this act." H.B. 23-1192 § 7, 74th Gen. Assemb., First Reg. Sess. (Colo. 2023). To the extent that Count 8 of the complaint seeks recovery for alleged conduct that occurred before June 7, 2023, that count should be dismissed in part.

Similarly, New Jersey amended its antitrust statute to allow indirect purchaser actions on August 5, 2022. *See* N.J. Stat. Ann. § 56:9-12. The assembly bill revising the statute states that the revision "shall take effect immediately" and is not retroactive. *See* H.B. 96-1556 § 5, 220th Legis., First Annual Sess. (N.J. 2022). To the extent that Count 36 seeks recovery for alleged conduct that occurred before August 5, 2022, that count likewise should be dismissed in part.

> **b.    Plaintiffs Fail to Allege In-State Conduct or Injury Sufficient to State a Claim Under the Alabama, Mississippi, or West Virginia Antitrust Laws (Counts 3, 27, and 53)**

Plaintiffs fail to state claims under Alabama, Mississippi, and West Virginia antitrust law because they fail to allege that defendants engaged in anticompetitive conduct within those states. *See Abbott Labs. v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999) (Alabama's antitrust statutes "regulate monopolistic activities that occur within this state—within the geographic boundaries of this state—even if such activities fall within the scope of the Commerce Clause of the Constitution of the United States."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 550 (N.D. Ill. 2019) (dismissing Alabama antitrust claim for failure to allege sufficient intrastate conduct); *State ex rel. Fitch v. Yazaki N. Am. Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020) (a "material element" under the Mississippi Antitrust Act "is that the illegal objective of the trust be accomplished in part at least by transactions lying wholly within the state" (citation omitted));

41

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266 ("[T]he antitrust law of Mississippi focuses on the location where the anticompetitive conduct occurred rather than the effects of such anticompetitive conduct or the broader nexus between the conduct and the state in question."); *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 WL 5166014, at *25 (E.D. Tenn. June 24, 2015) ("A plaintiff seeking to state a claim under the West Virginia Antitrust Act must also allege that the wrongful conduct has produced 'in-state effects.'" (citation omitted)).  Accordingly, Counts 3, 27, and 53 should be dismissed on this additional ground.

      **c.**     **Plaintiffs Have Not Complied With Statutory Notice Prerequisites to File an Antitrust Suit in Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, or Utah (Counts 4, 8, 10, 14, 32, 39, 45, and 51)**

The state antitrust laws of Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, and Utah all require that prospective indirect purchaser plaintiffs provide pre-suit notice to their respective state attorneys general.  (*See* Appendix D.)  Such pre-suit notice requirements are substantive, and failure to comply with them constitutes a failure of the claim. *In re Santa Fe Natural Tobacco Co. Mktg. & Sales Practices & Products Liab. Litig.*, 288 F. Supp. 3d 1087, 1254-55 (D.N.M. 2017).  Because the complaint does not allege compliance with these requirements, Counts 4, 8, 10, 14, 32, 39, 45, and 51 must be dismissed.  *See, e.g.*, *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 390 (D.N.J. 2018) (dismissing Arizona, Nevada, and Utah antitrust claims for failure to comply with statutory notice requirements).

5.      **State-Specific Deficiencies That Bar**
        **Individual State Consumer Protection Claims**

a.      **Plaintiffs Who Made Purchases for Business or**
        **Commercial Purposes Are Not Proper Plaintiffs Under the**
        **Consumer Protection Statutes of the District of Columbia,**
        **Maryland, Minnesota, Missouri, Montana, Nevada, and**
        **Oregon (Counts 12, 21, 26, 28, 29, 33, and 43)**

The consumer protection statutes of the District of Columbia, Maryland, Minnesota,

Missouri, Montana, Nevada, and Oregon permit suits only by consumers, not by business entities

or other persons purchasing goods and services for commercial, as opposed to personal or

household, use.  *See*, *e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042,

2013 WL 1431756, at *22 (E.D. Mich. Apr. 9, 2013) (District of Columbia's Consumer

Protection Procedures Act defines "a 'consumer' as a person who receives or demands goods or

services that are primarily for personal, household, or family use"); *D&G Flooring, LLC v.*

*Home Depot U.S.A., Inc.*, 346 F. Supp. 2d 818, 823 (D. Md. 2004) ("The Maryland Court of

