**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation*<br><br>This Document Relates to:<br><br>ALL ACTIONS. | Case No. 1:24-md-03119-MLG-LF |

**PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' JOINT MOTION TO DISMISS (DKT. 129)**

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ...........................................................................................1

II.   FACTS ...............................................................................................................................2

III.  ARGUMENT .....................................................................................................................4

   A.   This Court Has Subject Matter Jurisdiction..............................................................4

      1.   Binding Supreme Court Precedent Bars Defendants' Justiciability Arguments............4

      2.   The Political Question Doctrine Does Not Bar Plaintiffs' Claims.................................7

         a.   *Baker* Factor 1: A Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department. ...............................................................8

         b.   *Baker* Factors 2 & 3: A Lack of Judicially Discoverable and Manageable Standards for Resolving It, and the Impossibility of Deciding Without an Initial Policy Determination of a Kind Clearly for Nonjudicial Discretion. .........................................10

         c.   *Baker* Factors 4 & 6: The Impossibility of a Court's Undertaking Independent Resolution Without Expressing Lack of the Respect Due Coordinate Branches of Government, and the Potentiality of Embarrassment from Multifarious Pronouncements by Various Departments on One Question. .....................................................................11

         d.   *Baker* Factor 5: An Unusual Need for Unquestioning Adherence to a Political Decision Already Made. .............................................................................................12

      3.   The Act of State Doctrine Also Does Not Bar Plaintiffs' Claims...............................12

      4.   Defendants' Authorities Do Not Dictate Otherwise...................................................14

   B.   Plaintiffs Sufficiently Plead a Plausible Antitrust Violation. ..........................................15

      1.   Plaintiffs Sufficiently Allege an Agreement Among Defendants. ...............................16

         a.   Plaintiffs' Evidence of Agreement. ...........................................................................18

         b.   Plaintiffs' Allegations of Agreement Are Bolstered by Additional Circumstantial Evidence................................................................................................................21

            i.   Plaintiffs' More Than Sufficiently Plead Parallel Conduct. .................................21

            ii.   "Plus Factors" Support the Inference of Agreement.............................................24

      2.   Defendants' Agreement Inflated the Price of Oil and Harmed U.S. Consumers of Gasoline and Other Petroleum-Derivative Products. .........................................................30

   C.   Plaintiffs Have Standing to Bring These Antitrust Claims..............................................30

      1.   The *AGC* Factors Do Not Apply at All in Many States.............................................31

      2.   Plaintiffs' Allegations Satisfy the *AGC* Factors.......................................................32

a.    Overcharges Paid by Plaintiffs Are the Type of Injury that the Antitrust Laws Seek to Redress—Factor 3 (Jnt. Mtn. at 35-36). ...........................................................................32

b.    Defendants' Conduct Caused Plaintiffs' Loss—Factor 1 (Jnt. Mtn. at 34-35)..........35

c.    The CCAC Sufficiently Alleges Intent—Factor 2 (Jnt. Mtn. at 35). ........................38

d.    Defendants' Production Restraint Directly Impacted the Price of Oil Derivative Products—Factor 4 (Jnt. Mtn. at 36). ..............................................................................39

e.    Damages Are Not Speculative—Factor 5 (Jnt. Mtn. at 36-37). ...............................39

f.    The Risk of Duplicative Recoveries and Apportionment of Damages Does Not Weigh Against Standing—Factor 6 (Jnt. Mtn. at 37). ......................................................40

D.    Plaintiffs Sufficiently Plead State Law Claims. ................................................................40

1.    Defendants' State Law Standing Arguments Are Premature.......................................41

a.    Plaintiffs Who Made Purchases for Business or Commercial Purposes Are Proper Plaintiffs Under the Consumer Protection Statutes of the District of Columbia, Minnesota, Missouri, Montana, Nevada, and Oregon (Counts 12, 26, 28, 29, 33, 43) (Jnt. Mtn. at 43-44)................................................................................................................42

b.    Indirect Purchaser Plaintiff Who Made Purchases for Commercial Purposes Is a Proper Plaintiff Under the Massachusetts Consumer Protection Act (Count 22) (Jnt. Mtn. at 45). ..................................................................................................................................44

c.    Plaintiffs Are Proper Plaintiffs to Bring a Suit under Nevada's Consumer Protection Laws (Count 33) (Jnt. Mtn. at 50). .................................................................44

d.    Plaintiffs have Article III Standing to Assert Claims under West Virginia Law (Count 53) (Jnt. Mtn. at 39). ..........................................................................................................45

2.    The Remainder of Defendants' State Law Arguments Fail........................................45

a.    Plaintiffs Are Permitted to Bring Class Action Claims Under the Antitrust and Consumer Protection Laws of Illinois, Montana, and South Carolina (Counts 15, 16, 29, 47) (Jnt. Mtn. at 39). ......................................................................................................45

b.    Indirect Purchaser Actions Are Not Barred In Colorado and New Jersey (Counts 8 and 36) (Jnt. Mtn. at 40). ................................................................................................46

c.    Plaintiffs Sufficiently Alleged In-State Conduct or Injury Sufficient to State a Claim Under the Alabama, Mississippi, and West Virginia Antitrust Laws (Counts 3, 27, 53) (Jnt. Mtn. at 41). ................................................................................................................46

d.    Plaintiffs Have Provided Notice to the Attorneys General of Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, and Utah (Counts 4, 8, 10, 14, 32, 39, 45, and 51) (Jnt. Mtn. at 42). ....................................................................................47

e.    Indirect Purchaser Actions Are Not Barred Under the Consumer Protection Laws of Arkansas, Missouri, and South Carolina (Counts 2, 28, and 47) (Jnt. Mtn. at 44-45). ......48

f.    Plaintiffs Have Adequately Alleged Price-Fixing Based Claims Under the Consumer Protection Statutes of Arkansas, the District of Columbia, Illinois, Michigan, New Mexico, Oregon, Pennsylvania, Rhode Island, South Carolina, and South Dakota (Counts 2, 12, 16, 24, 38, 43, 44, 46, 47, and 49) (Jnt. Mtn. at 46-48). .......................................48

g.    Plaintiffs Sufficiently Allege In-State Conduct for Their Illinois and New Hampshire Consumer Protection Claims (Counts 16 and 35) (Jnt. Mtn. at 48). ...............................48

h.    Plaintiffs Are Not Required to Meet a Heightened Pleading Standard Under the Florida, Michigan, and Pennsylvania Consumer Protection Statutes (Counts 13, 24, 44) (Jnt. Mtn. at 48-49). .........................................................................................................49

i.    Reliance Is Not Required Under the Consumer Protection Statutes of Arkansas and Pennsylvania (Counts 2 and 44) (Jnt. Mtn. at 49). ........................................................50

IV.    CONCLUSION .............................................................................................................50

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraham v. WPX Prod. Prods., LLC*,
    184 F. Supp. 3d 1150 (D.N.M. 2016) ................................................................... 42

*Adam A. Weschler & Son, Inc. v. Klank*,
    561 A.2d 1003 (D.C. Cir. 1989) ......................................................................... 42

*Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.*,
    352 N.W. 2d 1 (Minn. 1984) .............................................................................. 43

*In re Aftermarket Filters Antitrust Litig.*,
    2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ....................................................... 32

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) .................................................................. 26

*Alperin v. Vatican Bank*,
    410 F.3d 532 (9th Cir. 2005) ..................................................................... 4, 8, 10

*Anchem Prods., Inc., v. Windsor*,
    521 U.S 591 (1997) ............................................................................................ 41

*Anesthesia Advantage, Inc. v. Metz Grp.*,
    759 F. Supp. 638 (D. Colo. 1991) ......................................................... 29, 35, 36

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983) ..................................................................................*passim*

*In re Auto. Parts Antitrust Litig.*,
    50 F. Supp. 3d 836 (E.D. Mich. 2014) ............................................................... 34

*In re Auto. Parts Antitrust Litig. (Fuel Senders)*,
    29 F. Supp. 3d 982 (E.D. Mich. 2014) ............................................................... 34

*B & R Supermarket, Inc. v. Visa, Inc.*,
    2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ............................................ 19, 32

*B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*,
    439 F.3d 653 (10th Cir. 2006) ........................................................................... 30

iv

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................*passim*

*In re Beef Indus. Antitrust Litig.*,
600 F.2d 1148 (5th Cir. 1979) ...............................................................................38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 15, 16, 21

*Beltran v. InterExchange, Inc.*,
176 F. Supp. 3d 1066 (D. Colo. 2016) ...............................................................16

*Betsinger v. D.R. Horton, Inc.*,
126 Nev. 162, 232 P.3d 433 (2010) ....................................................................45

*Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*,
712 F. Supp. 3d 499 (D. Vt. 2024) .....................................................................46

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ...........................................................*passim*

*Brown v. JBS USA Food Co.*,
2023 WL 6294161 (D. Colo. Sept. 27, 2023) .....................................................25

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
452 F. Supp. 3d 1029 (D. Kan. 2020) .................................................................21

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) ......................................................38

*Cal. v. ARC Am. Corp.*,
490 U.S. 93 (1989) ................................................................................. 33, 40

*Casados v. Safeco Ins. Co. of Am.*,
2015 WL 11089527 (D.N.M. Nov. 6, 2015) .......................................................41

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 7805628 (N.D. Cal. Aug. 4, 2016), *rev'd and remanded on other
grounds*, 720 F. App'x 835 (9th Cir. 2017) ........................................................37

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ....................................................... 16, 17, 19, 21

*In re Chocolate Confectionary Antitrust Litig.*,
749 F. Supp. 2d 224 (M.D. Pa. 2010) ................................................................49

*Ciardi v. F. Hoffman-La Roche, Ltd.*,
   436 Mass. 53, 762 N.E.2d 303 (Mass. 2002)............................................................44

*Cnty. of San Mateo v. CSL Ltd.*,
   2014 WL 4100602 (N.D. Cal. Aug. 20, 2014) ........................................................38

*Cohlmia v. St. John Med. Ctr.*,
   693 F.3d 1269 (10th Cir. 2012)...............................................................................35

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ........................................................................................... 13, 14

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ....................................................................................27

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
   691 F.2d 1335 (9th Cir. 1982) ............................................................................ 37, 38

*In re Credit Default Swaps Auctions Litig.*,
   710 F. Supp. 3d 895 (D.N.M. 2023) ............................................................. 17, 20, 21

*Crownalytics, LLC v. SPINS LLC*,
   2024 WL 2111570 (D. Colo. May 10, 2024).............................................................24

*Custer Cnty. Action Ass'n v. Garvey*,
   256 F.3d 1024 (10th Cir. 2001)..................................................................................9

*D'Augusta v. Am. Petroleum Inst.*,
   2023 WL 137474 (N.D. Cal. Jan. 9, 2023)........................................................... 14, 15

*Darke v. Lurie Besikof Lapidus & Co., LLP*,
   550 F. Supp. 2d 1032 (D. Minn. 2008) ............................................................... 16, 17

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018)........................................................................21

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 919 (N.D. Ill. 2023)........................................................................23

*Def. for Child. Int'l-Palestine v. Biden*,
   107 F.4th 926 (9th Cir. 2024) ....................................................................................7

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010)......................................................................24

*In re Disposable Contact Lens Antitrust Litig.*,
   2019 WL 6463343 (M.D. Fla. Nov. 27, 2019) .......................................................29

*Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*,
   12 F.4th 1212 (10th Cir. 2021) .............................................................................4

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ................................................ 20, 23, 24, 28

*In re Domestic Drywall Antitrust Litig.*,
   2019 WL 4918675 (E.D. Pa. Oct. 3, 2019) .........................................................38

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ..........................................................30, 37

*Edgar v. Teva Pharm. Indus., Ltd.*,
   2024 WL 1282436 (D. Kan. Mar. 26, 2024) .......................................................47

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*,
   407 F.3d 1091 (10th Cir. 2005)............................................................................30

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) ..........................................................45, 50

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019)..................................................................28

*F.T.C. v. Super. Ct. Trial Lawyers Ass'n*,
   493 U.S. 411 (1990) ...............................................................................................6

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009)...............................................................31

*In re Fragrance Direct Purchaser Antitrust Litig.*,
   2025 WL 579639 (D.N.J. Feb. 21, 2025)....................................................*passim*

*In re Generic Pharms. Pricing Antitrust Litig.*,
   2023 WL 2244685 (E.D. Pa. Feb. 27, 2023) .......................................................27

*In re Generic Pharms. Pricing Antitrust Litig.*,
   368 F. Supp. 3d 814 (E.D. Pa. 2019).............................................................47, 48

*George v. Urban Settlement Servs.*,
   2017 WL 4222620 (D. Colo. Sept. 21, 2017).......................................................41

*Gibbons v. J. Nuckolls, Inc.*,
  216 S.W.3d 667 (Mo. 2007) ........................................................................48

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007)......................................................31

*Gym Door Repairs, Inc. v. New York City Dept. of Educ.*,
  2015 WL 3883243 (S.D.N.Y. June 23, 2015) .............................................21

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
  2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ............................................46

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
  527 F. Supp. 2d 1257 (D. Kan. 2007) .........................................................17

*Hendershot v. S. Glazer's Wine & Spirits of Okla., LLLP*,
  2021 WL 3501523 (N.D. Okla. Aug. 9, 2021) ............................................29

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ......................................................................18

*Honey Bum, LLC v. Fashion Nova, Inc.*,
  63 F.4th 813 (9th Cir. 2023) .......................................................................18

*In re Hydroxycut Mktg. & Sales Pracs. Litig.*,
  299 F.R.D. 648 (S.D. Cal. 2014)................................................................46

*Interstate Cir. v. United States*,
  306 U.S. 208 (1939) ....................................................................................16

