# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation* <br><br> This Document Relates to: <br><br> ALL ACTIONS | No. 1:24-md-03119-MLG-LF |

**PLAINTIFFS' RESPONSE TO CONTINENTAL RESOURCES, INC.'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DKT. 123)**

**I.     INTRODUCTION**

The CCAC[1] adequately alleges that that Continental Resources, Inc.'s ("Continental") involvement in the conspiracy by establishing that it acted in parallel with Defendants by curtailing production growth despite high market prices and meeting with other Defendants to discuss the agreement.  When viewed as a whole with all inferences drawn in Plaintiffs' favor, as required, Plaintiffs' allegations are sufficient to tie Continental to the cartel.

**II.    ARGUMENT**

    **A.     Continental Disregards Applicable Rule 12(b)(6) Standards.**

Continental's motion disregards the standards that govern the analysis of sufficiency of pleadings under Rule 12(b)(6).  First, Continental's motion relies on isolating the allegations where it is explicitly mentioned by name.  *See* Dkt. 123 ("Cont. Mot.") at 2-3.  This tactic is contrary to the requirement on a motion to dismiss to consider all allegations together as a whole.  *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *Othart Dairy Farms LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1108

---

[1] Unless otherwise noted, all ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Dkt. 86, and all terms and acronyms are defined and used as in the CCAC. "OPEC" refers to the "Organization of Petroleum Exporting Countries," and references to "OPEC" from December 2016 onward include OPEC+.  *See* ¶95.

1

(D.N.M. 2024) (rejecting defendants' request that the court "consider and discard each allegation of parallel conduct or supporting factor in isolation").[2]

Second, Continental repeatedly asks the Court to reject the truth of Plaintiffs' allegations and instead draw inferences in Continental's favor, including that Continental's production decisions were not conspiratorial and that its public statements and meetings with other U.S. shale producers, including Defendants, were entirely innocent. Cont. Mot. at 4-6, 7-12. Continental attempts to refute Plaintiffs' allegations that Continental joined the conspiracy by arguing that Plaintiffs' allegations are wrong: Continental did not conspire with other Defendants to restrict production. By so arguing, Continental has implicitly acknowledged that the CCAC does in fact contain allegations linking Continental to the conspiracy. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("*Broilers*") ("Defendants' arguments boil down to the contention that Plaintiffs' allegations are wrong: they did not agree; they did not cut production; they actually increased market share. But all of these are arguments that should be tested by discovery; and they are not arguments that Plaintiffs have failed to *allege* participation.").

Continental's counter-factual arguments are inappropriate at the motion to dismiss stage. *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) ("Defendants ask the Court to…make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.").

---

[2] Unless otherwise noted, all internal citations and quotations are omitted, all emphasis is added, and all quotations are cleaned up.

### B. Plaintiffs Plausibly Allege Specific Facts that Tie Continental to the Conspiracy.

In weighing an individual defendant's motion to dismiss in Section 1 Sherman Act cases, Tenth Circuit courts ask whether the plaintiffs have alleged specific facts from which one could plausibly infer that the defendant was involved in the broader conspiracy. *See In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1234 (D. Kan. 2010); *Brown v. JBS USA Food Co.*, 2023 WL 6292717, at *12 (D. Colo. Sept. 27, 2023) (there is no requirement that plaintiffs demonstrate that an individual defendant's conduct, "on its own, affect[ed] the entire [ ] industry.").

Here, Plaintiffs have alleged specific facts concerning Continental from which the Court can plausibly infer that they had a role in the greater conspiracy to restrict shale oil production. Plaintiffs allege that on September 8, 2016, Continental's CEO, Harold Hamm, said that major crude oil producers need to settle on a plan to stabilize oil prices and called for "freeze of production." ¶111. Plaintiffs also allege that in September of 2017, Mr. Hamm met with Defendant John H. Hess, CEO of Defendant Hess, and other co-Defendant executives in which they agreed that "lower inventories would be beneficial to everyone . . . ." ¶¶115, 118. Mr. Hamm attended a board meeting of Saudi-owned state oil company Saudi Aramco in 2018. ¶¶118, 125.

