UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation* <br><br> This Document Relates to: <br><br> ALL ACTIONS | No. 1:24-md-03119-MLG-LF |

**PLAINTIFFS' RESPONSE TO DEFENDANT DIAMONDBACK ENERGY, INC.'S
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (DKT. 124)**

## I. INTRODUCTION

The CCAC[1] alleges sufficient facts to state plausible antitrust claims against Defendant Diamondback Energy Inc. ("Diamondback") for its participation in a conspiracy to constrain domestic shale oil production causing Plaintiffs to pay higher prices for crude oil derivative fuel products purchased in the United States. Diamondback's individual brief ("Diam. Mot.," Dkt. 124) rehashes the arguments made in Defendants' joint brief, improperly rewrites the allegations in a light more favorable to Diamondback, and misstates the applicable law. Under Tenth Circuit precedent, Plaintiffs have pled more than enough to link Diamondback to the well-pled conspiracy. Diamondback's individual motion to dismiss should be denied.

## II. ARGUMENT

Given that an overarching conspiracy has been sufficiently alleged,[2] the only remaining question is whether there is enough factual matter in the complaint to "suggest" that Diamondback was a participant in Defendants' cartel. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008). This is not a heavy burden. "Once a conspiracy is established, only slight evidence is required to connect a co-conspirator," *United States v. Troutman*, 814 F.2d 1428, 1446 (10th Cir. 1987), and at the pleadings stage "courts have held that antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis." *In re*

---

[1] Unless otherwise noted, all ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Dkt. No. 86, and all terms and acronyms are defined and used as in the CCAC. "OPEC" refers to the "Organization of Petroleum Exporting Countries," and references to "OPEC" from December 2016 onward include OPEC+. *See* ¶95.

[2] Background on the allegations in the CCAC and Plaintiffs' arguments that these allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), are contained in Plaintiffs' Response to Defendants' Joint Motion to Dismiss, at §II.B.1.

1

*Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (collecting cases). On a pre-discovery motion to dismiss under Rule 12(b)(6), the allegations here are, again, more than sufficient to tie Diamondback to the conspiracy.

### A.    Legal Standard.

Diamondback seeks to impose a heightened pleading requirement arguing that "even if it could be argued that Plaintiffs have adequately alleged the existence of a supply reduction conspiracy, Plaintiffs have not plausibly alleged that Diamondback was a participant in that conspiracy." Diam. Mot. at 1. At the pleadings stage, the Complaint merely needs to include allegations that plausibly suggest Diamondback participated in the alleged conspiracy and provide reasonable notice of the claims against it. *See In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1234 (D. Kan. 2010) (sufficient that "plaintiffs have pleaded facts from which one could *plausibly* infer that [the defendant] was involved in the conspiracy") (emphasis added); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) (plaintiffs "now [to survive a motion to dismiss] only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy"). This has been described by the Tenth Circuit as "slight evidence." *Troutman*, 814 F.2d at 1446.[3]

To support this argument, Diamondback urges the Court to incorrectly apply the "parallel conduct" and "plus factors" standards to Diamondback individually. *Id*. at 3, 6; *see also id*. at 2

---

[3] Diamondback's cited out-of-circuit authorities are not in disagreement. *See* Diam. Mot. at 2 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (holding that plaintiffs did not "specify how [] defendants are involved in the alleged conspiracy" where "neither is mentioned in the body of the Amended Complaint") and *Hinds County v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("Plaintiffs must allege a factual connection between each Defendant and the alleged conspiracy[.]").

2

(arguing that Diamondback's conduct should be looked at in isolation). But the Supreme Court's directive that pleading a Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made" applies to the entire complaint, not allegations against each defendant standing alone. *Twombly*, 550 U.S. at 556; *Othart Dairy Farms LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1109 (D.N.M. 2024) ("Not all defendants need to participate in all aspects of the allegations so long as each defendant has some role in the conspiracy.").[4] Allegations of antitrust conspiracies, in particular, must be assessed as a whole. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Further, Diamondback urges the Court to evaluate Diamondback's alternative explanations for its conduct. Diam. Mot. at 5. However, Diamondback's alternative explanations cannot be considered on a motion to dismiss. *See Othart*, 720 F. Supp. 3d at 1097 ("The court's role when reviewing 'a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'") (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)); *Broilers*, 290 F. Supp. 3d at 788 ("Although Defendants raise plausible alternative innocent explanations for their conduct, it is improper at this stage of the proceedings to weigh alternatives and which is more plausible.").

