UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

*In re: Shale Oil Antitrust Litigation*

This Document Relates to:

ALL ACTIONS

No. 1:24-md-03119-MLG-LF

**PLAINTIFFS' RESPONSE TO DEFENDANT
<u>EOG RESOURCES, INC'S MOTION TO DISMISS (DKT. 125)</u>**

I.     **INTRODUCTION**

The CCAC plausibly alleges that Defendant EOG Resources, Inc. ("EOG") participated in a conspiracy to suppress U.S. shale oil production, thereby artificially inflating prices and violating the antitrust laws.[1] EOG's Motion to Dismiss ignores all but seven of the 385 paragraphs of the CCAC. *See* Dkt. 125 ("EOG Mot.") at 1-2. EOG isolates these seven allegations rather than viewing the allegations in context of the rest of Plaintiffs' allegations, analyzes the allegations in the light most favorable to it rather than Plaintiffs, and offers alternative explanations—based on facts not alleged in the CCAC—for its conduct. None of this is permissible on a motion to dismiss.

Defendants, including EOG, engaged in anticompetitive conduct. Plaintiffs allege that the anticompetitive scheme was achieved through regular meetings and communications among the Defendants, starting as early as 2017. ¶11. The CCAC also describes parallel output restrictions in a manner contrary to Defendants' economic self-interest and historical behavior, ¶¶160-73, concurrent sky-high oil and gasoline prices that would otherwise incentivize Defendants to expand production, ¶224, and the relevant "plus factors" demonstrating how the structure of the oil industry is susceptible to collusion. ¶¶190-213. EOG played a central role in the conspiracy by making multiple statements that signaled to the other Defendants its commitment to the illegal agreement to restrict production. ¶¶140, 143(f), 149(f).

These allegations are more than "enough factual matter (taken as true) to suggest that an agreement was made" and certainly "enough fact[s] to raise a reasonable expectation that

---

[1] Unless otherwise noted, all ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Dkt. 86, and all terms and acronyms are defined and used as in the CCAC. "OPEC" refers to the "Organization of Petroleum Exporting Countries," and references to "OPEC" from December 2016 onward include OPEC+. *See* ¶95.

1

discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[2] Therefore, the only remaining question is whether there is enough factual matter in the complaint to "suggest" that EOG was a participant in this cartel. This is not a heavy burden. "Once a conspiracy is established, only slight evidence is required to connect a co-conspirator," *United States v. Troutman*, 814 F.2d 1428, 1446 (10th Cir. 1987), and at the pleadings stage "courts have held that antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (collecting cases). Applying the correct standards on a motion to dismiss, Plaintiffs have plead sufficient facts to link EOG to the well-pled conspiracy. Accordingly, EOG's motion to dismiss should be denied.

## II.   ARGUMENT

### A.   EOG Eschews the Rule 12(b)(6) Legal Standards.

On a motion to dismiss, allegations must be considered as a whole, not in isolation. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (holding at trial "[p]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . (T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *Othart Dairy Farms LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1108 (D.N.M. 2024) (rejecting defendants' request that the court "consider and discard each allegation of parallel conduct or supporting factor in isolation"). At this stage,

---

[2] *See* Joint Response, at §II.B.1.

"the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor." *Othart*, 720 F. Supp. 3d at 1096-97.

EOG subverts these standards by viewing seven paragraphs of the CCAC in isolation, disagreeing with the allegations, and drawing all inferences in its favor rather than Plaintiffs. EOG Mot. at 4-5, 7-9.[3] EOG essentially argues that Plaintiffs are wrong: it did not conspire with the Defendants to restrict output and inflate prices. By so arguing, EOG has implicitly acknowledged that the CCAC does in fact contain allegations linking EOG to the conspiracy. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("*Broilers*") ("Defendants' arguments boil down to the contention that [p]laintiffs' allegations are wrong: they did not agree; they did not cut production; they actually increased market share. But all of these are arguments that should be tested by discovery; and they are not arguments that Plaintiffs have failed to *allege* participation."); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) ("Defendants ask the Court to . . . make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.").

