UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation* <br><br> This Document Relates to: <br><br> ALL ACTIONS | No. 1:24-md-03119-MLG-LF |

**PLAINTIFFS' RESPONSE TO EXPAND ENERGY CORPORATION'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DKTS. 131 & 133)**

## I. INTRODUCTION

Plaintiffs' CCAC[1] alleges that Defendant Expand Energy Corporation ("Expand"), formerly known as Chesapeake Energy Corporation until merging with Southwest Energy Corporation on October 1, 2024, participated in a conspiracy to restrain the production of shale oil in the United States. Expand played a key role in this conspiracy by attending and participating in several conspiratorial inter-Defendant meetings, significantly slowing production growth during the cartel period, and publicly confirming its commitment to the other cartel members. Expand's individual Motion to Dismiss (Dkts. 131 & 133) ("Expand Br.") rehashes the same arguments made in Defendants' Joint Motion to Dismiss (Dkt. 129), misstates the applicable law, and attempts to bring in facts outside the four corners of the CCAC. Under Tenth Circuit precedent, Plaintiffs have pled more than enough to link Expand to the well-pled conspiracy. Expand's motion should be denied.

## II. ARGUMENT

The CCAC plausibly alleges that Expand had a role in the formation of a cartel to restrict the production of shale oil in the United States. Plaintiffs have also alleged that Expand individually engaged in parallel conduct alongside the other Defendants in the cartel's execution.

### A. Legal Standard.

A complaint must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A plaintiff may satisfy this

---

[1] Unless otherwise noted, all ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Dkt. 86, and all terms and acronyms are defined and used as in the CCAC. "OPEC" refers to the "Organization of Petroleum Exporting Countries," and references to "OPEC" from December 2016 onward include OPEC+. *See* ¶95.

1

requirement by pleading direct or circumstantial evidence, whereby circumstantial evidence alleges that the defendants engaged in parallel conduct." *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 943 (D.N.M. 2023). "Parallel conduct allegations must be accompanied by additional circumstances, or 'plus factors,' that 'raise[] a suggestion of a preceding agreement.'" *Id.* (quoting *Twombly*, 550 U.S. at 554).

In weighing an individual defendant's motion to dismiss in Section 1 Sherman Act cases, Tenth Circuit courts ask whether the plaintiffs have alleged specific facts from which one could plausibly infer that the defendant was involved in the broader conspiracy. *See In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1234 (D. Kan. 2010); *Brown v. JBS USA Food Co.*, 2023 WL 6292717, at *12 (D. Colo. Sept. 27, 2023) (there is no requirement that plaintiffs demonstrate that an individual defendant's conduct, "on its own, affect[ed] the entire [] industry."). This analysis is performed "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Therefore, "[o]nce a conspiracy is established, only slight evidence is required to connect a co-conspirator," *United States v. Troutman*, 814 F.2d 1428, 1446 (10th Cir. 1987), and at the pleadings stage "courts have held that antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis." *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011).

    **B.**     **Plaintiffs Have Met the Low Standard for Connecting Expand to the Conspiracy.**

On a pre-discovery motion to dismiss under Rule 12(b)(6), the CCAC's allegations are more than sufficient for the Court to infer that Expand participated in the conspiracy. Beginning

in 2017, Expand's prior CEOs, Robert Douglas Lawler and (later) Nick Dell'Osso, met behind closed doors with Defendant Pioneer's CEO, individual Defendant Scott Sheffield, and Defendant Hess's CEO, individual Defendant John Hess. ¶¶113, 150(d), 152(b). Mr. Hess described the first meeting with Mr. Lawler in September of 2017, a private dinner at a downtown Houston steakhouse, as "a very good exchange of information and views about oil . . . ." ¶113. It was during these meetings that Defendants "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . ." ¶115. Plaintiffs alleged that coordinating U.S. shale oil output was an express topic. ¶¶152(b).

