# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| *In re: Shale Oil Antitrust Litigation* <br><br> This Document Relates to: <br><br> ALL ACTIONS | No. 1:24-md-03119-MLG-LF |

**PLAINTIFFS' RESPONSE TO PERMIAN RESOURCES CORPORATION'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DKT. 127)**

I.  **INTRODUCTION**

The CCAC sufficiently alleges that Defendant Permian Resources ("PR"), formerly known as Centennial Resource Development, participated in a conspiracy to restrict U.S. shale oil production.[1] PR repeats many of the same arguments in its individual motion to dismiss that are contained in Defendants' Joint Motion (Dkt. 129), and they remain unavailing. Because Plaintiffs have adequately alleged the overarching conspiracy,[2] the question on this motion is whether Plaintiffs have pleaded facts from which one could plausibly infer that PR was involved.

Plaintiffs allege that PR's CEO, Mark Papa, attended multiple private dinners with other U.S. shale oil executives, including Defendants Hess, Occidental, and Pioneer, which included exchanges of forward-looking competitive information, and ultimately led to the formation of the cartel. ¶¶120-23, 132-34. Plaintiffs also allege that PR individually possessed excess production capacity at its disposal, yet restricted shale oil production in parallel with other Defendants, despite economic motivation to do the opposite. ¶160, Table 1. On these allegations alone, Plaintiffs have plausibly alleged that PR participated in the broader conspiracy, and thus, the Court should deny PR's Motion.

II.  **ARGUMENT**

Plaintiffs plausibly allege that PR participated in a collusive scheme to suppress the amount of shale oil that otherwise would have been extracted in a competitive market, PR had a role in the

---

[1] Unless otherwise noted, all ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint ("CCAC"), Dkt. 86, and all terms and acronyms are defined and used as in the CCAC. "OPEC" refers to the "Organization of Petroleum Exporting Countries," and references to "OPEC" from December 2016 onward include OPEC+. *See* ¶95.

[2] *See* Joint Response, at §II.B.1.

1

conspiracy, and that PR individually engaged in parallel conduct alongside the other Defendants to constrain oil production.

### A. Legal Standard.

In weighing an individual defendant's motion to dismiss in Section 1 Sherman Act cases, Tenth Circuit courts ask whether the plaintiffs have alleged specific facts from which one could plausibly infer that the defendant was involved in the broader conspiracy. *See In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1234 (D. Kan. 2010); *Brown v. JBS USA Food Co.*, 2023 WL 6292717, at *12-*16 (D. Colo. Sept. 27, 2023) ("*Brown*") (there is no requirement that plaintiffs demonstrate that an individual defendant's conduct, "on its own, affect[ed] the entire [] industry"). This analysis is performed "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Therefore, "[o]nce a conspiracy is established, only slight evidence is required to connect a co-conspirator," *United States v. Troutman*, 814 F.2d 1428, 1446 (10th Cir. 1987), and at the pleadings stage, "courts have held that antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis." *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (collecting cases); *Othart Dairy Farms LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1108 (D.N.M. 2024) ("Not all defendants need to participate in all aspects of the allegations so long as each defendant has some role in the conspiracy.").

### B. The CCAC Contains Sufficient Facts to Plausibly Infer PR Participated in the Greater Conspiracy.

Plaintiffs allege that PR's CEO, Mark Papa, attended a private dinner on March 5, 2018, with other U.S. shale oil executives, including Defendant Pioneer, where forward-looking

competitive information was exchanged. ¶120. Mr. Papa described a speech made at the dinner as "a statement that *everyone will work together*… and *everyone is happy to be working together*." *Id*. Another shale executive who spoke to the press after the same dinner described it as Defendants negotiating for a seat at the "table on pricing." ¶123. In 2019, Mr. Papa attended another private dinner with executives from Defendants Hess, Occidental, and Diamondback that included the exchange of additional forward-looking competitive information and further discussion of collective action. ¶¶132-34. PR's characterization of these private inter-Defendant meetings as merely "being represented at [] trade association meetings" is not based in reality. Dkt. 127 ("PR Mot.") at 3.