Appeals has . . . [held] that the CPA applies only where the purchaser intends to use the goods

for 'personal, household, family, or agricultural purposes.'" (citation omitted)); *In re Broiler*

*Chicken Antitrust Litig.*, No. 16 C 8637, 2023 WL 5227130, at *3 (N.D. Ill. Aug. 15, 2023)

(Minnesota consumer protection statutes "apply to only 'consumer' transactions as opposed to

purchases for 'business purposes.'" (citation omitted)); *In re Express Scripts, Inc., Pharmacy*

*Benefits Mgmt. Litig.*, MDL No. 1672, 2006 WL 2632328, at *10 (E.D. Mo. Sept. 13, 2006)

(plaintiff in Missouri Merchandising Practices Act claim must have purchased products or

services for "personal, family, or household purposes" and not for the "business purpose" of

serving clients); *In re DRAM*, 516 F. Supp. 2d at 1104 (dismissing claims under the Montana

consumer protection statute because commercial plaintiffs failed to allege that they purchased the

goods in question primarily for "personal, family, or household purposes"); *In re Cast Iron Soil*

*Pipe*, 2015 WL 5166014, at *31 (dismissing Nevada Deceptive Trade Practices Act claim as it was not brought by a "natural person"); *Ave. Lofts Condos. Owners' Ass'n v. Victaulic Co.*, 24 F. Supp. 3d 1010, 1015 (D. Or. 2014) ("Oregon courts have long held the UTPA 'applies only to consumer transactions; it does not regulate commercial transactions.'" (citation omitted)).

The named plaintiffs bringing claims under the consumer protection laws of the District of Columbia, Maryland, Minnesota, Missouri, Montana, Nevada, and Oregon are not consumers who are purchasing refined petroleum products for their personal or household use.  Those plaintiffs—Kevin Allen d/b/a Kevin Allen Photography (Counts 12 and 21), Mayor and City Council of Baltimore (Count 21), Waypoint Residential LLC (Counts 21, 29, and 33), Hayday Farms LLP (Count 26), Samantha Barsky d/b/a Noteify (Counts 26, 29, and 43), Best Expedite, Inc. (Counts 28 and 29), Western Cab Company (Count 33), Robert Jones (Count 33), Garvin Promotion Group LLC (Counts 29, 33, and 43), and TBC Services, LLC (Count 33)—concede that they purchased refined petroleum products for business or commercial use.  (Compl. ¶¶ 23, 39, 42, 48, 53, 58, 60, 62, 68-69.)  Their consumer protection claims under the laws of the District of Columbia, Maryland, Minnesota, Missouri, Montana, Nevada, and Oregon—Counts 12, 21, 26, 28, 29, 33, and 43—should be dismissed on this additional basis.

### b. Indirect Purchaser Actions Are Barred Under the Consumer Protection Laws of Arkansas, Missouri, and South Carolina (Counts 2, 28, and 47)

Plaintiffs' consumer protection claims under Arkansas, Missouri, and South Carolina law are barred because these states do not allow indirect purchaser claims.  Indirect purchasers are not permitted to bring actions under the antitrust statutes of these states, and courts have prohibited the use of these states' consumer protection laws as an "end run" around the ban on indirect purchaser claims.  *See, e.g.*, *Indep. Cnty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 888-89

(E.D. Ark. 2008) (explaining that Arkansas' consumer protection statute incorporates the "remoteness doctrine," which requires a <u>direct link</u> in between Defendants' products and Plaintiffs' damages"), *aff'd sub nom. Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 701-02 (E.D. Pa. 2014) (plaintiffs could not use Missouri consumer protection law as an end-run around prohibition against antitrust claims by indirect purchasers); *In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516 (SRU), 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (dismissing South Carolina Unfair Trade Practices Claim because "[t]he rule of *Illinois Brick* appears to control in South Carolina").  Counts 2, 28, and 47, which are simply antitrust claims presented as "consumer fraud," must therefore be dismissed.