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) ......................................................................................7

*Kerr v. Hickenlooper*,
  744 F.3d 1156 (10th Cir. 2014), *cert. granted, judgment vacated on other
  grounds*, 576 U.S. 1079 (2015)....................................................................8

*Kerr v. Hickenlooper*,
  759 F.3d 1186 (10th Cir. 2014)...................................................................10

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
  Amministrazione Straordinaria*,
  937 F.2d 44 (2d Cir. 1991) ...................................................................8, 10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ......................................................................37

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  897 F.3d 88 (2nd Cir. 2018) ............................................................42

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ............................................................37

*In re Lithium Ion Batteries Antitrust Litig.*,
  2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ........................... 31, 33, 48

*Llacua v. W. Range Ass'n*,
  930 F.3d 1161 (10th Cir. 2019)........................................................16

*In re Local TV Advert. Antitrust Litig.*,
  2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .......................................26

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ...........................................................40

*In re Loestrin 24 FE Antitrust Litig.*,
  410 F. Supp. 3d 352 (D.R.I. 2019).....................................................47

*Lorix v. Crompton Corp.*,
  736 N.W.2d 619 (Minn. 2007)...................................................... 32, 40

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*,
  2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ....................................49

*Mace v. Van Ru Credit Corp.*,
  109 F.3d 338 (7th Cir. 1997) ...........................................................47

*Maddox v. Adler*,
  2024 WL 4349481 (D. Nev. Sept. 29, 2024)......................................44

*Made in the USA Found. v. United States*,
  242 F.3d 1300 (11th Cir. 2001).........................................................11

*Malewicz v. City of Amsterdam*,
  517 F. Supp. 2d 322 (D.D.C. 2007) ..................................................13

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) .........................................................42

*Modern Mgmt. Co. v. Wilson*,
  997 A.2d 37 (D.C. Cir. 2010) ..........................................................42

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
292 F.R.D. 652 (D. Kan. 2013)................................................................50

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958)................................................................29

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004)................................................................43

*In re Optical Disk Drive Antitrust Litig.*,
2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ................................................................37

*Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*,
720 F. Supp. 3d 1087 (D.N.M. 2024)................................................................16

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ................................................................46

*In re Packaged Seafood Prods. Antitrust Litig.*,
338 F. Supp. 3d 1118 (S.D. Cal. 2018) ................................................................26

*In re Pork Antitrust Litig.*,
495 F. Supp. 3d 753 (D. Minn. 2020) ................................................................50

*Ports Petroleum Co., Inc. of Ohio v. Nixon*,
37 S.W.3d 237 (Mo. banc. 2001)................................................................43

*In re Potash Antitrust Litig.*,
667 F. Supp. 2d 907 (N.D. Ill. 2009), *aff'd sub nom. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) ................................................................31

*Powell v. McCormack*,
395 U.S. 486 (1969) ................................................................10

*R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in and for Cnty. of Clark*,
138 Nev. 585, 514 P.3d 425 (Nev. 2022) ................................................................43

*Ragner Tech. Corp. v. Berardi*,
324 F. Supp. 3d 491 (D.N.J. 2018) ................................................................38

*Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018) ................................................................19

*Riedel v. Bancam, S.A.*,
792 F.2d 587 (6th Cir. 1986) ................................................................12

*Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*,
    94 F.3d 1407 (10th Cir. 1996) ........................................................................................13

*Rivera v. Google Inc.*,
    238 F. Supp. 3d 1088 (N.D. Ill. 2017)...........................................................................48

*Schroder v. Bush*,
    263 F.3d 1169 (10th Cir. 2001).........................................................................................5

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) .........................21

*Searle v. Exley Exp., Inc.*,
    278 Or. 535, 564 P.2d 1054 (Or. 1977)..........................................................................43

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................................45, 46

*Sharp v. United Airlines, Inc.*,
    967 F.2d 404 (10th Cir. 1992) ........................................................................................32

*Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*,
    2024 WL 4884472 (D. Colo. Nov. 25, 2024) ............................................................24, 25

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    2015 WL 5458570 (D. Mass. Sept. 16, 2015) .................................................................49

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) .......................................................................................9, 15

*In re Sugar Indus. Antitrust Litig.*,
    579 F.2d 13 (3d Cir. 1978) .............................................................................................37

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
    238 F. Supp. 3d 1032 (N.D. Ill. 2017), *aff'd*, 902 F.3d 735 (7th Cir. 2018) .........................36

*Teague v. Bayer AG*,
    195 N.C. App. 18, 671 S.E.2d 550 (N.C. Ct. App. 2009) ....................................................32

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .....................................................................................17, 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008)....................................................................*passim*

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ................................................................. 17, 20

*U.S. Gypsum Co. v. Indiana Gas Co.*,
    350 F.3d 623 (7th Cir. 2003) ..................................................................38

*United States v. Sum of $70,990,605*,
    4 F. Supp. 3d 189 (D.D.C. 2014) .............................................................13

*United States v. Taubman*,
    297 F.3d 161 (2d Cir. 2002) ....................................................................20

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ............................................................................7, 9

*United States v. Trenton Potteries Co.*,
    273 U.S. 392 (1927) ................................................................................7

*In re Universal Serv. Fund Tel. Billing Pracs. Litig.*,
    300 F. Supp. 2d 1107 (D. Kan. 2003) ................................................. 22, 25

*In re Urethane Antitrust Litig.*,
    913 F. Supp. 2d 1145 (D. Kan. 2012) .......................................................20

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ...................................................................33

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) ...............................................................................10

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    872 F. Supp. 52 (S.D.N.Y. 1994) ...............................................................9

*Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*,
    133 F. Supp. 2d 1 (D.D.C. 1999) .............................................................13

*W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) ...............................................................................12

*In re Warfarin Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2000) ....................................................................34

*Woodard v. Fid. Nat. Title Ins. Co.*,
    2007 WL 5173415 (D.N.M. Dec. 4, 2007)..................................................41

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
   2022 WL 16729170 (11th Cir. Nov. 7, 2022) ....................................................42

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ...................................................................... 4, 8, 9, 10

**Statutes, Rules, and Regulations**

Federal Rule of Civil Procedure
   Rule 9.............................................................................................................49
   Rule 9(b) ..................................................................................................49, 50
   Rule 12...........................................................................................................41
   Rule 12(b)(1) .................................................................................................13
   Rule 12(b)(6) .................................................................................................13
   Rule 19...........................................................................................................13
   Rule 23.............................................................................................41, 42, 45
   Rule 23(b)(3) .................................................................................................42

Colo. Rev. Stat. §6-4-115 ...................................................................................46

Mich. Comp. Laws Ann. §445.903(1) ................................................................49

Minn. Stat. §645.44 subd. 7 ................................................................................43

Mo. Ann. Stat. §407.025 .....................................................................................43

Mont. Code Ann. §30-14-102(1) .........................................................................43

N.J. Stat. §56:9-12...............................................................................................46

Nev. Rev. Stat. §41.600.................................................................................43, 44

Nev. Rev. Stat. §598.0903...................................................................................44

Nev. Rev. Stat §598.0915-25..............................................................................44

ORS §646.605......................................................................................................43

*"Everybody's going to be disciplined, regardless whether it's $75 brent, $80 brent, or $100 brent. All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."* – Pioneer CEO Scott Sheffield, October 4, 2021

## I. PRELIMINARY STATEMENT

Plaintiffs plausibly allege that seven of the largest domestic shale producers and two of their CEOs formed a "cartel to constrain domestic production of shale oil in the United States." ¶16.[1]  Defendants, obligated by law to independently compete, chose to collude for their own benefit and the benefit of their interlocking shareholders.

Plaintiffs allege a domestic conspiracy to restrain U.S. shale oil production resulting in United States-based companies pulling less U.S. oil from U.S. oil fields.  Ignoring this, Defendants argue that OPEC's role in the global oil industry bars Plaintiffs' claims under the State Action and Political Question Doctrines.  Despite Defendants' contentions to the contrary, OPEC's participation in Defendants' conspiratorial meetings is not the basis for Plaintiffs' antitrust claims—which concern Defendants' agreement amongst themselves to coordinate domestic shale production and not any supplemental agreements with OPEC.  Defendants' horizontal output restriction is a *per se* violation of the Sherman Act.  Consequently, it does not matter *why* Defendants agreed amongst themselves to restrain their production, *only that they did*.  Nor does it matter whether OPEC also pursued their own parallel cartel activity.

Defendants also challenge Plaintiffs' Article III standing and their allegations on the merits. Both arguments fail.  Defendants' joint motion should be denied in its entirety.

---

[1] Unless otherwise noted, all ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Dkt. 86, and all terms and acronyms are defined and used as in the CCAC. As used herein, "OPEC" refers to the "Organization of Petroleum Exporting Countries," and references to OPEC from December 2016 onward include OPEC+.  *See* ¶95.

## II.    FACTS

From the start of the Shale Revolution in or around 2008, ¶97, until the onset of the COVID-19 pandemic in 2020, ¶138, vigorous competition in U.S. shale oil curbed OPEC's influence on global oil prices.  ¶100.  During that period, Defendants' ability to increase production and capitalize on high oil prices undercut OPEC's ability to profitably sustain high oil prices, ¶¶97-100, which is OPEC's explicit mission.  ¶93, n.6.  That U.S. shale production can influence oil prices is beyond question: OPEC's unsuccessful efforts to drive U.S. shale producers out of business from 2014 to 2016 through a global price war, ¶¶103-08, and U.S. shale's ability to act as a global swing producer, ¶¶100, n.19-21, 225-27, are both well-documented.

Having stared down OPEC and cut their respective break-even prices to around $40/bbl, ¶144, n.105, Defendants were well-positioned to benefit from their roles as global swing producers.  ¶137.  However, COVID-19 cratered gasoline demand, sending oil prices sharply lower.  ¶138.  But as demand for gasoline (and thus, oil, ¶13) rebounded sharply in 2021, Defendants abdicated their role as global swing producers.  ¶¶14, 140-43, 159-60.

Defendants' past response to rising global oil prices had been rapid expansion and market share acquisition.  ¶¶97-101.  But in 2021, Defendants collectively shifted 180° and adopted a "mantra of capital discipline," ¶143(d), and a new focus on maximizing "shareholder returns." ¶143(e).  Instead of seizing on sustained high prices to extract and sell more oil, Defendants each restricted production, ¶¶143, 149, stunning industry observers.  ¶¶144-50.

Defendants' CEOs stated publicly that they would cap production growth *no matter how high oil prices got*, ¶143(a), and openly encouraged other Defendants to "continue to stay in line," ¶149(a), and "remain disciplined."  ¶143(f).  All eight producer Defendants adopted this same

"mantra of capital discipline" despite oil prices far exceeding their respective breakeven costs. ¶¶143(d), 144, 150. Defendants were not spending the capital necessary to exploit their "huge inventory of high-quality" drilling opportunities, ¶149(c), in a stark departure from their pre-COVID behavior. ¶¶149(e), 161, Fig. 3. Defendants' production decisions in an industry that should be competitive, were economically irrational, and are strong evidence of agreement. ¶¶162-64.

Each Defendant curtailed domestic production and refused to fund expansion. ¶¶160-61. Defendants' agreement was successful. *Id.* Despite years of higher than pre-COVID oil prices, and record profits for Defendants, ¶161, Figs. 3-10, domestic shale production growth rates have still not returned to pre-COVID levels. ¶¶168-70, Figs. 11-13.

Notably, Defendants' anticompetitive conduct first came to light *in this litigation*. The allegations sparked public outcry, and the government was spurred into action. Specifically, the Federal Trade Commission ("FTC") discovered evidence that corroborates Plaintiffs' allegations, ¶¶175-88, and federal legislators have called for investigations.[2]

---

[2] *See, e.g.*, Press Release, *Budget Committee Initiates Probe into Suspected Collusion Between Big Oil and OPEC*, U.S. S. COMM. ON THE BUDGET (July 27, 2024), https://www.budget.senate.gov/chairman/newsroom/press/budget-committee-initiates-probe-into-suspected-collusion-between-big-oil-and-opec- (linking letters sent to Defendants Chesapeake Energy, Continental Resources, Diamondback Energy, EOG Resources, Hess, Occidental, and Permian Resources) (last accessed Apr. 10, 2025); Press Release, *E&C Democrats Launch Investigation into Reports of Oil Companies Colluding to Drive Up Gas Prices*, ENERGY & COM. COMM. DEMOCRATS (May 22, 2024), https://democrats-energycommerce.house.gov/media/press-releases/ec-democrats-launch-investigation-reports-oil-companies-colluding-drive-gas (linking letters sent to Defendants Occidental and Hess) (last accessed Apr. 10, 2025).

## III.    ARGUMENT

In their Joint Motion to Dismiss, Defendants argue: (1) under the Political Question and Act of State Doctrines, the Court lacks subject matter jurisdiction over this case; and (2) the CCAC fails to state a claim for relief.  Dkt. 129 ("Jnt. Mtn.").  Plaintiffs address each in turn below.

### A.    This Court Has Subject Matter Jurisdiction.

This Court "unquestionably" has subject matter jurisdiction over this action, as Plaintiffs assert federal claims arising under the Sherman Act.  *See Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*, 12 F.4th 1212, 1227 (10th Cir. 2021).  Defendants request that this Court decline to exercise that jurisdiction as an act of comity, either towards the executive branch of the U.S. government (the "Executive") because the conduct Plaintiffs challenge is better remedied by the Executive, or towards the foreign governments of OPEC members because adjudicating Plaintiffs' claims would require the Court to determine the legality of actions taken by foreign state actors ("State Action" and "State Actors," respectively).  Jnt. Mtn. at 10.  Neither the Political Question nor the Act of State Doctrine applies; Plaintiffs' claims are justiciable.