Continental attempts to wave away these allegations as "events [that] occurred years before the alleged conspiracy." Cont. Mot. at 11-12. However, the CCAC makes clear that Harold Hamm's communications in 2017 and 2018 helped Defendants establish the foundation on which the conspiracy was built. ¶¶103-110.³ Plaintiffs plausibly allege that this meeting—along with

---

³ The two cases cited by Continental in support of its arguments to disregard the allegations about then-CEO Harold Hamm's kick-starting the conspiracy in 2017-2018 are inapposite. Cont. Mot. at 11-12. Both cases involve allegations that banks rigged time-sensitive trades, and the courts

other interactions between Defendants—were part of the shift from a production-growth, market share, and competition focused strategy to coordination and collaboration between Defendants to restrict U.S. shale oil production. ¶¶109-35. Continental inappropriately asks the Court to isolate Paragraph 118 and construe it in Continental's favor. Cont. Mot. at 12.[4]

However, Plaintiffs' allegations as to Continental are not limited to pre-Class Period activity. Once the conspiracy was operational, Defendants—including Continental—publicly stated their commitments to decelerated production growth in parallel. ¶149(a-g). On a February 2022 earnings call, Continental's CEO Bill Berry proclaimed that Continental would, alongside the other Defendants—in a departure from its past practices and business strategies and despite record-high crude oil prices—be keeping its shale oil production to "flat to 5% annual production growth *over the next five years*." ¶149(b).

Continental claims that its CEO's statements during an earnings call regarding plans for flat to 5% annual production growth *for the next 20 fiscal quarters* cannot support an inference of conspiracy because it is a statement to investors about "how a company plans to maximize its

---

found that communications outside the relevant trading period were unpersuasive. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.* 92 F.4th 381, 398 (2d Cir. 2024) (holding that electronic chats about Treasury auctions occurring in 2011-2012 could not support conspiracy claims outside of those years); *In re Commodity Exch. Inc. Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 229 (S.D.N.Y. 2018) (holding that chat messages sent outside trading hours not probative of a conspiracy to manipulate benchmark price).

[4] The impropriety of Continental's argument is evidenced by its reliance on *Kleen Products LLC v. International Paper*, 276 F. Supp. 3d 811 (N.D. Ill. 2017), cited in Cont. Mot. at 12. That was a summary judgment opinion and thus was decided after discovery under different standards. The other case cited by Continental (Cont. Mot. at 12), *Armory Investments LLC v. Utrecht-American Holdings, Inc.*, 74 F.4th 525, 527 (7th Cir. 2023), is inapplicable. The court there dismissed allegations against a bank for its purported role in the conspiracy to suppress supply of broiler chickens because the allegations only evidenced that the bank was acting in its unilateral interest.

return to shareholders." Cont. Mot. at 10. First, for a business in a market famous for boom-and-bust cycles like oil to announce a static growth number on a 5-year time horizon is objectively absurd. Second, Continental misses the point—Plaintiffs allege that Continental's "plans to maximize its return to shareholders" through restraining production in the face of high prices would be economically ruinous if undertaken unilaterally in a truly competitive market. ¶¶162-66. In other words, the fact that Continental *even could* profitably pursue a strategy of "capital discipline" for as long as it did is evidence of the conspiracy. Second, courts regularly reject similar arguments by antitrust defendants at the pleading stage. *See, e.g.*, *Broilers*, 290 F. Supp. 3d at 799 (rejecting antitrust defendants' arguments that statements on earnings calls had "purposes wholly apart from conspiracy" and noting "[i]t is certainly possible for a statement to have multiple purposes or meanings directed at different audiences"); *Domestic Airline Travel*, 221 F. Supp. 3d at 62 (finding that antitrust defendants' "public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry" supported the plausibility of plaintiffs' claims).