Finally, Diamondback's argument that "Plaintiffs routinely make improper and generalized allegations against 'Defendants'" as a group, Diam. Mot. at 10, is unpersuasive as in

---

[4] Diamondback's cited portion of *Llacua v. Western Range Association*, 930 F.3d 1161, 1175 (10th Cir. 2019) addresses the standard for pleading a conspiracy among a group of defendants, *not* the standard for addressing individual defendant allegations after a conspiracy has been found to be adequately pled. Diam. Mot. at 2.

the Tenth Circuit, complaints can rely on group pleadings to plead collective action, for instance of the "Defendants," ¶82, and doing so is not a basis for dismissal under Rule 12(b)(6).[5]

### B. The CCAC Plausibly Alleges Diamondback's Participation in the Conspiracy.

When the CCAC's allegations are properly viewed as a whole, accepted as true, and read in the light most favorable to Plaintiffs, as they must be, the CCAC plausibly suggests Diamondback participated in the conspiracy. Plaintiffs allege that Diamondback participated in (a) the formation of the conspiracy, (b) additional conspiratorial meetings and statements in furtherance of the conspiracy, and (c) the implementation of the conspiracy, using information obtained from the meetings to align their production with competitors. *See* ¶¶82, 134, 149(c), 150(d), 151(a), 152(b), 160, 161 at Fig. 8, 167, 195(d), 197.

Plaintiffs specifically allege that Diamondback participated in inter-Defendant meetings, including the CERAWeek Conference, that precipitated industrywide production curtailment. ¶¶109-35. Plaintiffs further allege facts as to Diamondback's participation in a private dinner held during the March 11-14, 2019 CERAWeek Conference. ¶¶132-35. This private dinner was attended by the CEOs of Diamondback's competitors, including Defendants Hess, Occidental, and Centennial. ¶134. Commenting on this dinner, Diamondback's CEO Travis Stice stated that it was "a very good session" between Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the

---

[5] *See Scott v. City of Tulsa*, 2022 WL 36879, at *7-*8 (N.D. Okla. Jan. 4, 2022) ("district courts in this Circuit have repeatedly refused to dismiss complaints for allegedly improper group pleading" and "[d]ismissal for grouping defendants together at the pleading stage is particularly inappropriate because a plaintiff has not yet had the benefit of discovery") (collecting cases); *Bledsoe v. Bd. of Cty. Comm'rs of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1080 (D. Kan. 2020) ("the Tenth Circuit never has adopted a blanket prohibition against collective allegations").

4

associated balance of what's going on in our industry." *Id.* Plaintiffs further allege an additional private dinner attended by Mr. Stice and other Defendants' executives at a downtown Houston steakhouse in 2023. ¶¶150(d), 152(b). Plaintiffs also allege additional statements by Diamondback employees indicating that Diamondback would "continue to be disciplined" and "maintain[ed] flat production" despite prices, profits, and revenues being high. ¶¶149(c), 151(a), 161 at Fig. 8. And Plaintiffs allege that Diamondback reduced its U.S. production growth rate over the Class Period. ¶161 at Fig. 8. Plaintiffs have alleged far more than mere "participation in [] industry meetings" as Diamondback's rewriting of the facts would have it. Diam. Mot. at 8.

Diamondback seeks to have the Court assume that the allegations in the CCAC are the entirety of Diamondback's collusive conduct. *See* Diam. Mot. at 7. But antitrust conspiracies to artificially inflate prices are secretive, and Plaintiffs have "not yet had the benefit of discovery," so this assumption is inappropriate: the pleadings may not represent the whole universe of Diamondback's conduct. *Scott v. City of Tulsa*, 2022 WL 36879, at *8 (N.D. Okla. Jan. 4, 2022); *see also Broilers*, 290 F. Supp. 3d at 804 ("If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information.").