---

[3] EOG argues that "the Tenth Circuit holds that '[t]he conspiracy is not plausible if in light of common economic experience[,] the alleged conduct is equally likely to result from independent action.'" EOG Mot. at 3 (citing *Llacua v. Western Range Ass'n*, 930 F.3d 1161, 1175 (10th Cir. 2019)). But *Llacua* is distinguishable. In *Llacua*, the court found that "the very actions the [Plaintiffs] contend support the inference of a conspiracy" were, in part, permitted or required by regulation, making conspiracy allegations implausible. *Id.* at 1181-82. Here, Defendants were not required to suppress oil production because of regulation.

3

### B. Plaintiffs Adequately Plead that EOG Participated in the Conspiracy to Restrict U.S. Shale Oil Production.

When evaluating a motion to dismiss by an individual defendant in Section 1 Sherman Act cases, courts in the Tenth Circuit consider whether the plaintiffs have alleged specific facts that plausibly suggest the defendant's participation in the overarching conspiracy. *See In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1234 (D. Kan. 2010); *Brown v. JBS USA Food Co.*, 2023 WL 6292717 at *12-*16 (D. Colo. Sept. 27, 2023) ("*Brown*") (there is no requirement that plaintiffs demonstrate that an individual defendant's conduct, "on its own, affect[ed] the entire [] industry").

Here, Plaintiffs have alleged enough specific facts involving EOG from which the Court can plausibly infer that it had a role in the conspiracy to restrict U.S. shale oil production. Plaintiffs allege that in November 2020, EOG CEO Bill Thomas spoke on behalf of Defendants in signaling to OPEC that the domestic cartel had been formed: "In the future, certainly we believe OPEC will be the swing producer—really, totally in control of oil prices . . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices." ¶140. This statement is evidence that, right before the Class Period began, EOG agreed with the other Defendants to not ramp up production and push prices down, thereby abdicating their role as a global swing producer, ¶¶14, 140-43, 159-60, despite having the excess capacity and resources to do so. ¶¶143-52, 225. *See B & R Supermarket, Inc. v. Visa, Inc.*, 2016 WL 5725010, at *6-*7 (N.D. Cal. Sept. 30, 2016) (treating an allegation that a credit card V.P. said that "the card brands are not going to delay the liability shift date" as direct evidence of agreement because she "could not speak so confidently on behalf of all networks save and except for her knowledge of

collusion, for true competition would have driven one or more networks to break ranks and offer more competitive terms").

Plaintiffs allege that EOG abided by this agreement, which is evinced by further public statements. On an August 2021 earnings call, Mr. Thomas echoed language first said by Defendant Permian Resources' CEO earlier that year, ¶143(b), when he said it was a "new era" of collaboration in the global crude oil market and confirmed "the U.S. will remain disciplined." ¶143(f). On an August 2022 earnings call, EOG again "committed to remaining disciplined" and promised to keep production growth in the "low single digits." ¶149(f). EOG's actions mirrored that sentiment—EOG only increased its production growth rate from 2021 to 2023 by 6% despite spare capacity and oil prices well above its breakeven price. *Id.*, ¶144, n.105 (the oil price for EOG to secure a 10% return on capital was $40). This left industry observers stunned. For example, in February 2022, a *Bloomberg* article asked why EOG would not "take advantage of higher prices by pumping more crude from its shale fields." ¶149(b).

In addition, EOG and Defendant Pioneer pulled back their hedge positions to protect against downward oil price movements. ¶¶154-58. This was an unprecedented move that made little economic sense because it left the Defendants vulnerable and exposed to substantial economic risk if prices were to go down. *Id.* EOG offers alternative explanations for this behavior, EOG Mot. at 8, and improperly asks the Court to accept its interpretation of the facts which is not permitted at the pleading stage. *Broilers*, 290 F. Supp. 3d at 799 (rejecting antitrust defendants' arguments that statements on earnings calls had "purposes wholly apart from conspiracy" and noting "[i]t is certainly possible for a statement to have multiple purposes or meanings directed at different audiences"); *Domestic Airline Travel*, 221 F. Supp. 3d at 62 (finding that antitrust

5

defendants' "public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry" supported the plausibility of plaintiffs' claims). Plaintiffs allege that, despite slowing its production growth and taking risky positions in the oil futures market, EOG was able to collect record profits during the Class Period due to the conspiracy. ¶161, Fig. 9.