During the cartel period, Mr. Lawler acknowledged in February 2021 that there was a shift in "mindset" about U.S. shale oil production towards "more discipline and responsibility." ¶143(b). Plaintiffs allege that executives from each Defendant parroted the exact same language (*i.e.*, "discipline") throughout 2021 and 2022. ¶¶143, 149. Expand's next CEO, Nick Dell'Osso, confirmed that Expand would remain in the cartel despite the change in leadership: after a March 2022 meeting with Mr. Hess, Mr. Dell'Osso publicly signaled the continued commitment to the scheme, saying that "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem." ¶152(a).

This statement is notable because Plaintiffs allege that Expand has common core shareholders with Defendants Permian Resources, Diamondback, EOG Resources, Hess, Occidental, and Pioneer. ¶197. Plaintiffs allege that the shareholders' participation in Defendants' relationships with each other served as a mode of communication and an enforcement mechanism

for Defendants' agreement to restrict output.[2]  ¶¶198-203.  Plaintiffs allege that the CEO of Expand's co-Defendant, Pioneer, admitted Defendants' interlocking shareholders exerted anticompetitive pressure on Defendants.  ¶200, n.179 ("All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies.").

In March 2023, Mr. Dell'Osso attended a private dinner with Mr. Hess and the CEOs of Defendants Occidental and Diamondback, and at the dinner the Defendants discussed, among other matters, the "output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner."  ¶152(b).  Sharing an aggregate cross-firm forecast implies that the participants, including Mr. Dell'Osso, had to share their own firm's output plans. That Mr. Dell'Osso attended this meeting is strong evidence of Expand's participation in the alleged cartel.  *See Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*, 2024 WL 4884472, at *6 (D. Colo. Nov. 25, 2024) (fact that "[d]efendants attended exclusive meetings at which they discussed" the alleged conspiracy is plus factor); *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 255 (E.D. Pa. 2016) (notes from meeting between competitors referencing agreement found to be traditional conspiracy evidence).

During the cartel period, while its executives were meeting with other Defendants, exchanging competitive information, and making public statements supporting concerted action, Expand curtailed its production growth in parallel with the other Defendants.  ¶160, Table 1. Plaintiffs allege that Expand, specifically, was capable of and should have increased production

---

[2] "[C]ommon ownership, which occurs when individual investors hold non-controlling interests in firms that have a competitive relationship" can "influence decision-making . . . in ways that may substantially lessen competition."  U.S. DEP'T OF JUST. & FED. TRADE COMM'N, *Merger Guidelines*, §2.11 (2023).

during the Class Period, as Expand's breakeven price (the sale price of an oil barrel at which it is profitable to drill) of $42 was well below the price of oil during that time. ¶¶147, 150, n.126. Expand's participation in the cartel is why Expand's revenue was greater in 2022 than in any year since 2015 despite dramatically slowing its production growth. ¶161, Fig. 5.

On Expand's Q4 2021 earnings call, the Head of U.S. Oil and Gas at Bank of America was confounded by this new strategy, telling Mr. Lawler that Expand's plans to slow production would be "the easiest way to destroy value" for the company in the long term. ¶144(c). Absent a production restriction agreement between Defendants, the Bank of America analyst would have been right.[3]

Overall, these detailed and specific allegations adequately plead parallel conduct, including as to Expand individually. *See, e.g.*, *Domestic Airline Travel*, 221 F. Supp. 3d at 68-69 (parallel conduct where "various executives from Defendant airlines made statements close in time regarding the exercise of capacity discipline and, in concert, with these statements a new trend of limited capacity growth occurred within the industry"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) (parallel conduct where "each Defendant [publicly] signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert"); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000) (parallel conduct properly found when competitors adopted "new policies [that] represented a radical shift from the industry's prior business practices").

On this issue, *Brown v. JBS USA Food Company* is instructive. In *Brown*, the plaintiffs alleged that defendant Agri Beef entered into an agreement to restrain the U.S. market for red meat

---

[3] *See* Joint Response, §II.B.1.b.ii, at 26-28.