      Additionally, Plaintiffs allege that PR has common core shareholders with Defendants Expand Energy, Diamondback, EOG Resources, Hess, Occidental, and Pioneer. ¶197. Plaintiffs allege that the shareholders' participation in Defendants' relationships with each other served as a mode of communication and an enforcement mechanism for Defendants' agreement to restrict output.[3] ¶¶198-203. Plaintiffs allege that the CEO of PR's co-Defendant, Pioneer, admitted Defendants' interlocking shareholders exerted anticompetitive pressure on Defendants. ¶200, n.179 ("All the shareholders that I've talked to said that if anybody goes back to growth, they will punish those companies."). In further support, Plaintiffs allege that "[i]n September 2017, twelve major shareholders representing nearly 5% of shares in the 20 largest U.S. shale oil companies

---

[3] "[C]ommon ownership, which occurs when individual investors hold non-controlling interests in firms that have a competitive relationship" can "influence decision-making . . . in ways that may substantially lessen competition." U.S. DEP'T OF JUST. & FED. TRADE COMM'N, *Merger Guidelines*, §2.11 (2023).

(which includes Defendants), met in New York to 'discuss a common goal:' 'how to make frackers pump less and profit more.'" ¶117.

Plaintiffs also allege that PR's production growth rate slowed significantly during the conspiracy—from 123% before the conspiracy to 56% during the conspiracy—despite higher oil prices and rising demand. ¶160, Table 1. In a competitive market, PR would not restrain shale oil production unless they knew their competitors would also restrain their production. ¶163. PR had the ability to ramp up production and gain market share as smaller producers and supermajors did, but instead joined other Defendant co-conspirators in exercising "restraint." ¶¶165-67. These detailed allegations specific to PR are sufficient to plausibly allege that PR participated in the broader conspiracy.

On this issue, *Brown v. JBS USA Food Company* is instructive. In *Brown*, the plaintiffs alleged that defendant Agri Beef entered into an agreement to restrain the U.S. market for red meat processing labor. 2023 WL 6292717, at *13. There, the court found that allegations Agri Beef executives attended several meetings with two other defendants' executives were sufficient to "infer an unlawful agreement between Agri Beef and the other defendants" because they successfully linked Agri Beef to "meetings at which conspiratorial agreements are alleged to have taken place." *Id*.

Similarly, in *In re Broiler Chicken Antitrust Litigation*, the court found sufficient plaintiffs' allegations that each defendant was involved in the conspiracy because each defendant "either cut production or took action to restrain production at some point during the relevant time period" and "that executives from these companies participated in industry conferences and trade associations meetings." 290 F. Supp. 3d 772, 803-04 (N.D. Ill. 2017) ("*Broilers*"); *see also In re Urethane*

4

*Antitrust Litig.*, 683 F. Supp. 2d 1214 (D. Kan. 2010) (rejecting a lone defendant's "argument that plaintiffs were required to allege every detail of any meeting or communication" when "plaintiffs have sufficiently alleged that a conspiracy existed during that time period" and "that a particular representative from [the defendant] participated in communications and agreed on price ranges with other members of the conspiracy"); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1067-69 (N.D. Cal. 2015) (allegations one defendant participated in single trade show discussion to exchange competitively sensitive information, second participated in single cartel meeting, and third alleged to attend at least one meeting, together with information about the cartel meetings where defendants facilitated conspiracy, sufficient to sustain claims against all).

While Plaintiffs' allegations of inter-Defendant meeting attendance alone are sufficient, Plaintiffs allege additional facts specific to PR that allow the Court to reasonably infer PR was involved in the overarching conspiracy. For example, Plaintiffs allege that PR, specifically, was capable of increasing, and should have increased, production during the Class Period, as PR's breakeven price (the sale price of an oil barrel at which it is profitable to drill) continued to decrease during the Class Period, and at $32 in 2022, was well below the $120 high-water price of oil that year. ¶¶147, 150, n.126. PR's participation in the cartel is why PR's revenue rose significantly during the Class Period compared to previous years despite dramatically slowing its production growth. ¶161, Fig. 5. Finally, a fracking consultant who worked for PR and Defendant EOG Resources during the Class Period explained that most major producers in the Midland Basin "all work together to share resources" even though "it may seem like they are competitors." ¶195(a). The former consultant witnessed EOG Resources modify its fracking schedule to accommodate PR and said that "gentleman's agreements" are prevalent in the U.S. shale industry. *Id*.

5

PR's argument that Plaintiffs do not allege PR participated in any later meetings also misses the mark. *Brown*, 2023 WL 6292717, at *15 ("the actions [a defendant] took after joining the conspiracy need not show an agreement to join the conspiracy").[4] PR's attendance at inter-Defendant meetings at the alleged conspiracy's inception, combined with its objective manifestation of the cartel's intent—coordinated curtailed production, as discussed below—are enough to infer PR joined the conspiracy and "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

### C. Plaintiffs Adequately Plead that PR Engaged in Parallel Conduct.

PR asks the Court to disregard the production growth rate figures in the CCAC. PR's argument is contrary to the well-established principle that "the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor." *Othart*, 720 F. Supp. 3d at 1096-97. Plaintiffs "only need[] to allege that [PR] joined the conspiracy and played a role in it, not that [PR] individually engaged in parallel conduct sufficient to state a claim based on circumstantial evidence," *Brown*, 2023 WL 6292717, at *12.