> ### c.    Indirect Purchaser Plaintiffs Who Made Purchases for Business or Commercial Purposes Are Not Proper Plaintiffs <u>Under the Massachusetts Consumer Protection Act (Count 22)</u>

The state consumer protection law of Massachusetts prohibits businesses from bringing indirect purchaser actions.  *See*, *e.g.*, *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d at 373 (holding that a business (as opposed to a consumer) may bring a claim only under section 11 of Massachusetts' consumer protection statute, and "Massachusetts courts apply the *Illinois Brick* indirect-purchaser rule to section 11" claims).  Waypoint Residential, LLC, a named plaintiff bringing a Massachusetts consumer protection claim, concedes that it purchased refined petroleum products for business or commercial use.  (Compl. ¶¶ 68, 317.)  Accordingly, Count 22 should be dismissed with respect to plaintiff Waypoint Residential, LLC.

       **d.**     **Price-Fixing Claims Are Not Cognizable Consumer Protection Claims in the District of Columbia, Arkansas, Illinois, Maryland, Michigan, New Mexico, Oregon, Pennsylvania, Rhode Island, South Carolina, or South Dakota (Counts 2, 12, 16, 21, 24, 38, 43, 44, 46, 47, and 49)**

Plaintiffs' consumer protection claims, which are predicated entirely on plaintiffs' price-fixing allegations, are not cognizable under Illinois, Maryland, Michigan, Oregon, Pennsylvania, Rhode Island, South Carolina, or South Dakota consumer protection statutes. *See*, *e.g.*, *Gaebler v. New Mex. Potash Corp.*, 285 Ill. App. 3d 542, 544 (Ill. App. Ct. 1996) ("classic antitrust allegations dressed in Consumer Fraud Act clothing" cannot survive a motion to dismiss in Illinois (citation omitted)); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 188 (D. Me. 2004) ("[the Maryland Consumer Protection Act's] proscription of unfair and deceptive acts does not include antitrust violations"); *In re Cast Iron Soil Pipe*, 2015 WL 5166014, at *29 (plain language of the Michigan Consumer Protection Act does not include price-fixing claims); *In re Graphics Processing*, 527 F. Supp. 2d at 1030 (dismissing price-fixing claims brought under the Oregon Unfair Trade Practices Act); *In re DRAM*, 516 F. Supp. 2d at 1115-16 (dismissing price-fixing claims brought under the Oregon Unfair Trade Practices Act and dismissing Rhode Island consumer protection claim because "plaintiffs' allegations of price-fixing and conspiracy [do not] fall within the enumerated list of conduct and activity" prohibited by the state consumer protection statutes);[15] *In re K-Dur Antitrust Litig.*, Civil Action No. 01-

---

[15] The Oregon Unlawful Trade Practices Act includes a list of prohibited unlawful practices. Or. Rev. Stat. § 646.608(1). Price fixing is not a listed prohibited practice, though the statute contains a catchall provision stipulating that a person violates the statute if he or she "[e]ngages in any other unfair or deceptive conduct in trade or commerce." *Id.* § 646.608(1)(u). Nevertheless, to bring a claim under Section 646.608(1)(u), the Oregon Attorney General must first establish a rule declaring the conduct to be unfair or deceptive in trade or commerce. *Id.* § 646.608(4). The Oregon Attorney General has not declared price fixing as an included offense within the Oregon Unlawful Trade Practices Act.

1652 (JAG), MDL Docket No. 1419, 2008 WL 2660778, at *3 (D.N.J. Feb. 25, 2008)

("Pennsylvania has no general antitrust statute, nor any statute creating a private right of action

against restraints of trade."); *In re Aggrenox*, 2016 WL 4204478, at *9 (South Carolina consumer

protection law cannot act as a surrogate for antitrust law); *In re Hard Disk Drive Suspension*

*Assemblies Antitrust Litig.*, Case No. 19-md-02918-MMC, 2021 WL 4306018, at *19 (N.D. Cal.

Sept. 22, 2021) (plaintiffs cannot base their South Dakota Deceptive Trade Practices and

Consumer Protection Act claim on price-fixing allegations).

      Plaintiffs' District of Columbia, Arkansas, and New Mexico consumer protection claims

similarly fail because price fixing does not fall within the scope of the statutes. The consumer

protection statutes of those jurisdictions prohibit "deceptive" or "unconscionable" conduct. D.C.