### 1.    Binding Supreme Court Precedent Bars Defendants' Justiciability Arguments.

When determining whether a case is justiciable, the Court's first step is to "identify with precision the issue it is being asked to decide."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 208 (2012); *see also Alperin v. Vatican Bank*, 410 F.3d 532, 547 (9th Cir. 2005) ("[W]e take a surgical approach rather than a broad brush" in evaluating justiciability.).[3]  The Supreme Court has cautioned against "'semantic cataloguing'" of claims; justiciability is decided "on a 'case-by-

---

[3] Unless otherwise noted, all internal citations and quotations are omitted, all emphasis is added, and all quotations are cleaned up.

case' basis" after "a 'discriminating inquiry into the precise facts and posture of the particular case.'" *Schroder v. Bush*, 263 F.3d 1169, 1173-74 (10th Cir. 2001) (quoting *Baker v. Carr*, 369 U.S. 186, 211, 215, 217 (1962)).

Here, Defendants attempt to reframe Plaintiffs' allegations as a conspiracy between Defendants and the 25 "sovereign oil-producing nations comprising OPEC+ to raise the price of oil worldwide." Jnt. Mtn. at 1. But that is not what Plaintiffs allege. As Defendants previously acknowledged, the question before the Court is: did "Defendants, current and former independent producers of shale oil, agree[] with each other to raise oil prices by restricting domestic shale oil production in violation of Section 1 of the Sherman Act and the laws of several states"?[4]

Answering that question will require the Court or jury to weigh evidence on several salient disputed fact issues related to Defendants' conspiracy, including:

| | | |
|---|---|---|
| 1. | **Who entered the agreement?** | Defendants, who are domestic shale producers |
| 2. | **What did they agree to do?** | Artificially restrict domestic shale oil production |
| 3. | **When was the agreement active?** | At least 2021-2024 |
| 4. | **Where was the agreement effectuated?** | U.S. shale fields |
| 5. | **How was the agreement implemented?** | Curtailing domestic production |

*See* ¶253.

OPEC plays no role in any of these questions. The CCAC contains no allegations suggesting OPEC could or did reduce domestic shale oil production. Other than as evidence of

---

[4] *See In re Shale Oil Antitrust Litig.*, MDL No. 3119, Defendants' Response To Plaintiff Foos, et al.'s Motion to Transfer Related Actions for Consolidated or Coordinated Pretrial Proceedings, Dkt. 53 (J.P.M.L. June 3, 2024), at 4.

the plausibility of the cartel's potential success, and Defendants' motive to form it, whether OPEC "agreed" with Defendants' U.S. shale oil production decisions is legally irrelevant. Indeed, no OPEC member-state has U.S. shale holdings, so no OPEC member-state could (or did) effectuate an agreement to limit U.S. shale production. Only U.S. shale producers could effectuate such an agreement, and the only Defendants in this case are U.S. shale producers and two of their CEOs.

Also legally irrelevant is whether Defendants' cartel "coordinated" with OPEC on production levels. Even if the evidence showed that Defendants received production quotas *directly* from OPEC, that would still not absolve them. Absent any power to simultaneously implement restrictions in different U.S. shale oil fields, OPEC's quotas would be mere suggestions until Defendants *affirmatively* and *collectively* adopted them. Indeed, although OPEC might be immune from suit, the FTC has previously concluded it "would be illegal for U.S. companies to enter into an agreement with OPEC or any OPEC nation for the purposes of restricting output." *See* n.5, *infra*.

The parallel conduct pled by Plaintiffs is a coordinated shift in Defendants' response to global oil prices. And global oil prices cannot be explained without some reference to OPEC, who control over 50% of the world's oil production. But like its role as a cartel facilitator, OPEC's role in the global oil market's operation does not put them inside a domestic producer's cartel.

Plaintiffs plead a *per se* violation of the Sherman Act and associated state antitrust laws. Under established Supreme Court precedent, Defendants may contest the *who*, *what*, *when*, *where*, and *how* of a *per se* violation, but they are *not* permitted to offer exculpatory evidence on the *why*. *F.T.C. v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) ("It was settled shortly after the Sherman Act was passed that it 'is no excuse that the prices fixed are themselves reasonable.'")

6

(*quoting United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927)).  Defendants'

argument that they were just following OPEC is a thinly veiled *why* justification and therefore

foreclosed.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("[T]he Court has

consistently rejected the notion that naked restraints of trade are to be tolerated because they are

well intended . . . .").

At bottom, Defendants argue that global oil-related matters present such "momentous

foreign policy questions" that the Court cannot apply the Sherman Act to their *per se* illegal

agreement in service of that goal (Political Question).  Jnt. Mtn. at 13.  Or that Defendants' *per se*

illegal cartel is immune from the Sherman Act because it was "orchestrated by OPEC member

nations" (Act of State).  *Id.* at 16.  Both arguments fail independently, but as attempted end runs

around the unassailable bar on procompetitive justifications for *per se* agreements, they need not

even be considered, because they are barred under *Trenton Potteries*.

## 2. The Political Question Doctrine Does Not Bar Plaintiffs' Claims.

"The political question doctrine excludes from judicial review those controversies which

revolve around policy choices and value determinations constitutionally committed for resolution

to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am.

Cetacean Soc.*, 478 U.S. 221, 230 (1986).  "It reflects the foundational precept . . . that federal

courts decide only matters of law, with the elected branches setting the policies of our nation."

*Def. for Child. Int'l-Palestine v. Biden*, 107 F.4th 926, 930 (9th Cir. 2024).

But the Political Question Doctrine is narrowly applied, for "not every matter touching on

politics is a political question."  *Japan Whaling Ass'n*, 478 U.S. at 229-30.  The Political Question

Doctrine applies if and only if one of the six "*Baker* factors" is present:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Kerr v. Hickenlooper*, 744 F.3d 1156, 1176 (10th Cir. 2014) (quoting *Baker*, 369 U.S. at 217), *cert. granted*, *judgment vacated on other grounds*, 576 U.S. 1079 (2015). "[T]he common underlying inquiry [is] whether the very nature of the question is one that can properly be decided by the judiciary." *Alperin*, 410 F.3d at 544.

While Defendants cite the *Baker* factors, they do not meaningfully address them nor suggest which demands dismissal. *See* Jnt. Mtn. at 11. This is not sufficient; the Political Question doctrine does not apply "[u]nless one of these formulations is *inextricable* from the case at bar." *Baker*, 369 U.S. at 217. Applying the *Baker* factors to the facts at issue here, *see* §I.A, demonstrates that it is not a political question and that this Court is the proper forum to address Plaintiffs' grievances.

### a. *Baker* Factor 1: A Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department.

The first *Baker* factor warrants abstention when "a case would require a court to decide an issue whose resolution is textually committed to a coordinate political department." *Zivotofsky*, 566 U.S. at 203. While "no one [*Baker*] factor is dispositive," the first factor "is of particular importance." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 49 (2d Cir. 1991); *see also id.* (holding that an

otherwise "ordinary tort suit . . . has been 'constitutionally committed' . . . [to] the Judiciary" which "strongly suggests" that the Political Question Doctrine does not apply).

While foreign relations are constitutionally committed to the Executive, *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1031 (10th Cir. 2001), "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. Defendants point to no specific political *question* this Court must answer here. *See id.* at 217 ("The doctrine of which we treat is one of 'political questions,' not one of 'political cases.'"). That this case "may have significant political overtones or affect the conduct of this Nation's foreign relations" is not enough. *Zivotofsky*, 566 U.S. at 204-05; *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 60 (S.D.N.Y. 1994) (that case "may involve international agreements" or "brush against foreign relations does not render it nonjusticiable"). Defendants' broad generalizations about the Executive's role in foreign relations are not sufficient. *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) ("A general invocation of 'foreign policy,' without more, will not suffice."); *British Airways*, 872 F. Supp. at 60 (same).

Plaintiffs seek to enforce statutory rights under the Sherman Act, which are of significant national importance. *Zivotofsky*, 566 U.S. at 196 ("The existence of a statutory right, however, is certainly relevant to the Judiciary's power to decide Zivotofsky's claim."); *Topco Assocs.*, 405 U.S. at 610 ("Antitrust laws . . . are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."). Defendants have not identified compelling specific political questions that require the Court to invoke the Political Question doctrine, therefore this Court must allow Plaintiffs' claims to proceed. *Zivotofsky*, 566 U.S. at 205 (District courts cannot "decline to resolve a

controversy within [their] traditional competence and proper jurisdiction simply because the question is difficult, the consequences weighty, or the potential real for conflict with the policy preferences of the political branches.").

> **b.** ***Baker*** **Factors 2 & 3: A Lack of Judicially Discoverable and Manageable Standards for Resolving It, and the Impossibility of Deciding Without an Initial Policy Determination of a Kind Clearly for Nonjudicial Discretion.**

"The second and third *Baker* factors reflect circumstances in which a dispute calls for decision making beyond courts' competence." *Zivotofsky*, 566 U.S. at 203. A dispute is within the Court's competence if "the duty asserted can be judicially identified and its breach judicially determined, and . . . protection for the right asserted can be judicially molded." *Powell v. McCormack*, 395 U.S. 486, 517 (1969). If there are "judicially manageable standards of decision that might empower an Article III court to decide" the case, as here, these *Baker* factors do not apply. *Kerr v. Hickenlooper*, 759 F.3d 1186, 1194 (10th Cir. 2014) (dissent); *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (doctrine limits courts to deciding questions that are "governed by *standard*, by *rule*") (emphasis in original).

The regularly applied standards of the Sherman Act and associated state law antitrust analogues will guide the resolution of this dispute, and Defendants point to no question this Court must answer that falls outside that framework. Consequently, the second and third *Baker* factors have no application here. *See Alperin*, 410 F.3d at 548 (Involvement of "a foreign bank" and "a 'politically charged' context does not transform the Property Claims into political questions."); *Klinghoffer*, 937 F.2d at 49 ("politically charged context does not convert" otherwise ordinary case "into a non-justiciable political question").

      **c. *Baker* Factors 4 & 6: The Impossibility of a Court's Undertaking Independent Resolution Without Expressing Lack of the Respect Due Coordinate Branches of Government, and the Potentiality of Embarrassment from Multifarious Pronouncements by Various Departments on One Question.**

These *Baker* factors relate to "the special importance of our nation speaking with one voice" in the field of "foreign affairs" and "when regulating commercial relations with foreign governments." *Made in the USA Found. v. United States*, 242 F.3d 1300, 1317-18 (11th Cir. 2001). But Defendants fail to show how this case subverts the U.S. speaking with one voice.

This is not surprising. First, the conduct alleged by Plaintiffs touches on no international trade agreements or treaties. Second, Defendants offer no evidence (or real argument) that permitting Plaintiffs' claims to proceed would frustrate any efforts by the Executive to remedy the conduct alleged or regulate commercial relations with foreign governments. Nor have Defendants offered any suggestion of action the Executive might take to remedy a domestic cartel. Plaintiffs can conceive of none, short of a government-plaintiff lawsuit brought under the Sherman Act, decided in a Federal Court somewhere in the United States (likely this very Court).

In fact, while investigating Defendants' recent merger activity, the FTC discovered evidence of Defendants' alleged collusion. ¶¶175-88. Likewise, in 2006, the FTC published a report addressing U.S. gasoline prices after Hurricane Katrina. In a section titled "The Important Role of the Antitrust Laws," the FTC stated that "[t]he antitrust laws condemn certain conduct among competitors, such as . . . a horizontal agreement on price or output," and that it "would be

11

illegal for U.S. companies to enter into an agreement with OPEC or any OPEC nation for the purposes of restricting output."[5]

In short, allowing this action to proceed is in harmony with the Executive because the national policy regulating domestic competition in all industries, including shale oil production, is the Sherman Act. There is no evidence before the Court that the Executive's view is contrary.

### d. *Baker* Factor 5: An Unusual Need for Unquestioning Adherence to a Political Decision Already Made.

Defendants point to no prior political decision to which this *Baker* factor would apply.

### 3. The Act of State Doctrine Also Does Not Bar Plaintiffs' Claims.

The Act of State Doctrine "precludes courts in this country from questioning the validity and effect of a sovereign act of a foreign nation performed in its own territory." *Riedel v. Bancam, S.A.*, 792 F.2d 587, 592 (6th Cir. 1986). It *only* applies where "the relief sought or the defense interposed would" require the Court "to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990); *id.* at 406-07 ("Act of state issues only arise when a court *must decide—* that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.") (emphasis in original). The Doctrine "merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id.* at 409.

---

[5] FED. TRADE COMM'N, *Investigation of Gasoline Price Manipulation and Post-Katrina Gasoline Price Increases* (2006), at 184-85, n.6, https://www.ftc.gov/sites/default/files/documents /reports/federal-trade-commission-investigation-gasoline-price-manipulation-and-post-katrina-ga soline-price/060518publicgasolinepricesinvestigationreportfinal.pdf (last accessed Apr. 10, 2025).

Because each Defendant in this case is domestic, the Act of State Doctrine is not a jurisdictional defense but rather an affirmative merits defense. *See Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 337 (D.D.C. 2007) ("[A] motion to dismiss based on the act of state doctrine is properly considered under Rule 12(b)(6), not Rule 12(b)(1)."). Accordingly, "[t]he burden of proving that the court should apply the act of state doctrine . . . is on the party asserting the applicability of the doctrine." *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 7 (D.D.C. 1999); *see also United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014) ("[D]ismissing on the basis of . . . the act of state doctrine is appropriate only if the facts that give rise to the defense are clear from the face of the complaint.").