These meetings and statements, when considered alongside the allegations that Continental participated in the anticompetitive production growth reductions detailed below, give rise to a plausible inference of its involvement in the conspiracy. *See Domestic Airline Travel*, 221 F. Supp. 3d at 68-69 (parallel conduct where "various executives from Defendant airlines made statements close in time regarding the exercise of capacity discipline and, in concert, with these statements a new trend of limited capacity growth occurred within the industry"); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *14 (N.D. Cal. May 9, 2011) (alleged conversations in which defendants encouraged coordinated action "might well have legitimate

explanations ... [but c]onstrued in the light most favorable to [p]laintiffs, these communications support an inference that Defendants joined and participated in the conspiracy"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (attendance at meetings in which the conspiracy was discussed indicates that defendant had an opportunity to join the conspiracy); *In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 714-15 (E.D. Pa. 2012) (refusing to dismiss claims against defendants when each "participated in supply reductions").

Still, Plaintiffs allege additional specific facts regarding the plausibility of Continental's role in the conspiracy. *Othart*, 720 F. Supp. 3d at 1108 ("Not all defendants need to participate in all aspects of the allegations so long as each defendant has some role in the conspiracy."). First, Continental was capable of and should have increased production during the Class Period, as Continental's breakeven price (the sale price of an oil barrel at which it is profitable to drill), at $30 during the Class Period, was well below the price of oil during that time. ¶¶147, 150, n.126. Second, Continental's participation in the cartel is why its revenue was greater in 2022 than in any year despite reducing production growth. ¶161, Fig. 7. Third, Continental regularly collaborated and coordinated with Defendants EOG and Hess on shale oil production processes and methods. ¶195(c).

    **C.**    **Plaintiffs Plausibly Allege that Continental Engaged in Parallel Conduct.**

The crux of Continental's motion is that it could not have participated in a conspiracy to limit production of crude oil because it essentially maintained its pre-conspiracy rate of production growth during the Class Period. Cont. Mot. at 1, 4-6. This argument is contrary to the industry's recent history, and premised on an unduly narrow view of "Plaintiffs' theory" of the case, which

6

is not permissible at this stage of the litigation. *Id.* at 4.[5]  Plaintiffs allege that in a competitive market, Defendants, including Continental, would have *accelerated* their growth to take advantage of high prices, their favorable cost structures relative to other producers, and their nimbleness in both ramping up and winding down production relative to other producers. ¶¶9, 142, 144, 149, 160; *see also* ¶98 (discussing shale producers' advantages in the market compared to supermajors). Indeed, before the conspiracy, Defendants increased production growth to capture market share even when prices were low. ¶¶106-07.  But, during the conspiracy, Defendants, including Continental, elected to maintain or decelerate growth, contrary to their individual self-interests absent a conspiracy. ¶¶14, 149, 160, 163. No Defendant[6]—including Continental—increased its rate of production growth during the conspiracy above their pre-Class Period growth rates.[7] ¶160.

---

[5] *Broilers*, 290 F. Supp. 3d at 793 ("Defendants contend that, '[a]lthough the central premise of the claimed conspiracy is reduced output, production actually increased.' This argument fails to undermine Plaintiffs' conspiracy claim for a number of reasons. First, it is based on an incorrect characterization of Plaintiffs' claims. Plaintiffs' theory of the case is not that production decreased in absolute numbers, but that there was a decrease relative to the historic annual rate of production increase.").

[6] Continental cites *In re Pork Antitrust Litigation*, 2019 WL 3752497 (D. Minn. Aug. 8, 2019), and *Miami Products & Chemical Co. v. Olin Corp.*, 449 F. Supp. 3d 136 (W.D.N.Y. 2020), but both cases are readily distinguishable. Cont. Mot. at 5, n.3. Here, Plaintiffs alleged pre-conspiracy and conspiracy period production growth rates for *each Defendant*. ¶160 & Table 1. These Defendant-specific allegations distinguish the instant complaint from the supply restriction allegations dismissed in *Pork*. 2019 WL 3752497, at *8 ("Plaintiffs rely almost exclusively on industry-wide data and ask the Court to infer that the individual Defendants all contributed to the decreased production . . . The Court will not engage in such speculation."). In *Miami Products*, the supply restriction allegations were a plus factor in a price fixing conspiracy and thus it did not matter "how many Defendants actually cut production—just that production was cut" to support the price increases. 449 F. Supp. 3d at 163.