The exact scope of Diamondback's participation in the conspiracy, the number of meetings it participated in, the dates and contents of conspiratorial communications, the exact nature and scope of production changes, and the agreements reached and enforced to suppress capacity will be determined through discovery. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("Questions as to each

Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase."); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *33 (N.D. Cal. Oct. 2, 2014) ("Once a defendant's participation in the conspiracy is adequately alleged, questions about the scope of their participation are better decided on a complete factual record.").

At this stage, Plaintiffs' allegations that Diamondback restrained its production in parallel with its co-conspirators, participated in high-level meetings at which forward-looking competitive information was exchanged, and made statements in furtherance of the conspiracy are more than sufficient to plausibly suggest Diamondback participated in the conspiracy. *Brown v. JBS USA Food Co.*, 2023 WL 6292717 at *12-*16 (D. Colo. Sept. 27, 2023) (finding sufficient plaintiffs' allegations that each defendant was involved in the conspiracy because each defendant "either cut production or took action to restrain production at some point during the relevant time period" and "that executives from these companies participated in industry conferences and trade associations meetings").

Plaintiffs also allege that Diamondback had the excess capacity and resources to ramp up production growth during the Class Period, as well as breakeven prices well below the price of oil (approximately $32 per barrel), yet opted not to because of the conspiracy to restrict U.S. oil prices. ¶144, n.105.  And that a former lease manager at Diamondback said the company often collaborated with other U.S. shale oil producers and found it odd that "even with multiple acquisitions and growth, [Diamondback] always maintain[ed] flat production and flat oil sales" during the Class Period.  ¶¶155(a), 195(d).  Finally, that Diamondback reaped record profits due

to the illicit domestic cartel's production restriction. ¶161, Fig. 8. Thus, Diamondback's individual motion to dismiss should be denied on this basis alone.

    **C.    Even If the Court Were to Look at Evidence Against Diamondback in Isolation, Plaintiffs' Allegations Concerning Diamondback's Involvement in the Conspiracy Are Sufficiently Pled and Should Proceed.**

Even if the Court were to accept Diamondback's invitation to analyze "parallel pricing," "plus factors," and alternative explanations as to Diamondback, its arguments still fail.

    **1.    Plaintiffs Sufficiently Allege that Diamondback Engaged in Parallel Conduct by Curtailing U.S. Shale Oil Production Growth.**

Diamondback contends that it did not reduce supply in parallel with its competitors and that therefore Plaintiffs are unable to sufficiently allege parallel conduct between Diamondback and its co-Defendants. Diam. Mot. at 3. However, Plaintiffs do not need to demonstrate that Diamondback cut or limited capacity in exactly the same way as any other Defendant in order to adequately allege parallel conduct. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016). Instead, Plaintiffs must only show that Defendants engaged in production cuts that were "reasonably proximate in time and value." *Connecticut v. Aurobindo Pharma USA, Inc.*, 2025 WL 437302, at *6 (D. Conn. Feb. 7, 2025); s*ee also Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077, nn.8-9 (N.D. Ill. 2011) (finding that "[v]ariations in the size of capacity reductions do not disprove the existence of a conspiracy" and "[c]apacity reductions need not be simultaneous to demonstrate conscious parallelism").

Plaintiffs have met that standard here. Plaintiffs allege that Diamondback and its competitors "exploited their position as global marginal producers by agreeing to curtail their respective crude oil production to keep U.S. and global crude oil prices artificially high." ¶82. In addition to the substantial allegations of parallel conduct pled against Diamondback and its co-

7

conspirators, Plaintiffs plead specific facts as to Diamondback. For example, at Paragraph 160 of the CCAC, Plaintiffs plead that Diamondback reduced its U.S. Oil Production Growth Rate in parallel with is competitors and provide the following allegations: The Table shows that Defendants all decreased production growth despite rising prices far exceeding their prevailing breakeven and excess capacity, which is contrary to any individual Defendant's—including Diamondback's—self-interest. This allegation must be credited at this stage of the litigation. *See Othart*, 720 F. Supp. 3d at 1097 ("The court's role when reviewing 'a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'") (quoting *Miller*, 948 F.2d at 1565). Moreover, Plaintiffs allege additional facts suggesting that Defendants, including Diamondback, acted in parallel including common ownership, ¶197, and other forms of cooperation among the Defendants. ¶195(d).