Additionally, Plaintiffs allege that EOG has common core shareholders with the other Defendants. ¶197. Plaintiffs allege that the shareholders participation in Defendants' relationships with each other served as a mode of communication and an enforcement mechanism for Defendants' agreement to restrict output.[4]  ¶¶198-203. Plaintiffs allege that the CEO of EOG's co-Defendant, Pioneer, admitted Defendants' interlocking shareholders exerted anticompetitive pressure on Defendants. ¶200, n.179 ("All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."). In further support, Plaintiffs allege that "[i]n September 2017, twelve major shareholders representing nearly 5% of shares in the 20 largest U.S. shale oil companies (which includes Defendants), met in New York to 'discuss a common goal': 'how to make frackers pump less and profit more.'" ¶117.

Plaintiffs further allege that Defendant Permian Resources, formerly known as Centennial, asked EOG Resources to modify its fracking schedule to accommodate Centennial's production plans and a former fracking consultant for EOG said that "gentleman's agreements" in the industry are prevalent. ¶195(a). Plaintiffs also allege that a former senior construction manager for

---

[4] "[C]ommon ownership, which occurs when individual investors hold non-controlling interests in firms that have a competitive relationship" can "influence decision-making . . . in ways that may substantially lessen competition."   U.S. DEP'T OF JUST. & FED. TRADE COMM'N, *Merger Guidelines*, §2.11 (2023).

6

Defendant Hess said that he attended a regular in-person roundtable with "all top tier producers," including EOG, to discuss extraction process, measuring wells, and other construction and operation methods. ¶195(c). The allegations that EOG participated in the anticompetitive production growth reductions, as well as allegations about cooperative production schedules, give rise to a plausible inference of its involvement in the conspiracy. *See In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 714-715 (E.D. Pa. 2012) (refusing to dismiss claims against defendants when each "participated in supply reductions").

    **C.**    **Plaintiffs Adequately Plead Parallel Conduct.**

Plaintiffs have sufficiently pled parallel conduct. The CCAC alleges that EOG significantly suppressed its oil production growth rate from 36% in 2017-2019 to 6% in 2021-2023, and all other Defendants likewise suppressed their output. ¶¶14, 149, 160, Table 1, 163. This was not ignored by market commentators at the time. Indeed, *Bloomberg* reported on February 24, 2022, that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers . . . like [Defendant] Pioneer Natural Resources and [Defendant] Continental Resources[, who] are also limiting increases to less than 5% this year." ¶149(d). Abiding by this statement and Defendants' agreement, in 2022, EOG increased production by only 4% and said that it was targeting the same increase in 2023. ¶149(f).

EOG's claim that it never reduced its oil production output (EOG Mot. at 9) cannot be credited as the alleged 6% growth rate during the Class Period is plainly lower than pre-Class

7

Period's 36% growth rate.[5]  EOG further claims that the alleged specific amounts of each Defendant's suppression of oil production growth rates varied and thus cannot support an inference of conspiracy.  EOG Mot. at 9.  But pleading parallel conduct does not require pleading uniform conduct to suppress supply.  *See, e.g.*, *Domestic Airline Travel*, 221 F. Supp. 3d at 69 ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Plaintiffs do not need to allege that Defendants restricted supply in an identical manner."); *Broilers*, 290 F. Supp. 3d at 792 ("It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator . . . .").

Plaintiffs further allege that once the conspiracy was operational, Defendants, including EOG, publicly stated their commitments to decelerated production growth in parallel.  ¶¶143(d, f), 149(f).  EOG claims that these public statements reflect independent conduct regarding its output and statements to investors about market conditions and therefore do not show a conspiracy.  EOG Mot. at 4-5.  Even if these statements were plausible responses to investor and analyst questions as EOG contends (a question for another day), they still plausibly show parallel conduct supporting conspiracy allegations and price signaling.  *See In re Delta/AirTran Baggage Fee Antitrust Litig.,*

---

[5] EOG's assertion that it always increased output (EOG Mot. at 9) misses the point.  For purposes of analyzing output in antitrust case, the appropriate question is what would EOG's oil output have been but for its anticompetitive conduct.  *See Broilers*, 290 F. Supp. 3d 772, 796 (N.D. Ill. 2017) (accepting at motion to dismiss Plaintiffs' allegations that Defendants conspired to reduce the rate of production increase, not to reduce production absolutely); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 115 (E.D.N.Y. 2024) ("Output increasing over time does not address whether output would have increased at a greater rate in the absence of the network restraints.")  Plaintiffs allege that, absent collusion, EOG's U.S. shale oil production would have been higher, and that EOG effectively admitted that it was not producing as much oil as it could be despite high oil prices due to its commitment to production discipline.  ¶149(f) ¶¶14-15.