5

processing labor.  2023 WL 6292717, at *13.  There, the court found that allegations Agri Beef executives attended several meetings with two other defendants' executives were sufficient to "infer an unlawful agreement between Agri Beef and the other defendants" because they successfully linked Agri Beef to "meetings at which conspiratorial agreements are alleged to have taken place."  *Id.*

Similarly, in *In re Broiler Chicken Antitrust Litigation*, the court found sufficient plaintiffs' allegations that each defendant was involved in the conspiracy because each defendant "either cut production or took action to restrain production at some point during the relevant time period" and "that executives from these companies participated in industry conferences and trade associations meetings."  290 F. Supp. 3d 772, 803-04 (N.D. Ill. 2017) ("*Broilers*"); *see also Urethane*, 683 F. Supp. at 1214 (rejecting a lone defendant's "argument that plaintiffs were required to allege every detail of any meeting or communication" when "plaintiffs have sufficiently alleged that a conspiracy existed during that time period" and "that a particular representative from [the defendant] participated in communications and agreed on price ranges with other members of the conspiracy"); *In re Capacitors Antitrust Litig*., 106 F. Supp. 3d 1051, 1067-69 (N.D. Cal. 2015) (allegations one defendant participated in single trade show discussion to exchange competitively sensitive information, second participated in single cartel meeting, and third alleged to attend at least one meeting, together with information about the cartel meetings where defendants facilitated conspiracy, sufficient to sustain claims against all).

Giving the inferences to which Plaintiffs are entitled at this stage, the CCAC's allegations detail a series of historically unprecedented, closed-door, and high-level meetings between U.S. shale oil producers, supposedly competitors, where they discussed output and price—and these

6

discussions were followed by historic increases in price and slowing of output. Expand was involved in both the cartel's formation and its output restrictions. Viewed with the proper standard of review, the allegations state plausible claims against Expand.

> C.  **Expand's Factual Rebuttal Constructed with Materials Outside the Pleadings is Wrong and Cannot be Considered on a Motion to Dismiss.**

Expand concedes that it reduced output during the cartel period, but it says the inter-Defendant meetings Plaintiffs allege mean nothing, and that it reduced output for a different, non-conspiratorial reason: as "part of an announced company exit of the shale oil business." Dkt. 133 at 11. To prove this factual defense, Expand cites a flurry of extra-pleading materials, mostly comprised of statements written by Expand (or its lawyers) for investors. *See* Dkt. 133-1 (Exhibits A through E). This argument can be rejected for two reasons.

First, for the Court to follow Expand's freewheeling analysis of the extra-pleading materials, which Expand uses to concoct a factual rebuttal of the CCAC's allegations, the Court would have to expand the doctrine of judicial notice beyond recognition. While a court can take judicial notice of its own files and records or matters of public record, it may not consider those documents for the truth of the matter asserted in them. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Expand's use of these materials "to create a disputed version of the facts alleged and/or to create a defense to the allegations in the Complaint" is not a proper basis for judicial notice. *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 905 (N.D. Cal. 2019).[4] On a motion to dismiss, Expand "may not use plaintiffs' sources" or other documents "as an archive from which to build what

---

[4] This case cited by Expand, *see* Dkt. 133 at 14, though it clearly supports Plaintiffs' position.

7

amounts to a factual rebuttal" or "stack[] facts extracted from secondary sources to construct an alternative narrative, at odds with the [complaint's] well-pled allegations." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 481 (S.D.N.Y. 2017).

It is easy to see why this practice is not permitted: because courts—egged on by a defendant eager to take advantage of an incomplete record—can draw the wrong inferences about certain facts when they do not have the context of a more complete record, post-discovery. Here, for example, Expand urges the Court to consider that it announced plans in 2022 to pivot away from oil to natural gas, and then conclude that Expand thus had nothing to gain from a domestic cartel in shale oil production as a result. *See* Dkt. 133 at 11.