Plaintiffs allege that PR's production growth rate dropped precipitously during the conspiracy—from 123% before the conspiracy to 56% during the conspiracy—mirroring the other Defendants' growth rate declines. ¶160, Table 1. These allegations are sufficient at the pleading

---

[4] To the extent that PR's argument can be construed as an argument that PR withdrew from the conspiracy because it stopped attending meetings, it must fail for lack of factual basis. "A defendant's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action." *Jien v. Perdue Farms, Inc.*, 2022 WL 2818950, at *11 (D. Md. July 19, 2022) (quoting *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989)). Withdrawal is an affirmative defense a defendant must show. *Id.* PR does not make that showing here.

6

stage to show that PR acted in parallel with Defendants to constrain production growth. *See Domestic Airline Travel*, 221 F. Supp. 3d at 69 ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."). PR's arguments to the contrary are based on mischaracterizing Plaintiffs' allegations, improperly relying on materials outside the CCAC, and contravening the legal standards governing analysis of the adequacy of the pleadings.[5]

PR claims that Plaintiffs dishonestly presented PR's production figures.[6] Not so. PR was formed by a $3.9 billion merger between Centennial Resources and Colgate Energy Partners. ¶160, n.149. The CCAC transparently explains that the production growth rate figures for PR were limited to the period before the completion of the merger in September 2022. *Id.* Excluding wells acquired in this massive merger is reasonable because of the major difference between

---

[5] The cases relied upon by PR are factually distinguishable. PR Mot. at 4-5. *Burch v. Milberg Factors, Inc.*, involved claims that financial institutions conspired to withhold credit to a garment manufacturer. The Third Circuit explained, "[e]xchanging information regarding the creditworthiness of customers does not violate the Sherman Act." 662 F.3d 212, 222 (3d Cir. 2011). The complaint in *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.* was "premised on a theory that the defendants intentionally manufactured a public health crisis by orchestrating bogus product recalls that would . . . escape the FDA's attention." 328 F. Supp. 3d 824, 835 (N.D. Ill. 2018). The district court held such a theory "lack[ed] facial plausibility." *Id.* In *LaFlamme v. Societe Air France*, the alleged antitrust violations were premised on conduct immunized from antitrust liability. 702 F. Supp. 2d 136, 149 (E.D.N.Y. 2010) ("[T]he allegations that defendants discussed fuel surcharges…do not plausibly suggest an illegal agreement because such immunized conduct cannot be the basis for antitrust liability."). Indeed, *LaFlamme* never even reached the issue of whether the plaintiffs sufficiently alleged parallel conduct. *Id.* at 152. *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 223 (W.D.N.Y. 2024), centered on a complex, vertical arrangement involving pharmaceutical manufacturers' restrictions on contract pharmacy drug discounts.

[6] PR claims that "Plaintiffs' production figures for PR during the 'pre-class period' of 2017-2019 also include production increases due to mergers and acquisitions, which Plaintiffs made no attempt to exclude." PR Mot. at 5-6.

organic growth (for example, new wells) and acquisition growth. Acquisition growth does not affect the overall supply of domestic oil—it is merely transferring ownership of existing production—and thus is irrelevant to the conspiracy to constrain supply.[7]

PR continues to exceed the bounds of the Rule 12(b)(6) inquiry by asking the Court to take judicial notice of its SEC filings.[8] If the Court were to consider the extraneous materials (which it should not), PR's SEC filings could only be used for the limited purpose to show the fact of these statements' existence, not the truth of the matters asserted therein. *See United Water and Sanitation District v. Geo-Con, Inc.*, 488 F. Supp. 3d 1052, 1057 (D. Colo. 2020) ("When a court takes judicial notice of documents, it may do so only to show their contents, not to prove the truth