Code § 28-3904 (prohibiting "unfair or deceptive trade practice[s]"); *id.* § 28-3904(r)

(prohibiting a variety of "unconscionable" sale terms); Ark. Code Ann. § 4-88-107(a), (a)(10)

(prohibiting "[d]eceptive and unconscionable trade practices" including any "unconscionable,

false, or deceptive act or practice in business, commerce, or trade"); N.M. Stat. Ann. § 57-12-3

(prohibiting "[u]nfair or deceptive trade practices and unconscionable trade practices"). Courts

have held that allegations of price fixing do not fall within these statutes' definition of deceptive

or unconscionable conduct. "[P]leading unconscionability requires something more than merely

alleging that the price of a product was unfairly high. . . . [A]llegations of price fixing . . . are not

the kind of conduct prohibited under these statutes." *In re Graphics Processing*, 527 F. Supp. 2d

at 1029-30 (dismissing Arkansas, New Mexico, and District of Columbia consumer protection

claims).

      Because plaintiffs may not predicate their District of Columbia, Arkansas, Illinois,

Maryland, Michigan, New Mexico, Oregon, Pennsylvania, Rhode Island, South Carolina, and

South Dakota unfair trade practices claims on their price-fixing allegations, Counts 2, 12, 16, 21, 24, 38, 43, 44, 46, 47, and 49 should be dismissed.

        **e.**    **Plaintiffs' Failure to Allege In-State Conduct Compels Dismissal of Plaintiffs' Illinois and New Hampshire Consumer Protection Claims (Counts 16 and 35)**

Plaintiffs fail to state claims under the Illinois and New Hampshire consumer protection laws because they do not allege facts showing that any actions in furtherance of the alleged conspiracy occurred within these jurisdictions. To bring a claim under the Illinois Consumer Fraud Act, the "circumstances that relate to the disputed transaction [must] occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005). Similarly, the New Hampshire Consumer Protection Act applies only when the "offending conduct" occurred within the borders of New Hampshire. *See Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 504 (D.N.H. 1996) (citation omitted); *see In re Lithium Ion Batteries Antitrust Litig.*, Case No. 13-MD-2420 YGR, 2014 WL 4955377, at *22 (N.D. Cal. Oct. 2, 2014) ("[M]erely selling a good in New Hampshire is not enough when the proscribed conduct occurs elsewhere."). For this additional reason, Counts 16 and 35 should be dismissed.

        **f.**    **Plaintiffs Do Not Meet Rule 9(b)'s Heightened Pleading Standard for Claims Sounding in Fraud as Required Under the Consumer Protection Statutes of Florida, Michigan, and Pennsylvania (Counts 13, 24, and 44)**

Plaintiffs' claims under the Florida, Michigan, and Pennsylvania consumer protection laws fail because plaintiffs have not pleaded these claims with the particularity required by Federal Rule of Civil Procedure 9(b). Each of these statutory regimes sounds in fraud and requires compliance with Rule 9(b) to state a claim for relief. *See WrestlemaniaReunion, LLC v. Live Nation Television Holdings, Inc.*, No. 8:07-cv-2093-JDW-MSS, 2008 WL 3048859, at *3 (M.D. Fla. Aug. 4, 2008) (claims under the Florida Deceptive and Unfair Trade Practices Act

must be pleaded with the particularly required by Rule 9(b)); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) (dismissing Florida Deceptive and Unfair Trade Practices Act Claim for failure to allege fraud with particularity); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1076 (S.D. Cal. 2017) (because Michigan's Consumer Protection Act does not cover antitrust violations, "the only manner in which Plaintiffs may assert a violation of the MCPA is through fraud, and therefore Rule 9(b)'s heightened pleading standard applies"); *In re New Motor Vehicles*, 350 F. Supp. 2d at 200 (dismissing claim under Pennsylvania consumer protection statute, which prohibits false and misleading conduct that is likely to create confusion or misunderstanding, for failing to adequately allege fraud or deception).

"At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud, and [plaintiff] must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *U.S. ex rel. Lacy v. New Horizons, Inc.*, 348 F. App'x 421, 424 (10th Cir. 2009) (citation omitted). Plaintiffs do not allege any false or misleading representation, and they manifestly have not pleaded the elements of fraud with the particularity required by Rule 9(b). Accordingly, Counts 13, 24, and 44 should be dismissed on this ground as well.