Defendants cannot meet this standard because Plaintiffs do not seek to invalidate any State Action. Defendants are all domestic U.S. corporations and U.S. residents, and while Defendants argue in their papers that "[t]rial of this case would necessarily require the participation of the sovereign OPEC nations," Jnt. Mtn. at 17, Defendants do not say which OPEC nations would be required to participate nor what element of Plaintiffs' claims "turns on" the invalidity of any State Action. Defendants did not move to dismiss for failure to join a necessary party under Fed. R. Civ. P. 19. *See Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1411 (10th Cir. 1996) (on a Rule 19 motion, the "moving party has the burden of persuasion" and must show "the absent party has an interest related to the suit which as a practical matter would be impaired"). Certainly if "the outcome of the case turns upon" the actions of a State Actor, that State Actor would be a necessary party. *Cf. Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 706 (1962) ("[P]etitioners do not question the validity of any action taken by the Canadian

Government or by its Metals Controller" and there is no "question of the liability of the Canadian Government's agent, *for Electro Met of Canada was not served*.").

Vague references to the involvement of OPEC are not enough to shield Defendants' cartel activities from review. *See Cont'l Ore*, 370 U.S. at 706 (cartel activities "not insulated by the fact that [the] conspiracy involved some acts by the agent of a foreign government"); *see also id*. at 704 (domestic cartel activity is "not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries").

### 4. Defendants' Authorities Do Not Dictate Otherwise.

Defendants' justiciability arguments rely heavily on two cases. Both feature allegations involving OPEC, but neither are controlling, and both are easily distinguishable on the facts.

*D'Augusta v. American Petroleum Institute* involved allegations that "then-President Trump engineered an antitrust conspiracy among the United States, Saudi Arabia, Russia, and Defendants." 117 F.4th 1094, 1098 (9th Cir. 2024). The court held that "allegations of a conspiracy between the President, foreign sovereigns, and American corporations raise exactly the non-justiciable issue barred by the political question doctrine." *Id*. at 1101. Here, Plaintiffs have not challenged the conduct of the President. Another key distinction: plaintiffs in *D'Augusta* "s[ought] to control how sovereign nations—Russia and Saudi Arabia—manage their own petroleum resources." *Id*. at 1103; *see D'Augusta v. Am. Petroleum Inst.*, 2023 WL 137474, at *4 (N.D. Cal. Jan. 9, 2023) (rejecting "an independent and completely domestic conspiracy" because "the actual allegations in the complaint confirm a purported global, not just private or domestic[,] agreement . . . to cut production of oil"). Plaintiffs seek no such remedies here. Plaintiffs only seek damages and injunctive relief necessary to restore competition in the domestic shale markets.

14

Defendants fare no better with *Spectrum*, 632 F.3d at 938. There, plaintiffs sued both domestic defendants, some of which were owned by OPEC member states, and OPEC members, seeking remedies that would require the district court to "to reprimand foreign nations and command them to dismantle their international agreements." *Id*. at 951. Plaintiffs in *Spectrum* alleged that "the price-fixing at issue [was] *caused by the production decisions of the sovereign state members of the conspiracy*." *Id*. at 946. The price-fixing alleged in *Spectrum* was effectuated through decisions made by "foreign sovereigns regarding the production of crude oil within their own territories." *Id*. Here, Plaintiffs allege the opposite. Plaintiffs allege a purely domestic cartel; they do not challenge the production decisions of OPEC nations. And unlike in *Spectrum*, Plaintiffs here do not seek relief that "would effectively order foreign governments to dismantle their chosen means of exploiting the valuable natural resources within their sovereign territories." *Id*. at 955. If Plaintiffs prevail here, OPEC-related entities will owe no damages, and no injunctive relief will limit OPEC's commercial ambit. *Spectrum* is inapposite.

Finally, although the *D'Augusta* and *Spectrum* plaintiffs failed to clear the justiciability hurdle as to their foreign conduct allegations, both courts evaluated plaintiffs' domestic conspiracy allegations before dismissing the case entirely. *See D'Augusta*, 117 F.4th at 1103-05; *Spectrum*, 632 F.3d at 947 (plaintiffs "failed to allege an independent conspiracy based on refining decisions"). While those plaintiffs' domestic allegations were found lacking, as explained further below, Plaintiffs have more than adequately pleaded a domestic conspiracy here.

**B.    Plaintiffs Sufficiently Plead a Plausible Antitrust Violation.**

At the motion to dismiss stage, Plaintiffs must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

To prove their Section 1 claims, Plaintiffs must show: (1) agreement between Defendants that; (2) unreasonably restrained trade in the relevant market. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006). Defendants challenge both prongs. *See* Jnt. Mtn at 18-32.

### 1. Plaintiffs Sufficiently Allege an Agreement Among Defendants.

"*Twombly* itself made clear [that] plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179, n.28 (10th Cir. 2019). Plaintiffs' allegations "should be considered as a whole 'without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1106 (D.N.M. 2024) (quoting *Cont'l Ore*, 370 U.S. at 699). "Further, an agreement need not be express; rather, the character and effect of a conspiracy can be inferred from a course of dealing and other circumstances." *Id.*; *see also Interstate Cir. v. United States*, 306 U.S. 208, 226-27 (1939) ("Acceptance by competitors . . . of an invitation to participate in a plan" where competitors "kn[ew] that concerted action was contemplated and invited" and that "the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.").

A plaintiff will withstand a 12(b)(6) motion if they "present[] a combination of direct evidence and circumstantial evidence positing an economically rational theory of an agreement." *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1074, 1076 (D. Colo. 2016) (*citing Champagne Metals*, 458 F.3d at 1085). This is because, pragmatically, "evidence cannot be neatly sorted into two categories: 'direct' and 'circumstantial.'" *Darke v. Lurie Besikof Lapidus & Co.,*

*LLP*, 550 F. Supp. 2d 1032, 1041 (D. Minn. 2008).  As explained in *Darke*, "[i]n reality, *all* evidence is 'circumstantial,' in the sense that *all* evidence requires the factfinder to make inferences.  Even the most 'direct' of direct evidence requires the factfinder to make inferential leaps of some kind."  *Id.* (emphasis in original);[6] *accord Champagne Metals*, 458 F.3d at 1083, n.9 ("weak direct evidence," despite inferences required, when there is "no other discrete interpretation" of the evidence, but that defendants conspired); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1301 (D. Kan. 2007) (testimony regarding agreement was direct evidence, even though it did not "identify who was included in the unwritten understanding"); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 220-21 (3d Cir. 2008) (while the absence of all the details of the alleged agreement in direct evidence might "leave a jury unpersuaded that such agreements did in fact exist," it does not "mean that the jury should not consider it").

Therefore, Defendants' argument that Plaintiffs failed to plead direct evidence of agreement, Jnt. Mtn. at 19, is not dispositive.  *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("[d]irect evidence of conspiracy is not a sine qua non" of antitrust litigation); *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 943-44 (D.N.M. 2023) (direct evidence requirement at pleading stage "would all but nullify the nation's antitrust laws").

---

[6] The *Darke* court continued, "[p]ut another way, all evidence can be plotted along a continuum. At one pole of the continuum is strong evidence—evidence that requires the factfinder to make inferential leaps that are very few and very short.  At the other pole of the continuum is weak evidence—evidence that requires the factfinder to make inferential leaps that are very many and very long.  When judges and lawyers refer to 'direct' evidence, they are simply using shorthand to refer to evidence that is on the stronger end of the continuum, and when they refer to 'circumstantial' evidence, they are likewise using shorthand to refer to evidence that is on the weaker end of the continuum.  Thus, 'direct' evidence is not the *opposite* of 'circumstantial' evidence; it is, instead, *very strong* circumstantial evidence."  *Id.* (emphasis in original).

Defendants also grossly mischaracterize Plaintiffs' allegations—as shown below, many of Plaintiffs' allegations, taken as true *at the pleading stage*, are analogous to evidence other courts have found to be direct evidence *sufficient to withstand summary judgment*.  Categorizing this evidence as direct or circumstantial is unnecessary at this stage.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) (evidence that is not direct is "not to be disregarded because of [its] ambiguity" but rather considered alongside "other circumstantial evidence"); *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) ("A plaintiff can establish a conspiracy through direct evidence, circumstantial evidence, *or both*.").

### a.  Plaintiffs' Evidence of Agreement.

Plaintiffs present substantial factual allegations supporting the existence of Defendants' agreement.  Plaintiffs allege that Defendants executed their agreement to restrict U.S. shale oil production by moving in lockstep to a model of constrained production despite high oil prices, as statements from several of the CEOs of publicly-traded Defendants show:[7]

- **April 2021, Pioneer CEO Sheffield**: Shale producers "will stick to their mantra of capital discipline."  ¶143(d).

- **August 2021, EOG CEO Thomas**: Shale was entering a "new era" where "the U.S. will remain disciplined."  ¶143(f).

- **October 2021, Pioneer CEO Sheffield**: "Everybody's going to be disciplined, regardless whether it's $75 brent, $80 brent, or $100 brent. . . All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."  ¶¶147(g), 200 n.179.

- **February 2022, Pioneer CEO Sheffield**: U.S. shale producers are "staying in line" and he was "confident they will continue to stay in line."  ¶149(a).

---

[7] Defendant Hess attended meetings between Defendants.  ¶¶113-18, 126-34, 152.  Hess is privately held and does not hold quarterly earnings calls.  Hess's pre-Class Period production growth rate of 25% dropped to -6% during the Class Period.  ¶160.

Each of these CEOs purports to speak to and on behalf of U.S. shale oil producers as a whole (*i.e.*, all Defendants), preaching, even as oil prices rise, the practice of "discipline" (*i.e.*, production restraint). These statements are forward-looking ("the U.S. *will remain* disciplined"; "Everybody's *going to be* disciplined"), and Plaintiffs allege that in other statements, co-Defendants unanimously responded that they are aligned ("We will continue to be disciplined").[8]

These allegations are stronger than the evidence found to be direct evidence in *Champagne Metals*. There, the Tenth Circuit (at summary judgment) found that a single statement from a single distributor to a mill that the distributor "and other potential customers within the industry . . . would cause other distributors in that area of the country to source their metals from other mill sources" was "direct evidence of collusive action." 458 F.3d at 1083; *see also B & R Supermarket, Inc. v. Visa, Inc.*, 2016 WL 5725010, at \*6-\*7 (N.D. Cal. Sept. 30, 2016) (treating an allegation that a credit card vice president said that "the card brands are not going to delay the liability shift date" as direct evidence of agreement because she "could not speak so confidently on behalf of all networks save and except for her knowledge of collusion, for true competition would have driven one or more networks to break ranks and offer more competitive terms"); *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 318 (S.D.N.Y. 2018) (defendant executive's statement that he and another defendant's executive had agreed to "get a

---

[8] ¶149(c) (February 2022, Diamondback CEO Stice: "[W]e have no reason to put growth before returns . . . we will continue to be disciplined."); *see also* ¶143(b) (February 2021, Chesapeake CEO Lawler: Shale production was entering a "new era" that "requires a different mindset" of "more discipline and responsibility"); ¶143(c) (March 2021, Occidental CEO Hollub: Shale producers now "committed to value growth, rather than production growth," despite a "healthier supply and demand environment"); ¶149(b) (February 2022, Continental CEO Berry: "We project generating flat to 5% annual production growth over the next five years.").

hold of this thing" (referring to the threat of competition a rival firm) was direct evidence of agreement).[9]

Plaintiffs allege inter-Defendant in-person meetings and other forms of communication facilitated Defendants' exchange of forward-looking production information and affirmed their production restraint. ¶¶115, 139, 152, 177-79. Firsthand witness accounts from inside Defendants' meetings speak of "common desire[s]," "shared responsibility," and "common objective[s]." ¶119. Nearly every witness recounts the exchange of forward-looking information. *See, e.g.*, ¶¶121-23, 130, 152. Much of the evidence comes from Defendants' own employees. ¶¶114, 120, 134.

These meetings, and witnesses' contemporaneous descriptions of them, are analogous to evidence other courts have found to be direct evidence of conspiracy. *See*, *e.g.*, *Toledo Mack*, 530 F.3d at 211, 220 (evidence from witness at meeting that "two Mack dealers from New Jersey approached him and told him that 'the way it works' in New Jersey is that 'dealers don't compete on price'" is direct evidence of agreement); *United States v. Taubman*, 297 F.3d 161, 165 (2d Cir. 2002) (witness testimony was "direct evidence" of both meetings and subsequent agreement).

Because these statements are strong evidence of Defendants' agreement,[10] Defendants' arguments presenting alternate interpretations of this evidence are premature and can be ignored.

---

[9] The Court may also properly consider Defendants' similar statements regarding their in-person meetings conducted prior to the Class Period. ¶¶109-35. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 60 (D.D.C. 2016) (court credited pre-class period statements by industry participants discussing the importance of industry focus on "capacity" in context of plaintiffs' claim that defendants colluded years later by exercising "capacity discipline"); *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1154-56 (D. Kan. 2012) (at summary judgment, weighing pre-class period evidence in evaluating whether conspiracy existed).

[10] *See, e.g.*, *Credit Default Swap Auctions*, 710 F. Supp. 3d at 943 ("It strains credulity to believe that Plaintiffs could possess intentionally hidden communications at the pleading stage.").