[7] Plaintiffs allege that, absent collusion, shale oil production would have been higher. ¶¶14-15. *See Broilers*, 290 F. Supp. 3d at 796 (accepting at motion to dismiss stage plaintiffs' allegations that defendants conspired to reduce the rate of production increase, not to reduce production absolutely); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F.

Continental acted in parallel with Defendants when it decreased its pre-conspiracy rate growth rate by 1%.[8] *Id.* Indeed, this parallel behavior was noted by *Bloomberg*, who reported on February 24, 2022, that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth despite surging prices, falling into line with most other major U.S. independent shale producers… like [Defendant] Pioneer Natural Resources and Continental Resources[, who] are also limiting increases to less than 5% this year." ¶149(d); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) (parallel conduct where "each Defendant [publicly] signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert").

Continental next claims it could not have acted in parallel with other Defendants because the production growth rates varied among Defendants. Cont. Mot. at 5-6. This is nonsense and finds no support in common sense or the law.[9] Pleading parallel conduct does not require pleading

---

Supp. 3d 65, 115 (E.D.N.Y. 2024) ("Output increasing over time does not address whether output would have increased at a greater rate in the absence of the network restraints.").

[8] Continental's reliance on *Brown*, 2023 WL 6292717, is misplaced. Continental relies on the portion of the opinion where the court dismissed a defendant who was alleged to have entered into an agreement with one other defendant but was not alleged to have participated in the surveys or the accompanying meetings that were central to plaintiffs' claims. Cont. Mot. at 4 (citing *Brown*, 2023 WL 6292717, at *10). Here, Plaintiffs allege that Continental participated in a single supply restriction agreement with all Defendants. Further, the court in *Brown* denied the motions to dismiss filed by two defendants who were alleged to have only participated in a single meeting, holding that the allegations were sufficient to infer each defendant joined the conspiracy. *Brown*, 2023 WL 6292717, at *14-*15. As demonstrated herein and in the CCAC, Continental's participation in the conspiracy here was much more involved.

[9] Continental relies on *Domestic Airline Travel*, 691 F. Supp. 3d at 194, in support of its arguments about parallel conduct, but this case clearly supports Plaintiffs. First, this opinion *denied* defendants' motion for *summary judgment*. Second, a triable issue was found regarding parallel conduct where they showed that "Defendants continued to exercise capacity discipline even after the Great Recession, when fuel prices stabilized and demand increased." 691 F. Supp. 3d at 201. Plaintiffs here allege similar production discipline despite market conditions that would motivate a rational self-interested competitor to increase production rates.

uniform conduct to suppress supply. *See Domestic Airline Travel.*, 221 F. Supp. 3d at 69 ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Plaintiffs do not need to allege that Defendants restricted supply in an identical manner."); *Broilers*, 290 F. Supp. 3d at 792 ("It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator . . . .").

Continental asks the Court to ignore many of Plaintiffs' allegations because they refer to "Defendants" or "shale executives." Cont. Mot. at 12. Continental's proposed prohibition on group pleadings has been explicitly rejected by district courts in this Circuit. *See, e.g.*, *Bledsoe v. Bd. of Cty. Comm'rs of Cnty. of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1080 (D. Kan. 2020) (collective allegations against a defined group of sufficiently specific to survive a motion to dismiss, as "the Tenth Circuit never has adopted a blanket prohibition against collective allegations"); *Scott v. City of Tulsa*, 2022 WL 36879, at *7-*8 (N.D. Okla. Jan. 4, 2022) ("[D]istrict courts in this Circuit have repeatedly refused to dismiss complaints for allegedly improper group pleading" and "[d]ismissal for grouping defendants together at the pleading stage is particularly inappropriate because a plaintiff has not yet had the benefit of discovery.").