Diamondback further contends that because it increased its production of shale oil by a rate of 19% during the alleged conspiracy period, it could not have plausibly participated in a conspiracy to restrain output. Diam. Mot. at 1. However, Diamondback's production growth rate was much higher in 2017 to 2019 at 220% and then dropped dramatically to 19%, which is a clear shift from its historical rate of production increase, and which Diamondback's own employee described as strange. ¶151(a). Diamondback also argues that this "was the third-highest growth rate of all Defendants," Diam. Mot. at 3, which does nothing to address their precipitous decline in growth rate and places Diamondback directly in the middle of the pack of its co-conspirators. Therefore, Plaintiffs' allegations of parallel production growth rate decreases are sufficient to show parallel conduct. *See Broilers*, 290 F. Supp. 3d at 793 ("Plaintiffs' theory of the case is not that

8

production decreased in absolute numbers, but that there was a decrease relative to the historic annual rate of production increase.").

### 2. The Parallel Conduct of Diamondback's CEO Travis Stice Is Evidence of Diamondback's Involvement in the Alleged Conspiracy.

Diamondback's CEO Travis Stice is at the center of the alleged conspiracy. On February 22, 2022, Mr. Stice said that Diamondback would keep its shale oil production flat in 2024 while increasing dividends and share buyouts, noting "we have no reason to put growth before returns . . . we will continue to be disciplined." ¶149(c). This statement is evidence of the alleged conspiracy, of Diamondback's participation in it, and of Diamondback's excess capacity. Plaintiffs allege that lack of domestic competition was the reason Diamondback had "*no reason* to put growth before returns," and that doing so would be economically ruinous if undertaken unilaterally in a market as competitive as shale oil. ¶¶162-66. The fact that Diamondback *felt no pressure* to grow production, despite having excess capacity and despite oil prices well in excess of industry-wide breakevens, and could profitably pursue a strategy of "capital discipline" for as long as it did is evidence of the conspiracy.

Plaintiffs allege that executives from each Defendant parroted the exact same language (*i.e.*, "discipline") throughout 2021 and 2022. ¶¶143, 149. And, as explained above, each Defendant limited their production growth during the Class Period. These allegations are sufficient to demonstrate parallel conduct. *See, e.g.*, *Domestic Airline Travel*, 221 F. Supp. 3d at 68-69 (parallel conduct where "various executives from Defendant airlines made statements close in time regarding the exercise of capacity discipline and, in concert, with these statements a new trend of limited capacity growth occurred within the industry"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) (parallel conduct where "each

9

Defendant [publicly] signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert"); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000) (parallel conduct properly found when competitors adopted "new policies [that] represented a radical shift from the industry's prior business practices").

Additionally, Diamondback argues that Plaintiffs do not allege that Mr. Stice attended any meeting with Defendants "that included any discussion about Diamondback's production plans." Diam. Mot. at 8. Diamondback is wrong. Plaintiffs allege that in March 2023, Mr. Stice attended a private dinner with executives from Defendants Chesapeake Energy, Occidental Petroleum, Pioneer, and Hess, and at the dinner the Defendants discussed, among other matters, the "output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner." ¶152(b). Sharing an aggregate forecast implies that the participants, including Mr. Stice, had to share their own firm's output plans. That Mr. Stice attended this meeting is strong evidence of Diamondback's participation in the alleged conspiracy. *See Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*, 2024 WL 4884472, at *6 (D. Colo. Nov. 25, 2024) (fact that "Defendants attended exclusive meetings at which they discussed" the alleged conspiracy is plus factor); *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 255 (E.D. Pa. 2016) (notes from meeting between competitors referencing agreement traditional conspiracy evidence).