733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("[I]t is clear that anticompetitive coordination can also be arranged through public signals and public communications, including speeches, press releases, trade association meetings and the like"); *In re Domestic Airline*, 221 F. Supp. 3d at 62 (finding that antitrust defendants' "public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry" supported the plausibility of plaintiffs' claims).[6]

EOG ignores these detailed allegations of parallel conduct, instead trying to explain away its oil output suppression as an independent response to "marketplace instability and uncertainty" and concluding the CCAC does not plausibly allege EOG's participation in the conspiracy. EOG Mot. at 9. But this alternative explanation for EOG's conduct must be rejected on a motion to dismiss.[7]  *See, e.g.*, *Broilers*, 290 F. Supp. 3d at 788 ("Although Defendants raise plausible

---

[6] EOG's contention that "[s]tatements to investors regarding prevailing market conditions" cannot plausibly allege conspiracy (EOG Mot. at 5) is a merits argument which must be decided on summary judgment. Not surprisingly, the cases EOG cites to support this argument, *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) and *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343 (N.D. Ga. 2017) were decided at summary judgment after the factual record was fully developed.

[7] EOG's reliance on *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, is misplaced. In *Matsushita*, after the parties engaged in "several years of detailed discovery" the court granted summary judgment because the evidence did not "exclude the possibility that the alleged conspirators acted independently." 475 U.S. 574, 578, 588 (1986) (emphasis added). The same is true for *Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999), where the court affirmed a summary judgment decision finding that defendants did not illegally restrain trade absent evidence of agreement.

EOG also cites *Cayman Exploration Corp. v. United Gas Pipe Line Co.* and *D'Augusta v. American Petroleum Institute* to argue that Plaintiffs' claims against EOG fail because EOG's production rates are "consistent with permissible competition as it is with illegal conspiracy." EOG Mot. at 8-9. In *Cayman*, the plaintiff alleged a "concerted action . . . for all transmission companies to uniformly breach contracts with producers" to force lower gas prices. 873 F.2d 1357, 1361 (10th Cir. 1989). The court dismissed the claim because the plaintiff failed to "identify the alleged

alternative innocent explanations for their conduct, it is improper at this stage of the proceedings to weigh alternatives and which is more plausible.").

When the factual allegations here are viewed in their entirety, they show that EOG acted in parallel with Defendants when it decreased its pre-conspiracy growth rate, communicated with erstwhile competitors, and coordinated hedge positions.[8]

### D. Plus Factor Allegations Plausibly Imply EOG's Participation in the Conspiracy.

The CCAC contains detailed plus factor allegations about actions against self-interest, opportunities to conspire, common ownership, and market conditions that must be considered together with the allegations about EOG's conduct and output suppression. Collectively, these

---

conspirators, when or how they functioned, or the nature and extent of [the defendant's] participation," and did not allege any facts showing an anticompetitive market effect. *Id.* The court found the dispute contractual, not antitrust. *Id.*

In *D'Augusta*, the court found that Plaintiffs failed "to allege which Defendants of these 'major oil companies' reduced their production, or when or how they allegedly made these decisions. Nor do Plaintiffs allege the amount of production cut or why these unnamed 'major oil companies' did so." *Id*. at 1104. Here, Plaintiffs specifically identify the conspirators and each one's suppressed output and the reasons for doing so—an anticompetitive scheme to depress output and artificially inflate the price of oil.

[8] EOG argues that, viewed collectively, the allegations are insufficient to plausibly plead a conspiracy including EOG. EOG Mot. at 11. But EOG has not viewed the allegations collectively. It ignores all allegations in the CCAC except for the seven paragraphs highlighted in its brief. Having given mere lip-service to the appropriate standard, EOG's argument cannot be credited.