There is no basis in the CCAC for Expand's alternative narrative, so should it be ignored. Expand's alternative narrative should also be ignored because it is wrong. Plaintiffs demonstrate why in the next paragraph—Plaintiffs offer these outside-the-CCAC citations not to suggest that it is proper for the Court to consider them, but to illustrate why the Court should *not* engage in Expand's self-serving guided tour of materials not cited or quoted in the CCAC. Along with Expand's non-CCAC materials, the Court can (and should) ignore everything in the next paragraph, too.

Expand's alternative narrative is wrong because it wanted to sell its shale oil business for the highest price. Its then-CEO, Mr. Dell'Osso—the same individual who attended conspiratorial inter-Defendant meetings where they talked about output, *see* ¶¶113, 150(d), 152(b)—assured his investors that the sale of the shale oil business "will not be a fire sale," could comprise multiple transactions over time, and was "expected to generate billions of dollars of proceeds that will be

8

used to boost the company's plans to return capital to investors."[5]  One of the terms of Expand's sale of one of its oil assets entitled it to an additional $25 million to $50 million contingent payment if oil prices stayed high or grew higher.[6]  High oil prices enabled Expand to demand a premium for the sale of its shale oil business—so even if Expand's counter-narrative is credited, Expand still had a very strong financial motive to participate in the conspiracy and curtail shale production.

Second, Expand's motion fragments the allegations into bits, views each bit in the light least favorable to Plaintiffs, and engages in a summary judgment-style weighing of facts.  *See* Dkt. 133 at 13-15.  On a motion to dismiss, the allegations must be viewed holistically and in the light most favorable to Plaintiffs.  *See Cont'l Ore*, 370 U.S. at 699 ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . (T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *Othart Dairy Farms LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1097 (D.N.M. 2024) ("The court's role when reviewing 'a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone

---

[5] *See* Sergio Chapa, "Chesapeake to Exit Eagle Ford Shale in Pivot to Natural Gas," *Bloomberg* (Aug. 3, 2022), https://www.bloomberg.com/news/articles/2022-08-02/chesapeake-energy-to-exit-eagle-ford-shale-in-hard-pivot-to-gas?sref=ozUx8R8E.

[6] *See* "Chesapeake Energy Exceeds Expectations with $700M Eagle Ford Sale," *Hart Energy* (Aug. 14, 2023), https://www.hartenergy.com/exclusives/chesapeake-energy-exceeds-expectations-700mm-eagle-ford-sale-206135 ("The transaction has an effective transaction date of Feb. 1, 2023. SilverBow will pay an additional contingent payment of $25 million if oil prices average between $75/bbl and $80/bbl WTI Nymex. If oil prices average above $80, however, the additional continent payment will increase to $50 million.").

is legally sufficient to state a claim for which relief may be granted.'") (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

For example, Expand asserts that its CEOs' "[a]ttendance at these trade association conference dinners" was innocuous because "nothing in the Complaint suggests these dinners facilitated an agreement to violate antitrust laws." *See* Dkt. 133 at 13. Plaintiffs disagree. Expand's attendance, viewed alongside the alleged subject of those meetings (output and price, *see* ¶152(b)), the context (an attempted resolution of a price war between Defendants and OPEC/OPEC+, *see* ¶¶103-35), the setting (closed-door, private meetings on the sidelines of a conference between competitors, *see* ¶¶118-35, 152), the participants' corresponding behavior (restrictions in output, increases in price, *see* ¶¶160-73, 224), and the FTC's findings and corresponding prohibitions on co-Defendants Sheffield and Hess from serving on the boards of (respectively) Exxon and Chevron (*see* ¶¶177-84), the allegations persuasively state plausible antitrust claims and Expand's participation.