---

[7] PR's reliance on *In re Pork Antitrust Litigation*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019); *In re Domestic Airline Travel Antitrust Litigation*, 691 F. Supp. 3d 175, 197 n.17 (D.D.C. 2023); and *D'Augusta v. American Petroleum Institute*, 117 F.4th 1094, 1104 (9th Cir. 2024) is misplaced. PR Mot. at 5, n.3. Here, Plaintiffs alleged pre-conspiracy and conspiracy period production growth rates for *each Defendant*. ¶160 & Table 1. These Defendant-specific allegations distinguish the instant complaint from the supply restriction allegations dismissed in *Pork*. 2019 WL 3752497, at *8 ("Plaintiffs rely almost exclusively on industry-wide data and ask the Court to infer that the individual Defendants all contributed to the decreased production….The Court will not engage in such speculation."). In *Domestic Airline Travel*, the court *denied* defendants' motion for *summary judgment after* discovery. A triable issue was found regarding parallel conduct where they showed that the airline "Defendants continued to exercise capacity discipline even after the Great Recession, when fuel prices stabilized and demand increased." 691 F. Supp. 3d at 202. Plaintiffs here allege similar production discipline despite market conditions that would motivate a rational self-interested competitor to increase its production rates. Lastly, *D'Augusta* is far afield from relevant issues. The court there had already found Plaintiffs' claims barred by the political question doctrine and act of state doctrine before it addressed the role of COVID. 117 F.4th at 1104. And in any case, "[r]uinous competition, financial disaster, evils of price cutting and the like" from foreign pressures and prices wars are not an excuse to fix prices. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned . . . .").

[8] Plaintiffs provide arguments against PR's request in Plaintiffs' Opposition to PR's Request for Judicial Notice, filed contemporaneously herewith.

of the matters asserted therein.") (cleaned up).[9] PR ignores this principle, asks the Court to accept the truth of the matters asserted in its SEC filings, and argues that Plaintiffs could have dealt with the merger differently by subtracting the acquired wells rather than excluding the post-merger production growth information. PR Mot. at 8. It is no matter, because as discussed above, even if the filings are accepted for the truth of the matter asserted, the relevant inquiry is production growth by drilling new wells, not by acquisition.

By arguing that Plaintiffs' allegations linking PR to the conspiracy are factually wrong, PR has implicitly acknowledged that the CCAC does in fact contain allegations linking PR to the conspiracy. *See Broilers*, 290 F. Supp. 3d at 804 ("Defendants' arguments boil down to the contention that Plaintiffs' allegations are wrong: they did not agree; they did not cut production; they actually increased market share. But all of these are arguments that should be tested by discovery; and they are not arguments that Plaintiffs have failed to *allege* participation.").

And of course, even if it did change things (it doesn't), none of these factual arguments are appropriate at the pleadings stage. *See Othart*, 720 F. Supp. 3d at 1097 ("The court's role when reviewing 'a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'") (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)); *Prudential Ins. Co. of Am. v. Bank of Am., Nat. Ass'n*, 14 F. Supp. 3d 591, 597 (D.N.J. 2014)

---

[9] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997), is inapplicable. PR Mot. at 6. *GFF Corp.* involved a breach of contract claim where the alleged agreement was memorialized in a letter. 130 F.3d at 1383. The Tenth Circuit found that the district court did not err in considering the letter agreement because "GFF frequently referred to and quoted from the letter in its amended complaint" and "GFF also attached the letter as an exhibit to its opposition to the 12(b)(6) motion." *Id.* at 1385. Here, Plaintiffs never even cited PR's SEC filing in the CCAC let alone attached it as an exhibit to a filing.

9

("[d]efendants' methodological attacks on the Analysis confuse the process of weighing evidence as proof with the process of examining whether allegations suffice to make a claim plausible. The two are very different and, on a Rule 12(b)(6) motion, this Court does only the latter").

### D. Plaintiffs Plausibly Allege Sufficient Plus Factors Applicable to PR.

PR cites to *no authority* supporting its argument that this Court should analyze plus factors as to PR individually. Nevertheless, Plaintiffs allege numerous "plus factors" applicable to PR which support an inference of conspiracy, including market conditions that make the industry susceptible to collusion, opportunities to collude, inter-firm communications, actions against self-interest, and common ownership.[10] ¶¶190-96, 204-13. These plus factor allegations—like all of Plaintiffs' allegations—must be viewed as a whole. *See Broilers*, 290 F. Supp. 3d at 797 (rejecting efforts to isolate each plus factor).

PR improperly asks the Court to disassemble the CCAC and view each of these allegations in isolation and draw inferences in its favor—all of which is contrary to the applicable legal standards. *Compare* PR Mot. at 9-10 with *Othart*, 720 F. Supp. 3d at 1108 (rejecting defendants' request that the court "consider and discard each allegation of parallel conduct or supporting factor in isolation"). For example, PR claims that its regular collaboration with would-be competitors did not reduce shale oil production and that it was merely coordinating to "reduce unsafe conditions." PR Mot. at 9-10 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010)).

---

[10] For a complete discussion on Plaintiffs' plus factors, *see* Joint Response, at §II.B.1.b.ii, at 26-29.