### g.    Plaintiffs Fail to Allege Reliance as Required By the Consumer Protection Statutes of Arkansas, Maryland, and Pennsylvania (Counts 2, 21, and 44)

Plaintiffs' claims under the consumer protection laws of Arkansas, Maryland, and Pennsylvania fail because plaintiffs do not allege that they relied on any deception to their detriment. *See* Ark. Code Ann. § 4-88-113(f)(1)(A) ("A person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter

may bring an action to recover his or her actual financial loss."); *Hoffman v. Stamper*, 843 A.2d 153 (Md. Ct. Spec. App. 2004) (reasonable reliance necessary for recovery), *aff'd in relevant part on other grounds, rev'd in part on other grounds*, 867 A.2d 276, 294-95 (Md. 2005); *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186 (Pa. 2007) (reliance is an element of a Pennsylvania Uniform Deceptive Acts and Practices claim). Plaintiffs do not plead that they relied on any allegedly deceptive act of any defendant when they made their retail purchases of refined petroleum products from third-party vendors. Accordingly, Counts 2, 21, and 44 should be dismissed on this ground as well.

### h.    Plaintiffs Fail to Allege That They Are Elderly or Disabled Under Nevada Law (Count 33)

Plaintiffs allege that defendants violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, but only "an elderly person or a person with a disability" may invoke this statute. Nev. Rev. Stat. § 598.0977. Because the Nevada plaintiffs do not allege that they are elderly or disabled, Count 33 should be dismissed. *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234 (M.D. Pa. 2010) (dismissing Nevada consumer protection claim).

## <u>CONCLUSION</u>

For all the foregoing reasons, defendants respectfully request this Court to dismiss plaintiffs' complaint in its entirety with prejudice.

Dated: February 24, 2025                                    Respectfully submitted,

*/s/ Boris Bershteyn*
Boris Bershteyn
Karen M. Lent
Michael H. Menitove
Zachary C. Siegler
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West

New York, New York 10001-8602
Telephone: (212) 735-3000
boris.bershteyn@skadden.com
karen.lent@skadden.com
michael.menitove@skadden.com
zachary.siegler@skadden.com

Samuel G. Liversidge
Jay P. Srinivasan
S. Christopher Whittaker
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
sliversidge@gibsondunn.com
jsrinivasan@gibsondunn.com
cwhittaker@gibsondunn.com

Eric R. Burris
BROWNSTEIN HYATT
  FARBER SCHRECK, LLP
201 Third Street NW, Suite 1800
Albuquerque, NM 87102-4386
Telephone: (505) 244-0770
eburris@bhfs.com

*Attorneys for Defendant*
*Pioneer Natural Resources Company*


By: _/s/ John M. Taladay_____
John M. Taladay
Christopher Wilson
Kelsey Paine
Megan Tankel
Fran Jennings
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001-5692
Tel: (202) 639-7909
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
kelsey.paine@bakerbotts.com
megan.tankel@bakerbotts.com
fran.jennings@bakerbotts.com

Benjamin F. Feuchter
Thomas C. Bird
JENNINGS HAUG KELEHER MCLEOD
201 Third Street NW, Suite 1200
Albuquerque, NM 87102
Tel: (505) 346-4646
bf@jhkmlaw.com
tcb@jhkmlaw.com

*Attorneys for Defendant*
*EOG Resources, Inc.*


By: */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
Jeffrey J. Amato
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
jkessler@winston.com
jamato@winston.com

Thomas M. Melsheimer
Thomas B. Walsh, IV
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Tel: (212) 294-6700
tmelsheimer@winston.com
twalsh@winston.com

Benjamin Allison
Billy Trabaudo
BARDACKE ALLISON MILLER LLP
P.O. Box 1808
141 E. Palace Avenue
Santa Fe, NM 87501
Tel: (505) 995-8000
ben@bardackeallison.com
billy@bardackeallison.com

*Attorneys for Defendant*
*Diamondback Energy, Inc.*

By: */s/ Marguerite M. Sullivan*
Marguerite M. Sullivan
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Marguerite.Sullivan@lw.com

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Lawrence.Buterman@lw.com

*Attorneys for Defendant*
*Expand Energy Corporation*
*(F/K/A Chesapeake Energy Corporation)*


By: */s/ Kevin S. Schwartz*
Kevin S. Schwartz
David A. Papirnik
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Tel: (212) 403-1062
kschwartz@wlrk.com