*See, e.g.*, *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1047, 1052 (D. Kan. 2020) (rejecting defendants' alternative reading of a phone call containing direct evidence: "at best, [defendant] identifies a competing inference that may be weighed by a fact-finder at later stages of the proceeding"); *Gym Door Repairs, Inc. v. New York City Dept. of Educ.*, 2015 WL 3883243, at *5 (S.D.N.Y. June 23, 2015) ("[W]hether a finder of fact will choose to credit Defendants' interpretation of the email exchange [is] . . . not resolvable at the pleadings stage."). Similarly, any argument that the statements are insufficient because the alleged agreement is irrational or non-sensical can be rejected.  *See, e.g.*, *Champagne Metals, Inc.*, 458 F.3d at 1085 ("[W]hen evaluating direct evidence of an agreement, [the court] need not worry whether such an agreement would have been a rational one . . . ."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 952 (N.D. Ill. 2018) (court could not "ignore well-pleaded allegations of fact" to credit defendants' arguments that "alleged confessions [were] 'nonsensical'").

### b. Plaintiffs' Allegations of Agreement Are Bolstered by Additional Circumstantial Evidence.

The plausibility of Defendants' alleged agreement is bolstered by Plaintiffs' allegations of "[p]arallel conduct . . . accompanied by additional circumstances, or 'plus factors,' that 'raise[] a suggestion of a preceding agreement.'"  *Credit Default Swaps Auctions*, 710 F. Supp. 3d at 943 (quoting *Twombly*, 550 U.S. at 554, 557).

### i.  Plaintiffs' More Than Sufficiently Plead Parallel Conduct.

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015).  Parallel conduct "can, but need not necessarily, rest on parallel pricing.  Rather, it depends upon whether the alleged conspirators engaged in 'parallel

*business behavior.*'" *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, 300 F. Supp. 2d 1107, 1147 (D. Kan. 2003) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954)) (emphasis in *Universal Serv. Fund*).

Contemporaneous industry observations demonstrate that Defendants' production restraint was a significant departure from past behavior, which had spanned multiple oil price cycles.[11] ¶¶144, 150.  In April 2023, a Bloomberg energy analyst succinctly summarized the Defendants' agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up.  That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects.  Today, shale is as responsive as in the past.  But there's a difference.  ***The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share*.**  Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.

¶159.

Defendants do not meaningfully engage with Plaintiffs' actual allegations of parallel conduct and instead spend pages arguing that variations in each Defendants' production growth during the Class Period defeats any finding of parallelism.  Jnt. Mtn. at 22-24.  This is an attack on allegations found nowhere in the CCAC.  Shale oil production cratered during the COVID

---

[11] In economic terms, an oil price cycle is the recurring pattern of boom and bust that occurs over years and defines crude oil prices and resulting production, driven by supply, demand, and external factors.  During the boom phase, high demand and rising prices lead to increased production and investment, eventually causing oversupply.  This results in a bust phase, where prices fall, profitability declines, and production slows.  As supply decreases, the market rebalances, demand recovers, and prices rise again, restarting the cycle.  ¶¶122, 133, 144(a).

lockdowns.  ¶138.  Plaintiffs allege that Defendants throttled their post-COVID growth to delay production returning to pre-COVID levels despite oil prices well above their breakevens, not that Defendants executed parallel cuts to existing production levels.  ¶¶143-50, 160-70, 226-29.

Defendants restrained their production growth, in part, by reducing capital expenditures on drilling.  ¶160 and Fig. 3 (showing declining reinvestment in new drilling).  Shale rig counts still have not returned to pre-COVID levels, despite years of stronger-than-pre-COVID oil prices and Defendants' ever-lowering breakevens.  *See* ¶¶168-70.[12]  Defendants' public statements about exercising production "restraint" during the Class Period only make sense, by definition, if each Defendant was actually foregoing available productive capacity.  *See, e.g.*, ¶¶143-52, 225; *see also* ¶143(b), n.95 (February 22, 2021 Reuters article quoting industry analyst: "As long as operators have sufficient drilled but unfracked well inventory to complete, they should be able to easily grow production while keeping [capital expenditures] in check.").   And this restraint was executed by Defendants in parallel.  *See, e.g.*, ¶¶144(a), 149(d), 227.

The fact that Defendants may have implemented differing levels of production restraint is not dispositive, given Plaintiffs have plausibly alleged that each participated in coordinated supply restrictions.  *See, e.g.*, *Domestic Airline Travel*, 221 F. Supp. 3d at 69 ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1002 (N.D. Ill. 2023) (same); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) ("*Broilers*") ("It is more than plausible that conspirators would leave the precise means of

---

[12] The curtailment in active rigs and completed wells in the Permian, Bakken, and Eagle Field plays shown in Figures 11-13 cannot be attributed to the super-majors and/or Defendants' smaller competitors, who in contrast, raised production in response to rising oil prices.  ¶¶165-67.

cutting production up to each conspirator, where multiple options would accomplish the intended goal."). And parallel conduct does not require that "production decreased in absolute numbers"; allegations of "a decrease relative to the historic annual rate of production increase" will suffice. *Broilers*, 290 F. Supp. 3d at 793.

These allegations of Defendants' collective and sudden shift away from profitable growth to production restraint, combined with the CEO and witness statements described, is certainly parallel conduct. *See, e.g.*, *Crownalytics, LLC v. SPINS LLC*, 2024 WL 2111570, at *8 (D. Colo. May 10, 2024) ("An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference of an agreement."); *Domestic Airline Travel*, 221 F. Supp. 3d at 68-69 (parallel conduct where "[d]efendant airlines made statements close in time regarding the exercise of capacity discipline and, in concert, with these statements a new trend of limited capacity growth occurred within the industry"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) (parallel conduct where "each [d]efendant [publicly] signaled its willingness to cut capacity and increase prices if the other [d]efendant acted in concert").

### ii.    "Plus Factors" Support the Inference of Agreement.

"Plus factors are economic actions and outcomes that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action." *Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*, 2024 WL 4884472, at *4 (D. Colo. Nov. 25, 2024). They can include "allegations (1) about the defendants' motives to enter into an unlawful agreement; (2) that the defendants acted contrary to their interests; (3) implying a traditional conspiracy, or (4) of a high level of interfirm communications." *Id*. This list is "neither exhaustive

nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.*

When viewed collectively, together with Plaintiffs' other factual allegations, the plus factors offered by Plaintiffs provide ample circumstantial evidence of collusion. *Brown v. JBS USA Food Co.*, 2023 WL 6294161, at *10 (D. Colo. Sept. 27, 2023) ("[T]he Court rejects the moving defendants' analysis to the extent it evaluates each plus factor as a separate part without examining the allegations as a whole.").

*Traditional Conspiracy – Meetings and Inter-Defendant Communications:* Defendants' motion argues that mere attendance at industry events, such as the CERAWeek Conference, does not suggest collusion. Jnt. Mtn. at 27-28. But Defendants again grossly mischaracterize Plaintiffs' allegations. Plaintiffs do not allege mere attendance at trade shows; Plaintiffs list a half-dozen specific meetings where Defendants exchanged forward-looking production information and reached a "common understanding" about collective production. Public statements from attendees of those meetings are strong evidence of Defendants' agreement. *See* §II.A.1, above.

As are Defendants' CEOs' forward-looking public statements affirming irrational production restraint and confidently predicting each other's production growth strategies. ¶¶143, 149, 152. These statements strongly support the plausibility of Defendants' agreement. *Broilers*, 290 F. Supp. 3d at 798 ("[T]he announcement of production cuts soon after demands by other producers for such cuts is indicative of agreement."); *Universal Serv. Fund*, 300 F. Supp. 2d at 1148 ("[A] high level of communications among competitors can constitute a plus factor . . . .").

Finally, the FTC uncovered evidence of interfirm communications that support an inference of traditional conspiracy. *Cf.* Jnt. Mtn. at 30. The FTC reported communications

whereby the CEO of Pioneer, Individual Defendant Sheffield, "campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers," "'discuss[ed] crude oil market dynamics, pricing, and output' with Pioneer's U.S. competitors," "served as a 'conduit' between Defendants and OPEC," "and 'also worked to facilitate communications between his competitors in the Permian Basin and OPEC.'" ¶¶177-79.  As to Individual Defendant Hess, the FTC uncovered evidence that he "communicated publicly and privately with OPEC representatives and oil ministers of OPEC member states about global output and other dimensions of crude oil market competition" and "encouraged high-level OPEC representatives in their stated mission to stabilize global oil markets." ¶185.  The FTC describes that Mr. Hess's statements to other domestic shale producers, and to investors, were "consistent with" and "repeated themes from his private conversations [with OPEC] about market stability and other business topics." ¶187.

The FTC's discovery of corroborating evidence supports the plausibility of Plaintiffs' allegations.  *In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *9 (N.D. Ill. Nov. 6, 2020) ("A DOJ investigation alone is not enough to support an inference of antitrust conspiracy, but the allegations here are that the investigations produced results . . . ."); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1188 (S.D. Cal. 2018) (investigation is plus factor); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (same).

<u>Production Restraints Were Contrary to Individual Competitive Interests</u>: Defendants' sudden decision in 2021 to cease acting as global swing producers ceded profitable growth opportunities to their rivals.  ¶¶150-51, 162-67, 204-13.  A decision to forego additional profitable production is economically irrational absent knowledge that competitors intend to likewise restrain

production. *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 463 (9th Cir. 1990) ("The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely."); *Text Messaging Antitrust*, 630 F.3d at 628 (labeling as "anomalous behavior[,]" evidence firm was not taking actions "in order to take business from his competitors"). Publicly announcing production restraints, as Defendants did here, is even more irrational. *Broilers*, 290 F. Supp. 3d at 798 ("[I]n an industry in which unilateral production cuts expose a company to loss of market share, a publicly announced production cut makes it more likely that the producer has an agreement from other producers to either cut production as well, or at least to forebear from assuming the vacated market share. Such conduct without an agreement makes little economic sense.").

Defendants ask the Court to draw inferences in their favor and prematurely conclude that their collective production restraint was a rational response to market volatility. Jnt. Mtn. at 29. Defendants are wrong on the law and the facts. First, "Plaintiffs are not required to plead facts that, if true, definitively rule out all possible innocent explanations." *In re Generic Pharms. Pricing Antitrust Litig.*, 2023 WL 2244685, at *4 (E.D. Pa. Feb. 27, 2023); *see also Broilers*, 290 F. Supp. 3d at 801 ("[F]or courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct . . . would be equivalent to imposing a probability requirement at the pleading stage, which *Twombly* expressly does not do.").

Second, Plaintiffs allege that the period immediately post-COVID included an "extended run of historically high crude oil prices [that] provided prime market conditions for . . . Defendants . . . to aggressively increase production," ¶13, given Defendants' historically low breakevens.

¶¶106, 144 n.105, 150 n.126, 163-64.  Thus, even if the Court were to consider Defendants'
alternate explanations, Plaintiffs' well-pled factual allegations that market conditions were ripe for
growth do not permit the inferences Defendants ask the Court to draw.

_Common Motive, Inelastic Demand, and Other Market Factors Incentivize Collusion_:
Crude oil and its derivatives are essential goods with few immediate substitutes.  ¶¶5, 6, 190-91,
222-24.  Contra to economic theory, Defendants dismiss the importance of inelastic demand.  Jnt.
Mtn. at 26.  Yet courts routinely recognize that collusion is more likely in markets where
consumers cannot easily reduce consumption.  _In re Fragrance Direct Purchaser Antitrust Litig._,
2025 WL 579639, at *9 (D.N.J. Feb. 21, 2025) (inelastic demand considered as plus factor);
_Evanston Police Pension Fund v. McKesson Corp._, 411 F. Supp. 3d 580, 597 (N.D. Cal. 2019)
(same).

Plaintiffs allege that the shale industry is concentrated at the top but fragmented with many
small producers at the bottom.  This provided Defendants visibility into one another's market
conduct.  ¶192.  Defendants also had excess drilling capacity, which allowed them to restrain
production growth.  ¶¶143-52, 193.  These market conditions applied broadly to all Defendants
and support the plausibility of agreement.  _See Domestic Airline Travel_, 221 F. Supp. 3d at 61
(considering "general allegations regarding the nature of the airline industry" as plus factor).

Defendants' common ownership provides additional motive to collude.[13]  Plaintiffs allege
that common investors exerted influence to discourage aggressive competition in shale oil

---

[13] "[C]ommon ownership, which occurs when individual investors hold non-controlling interests
in firms that have a competitive relationship" can "influence decision-making . . . in ways that may
substantially lessen competition." U.S. DEP'T OF JUST. & FED. TRADE COMM'N, _Merger_

production.  ¶¶197-203; *see also* ¶¶143(e), 152(a).[14]  Defendant Sheffield admitted as such in 2021, stating "[a]ll the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."  ¶200, n.179.  Defendants' use of a cartel enforcement mechanism supports the existence of Defendants' conspiracy.  *See In re Disposable Contact Lens Antitrust Litig.*, 2019 WL 6463343 (M.D. Fla. Nov. 27, 2019) (presence of enforcement mechanism supports conspiracy allegations).

Defendants attack the plausibility of the alleged conspiracy due to "low barriers to entry[.]" Jnt. Mtn. at 27.  But as Defendant Sheffield admitted, ¶143(e), most smaller U.S. shale oil producers only operate one rig, and collectively, they could not restrain Defendants' cartel despite their efforts to increase production.  ¶¶165-67.  Meanwhile, Defendants are the founders and leaders of the U.S. shale industry.  *See* ¶¶225-29 (addressing Defendants' market power and impact of their production decision on oil prices).  A "market in which sales power is concentrated in the hands of the few" can facilitate collusion, as is evidenced here.  *Hendershot v. S. Glazer's Wine & Spirits of Okla., LLLP*, 2021 WL 3501523 (N.D. Okla. Aug. 9, 2021).[15]

---

*Guidelines*, §2.11 (Dec. 18, 2023), https://www.justice.gov/d9/2023-12/2023%20Merger% 20Guidelines.pdf (last accessed Apr. 10, 2025).