In sum, Plaintiffs plausibly allege Continental joined (by meeting with and agreeing with the other Defendants to slow its shale oil production growth) and furthered (by making public statements about production discipline) the conspiracy alongside other Defendants.

### D. Plaintiffs Adequately Plead Plus Factors Applicable to Continental.

Plaintiffs plead that the existence of the conspiracy is supported by numerous plus factors, including market conditions that make the industry susceptible to collusion, opportunities to

9

collude and inter-firm communications, and actions against self-interest.[10] ¶¶190-96, 204-13. These plus factor allegations—like all of Plaintiffs' allegations—must be viewed as a whole, despite Continental's efforts to view each in isolation. *Compare* Cont. Mot. at 6-12 with *Broilers*, 290 F. Supp. 3d at 797 (rejecting antitrust defendants' efforts to isolate each plus factor); *Othart*, 720 F. Supp. 3d at 1108 (rejecting defendants' request that the court "consider and discard each allegation of parallel conduct or supporting factor in isolation").

Continental also improperly asks the Court to draw inferences in its favor—which is contrary to the applicable pleading standards. For example, Continental attempts to rebut Plaintiffs' allegations that it acted against self-interest by arguing: (1) it maintained its pre-conspiracy rate of production growth; and (2) declining to increase its rate of production growth was rational due to the COVID pandemic. Cont. Mot. at 7-9. Neither argument is persuasive.

In a competitive market, Defendants, including Continental, would have *accelerated* their growth, but instead, they maintained (as Continental did) or decreased production growth, contrary to their individual self-interest. ¶¶9, 142, 144, 149, 160, 204-13. Continental's argument that its production decisions were attributable to the COVID pandemic is both implausible on the facts and impermissible at the pleadings stage when the Court must accept Plaintiffs' allegations as true and draw inferences in Plaintiffs' favor. *See, e.g.*, *Othart*, 720 F. Supp. 3d at 1096-97; *Broilers*, 290 F. Supp. 3d at 788 ("[I]t is improper at this stage of the proceedings to weigh alternatives and which is more plausible."); *see also In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002-03 (N.D. Ill. 2011) ("It is not necessary that the factual allegations tend

---

[10] For a complete discussion on Plaintiffs' plus factors, *see* Joint Response, at §II.B.1.b.ii, at 26-29.

to exclude the alternative explanation offered by defendants.") (denying defendants' motion to dismiss in a case alleging a supply restriction conspiracy where defendants made "a somewhat convincing case" that they "naturally had an incentive to reduce capacity").[11]

### E.  Judicial Notice of Materials Outside the Complaint Is Inappropriate.

"When reviewing a motion to dismiss under Rule 12(b)(6), the court generally may not look beyond the four corners of the complaint." *J.D. Heiskell Holdings, LLC v. Willard Dairy, LLC*, 750 F. Supp. 3d 1289, 1293 (D.N.M. Sept. 24, 2024). The Tenth Circuit has identified three exceptions to this rule: "(1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint … [that] are central to plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters … [where] a court may take judicial notice." *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). No exception applies here.

Continental asks the Court to take judicial notice of its Exhibit B, a Form 8-K dated Febuary 24, 2016. Cont. Mot. at 10, n.6. Exhibit B is *not* cited in the CCACand consideration of it at the pleadings stage for the truth of the matters asserted therein is plainly inappropriate. *See United Water and Sanitation District v. Geo-Con, Inc.*, 488 F. Supp. 3d 1052, 1057 (D. Colo. 2020) ("When a court takes judicial notice of documents, it may do so only to show their contents, not to prove the truth of the matters asserted therein."); *Domestic Airline Travel*, 221 F. Supp. 3d