### 3. There Is No Requirement that Plaintiffs Allege "Plus Factors" Specifically as to Diamondback.

Diamondback also argues that, even if Plaintiffs have plausibly alleged a conspiracy among Defendants *and* that Diamondback constrained its production in parallel with the other Defendants, the CCAC still must fail because Plaintiffs have failed to properly allege plus factors specifically as to Diamondback. Diam. Mot. at 6. Diamondback cites to *no authority* supporting

10

its contention that the Court should analyze plus factors as to Diamondback individually. For the reasons discussed above, such parsing of the CCAC is impermissible and a misapprehension of the law. *See Othart*, 720 F. Supp. 3d at 1108. And as outlined above, Plaintiffs here have pled more than enough factual content as to Diamondback. *See also In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1067-69 (N.D. Cal. 2015) (allegations that one defendant participated in single trade show discussion to exchange competitively sensitive information, second participated in single cartel meeting, and third alleged to attend at least one meeting, together with general information about the cartel meetings where defendants facilitated their conspiracy, sufficient to sustain claims against all).

### 4. Diamondback's Alternative Explanations Are Not Suitable for Resolution on a Motion to Dismiss.

The remainder of Diamondback's individual brief boils down to arguing alternative explanations for Diamondback's conduct. *See, e.g.*, Diam. Mot. at 1 ("Diamondback did not make production decisions in parallel with its competitors, but rather pursuant to a unilateral and economically rational strategy driven by market factors and the directives issued by Diamondback's core shareholders."); 4-6 (discussing CEO Stice's statements); 8-10 (statements by another Diamondback employee). This is impermissible. For now, the Court must accept Plaintiffs' version of events as true. *See Domestic Airline Travel*, 221 F. Supp. 3d at 71-72 ("Defendants ask the Court to consider all the facts in the Complaint and the underlying documents provided as exhibits to their briefing and make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.").

Diamondback cites no authority for the proposition that the Court should weigh alternative explanations for an *individual* Defendant's behavior.[6]  "Although [Diamondback] [may] raise plausible alternative innocent explanations for [its] conduct, it is improper at this stage of the proceedings to weigh alternatives and which is more plausible." *Broilers*, 290 F. Supp. 3d at 788. *See also id.* at 801 ("*Twombly* does not stand for the proposition that the mere existence of an alternative explanation for Defendants' conduct serves to destroy the plausibility of Plaintiffs' conspiracy claims . . . the Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct.").  In any case, Diamondback's excuses fall flat, as "[r]uinous competition, financial disaster, evils of price cutting and the like" from foreign pressures and prices wars are not an excuse to fix prices.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221, 224, n.59 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness.  They are all banned . . . .").

### III. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny Defendant Diamondback Energy Inc.'s individual motion to dismiss.

---

[6] Diamondback cites to *D'Augusta v. American Petroleum Institute*, 117 F.4th 1094, 1104 (9th Cir. 2024) in support of its argument that "following the directives of shareholders" is a non-conspiratorial "obvious alternative explanation' for the challenged conduct[.]"  Diam. Mot. at 5.  Yet, Plaintiffs allege that common investors exerted influence to discourage aggressive competition in shale oil production and acted as the enforcement mechanism for Defendants' conspiracy, further supporting an inference of coordinated action.  ¶¶165-67, 200, n.179.

Dated: April 10, 2025

/s/Christopher A. Dodd
Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

*Interim Liaison Counsel for Plaintiffs and Putative Class*

Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice* forthcoming)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com
mchadwick@scott-scott.com

Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Karin E. Garvey (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444
kgarvey@scott-scott.com

Michael Dell'Angelo (*pro hac vice*)
Candice Enders (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3080
mdellangelo@bm.net
cenders@bm.net

Richard D. Schwartz (*pro hac vice*)
BERGER MONTAGUE PC
1720 W. Division
Chicago IL 20622
Tel: (773) 257-0255
rschwartz@bm.net

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (*pro hac vice*)
Vara G. Lyons (*pro hac vice*)
Ellen Wen (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98103
Tel: (206) 778-2123
kswope@cpmlegal.com
tloeser@cpmlegal.com
vlyons@cpmlegal.com
ewen@cpmlegal.com
jalhadeff@cpmlegal.com

Joseph W. Cotchett (*pro hac vice*)
Adam Zapala (*pro hac vice*)
Vasti S. Montiel (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
vmoniel@cpmlegal.com

*Interim Co-Lead Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2025, I caused to be served a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record receiving electronic notification.

>        */s/Christopher A. Dodd*
>          Christopher A. Dodd