EOG's reliance on *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*, is misplaced. *See* EOG Mot. at 6, 11. In *DRAM*, plaintiffs alleged that they paid artificially inflated prices for DRAM devices because defendants colluded to constrain DRAM supply. 28 F.4th 42, 46 (9th Cir. 2022). But in *DRAM*, plaintiffs' allegations showed that the timing of the production cuts did not align with plaintiffs' theory (*id*. at 49-50) and showed 'follow the leader' conduct rather than anticompetitive collusion (*id*. at 50-51).

allegations plausibly support an alleged conspiracy to suppress oil product and EOG's connection to it.[9]

Plaintiffs allege that, in a competitive market, Defendants, including EOG, would have *accelerated* their growth to take advantage of high prices, their favorable cost structures relative to other producers, and their nimbleness in both ramping up and winding down production relative to other producers. ¶¶9, 98, 142, 144, 149, 160. Indeed, before the conspiracy, Defendants increased production growth to capture market share even when prices were low. ¶¶106-107. But, during the conspiracy, Defendants, including EOG, elected to maintain or decelerate growth, contrary to their individual self-interests absent a conspiracy. ¶¶14, 149, 160, 163. No Defendant—including EOG—increased its rate of production growth during the conspiracy. ¶160.

EOG's arguments also disregard the fact that antitrust conspiracies to artificially inflate prices are secretive, and Plaintiffs have not yet had the benefit of discovery. Accordingly, EOG's assertion about the lack of factual detail concerning particular meetings, discussions or agreements with any of the other Defendants is inappropriate: the pleadings may not represent the whole universe of EOG's conduct.[10] *See, e.g.*, *Scott v. City of Tulsa*, 2022 WL 36879, at *7-*8 (N.D. Okla. Jan. 4, 2022); *Broilers*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("If private plaintiffs, who

---

[9] For a complete discussion on Plaintiffs' plus factors, *see* Joint Response, §II.B.1.b.ii, at 26-29.

[10] EOG's reliance on *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) to argue Plaintiffs must "make clear exactly who is alleged to have done what" is misplaced. EOG Mot. at 10-11. In *Kansas Penn Gaming*, plaintiffs alleged a civil rights violation under §1983 which requires for each defendant allegations of personal involvement in the civil rights violation. 656 F.3d at 1121. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (EOG Mot. at 7) is another civil rights case premised on allegations "with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."

11

do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information."). The exact scope of EOG's participation in the conspiracy, the number of meetings it participated in, the statements made by EOG employees, the dates and contents of conspiratorial communications, the exact nature and scope of production changes, and the agreements reached and enforced to suppress capacity will be determined through discovery. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase."); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *33 (N.D. Cal. Oct. 2, 2014) ("Once a defendant's participation in the conspiracy is adequately alleged, questions about the scope of their participation are better decided on a complete factual record.").

### III.   CONCLUSION

For the foregoing reasons, EOG's motion to dismiss should be denied.

Dated: April 10, 2025

/s/Christopher A. Dodd
Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

*Interim Liaison Counsel for Plaintiffs and Putative Class*

Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice* forthcoming)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com
mchadwick@scott-scott.com

Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Karin E. Garvey (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444
kgarvey@scott-scott.com

Michael Dell'Angelo (*pro hac vice*)
Candice Enders (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3080
mdellangelo@bm.net
cenders@bm.net

Richard D. Schwartz (*pro hac vice*)
BERGER MONTAGUE PC
1720 W. Division
Chicago IL 20622
Tel: (773) 257-0255
rschwartz@bm.net

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (*pro hac vice*)
Vara G. Lyons (*pro hac vice*)
Ellen Wen (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98103
Tel: (206) 778-2123
kswope@cpmlegal.com
tloeser@cpmlegal.com
vlyons@cpmlegal.com
ewen@cpmlegal.com
jalhadeff@cpmlegal.com

Joseph W. Cotchett (*pro hac vice*)
Adam Zapala (*pro hac vice*)
Vasti S. Montiel (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
vmoniel@cpmlegal.com

*Interim Co-Lead Counsel for Plaintiffs and the Putative Class*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2025, I caused to be served a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record receiving electronic notification.

                                                                                 */s/Christopher A. Dodd*
                                                                                  Christopher A. Dodd