In another example, Expand argues that because its output restraint did not exactly mimic the other Defendants' output restraint, Defendants' conduct is "not parallel as a matter of law." *See* Dkt. 133 at 11. This argument conflates "parallel" conduct with "uniform" conduct. Courts have repeatedly rejected that conflation—particularly on a motion to dismiss—because "[i]t is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator." *Broilers*, 290 F. Supp. 3d at 792; *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Plaintiffs do not need to allege that Defendants restricted supply in an identical manner."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428 (4th Cir. 2015) (rejecting argument that allegations must show defendants moved "in relative lockstep" to

establish plausible antitrust conspiracy claim). It is similarly wrong to draw the inference that the purported absence of uniformity in output reductions is a fact indicating that Defendants did not conspire, when the CCAC's other allegations (*see supra*) weigh strongly in favor of the conclusion that there was a conspiracy. *See Broilers*, 290 F. Supp. 3d at 792 ("Despite Defendants' attempts to highlight the aspects of their alleged conduct that are not absolutely uniform, Plaintiffs have alleged that all of the defendants engaged in production cuts at the same time. Thus, the Court finds that Plaintiffs have sufficiently alleged Defendants' conduct was parallel.").

### D. Plaintiffs' Injunctive Relief Request is Proper.

Expand contends that its voluntary divestment of certain of its shale oil assets means that there is no longer need for an injunction that blocks it from colluding with its competitors. *See* Dkt. 133 at 16. This argument is meritless. Plaintiffs seek injunctive relief that prevents Defendants or their agents from "continuing, maintaining, or renewing" certain anticompetitive conduct or other conduct "having a similar purpose or effect." *See* Dkt. 86 at 150-51. Expand could renew its conduct (it has exited and re-entered the oil business before) or be engaging in other conduct that has a similar purpose or effect, and it is premature for the Court to decide that issue without discovery. Moreover, Expand is still in the oil business. Its 2024 annual report (published in February 2025) states that Expand "is focused on responsibly developing an abundant supply of natural gas, *oil* and NGL [natural gas liquids] to expand energy access for all" and quantifies that it has "approximately 8,000 gross natural gas *and oil wells*."[7] The word "oil"

---

[7] *See* Expand Energy Corp., Form 10-K, at 10 (Feb. 26, 2025), https://investors.expandenergy.com/static-files/5eecec13-8125-49ec-a7b5-37a8731c0537. (emphasis added).

11

appears 374 times in its 2024 annual report. An injunction prohibiting Expand from engaging in anticompetitive conduct of the character described in the CCAC remains a live issue.

### III. CONCLUSION

Expand's motion should be denied.

Dated: April 10, 2025

/s/Christopher A. Dodd
Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

*Interim Liaison Counsel for Plaintiffs and Putative Class*

Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice* forthcoming)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com
mchadwick@scott-scott.com

Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com

Michael Dell'Angelo (*pro hac vice*)
Candice Enders (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3080
mdellangelo@bm.net
cenders@bm.net

Richard D. Schwartz (*pro hac vice*)
BERGER MONTAGUE PC
1720 W. Division
Chicago IL 20622
Tel: (773) 257-0255
rschwartz@bm.net

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (*pro hac vice*)
Vara G. Lyons (*pro hac vice*)
Ellen Wen (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98103
Tel: (206) 778-2123
kswope@cpmlegal.com
tloeser@cpmlegal.com
vlyons@cpmlegal.com
ewen@cpmlegal.com
jalhadeff@cpmlegal.com

Joseph W. Cotchett (*pro hac vice*)
Adam Zapala (*pro hac vice*)
Vasti S. Montiel (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
840 Malcolm Road

12

Karin E. Garvey (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444
kgarvey@scott-scott.com

Burlingame, CA 94010
Tel: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
vmoniel@cpmlegal.com

*Interim Co-Lead Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2025, I caused to be served a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record receiving electronic notification.

*/s/Christopher A. Dodd*
Christopher A. Dodd