PR's argument inappropriately asks the Court to choose between alternative explanations at the pleadings stage. *See Broilers*, 290 F. Supp. 3d at 801 ("*Twombly* does not stand for the proposition that the mere existence of an alternative explanation for Defendants' conduct serves to destroy the plausibility of Plaintiffs' conspiracy claims…the Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendant's alternative explanation for their conduct."). "It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002-03 (N.D. Ill. 2011) (denying defendants' motion to dismiss in supply restriction conspiracy case where defendants made "a somewhat convincing case" that they "naturally had an incentive to reduce capacity").

### E.  Dismissal With Prejudice Is Particularly Inappropriate.

"[L]eave to amend shall be given freely." *Perez v. City & Cnty. of Denver*, 2023 WL 7486461, at *3 (10th Cir. Nov. 13, 2023); *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). PR argues for dismissal with prejudice. PR Mot. at 10-11.[11] In claiming that Plaintiffs' complaint is not "fixable," PR asks this Court to (1) look to extrinsic material, (2) adopt PR's incorrect analysis of it, (3) weigh that incorrect analysis of extrinsic material against Plaintiffs' well-pleaded allegations, and (4) draw an inference in PR's favor that no set of allegations could show that PR constrained production as a member of the

---

[11] The cases relied upon by PR do not support its argument. PR Mot. at 10-11. In *Brereton v. Bountiful City Corp.*, 434 F.3d 1213 (10th Cir. 2006), the Tenth Circuit reviewed the district court's dismissal with prejudice based on lack of jurisdiction, held that the complaint would more appropriately be dismissed without prejudice, and remanded to the district court. *Knight v. Mooring Capital Fund, LLC* involved claims that were dismissed with prejudice due to claim preclusion. 749 F.3d 1180 (10th Cir. 2014). Neither case is remotely close to the factual and procedural circumstances present here.

conspiracy. PR's dismissal with prejudice chain of analysis is divorced from the proper Rule 12(b)(6) analytical frame at every stage, and should be rejected. In the event the Court is inclined to dismiss PR as a Defendant, Plaintiffs respectively request the Court give Plaintiffs leave to amend the CCAC to cure any perceived deficiencies in allegations with respect to PR.

### III. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny PR's individual motion to dismiss.

Dated: April 10, 2025

/s/Christopher A. Dodd
Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

*Interim Liaison Counsel for Plaintiffs and Putative Class*

Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
Mollie E. Chadwick (*pro hac vice* forthcoming)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com
mchadwick@scott-scott.com

Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP

Michael Dell'Angelo (*pro hac vice*)
Candice Enders (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3080
mdellangelo@bm.net
cenders@bm.net

Richard D. Schwartz (*pro hac vice*)
BERGER MONTAGUE PC
1720 W. Division
Chicago IL 20622
Tel: (773) 257-0255
rschwartz@bm.net

Karin B. Swope (*pro hac vice*)
Thomas E. Loeser (*pro hac vice*)
Vara G. Lyons (*pro hac vice*)
Ellen Wen (*pro hac vice*)
Jacob M. Alhadeff (*pro hac vice*)
COTCHETT, PITRE, & McCARTHY, LLP
1809 7th Avenue, Suite 1610
Seattle, WA 98103
Tel: (206) 778-2123
kswope@cpmlegal.com
tloeser@cpmlegal.com
vlyons@cpmlegal.com
ewen@cpmlegal.com
jalhadeff@cpmlegal.com

12

156 S Main Street  
P.O. Box 192  
Colchester, CT 06415  
Tel: (860) 537-5537  
pmcgahan@scott-scott.com  
msrodoski@scott-scott.com  

Karin E. Garvey (*pro hac vice*)  
SCOTT+SCOTT ATTORNEYS AT LAW LLP  
230 Park Ave., 24th Floor  
New York, NY 11069  
Tel: (212) 223-6444  
kgarvey@scott-scott.com  

Joseph W. Cotchett (*pro hac vice*)  
Adam Zapala (*pro hac vice*)  
Vasti S. Montiel (*pro hac vice*)  
COTCHETT, PITRE, & McCARTHY, LLP  
840 Malcolm Road  
Burlingame, CA 94010  
Tel: (650) 697-6000  
jcotchett@cpmlegal.com  
azapala@cpmlegal.com  
vmoniel@cpmlegal.com  

*Interim Co-Lead Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2025, I caused to be served a true and correct copy of the foregoing document with the Clerk of this Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record receiving electronic notification.

                                                                         */s/Christopher A. Dodd*
                                                                           Christopher A. Dodd