*Attorneys for Defendants*
*Hess Corporation and John Hess*


By: */s/ Jeffrey J. Zeiger.*
Jeffrey J. Zeiger
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Tel: 312-862-3237
jzeiger@kirkland.com

Devora W. Allon

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: 212-446-5967
devora.allon@kirkland.com

Earl E. DeBrine, Jr.
MODRALL SPERLING
500 4th St. NW, Suite 1000
Albuquerque, NM 87102
Tel: (505) 848-1800
earl.debrine@modrall.com

*Attorneys for Defendant*
*Occidental Petroleum Corporation*


By: */s/ Christopher E. Ondeck*
Christopher E. Ondeck
Stephen R. Chuk
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW
Suite 600 South
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

Kyle A. Casazza
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 284-5677
kcasazza@proskauer.com

Jared DuBosar
PROSKAUER ROSE LLP
2255 Glades Road, Suite 421 Atrium
Boca Raton, FL 33431
Telephone: (561) 995-4702
jdubosar@proskauer.com

Hannah Silverman
Henrique Carneiro
PROSKAUER ROSE LLP

Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3193
Facsimile: (212) 969-2900
hsilverman@proskauer.com
hcarneiro@proskauer.com

Michael Burrage
WHITTEN BURRAGE
512 North Broadway Avenue, Ste 300
Oklahoma City, OK 73102
Tel: (888) 783-0351
mburrage@whittenburragelaw.com

H. Brook Laskey
MCCOY LEAVITT LASKEY LLC
317 Commercial St. NE, Suite 200
Albuquerque, NM 87102
Telephone: (505) 246-0455
blaskey@MLLlaw.com

*Attorneys for Defendant*
*Continental Resources, Inc.*


By: */s/ Michael W. Scarborough*
Michael W. Scarborough
Dylan I. Ballard
VINSON & ELKINS LLP
555 Mission Street, Suite 2000
San Francisco, CA 94105
Tel: (415) 979–6900
mscarborough@velaw.com
dballard@velaw.com

Craig P. Seebald
Stephen M. Medlock
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW, Suite 500 West
Washington, DC 20037
Tel: (202) 639-6500
cseebald@velaw.com
smedlock@velaw.com

*Attorneys for Defendant*
*Permian Resources Corporation*

By: _/s/ David I. Gelfand_____
David I. Gelfand
Jeremy J. Calsyn
Joseph M. Kay
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
2112 Pennsylvania Avenue NW
Ste 1000
Washington, DC 20037
Tel: (202) 974-1690
dgelfand@cgsh.com
jcalsyn@cgsh.com
jkay@cgsh.com

Kurt A. Sommer
SOMMER, UDALL, SUTIN, HARDWICK &
HYATT, PA
PO Box 1984
Santa Fe, NM 87504
Tel: (505) 982-4676
kas@sommerudall.com

*Attorneys for Defendant*
*Scott D. Sheffield*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 24, 2025, true and correct copies of (i) Defendants' Joint Motion to Dismiss and (ii) Defendant Pioneer Natural Resources Company's Motion to Dismiss for Lack of Personal Jurisdiction were filed electronically pursuant to CM/ECF procedure for the District of New Mexico, which caused the parties to be served via electronic means.

Dated:  February 24, 2025

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By /s/ Boris Bershteyn
    Boris Bershteyn
    Karen M. Lent
    Michael H. Menitove
    Zachary C. Siegler
    SKADDEN, ARPS, SLATE,
        MEAGHER & FLOM LLP
    One Manhattan West
    New York, New York 10001-8602
    Telephone: (212) 735-3000
    boris.bershteyn@skadden.com
    karen.lent@skadden.com
    michael.menitove@skadden.com
    zachary.siegler@skadden.com

    Samuel G. Liversidge
    Jay P. Srinivasan
    S. Christopher Whittaker
    GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
    Los Angeles, CA 90071-3197
    Telephone: (213) 229-7000
    sliversidge@gibsondunn.com
    jsrinivasan@gibsondunn.com
    cwhittaker@gibsondunn.com

Eric R. Burris
BROWNSTEIN HYATT FARBER SCHRECK, LLP
201 Third Street NW, Suite 1800
Albuquerque, NM 87102-4386
Telephone: (505) 244-0770
eburris@bhfs.com

*Attorneys for Defendant*
*Pioneer Natural Resources Company*