[14] Before the Class Period, these common shareholders met in New York "to discuss a common goal:" "how to make frackers pump less and profit more."  ¶117.

[15] Plaintiffs allege that Defendants were sitting on a "huge inventory of high-quality" drilling opportunities, ¶149(e), while other shale drillers were aggressively, but unsuccessfully, attempting to ramp up production to offset Defendants' production restraints.  ¶¶165-67.  As Plaintiffs plead a *per se* Sherman Act violation, proof of market power is not required.  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) (*per se* agreements are "presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"); *Anesthesia Advantage, Inc. v. Metz Grp.*, 759 F. Supp. 638, 643-44 (D. Colo. 1991) (finding that a "market force argument does not apply to per se violations of the Sherman Act"). However, from these allegations, it is plausible to infer that Defendants' market power could arise

### 2. Defendants' Agreement Inflated the Price of Oil and Harmed U.S. Consumers of Gasoline and Other Petroleum-Derivative Products.

At various points in their brief, Defendants indirectly challenge whether Plaintiffs have adequately alleged that Defendants unreasonably restrained trade in the relevant market. *See* Jnt. Mtn. at 1 ("Plaintiffs allege that eight independent American oil producers, collectively accounting for <u>less than 2% of the world's crude oil production</u> . . . .") (emphasis in original); 9 ("[D]efendants <u>collectively account for only 1.9% of the world's crude oil production</u>.") (emphasis in original); 34 ("The eight producer defendants account for less than 2% of global crude oil production.").

Though styled as challenges to the plausibility of Defendants' agreement, at bottom these are arguments that Defendants did not have the ability to influence oil prices and cause Plaintiffs' injury. Thus, they challenge Plaintiffs' standing to sue. *See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005) ("Antitrust injury and antitrust standing are overlapping concepts; standing cannot be established without an antitrust injury . . . ."). As explained further below, Defendants' conduct injured Plaintiffs, who have standing.

### C. Plaintiffs Have Standing to Bring These Antitrust Claims.

Defendants argue that Plaintiffs fail to plead facts showing antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-38 (1983) ("*AGC*"). The *AGC* factors do not apply to most of Plaintiffs' state law antitrust claims, and the *AGC* analysis for determining Sherman Act injunctive relief standing is different—more permissive—than for damages. Specifically, *AGC* factors five and six, which relate to damages, are not relevant to standing for injunctive relief. *See B-S Steel of Kansas, Inc.*

---

from control of *access* to profitable shale oil drilling opportunities. *Cf.* Dkt. 130-1 (Defendant Pioneer had "non-operating" interests in 87 N.M. wells during the Class Period).

*v. Texas Indus., Inc.*, 439 F.3d 653, 667 (10th Cir. 2006). These *AGC* factors can be disregarded when assessing Plaintiffs' injunctive relief claim. For claims that are subject to the *AGC* factors, Plaintiffs plainly satisfy them.

### 1. The AGC Factors Do Not Apply at All in Many States.

Whether *AGC* is applicable to state law antitrust claims "is predicated on state law" and "federal courts are bound by the decisions of the state's highest court." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151 (N.D. Cal. 2009). Further, federal courts have generally adopted the presumption that, absent a binding decision to the contrary, "any state with an *Illinois Brick* repealer would reject application of *AGC*." *Broilers*, 290 F. Supp. at 816.

Defendants have not made a showing to overcome this presumption, relying on one sentence in their brief and an external appendix of citations with bald assertions that some states have adopted *AGC* and that the remainder "Would Likely Adopt *AGC* or Similar Factors," for some because "State Law [Is] Interpreted in Harmony with Federal Law." Jnt. Mtn. at 33 and Def. App. B. For all but a few states, Defendants do not offer any controlling state authority, pointing to a mix of lower-court decisions, federal opinions, and likelihood arguments that are insufficient to invoke *AGC*. *See In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *8, *10 (N.D. Cal. Oct. 2, 2014) (finding that lower state court decisions are not "definitive pronouncements of that state's law" and a harmonization statute is insufficient to conclude *AGC* would apply); *see also In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) ("*GPU*") (same); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943-44 (N.D. Ill. 2009) (same), *aff'd sub nom. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). Defendants also omit key precedents from their appendix where state courts have held

*AGC* does not apply to indirect purchaser claims.  *See, e.g.*, *Teague v. Bayer AG*, 195 N.C. App. 18, 671 S.E.2d 550, 557 (N.C. Ct. App. 2009) (*AGC* does not apply to indirect purchaser claims under North Carolina law); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627 (Minn. 2007) (same for Minnesota).  Plaintiffs address Defendants' authorities in Plaintiffs' Appendix 1.

Defendants' Appendix B also repeatedly cites the "*Visa* cases," which are distinguishable because those cases applied *AGC* to standing of plaintiffs that did not use the price-fixed products or products in the distribution chain, unlike here, where Plaintiffs are indirect purchasers in the distribution chain of the price-fixed product.  *See In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *8 (N.D. Ill. Nov. 5, 2009) (distinguishing *Visa*, and determining that "*AGC* has no application" to indirect purchasers who are "in the chain of distribution").  *See* Appendix 1.

### 2.  Plaintiffs' Allegations Satisfy the AGC Factors.

Even if *AGC* applies to Plaintiffs' antitrust claims, an analysis of the six *AGC* factors, as distilled by the Tenth Circuit, shows that Plaintiffs have antitrust standing.

The six *AGC* factors are:

> (1) the causal connection between the antitrust violation and plaintiff's injury, (2) the defendant's intent or motivation; (3) the nature of the plaintiff's injury—i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) that the risk of duplicative recoveries or complex damages apportionment.

*Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406-07 (10th Cir. 1992).

### a.  Overcharges Paid by Plaintiffs Are the Type of Injury that the Antitrust Laws Seek to Redress—Factor 3 (Jnt. Mtn. at 35-36).

The nature of the Plaintiff's injuries is the most important factor in the *AGC* analysis.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1118 (N.D. Cal. 2008).  Plaintiffs

satisfy this element as the overcharges paid by Plaintiffs on oil derivative fuel products, ¶¶15-16, are exactly the kind of injury that state and federal antitrust laws seek to redress. *See Broilers*, 290 F. Supp. 3d at 814 (Under *AGC*, "consumers and competitors in the market in which trade was restrained generally have antitrust standing."); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020) (citing *AGC* for the contention that "[t]he general rule is that customers and competitors in the affected market have antitrust standing"). The primary purpose of state and federal antitrust statutes is to "deter[] anticompetitive conduct and ensur[e] the compensation of victims of that conduct." *Cal. v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989).

Defendants argue that Plaintiffs do not show antitrust injury because they must plead that the products they purchased were derived from the specific oil Defendants produced. Defendants' traceability argument is absurd when applied to the premise of the alleged conspiracy: Defendants conspired to constrain oil production, thereby raising the price paid on all oil. How does one trace Defendants' foregone production through the supply chain? Defendants also ignore countless authorities that permit indirect purchasers of finished products that contain the allegedly restrained products to bring suit under repealer statutes. *See, e.g.*, *Flat Panel*, 586 F. Supp. 2d at 1124 (finding that "indirect plaintiffs have demonstrated standing because they have alleged . . . that they were overcharged for products . . . as a result of [a] price-fixing agreement"); *Batteries*, 2014 WL 4955377, at *12 (finding antitrust injury where indirect plaintiffs alleged "facts sufficient to conclude, for pleading purposes, that battery cells, batteries, and battery products reside in the same market, or inextricably linked markets").

Here, where the overcharge paid by the end-user of oil derivative fuel products is the "inextricabl[e]" result of Defendants' oil price fixing "[it] is difficult to imagine a more formidable

demonstration of antitrust injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000); *see also In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 855 (E.D. Mich. 2014) (finding antitrust standing where plaintiffs alleged "that the markets for Bearings and cars are inextricably intertwined, that the demand for cars creates the demand for Bearings, that the Bearings market exists to serve the vehicle market and bearings have little to no value outside the vehicle"); *In re Auto. Parts Antitrust Litig. (Fuel Senders)*, 29 F. Supp. 3d 982, 1002 (E.D. Mich. 2014) (same holding as to fuel senders).

Plaintiffs offer substantial facts that show that the prices for gasoline, distillate fuels, marine fuel, and jet fuel are inextricably intertwined with the price of oil, and that an anticompetitive increase in the price of oil, paid for by U.S. refiners, is passed onto end-users such as Plaintiffs. Plaintiffs detail that:

- oil prices globally are linked, such that the prices U.S. refiners pay for U.S. oil correspond with global oil prices (¶¶230-36, Fig. 15);

- Defendants' shale oil production decisions impacted global oil prices (including that they act as "global swing producers") (¶¶225-29; *see also* ¶¶8-9, 100, n.21, 103-08, n.27, 142-43, 149-50, n.116);

- the overcharge paid by U.S. refiners for oil bought from Defendants and other suppliers is passed onto purchasers of oil derivative fuel products through a relatively short distribution chain (¶¶6, 214-24, 234-36, 239, 241, 245);[16]

- oil is the central component of the oil derivative fuel products purchased by Plaintiffs (¶¶6, 234, 236, 240, 244, 247);

- the price of oil comprises the majority of the prices paid by end-users of oil derivative fuel products and explains the vast majority of the changes in price of oil derivative fuel products, and that the prices of these products is highly correlated (¶¶230-36, 238, 242-44, 246-47);

- the significant cross-elasticity of demand for oil and oil derivative fuel products (¶¶12-13, 138, 142, 190-91);

---

[16] *See Flat Panel*, 586 F. Supp. 2d at 1124 (short distribution chain weighed in Plaintiffs' favor under *AGC*).

- how the oil derivative fuel products at issue here compromise over 70% of U.S. petroleum consumption (¶217); and

- how the retail and wholesale prices charged for oil derivative fuel products are highly correlated (¶¶224, 235).

This is more than sufficient.  In *Fragrance*, the court found that end-users of goods such as soap, shampoo, and candles which incorporated fragrances manufactured by defendants had shown antitrust injury (and satisfied the other elements of *AGC*), despite multiple intermediate steps in the distribution chain, and even though fragrances comprised a small portion of the cost of the consumer goods at issue.  2025 WL 579639, at *15-*16 ("[T]he fact that supra-competitively priced ingredients comprise *any* amount of the purchase price of end-user products purchased by the plaintiffs is sufficient to establish that *some* injury occurred.").

### b. Defendants' Conduct Caused Plaintiffs' Loss—Factor 1 (Jnt. Mtn. at 34-35).

Defendants claim that Plaintiffs have not pled causal connection and cannot show causation because Defendants had insufficient market power to impact global oil prices and that, even if they did, Plaintiffs could not calculate pass-on of that overcharge to end-users of oil derivative products. Jnt. Mtn. at 34.  Defendants' arguments against causation fail because: (1) they are premature; (2) plaintiffs satisfy the first *AGC* factor (causal connection); and (3) even if the Tenth Circuit forbids umbrella damages, the prohibition does not apply to state antitrust claims.  Moreover, Defendants' hypothetical causation and anticompetitive effects arguments are premature because the standing analysis "relies entirely upon what the complaint states."  *Fragrance*, 2025 WL 579639, at *14.[17]

---

[17] *See also Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1274, 1282-84 (10th Cir. 2012) (examining anticompetitive effect at the summary judgment stage); *Anesthesia Advantage*, 759 F. Supp. at 643-49 (same).

Regardless, Plaintiffs satisfy the first *AGC* factor (causal connection) because Plaintiffs allege that Defendants' conspiracy to restrain production of shale oil resulted in an increase in U.S. oil prices, ¶¶225-29, and that this overcharge was passed along the distribution chain and absorbed by Plaintiffs in the form of supra-competitive prices for gasoline, distillate fuels, marine fuel, and jet fuel. ¶¶214-24, 230-39, 242-44, 246-47. Thus, Plaintiffs allege a clear causal connection between the conspiracy and the subsequent harm to Plaintiffs. *Id.* Nothing further is required. *Fragrance*, 2025 WL 579639, at *14 (similar allegations sufficient to show causal connection).

Plaintiffs further offer facts that support that Defendants collectively possess market power in shale production.[18] Defendants are responsible for 16.2% of total U.S. crude oil production, and "are able to leverage their collective market share because of how fragmented the U.S. oil market is: of the 246 operating oil rigs in the U.S., 162 companies are running just one rig" and "[o]nly 10 companies own 15 or more rigs—five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental)." ¶167. These allegations bolster the requisite causal connection. *See Anesthesia Advantage*, 759 F. Supp. at 647-49 (at summary judgment, sufficient evidence to show defendants unreasonably restrained trade, despite 5.8% aggregate market share).

Defendants' traceability arguments, Jnt. Mtn. at 34, fare no better. Plaintiffs here allege enough facts to permit the Court to conclude that changes in prices of the component product sold by Defendants, oil, impacted the price of finished oil derivative fuel products bought by Plaintiffs, distinguishing Defendants' authorities.[19] Indeed, Plaintiffs have already offered econometric

---

[18] *See* n.14, *supra*.

[19] *See, e.g.*, *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) (finding that plaintiffs failed to meet the *AGC* factors in part because of "the absence of

evidence that shows that changes in the price of oil are the primary driver of changes in the price of oil derivative fuel products. ¶¶233, 235, 243, 246, Figs. 17-19; *see also* ¶224 (correlation between rack and retail prices). These same traceability arguments have been roundly rejected by courts considering indirect purchaser claims involving price-fixed components or ingredients. *See, e.g.*, *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 980-81 (9th Cir. 2000); *Flat Panel*, 586 F. Supp. 2d at 1124.