---

[11] The cases relied upon by Continental on this point are distinguishable. *Stanislaus Food Products Co. v. USS-POSCO Industries* affirmed the district court's grant of *summary judgment* following discovery and under different standards. 803 F.3d 1084 (9th Cir. 2015). In *In re January 2021 Short Squeeze Trading Litigation*, the complaint identified companies that were not alleged to be part of the conspiracy that imposed the same restrictions in response to market conditions, thus undermining the argument that the restrictions were irrational absent a conspiracy. 2021 WL 5359731, at *21 (S.D. Fla. Nov. 17, 2021). In *D'Augusta v. American Petroleum Inst*itute, the Ninth Circuit had already found plaintiffs' claims barred by the political question doctrine and act of state doctrine before it addressed the role of COVID. 117 F.4th 1094, 1104 (9th Cir. 2024).

at 69 (rejecting antitrust defendants' attempt "to undercut the Plaintiffs' factual allegations by providing as exhibits to their Motion to Dismiss, documents cited by Plaintiffs in their Complaint and other documents not cited by Plaintiffs"); *Broilers*, 290 F. Supp. 3d at 794; *Olean Wholesale Grocery Cooperative, Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *9 (N.D. Ill. Oct. 19, 2020).[12]

Continental also seeks judicial notice of four articles cited in the CCAC, which it attaches as Exs. A, C, D, and E. Cont. Mot. at 12, n. 7. Judicial notice of materials referenced in the complaint is only appropriate where the documents "are central to the plaintiff's claim." *Jacobsen v. Desert Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). The CCAC cites dozens of articles and other sources. While the four articles attached as Exhibits A, C, D, and E discuss Continental, they are just a handful among many and cannot be characterized as central to Plaintiffs' claims. Even should those documents be considered, those articles and filings support Plaintiffs' allegations of conspiracy when properly considered, not in isolation as Continental suggests, but in proper context of the balance of Plaintiffs' allegations.

### III.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny Defendant Continental's individual motion to dismiss.

---

[12] During its Q4 2021 earnings call, Continental's CEO stated that the company was projecting flat to 5% annual production growth over the next five years. ¶49(b). Continental claims—relying on Exhibit B—that the information on the Q4 2021 earnings call had been publicly disclosed in the years prior to the conspiracy. Cont. Mot. at 10. Even if the Court were to take judicial notice of Continental's Exhibit B (which it should not), Exhibit B does not contain the same information conveyed on the Q4 2021 earnings call. Rather, Exhibit B contains a general statement about "remain[ing] patient and disciplined in our activities." It does not discuss Continental's production growth rate plans. Further, the February 24, 2016 statement in Exhibit B cited by Continental is explicitly limited to the remainder of 2016. Continental's Ex. B ("***For 2016***, we will remain patient and disciplined in our activities…") (emphasis supplied).

12

Dated: April 10, 2025

/s/Christopher A. Dodd
Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

*Interim Liaison Counsel for Plaintiffs and Putative Class*

Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice* forthcoming)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com
mchadwick@scott-scott.com

Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Karin E. Garvey (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444
kgarvey@scott-scott.com

Michael Dell'Angelo (*pro hac vice*)
Candice Enders (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3080
mdellangelo@bm.net
cenders@bm.net

Richard D. Schwartz (*pro hac vice*)
BERGER MONTAGUE PC
1720 W. Division
Chicago IL 20622
Tel: (773) 257-0255
rschwartz@bm.net

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (*pro hac vice*)
Vara G. Lyons (*pro hac vice*)
Ellen Wen (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98103
Tel: (206) 778-2123
kswope@cpmlegal.com
tloeser@cpmlegal.com
vlyons@cpmlegal.com
ewen@cpmlegal.com
jalhadeff@cpmlegal.com

Joseph W. Cotchett (*pro hac vice*)
Adam Zapala (*pro hac vice*)
Vasti S. Montiel (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
vmoniel@cpmlegal.com

*Interim Co-Lead Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2025, I caused to be served a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record receiving electronic notification.

                                                              */s/Christopher A. Dodd*
                                                                Christopher A. Dodd