Finally, Defendants rely on the Ninth Circuit's decision, *In re Coordinated Pretrial Proc. in Petroleum Products Antitrust Litigation*, 691 F.2d 1335 (9th Cir. 1982), which predates *AGC*, to argue that Plaintiffs cannot claim umbrella damages. Jnt. Mtn. at 34-35. However, not only does that decision concern the application of the Sherman Act and *Illinois Brick*, Defendants cite no law showing that the Tenth Circuit has adopted the Ninth Circuit's opinion. Plaintiffs could find none. And even if the damages resulting from Defendants' supply restriction were umbrella damages (they are not), the bar for umbrella damages does not apply to state antitrust claims,

---

plausible evidence of any link between specific products [refrigerators and automobiles] and defendants' steel mills" and plaintiffs' counterargument was "a conclusory statement that supercompetitive prices were a direct and proximate result of defendants' unlawful acts"), *aff'd*, 902 F.3d 735 (7th Cir. 2018); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007) (plaintiffs' complaint "sets forth no allegations that demonstrate that, within the final purchase price of a given product purchased by plaintiffs for 'end use,' the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable [from other factors that impact price]").

*DRAM* has also been criticized with subsequent courts declining to follow its reasoning. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 7805628, at *19, n.16 (N.D. Cal. Aug. 4, 2016) ("Although Judge Hamilton from this district came out on the other side in *DRAM*, her opinion appears to be an outlier."), *rev'd and remanded on other grounds*, 720 F. App'x 835 (9th Cir. 2017); *Flat Panel*, 586 F. Supp. 2d at 1121; *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *12 (N.D. Cal. Aug. 3, 2011).

specifically in repealer states, even if such states have a harmonization provision. *See In re Domestic Drywall Antitrust Litig.*, 2019 WL 4918675, at *8-*9 (E.D. Pa. Oct. 3, 2019) (finding that *Petroleum Products* is distinguishable "because there the plaintiffs brought their claims solely under federal law," while "here [p]laintiffs' claim for umbrella damages is asserted under state law" and denying partial summary judgment).[20]

### c. The CCAC Sufficiently Alleges Intent—Factor 2 (Jnt. Mtn. at 35).

Defendants argue that Plaintiffs must allege that Defendants specifically intended to harm Plaintiffs, but cite no case law in support. The intent factor is not dispositive under *AGC*. *See Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 512 (D.N.J. 2018) (while intent is not dispositive, factor weighed in Plaintiffs' favor because "the injury alleged is the predictable, direct, and intended result of the anticompetitive conduct"). Plaintiffs sufficiently plead intent and

---

[20] *See also Cnty. of San Mateo v. CSL Ltd.*, 2014 WL 4100602, at *5-*6 (N.D. Cal. Aug. 20, 2014) (rejecting *Petroleum Products* application to repealer action alleging umbrella damages brought under the Cartwright Act as California, like other repealer states, "has rejected Illinois Brick" on which *Petroleum Products* was premised); *In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002, at *3 (N.D. Cal. Aug. 9, 2022) (following *CSL Limited* and holding "umbrella damages under the Cartwright Act are not barred as a matter of law as too inherently speculative").

Indeed, even under federal law, there is no doubt that Plaintiffs have suffered antitrust injury. *See, e.g.*, *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (finding plaintiff had alleged antitrust standing in circumstances in which defendants had restricted output and elevated prices on gas pipelines defendants did not operate, but instead supplied some of the capacity: "[a] cartel cuts output, which elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like customers of the cartel's members"); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1166, n.24 (5th Cir. 1979) (in a monopsony case, holding that "[i]t is enough if, as alleged, the conspirators' activities caused a general depression in wholesale prices and the intermediary purchasing from a plaintiff based his pricing decision on the depressed wholesale beef price"); *see also* P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (CCH), ¶347 (umbrella damages proper under federal and state antitrust laws, and consequently "standing for the umbrella plaintiff is limited not by Illinois Brick but by the more general requirements of causation and proof of damages governing private plaintiffs generally.").

motivation by alleging that Defendants conspired to restrain their respective production volumes, which fixed/stabilized crude oil prices that had the direct and foreseeable result of causing artificially higher prices for oil derivative fuel products.  ¶¶6, 15, 230-36, 238, 242-44, 246-47.[21]

### d. Defendants' Production Restraint Directly Impacted the Price of Oil Derivative Products—Factor 4 (Jnt. Mtn. at 36).

When assessing *AGC* under a repealer statute, the 'directness' factor "must either carry significantly less weight or directness must be analyzed more generously than under federal law" because "[i]t would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers." *Fragrance*, 2025 WL 579639, at *16.  Therefore, based on the same facts highlighted in relation to antitrust injury and causal connection, the "directness" factor weighs in Plaintiffs' favor in relation to their state law claims.  The same is true of their injunctive relief claim, as Plaintiffs allege an "injury cognizable in equity (overcharges for purchases of products produced by, or containing products produced by, the Defendants)" and "that these overcharges were the proximate result of Defendants' price-fixing conspiracy." *Id.* at *17.

### e. Damages Are Not Speculative—Factor 5 (Jnt. Mtn. at 36-37).

As noted above, Plaintiffs allege that Defendants' shale oil production decisions impacted U.S. oil prices, the overcharge paid by U.S. refiners as a result of Defendants' cartel is passed onto U.S. purchasers of oil derivative products, like Plaintiffs, through the distribution chain, and that

---

[21] Plaintiffs also alleged facts supporting that Defendants intended to forego profitable production to increase their margins and benefit their joint owners. *See, e.g.*, ¶¶11-16; 143-44, 149-55, 159, 161, 193, 197-203.

the price of oil at the refinery drives the cost of oil derivative fuel products. The exact size of that loss, and the role (if any) that other factors had on the prices paid by Plaintiffs will be shown through discovery (fact and expert). *See Fragrance*, 2025 WL 579639, at *14.[22]

> **f. The Risk of Duplicative Recoveries and Apportionment of Damages Does Not Weigh Against Standing—Factor 6 (Jnt. Mtn. at 37).**

Defendants argue that the risk of duplicative recovery or apportioning damages warrants dismissal. First, there is no current risk of double recovery because despite these cases being on file for over a year and the public FTC actions, no direct purchaser has yet filed suit. Nor can any reasonably be expected, because most of the refining capacity in this country is owned by supermajors, who benefited from Defendants' conspiracy. Second, Defendants again ignore how the *AGC* test must be modified to reflect injunctive relief claims and claims brought under state repealer statutes. *See Lorix*, 736 N.W.2d at 628 (reasoning that the risk of duplicative recoveries "is inherent in the dual system of private antitrust enforcement created by *Illinois Brick* and [*ARC*]"); *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 492 (7th Cir. 2002) (possibility of direct claims under the Sherman Act and indirect claims under state law "presents no risk of duplicate recovery for the same injury under the same law and is thus no bar to the plaintiffs' recovery"). This factor weighs in Plaintiffs' favor.

> **D.    Plaintiffs Sufficiently Plead State Law Claims.**

Defendants incorrectly argue that all Plaintiffs' state law antitrust claims must fail with

---

[22] *See also Flat Panel*, 586 F. Supp. 2d at 1124 ("inappropriate to determine 'complex and intensely factual' damages issues without a more fully developed factual record").

their Sherman Act Claims. *See* §II.A.1.[23] Defendants' remaining arguments are either premature

under the logical antecedent exception to federal standing law, fail on the merits, or both.

### 1. Defendants' State Law Standing Arguments Are Premature.

Defendants challenge Plaintiffs' Article III standing regarding certain state law claims,

arguing named Plaintiffs either do not reside in those states or their purchases do not satisfy state

law requirements. Defendants implicitly concede some members of those state classes have

standing, but argue for dismissal because they claim the named Plaintiffs are not among them.

Since all named Plaintiffs have Article III standing, *see* §III above, whether named Plaintiffs can

represent specific state law classes is a matter for Rule 23 certification, not Rule 12 dismissal.

The "logical antecedent exception" to the general rule that standing must be established by

every plaintiff as to every cause of action at the outset of the case was first recognized by the

Supreme Court in *Anchem Prods., Inc., v. Windsor*, 521 U.S 591, 612 (1997).[24] This exception

allows courts to consider class certification before standing issues when class issues are "logically

antecedent to the existence of any Article III issues." *Amchem*, 521 U.S. at 612. The test to

determine whether class issues are "logically antecedent" to standing is "whether the Plaintiff's

putative standing problem would exist but for the class action nature of this case." *Woodard v.*

---

[23] Defendants do not otherwise challenge Plaintiffs' allegations that Defendants violated the antitrust statutes of California (Count 6), the District of Columbia (Count 11), Iowa (Count 17), Kansas (Count 18), Maine (Count 19), Maryland (Count 20), Michigan (Count 23), Minnesota (Count 25), Nebraska (Count 30), New Hampshire (Count 34), New Jersey (Count 36), New Mexico (Count 37), North Carolina (Count 40), North Dakota (Count 41), Oregon (Count 42), South Dakota (Count 48), Tennessee (Count 50), Vermont (Count 52), and Wisconsin (Count 54), and the consumer protection statutes of Arizona (Count 5), California (Count 7), Colorado (Count 9), and Nebraska (Count 31).

[24] *See Casados v. Safeco Ins. Co. of Am.*, 2015 WL 11089527, at *4 (D.N.M. Nov. 6, 2015); *George v. Urban Settlement Servs.*, 2017 WL 4222620, at *2 (D. Colo. Sept. 21, 2017).

*Fid. Nat. Title Ins. Co.*, 2007 WL 5173415, at *4 (D.N.M. Dec. 4, 2007).  Other Circuit courts and Tenth Circuit district courts, including in the District of New Mexico, recognize this application of the logical antecedent exception.[25]

If a class is not certified for the causes of actions discussed below, all of Defendants' challenges will be mooted.  Thus, the logical antecedent exception applies, and Defendants' arguments should be reserved for class certification.  Regardless, Plaintiffs have sufficiently alleged Article III standing as to each state class, save West Virginia, as discussed in this section.

### a. Plaintiffs Who Made Purchases for Business or Commercial Purposes Are Proper Plaintiffs Under the Consumer Protection Statutes of the District of Columbia, Minnesota, Missouri, Montana, Nevada, and Oregon (Counts 12, 26, 28, 29, 33, 43) (Jnt. Mtn. at 43-44).

Defendants incorrectly contend that Plaintiffs' allegations that Defendants violated certain states' consumer protection statutes fail because Plaintiffs' purchases were for commercial rather than personal use.  *See* Appendix 2.A.  The D.C. Consumer Protection Procedures Act ("CPPA") is to be "read broadly" and "the consumer in a consumer transaction is allowed to have a financial motive." *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, 62 (D.C. Cir. 2010).  However, if the business is a reseller "in the distribution chain . . . then a transaction in the course of that business is not within the Act." *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. Cir. 1989).

---

[25] *See Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1200 (D.N.M. 2016) (advising "courts should" apply logical antecedent exception where appropriate); *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 96 (2nd Cir. 2018) ("whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III"); *Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015) (state standing Rule 23, not Article III issue); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2022 WL 16729170, at *6 (11th Cir. Nov. 7, 2022) (same).

Plaintiff and photography business owner Kevin Allen purchases gasoline to travel for shoots and is not a gasoline reseller.  ¶48.  Consequently, his purchases are covered by the D.C. CCPA.

Minnesota and Nevada statutes do not bar commercial claimants.  *See* Minn. Stat. §645.44 subd. 7 ("[The definition of] '[p]erson' may extend and be applied to bodies politic and corporate, and to partnerships and other unincorporated associations."); *Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.*, 352 N.W. 2d 1 (Minn. 1984) (granting a firearms manufacturer an injunction under Minnesota DTPA); Nev. Rev. Stat. §41.600(1) (permits "any person who is a victim of consumer fraud" to bring a claim under Neveda's Deceptive Trade Practices Act); *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in and for Cnty. of Clark*, 138 Nev. 585, 514 P.3d 425, 430-31 (Nev. 2022) (liberal construction of Nevada DTPA as to who may bring claim).

Facially, Missouri (Count 28), Montana (Count 33), and Oregon (Count 43) require goods to be purchased for "primarily for personal, family, or household purposes."  Mo. Ann. Stat. §407.025; Mont. Code Ann. §30-14-102(1); ORS §646.605.  However, courts have found that these statutes are to be construed broadly and their application "is not limited to those who engage directly in consumer transactions."  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 193 (D. Me. 2004) (as to Montana); *see also Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc. 2001) (Missouri statutory terms are "unrestricted, all-encompassing, and exceedingly broad."); *see also Searle v. Exley Exp., Inc.*, 278 Or. 535, 540, 564 P.2d 1054, 1056 (Or. 1977) (Oregon statute applies "[i]f goods are customarily bought by a substantial number of purchasers for personal, family, or household uses and were, in fact, bought by the plaintiff for his or someone else's use and not for resale").  Plaintiffs allege Plaintiffs Deneige Kapor of Montana, and Russell Deman of Oregon made fuel purchases for personal use

43

in their respective states.  ¶¶34, 59.    Plaintiff Best Expedite, Inc. also regularly purchased gasoline in Missouri.  ¶23.  Therefore, none of these claims should be dismissed.

      **b.  Indirect Purchaser Plaintiff Who Made Purchases for Commercial Purposes Is a Proper Plaintiff Under the Massachusetts Consumer Protection Act (Count 22) (Jnt. Mtn. at 45).**

Defendants argue that Plaintiff Waypoint Residential is not a proper plaintiff under the Massachusetts Consumer Protection Act ("MCPA") because it is a business entity and an indirect purchaser of jet fuel.  The Massachusetts Supreme Court has held that indirect purchasers may bring MCPA claims.  *Ciardi v. F. Hoffman-La Roche, Ltd.*, 436 Mass. 53, 762 N.E.2d 303 (Mass. 2002) (permitting indirect purchaser MCPA claim).  Even if a business entity is not permitted to bring a claim under the MCPA, this claim should proceed because the CCAC names additional Plaintiffs, Catherine Foster and Michael Clancy, who are individual consumers that purchased gasoline in Massachusetts for personal and non-commercial use.  ¶317.

      **c.  Plaintiffs Are Proper Plaintiffs to Bring a Suit under Nevada's Consumer Protection Laws (Count 33) (Jnt. Mtn. at 50).**

Plaintiffs have properly brought a claim under Nevada's Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. §598.0903 *et seq.*, which prohibits unfair competition, and unfair or unlawful acts.  This statute facially limits application by private plaintiffs to elderly or disabled persons.  However, Nev. Rev. Stat. §41.600, which define terms incorporated in the statute Plaintiffs are suing under, provides that "an action may be brought by *any person* who is a victim of consumer fraud" and defines "consumer fraud" to include "[a] deceptive trade practice as defined in Nev. Rev. Stat §598.0915 to 598.0925" (emphasis added).

Further, Defendants are incorrect to argue for heightened 9(b) pleading requirements or reliance.  *See Maddox v. Adler*, 2024 WL 4349481, at *9 (D. Nev. Sept. 29, 2024) (the NDTPA is

"not subject to the heightened 9(b) pleading standard"); *Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 165, 232 P.3d 433, 435 (2010) (not all "deceptive trade practices defined in NRS Chapter 598 sound in fraud"). Plaintiffs have pled a violation of the NDTPA.

>    **d.  Plaintiffs have Article III Standing to Assert Claims under West Virginia Law (Count 53) (Jnt. Mtn. at 39).**

Defendants argue that Plaintiffs lack Article III standing for their West Virginia claim because the CCAC does not include a Plaintiff that resides in or made purchases in West Virginia. However, Defendants' argument is premature because, as discussed above, all Plaintiffs have Article III standing, and this issue is more appropriately considered at class certification.[26]

>    **2.  The Remainder of Defendants' State Law Arguments Fail.**

The remainder of Defendants' motion to dismiss the state law claims also fails because Plaintiffs' claims are not deficient as a matter of law under applicable state laws.

>    **a.  Plaintiffs Are Permitted to Bring Class Action Claims Under the Antitrust and Consumer Protection Laws of Illinois, Montana, and South Carolina (Counts 15, 16, 29, 47) (Jnt. Mtn. at 39).**

Defendants argue that the antitrust and consumer protection laws of Illinois, Montana, and South Carolina prohibit class actions. Defendants are incorrect. The Illinois, Montana, and South Carolina statutory class action bars do not apply to class actions in federal court, which are governed by Federal Rule of Civil Procedure Rule 23. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) (plurality opinion) (state bars are a procedural, not substantive conflict, as "Rule 23 provides a one-size-fits-all formula for deciding the class action question"); *see also In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust*

---

[26] Should the Court disagree, Plaintiffs respectfully request leave to amend to cure.

*Litig.*, 336 F. Supp. 3d 1256, 1311-12, 1341 (D. Kan. 2018) (denying dismissal of Illinois and South Carolina claims); *Broilers*, 290 F. Supp. 3d at 818, 820-21 (adopting *Shady Grove*); *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 299 F.R.D. 648, 654 (S.D. Cal. 2014) (Montana class claim); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1086 (S.D. Cal. 2017) (South Carolina class claim).  Likewise, here, Plaintiffs' claims under these state laws are sufficiently alleged.

### b. Indirect Purchaser Actions Are Not Barred In Colorado and New Jersey (Counts 8 and 36) (Jnt. Mtn. at 40).

Colorado and New Jersey repealed *Illinois Brick* on June 7, 2023, and August 5, 2022, respectively.  *See* Colo. Rev. Stat. §6-4-115; N.J. Stat. §56:9-12.  Plaintiffs allege that Defendants' collusive conduct continued past the amendment date of both state's statutes, ¶¶248-49, so these claims should not be dismissed.  *See In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) (allowing antitrust claims where 2013 statutory amendment fell within alleged class period of 2005-2016).

### c. Plaintiffs Sufficiently Alleged In-State Conduct or Injury Sufficient to State a Claim Under the Alabama, Mississippi, and West Virginia Antitrust Laws (Counts 3, 27, 53) (Jnt. Mtn. at 41).

Defendants incorrectly argue that Plaintiffs fail to allege sufficient in-state conspiratorial conduct under the Mississippi Antitrust Act ("MAA"), West Virginia Antitrust Act ("WVAA"), and Alabama Antitrust Act ("AAA").  Again, Defendants are incorrect as to all three, as the oil taken from U.S. shale fields ultimately finds itself in every state.  ¶¶1, 89, 91, 263(b).  Courts widely hold that plaintiffs "have sufficiently pled intrastate activity where [as here] they allege nationwide antitrust violations, the antitrust impact of which was felt within each state." *Blue Cross & Blue Shield of Vt. v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 548 (D. Vt. 2024)

(finding that this "appears to be the 'majority' view" and denying dismissal of Mississippi, North Carolina, Tennessee, Wisconsin, and West Virginia claims where sole plaintiffs were Vermont-based); *see also In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 375 (D.R.I. 2019) (joining "majority of courts," finding sufficient contact to Tennessee and West Virginia despite no named plaintiffs in those states).   The paucity of Defendants' argument is even clearer when addressed state by state.  *See* Appendix 2.B.

> **d. Plaintiffs Have Provided Notice to the Attorneys General of Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, and Utah (Counts 4, 8, 10, 14, 32, 39, 45, and 51) (Jnt. Mtn. at 42).**

Since filing the CCAC, Plaintiffs have served notice of the lawsuit along with a copy of the CCAC to the Attorneys General of Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, and Utah.  *See* Declaration of Patrick Coughlin filed herewith, Exhibits A-I. To the extent the laws of these states envisage that such notice is provided pre-suit, courts regularly permit plaintiffs to cure such deficiencies by providing post-filing notice.  *See Edgar v. Teva Pharm. Indus., Ltd.*, 2024 WL 1282436, at *34 (D. Kan. Mar. 26, 2024) (denying dismissal of Arizona and Hawaii claims after post-filing notice).   In any event, such notice requirements are procedural and do not apply to cases brought in federal courts.  *See, e.g.*, *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 346 (7th Cir. 1997) ("such a notice requirement is not substantive"); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 835 (E.D. Pa. 2019) ("*Generic II*") (notice requirements "do not alter the substantive elements of Plaintiffs' claims and are not a pleading requirement").  Therefore, delayed notice is not a basis for dismissal.

      **e.  Indirect Purchaser Actions Are Not Barred Under the Consumer Protection Laws of Arkansas, Missouri, and South Carolina (Counts 2, 28, and 47) (Jnt. Mtn. at 44-45).**

Defendants' argument that the Arkansas Deceptive Trade Practices Act ("ADTPA"), Missouri Merchandising Practices Act ("MMPA"), and the South Carolina Unfair Trade Practices Act ("SCUTPA") do not permit indirect purchaser claims, has been regularly rejected.  *See* Appendix 2.C; *see also Batteries*, 2014 WL 4955377, at *19, *22-*23 (refusing to dismiss indirect purchasers' claims under ADTPA and MMPA); *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) (same - MMPA); *Broilers*, 290 F. Supp. 3d at 821 ("follow[ing] the majority of courts on this issue" in refusing to dismiss SCUTPA claims); *Generic II*, 368 F. Supp. 3d at 840-42 (same - ADTPA and SCUTPA).  This Court should reject Defendants' arguments, too.

      **f.  Plaintiffs Have Adequately Alleged Price-Fixing Based Claims Under the Consumer Protection Statutes of Arkansas, the District of Columbia, Illinois, Michigan, New Mexico, Oregon, Pennsylvania, Rhode Island, South Carolina, and South Dakota (Counts 2, 12, 16, 24, 38, 43, 44, 46, 47, and 49) (Jnt. Mtn. at 46-48).**

Defendants mistakenly argue that price-fixing claims are not cognizable under several state consumer protection statutes.  While Plaintiffs concede Defendants' argument as it relates to Maryland (Count 21), Plaintiffs properly and sufficiently plead Defendants' price-fixing conspiracy for the remainder of the state statutes.  *See* Appendix 2.D.

      **g.  Plaintiffs Sufficiently Allege In-State Conduct for Their Illinois and New Hampshire Consumer Protection Claims (Counts 16 and 35) (Jnt. Mtn. at 48).**

Plaintiffs allege in-state conduct as required by the Illinois and New Hampshire Consumer Protection Acts.  Courts analyzing the Illinois Consumer Protection Act ("CPA") look to the site of the injury and the plaintiff's residency to determine whether conduct took place in-state.  *Rivera*

*v. Google Inc.*, 238 F. Supp. 3d 1088, 1101 (N.D. Ill. 2017). Plaintiffs' allegations that: (1) Illinois resident Plaintiff Eric Wilim regularly purchased gasoline in Illinois during the Class Period; and (2) three other Plaintiffs purchased gasoline for business purposes in Illinois, are sufficient to establish in-state conduct for an Illinois CPA claim. ¶304. Similarly, Plaintiffs' allegations that two New Hampshire resident Plaintiffs incurred overcharges on crude derivative fuel products purchased in New Hampshire during the Class Period sufficiently pleads in-state conduct in New Hampshire. ¶344; *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010); *see also* Appendix 2.E.

### h. Plaintiffs Are Not Required to Meet a Heightened Pleading Standard Under the Florida, Michigan, and Pennsylvania Consumer Protection Statutes (Counts 13, 24, 44) (Jnt. Mtn. at 48-49).

Plaintiffs' claims are not subject to Fed. R. Civ. P. 9(b) because they do not sound in fraud (but would satisfy Rule 9 regardless). Under the Michigan's Consumer Protection Act ("MCPA"), Florida's Deceptive and Unfair Practices Act ("FDUPTA"), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), Rule 9(b)'s pleading requirements are not applicable as Plaintiffs plead claims of deception, unfairness, and/or unconscionability. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *17 (D. Mass. Sept. 16, 2015) (MCPA applies to "'charging the consumer a price that is grossly in excess of the price at which similar property or services are sold'") (quoting Mich. Comp. Laws Ann. §445.903(1)); *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*, 2015 WL 4755335, at *24 (N.D. Cal. Aug. 11, 2015) ("[a]nticompetitive conduct alone may give rise to a claim under [the FDUTPA]"); *Fragrance*, 2025 WL 579639, at *21 (deception under the UTPCPL sufficiently

49

plead because "[d]efendants misrepresented the true cause of price increases"); *see also* Appendix 2.F. Thus, Plaintiffs need not satisfy Rule 9(b).

In any event, Plaintiffs have sufficiently alleged the time, place, and contents of Defendants' false representations and the consequences of this conduct, ¶¶109-36, 142-73, and so have satisfied Rule 9(b), should the Court apply it. *See EpiPen*, 336 F. Supp. 3d at 1341-42 (pleading defendants "gave false and misleading statements about EpiPen's profits" met "relaxed" 9(b) standard applied to FDUPTA and PUTCPL); *see also* Appendix 2.F.

### i. Reliance Is Not Required Under the Consumer Protection Statutes of Arkansas and Pennsylvania (Counts 2 and 44) (Jnt. Mtn. at 49).

Defendants incorrectly argue that reliance is required under the Arkansas and Pennsylvania consumer protection statutes. Defendants' cases required reliance because they sound in fraud, while Plaintiffs' allegations here do not. *See In re Motor Fuel Temperature Sales Pracs. Litig.*, 292 F.R.D. 652, 663, n.5 (D. Kan. 2013) (reliance not required "in suits involving many types of unfair business practices"); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 781 (D. Minn. 2020) (ADPTA price-fixing claims do not sound in fraud because "[p]laintiffs did not have to rely on anything to suffer damages; they only had to pay inflated prices for pork"); *Fragrance*, 2025 WL 579639, at *22 (disregarding "reliance" because price fixing met Pennsylvania's standard for "allegedly disingenuous and misleading behavior"); *see also* Appendix 2.G. Thus, Plaintiffs' Arkansas and Pennsylvania consumer protection claims should not be dismissed.

## IV.    CONCLUSION

The Court has subject matter jurisdiction over this case, and the allegations in the CCAC more than adequately plead claims for relief against Defendants. For the reasons stated above, Defendants' motion should be denied in its entirety.

Dated: April 10, 2025

/s/ Christopher A. Dodd
Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

*Interim Liaison Counsel for Plaintiffs and
Putative Class*

Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice* forthcoming)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com
mchadwick@scott-scott.com

Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Karin E. Garvey (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444
kgarvey@scott-scott.com

Michael Dell'Angelo (*pro hac vice*)
Candice Enders (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3080
mdellangelo@bm.net
cenders@bm.net

Richard D. Schwartz (*pro hac vice*)
BERGER MONTAGUE PC
1720 W. Division
Chicago IL 20622
Tel: (773) 257-0255
rschwartz@bm.net

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (*pro hac vice*)
Vara G. Lyons (*pro hac vice*)
Ellen Wen (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98103
Tel: (206) 778-2123
kswope@cpmlegal.com
tloeser@cpmlegal.com
vlyons@cpmlegal.com
ewen@cpmlegal.com
jalhadeff@cpmlegal.com

Joseph W. Cotchett (*pro hac vice*)
Adam Zapala (*pro hac vice*)
Vasti S. Montiel (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
vmoniel@cpmlegal.com

*Interim Co-Lead Counsel for Plaintiffs and the
Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2025, I caused to be served a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record receiving electronic notification.

*/s/Christopher A. Dodd*
Christopher A. Dodd