**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| IN RE: SHALE OIL ANTITRUST LITIGATION | Case No. 1:24-md-03119-MLG-LF |
| This Document Relates to All Actions | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR JOINT MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..........................................................................................................................3

I.  PLAINTIFFS CANNOT DISAVOW THEIR COMPLAINT TO AVOID THE
    POLITICAL QUESTION AND ACT OF STATE DOCTRINES....................................3

    A.  Plaintiffs Allege That OPEC Initiated and Led a Global Conspiracy to
    Stabilize Worldwide Crude Oil Prices by Restricting Global Production ..............3

    B.  The Political Question Doctrine Bars Plaintiffs' Claims ......................................6

    C.  The Act of State Doctrine Also Bars Plaintiffs' Claims .......................................9

II.  PLAINTIFFS' OPPOSITION CONFIRMS THAT THEY HAVE NOT
     ALLEGED A PLAUSIBLE CONSPIRACY INVOLVING DEFENDANTS................11

    A.  Plaintiffs Concede That They Have Pleaded No Direct Evidence of the
    Alleged Conspiracy.............................................................................................11

    B.  Plaintiffs Fail to Plausibly Allege Circumstantial Evidence of the Alleged
    Conspiracy..........................................................................................................13

        1.  Plaintiffs' Failure to Plead Facts Showing Parallel Conduct Dooms
    Their Effort to Plead Circumstantial Evidence .........................................13

        2.  Plaintiffs' "Plus Factors" Are Irrelevant And Do Not Plausibly
    Suggest the Alleged Conspiracy ...............................................................17

III.  PLAINTIFFS FAIL TO PLEAD FACTS SHOWING THAT THEY HAVE
      ANTITRUST STANDING.........................................................................................20

IV.  PLAINTIFFS' STATE LAW CLAIMS FAIL FOR THE SAME REASONS AS
     THEIR FEDERAL CLAIM AND FOR ADDITIONAL REASONS.............................25

    A.  All of Plaintiffs' State Law Claims Fail With Their Sherman Act Claim ...........25

    B.  Plaintiffs Lack Standing to Bring Their State Law Claims..................................25

        1.  Plaintiffs Lack Antitrust Standing to Bring Their State Law Claims........25

        2.  Plaintiffs Lack Article III Standing Under Various State Laws ...............27

    C.  State Bars on Indirect Purchaser Actions Apply to Plaintiffs' Claims ................29

        1.  Indirect Purchaser Claims Are Barred in Part In New Jersey and
    Colorado (Counts 8 and 36)......................................................................29

i

2.      State Class Action Bars Apply in Federal Court (Counts 15, 16, 29, and 47) ...................................................................................................30

D.      Plaintiffs' State Law Claims Fail for Additional Reasons ...................................30

CONCLUSION.........................................................................................................................30

## **TABLE OF AUTHORITIES**

Page(s)

### CASES

*Abraham v. WPX Productions, LLC,*
 184 F. Supp. 3d 1150 (D.N.M. 2016) ............................................................28

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
 459 U.S. 519 (1983) ..................................................................................*passim*

*Amchem Products, Inc. v. Windsor,*
 521 U.S. 591 (1997) ....................................................................................28

*Arthur v. Microsoft Corp.,*
 676 N.W.2d 29 (Neb. 2004).........................................................................26

*In re Automotive Parts Antitrust Litigation,*
 29 F. Supp. 3d 982 (E.D. Mich. 2014) .........................................................24

*In re Automotive Parts Antitrust Litigation,*
 50 F. Supp. 3d 836 (E.D. Mich. 2014) .........................................................24

*B & R Supermarket, Inc. v. Visa, Inc.,*
 No. C 16-01150 WHA, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) .........................12

*Baker v. Carr,*
 369 U.S. 186 (1962) ..........................................................................6, 7, 8, 9

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007) ...............................................................................16, 17

*In re Broiler Chicken Antitrust Litigation,*
 290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................................13, 14

*Champagne Metals v. Ken-Mac Metals, Inc.,*
 458 F.3d 1073 (10th Cir. 2006)....................................................................12

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.,*
 92 F.4th 381 (2d Cir. 2024).....................................................................15, 17

*Crownalytics, LLC v. SPINS LLC,*
 No. 22-CV-01275-NYW-JPO, 2024 WL 2111570 (D. Colo. May 10, 2024).................14

*D'Augusta v. American Petroleum Institute,*
 117 F.4th 1094 (9th Cir. 2024)............................................3, 7, 8, 9, 10, 18

iii

*In re Dealer Management Systems Antitrust Litigation*,
    680 F. Supp. 3d 919 (N.D. Ill. 2023) ....................................................................... 13, 14

*In re Delta/AirTran Baggage Fee Antitrust Litigation*,
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........................................................................ 14

*In re Digital Music Antitrust Litigation*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) .......................................................................... 30

*In re Domestic Airline Travel Antitrust Litigation*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ............................................................................... 15

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*,
    28 F. 4th 42 (9th Cir. 2022) ......................................................................................... 12

*In re Effexor Antitrust Litigation*,
    357 F. Supp. 3d 363 (D.N.J. 2018) .............................................................................. 29

*E.W. v. Health Net Life Insurance Co.*,
    86 F.4th 1265 (10th Cir. 2023) ................................................................................... 19

*Elkins v. Microsoft Corp.*,
    817 A.2d 9 (Vt. 2002) .................................................................................................. 26

*In re Fragrance Direct Purchaser Antitrust Litigation*,
    No. 2:23-02174, 2025 WL 579639 (D.N.J. Feb. 21, 2025) ......................................... 22

*In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*,
    No. 19-md-02918-MMC, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ...................... 29

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019) .......................................................................... 30

*Howe v. Microsoft Corp.*,
    656 N.W.2d 285 (N.D. 2003) ...................................................................................... 26

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010) .................................................................................. 11, 16

*International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*,
    196 F.3d 818 (7th Cir. 1999) ...................................................................................... 25

*Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018) .......................................................................... 12

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000)...................................................................................22, 25

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (Cal. 2003)...................................................................................26, 27

*Langan v. Johnson & Johnson Consumer Cos.*,
    897 F.3d 88 (2d Cir. 2018)............................................................................................28

*In re Linerboard Antitrust Litigation*,
    305 F.3d 145 (3d Cir. 2002)..........................................................................................22

*In re Lithium Ion Batteries Antitrust Litigation*,
    No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)..........................26

*Llacua v. Western Range Association*,
    930 F.3d 1161 (10th Cir. 2019).....................................................................................14

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007).......................................................................................27

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015).......................................................................................28

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015).......................................................................................15

*Oliver v. SD-3C LLC*,
    No. 11-CV-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) ......................15

*In re Opana ER Antitrust Litigation*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016).............................................................................30

*In re Packaged Ice Antitrust Litig.*
    779 F. Supp. 2d 642 (E.D. Mich. 2011) ........................................................................28

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995).........................................................................................19

*In re Refrigerant Compressors Antitrust Litigation*,
    No. 2:09-md-02042, 2012 WL 2917365 (E.D. Mich. July 17, 2012) ............................28

*Romero v. Philip Morris Inc.*,
    109 P.3d 768 (N.M. Ct. App. 2005)..............................................................................26

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*,
    22 F.4th 103 (2d Cir. 2021)..........................................................................................25

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
    559 U.S. 393 (2010) ......................................................................................30

*In re South Dakota Microsoft Antitrust Litigation*,
    657 N.W.2d 668 (S.D. 2003) ........................................................................26

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011)...........................................3, 4, 6, 7, 8, 9, 10, 11

*In re Sugar Industry Antitrust Litigation*,
    579 F.2d 13 (3d Cir. 1978).............................................................................22

*Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*,
    902 F.3d 735 (7th Cir. 2018).........................................................................26

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008).......................................................24

*Thomas v. Metropolitan Life Insurance Co.*,
    631 F.3d 1153 (10th Cir. 2011).................................................................27, 29

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008)..........................................................................11

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) .........................................................................................9

*United States v. Taubman*,
    297 F.3d 161 (2d Cir. 2002)..........................................................................12

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020).........................................................................23

*In re Vitamins Antitrust Litigation*,
    No. MISC 99-197(TFH), 2000 WL 1475705 (D.D.C. May 9, 2000) .............29

*In re Warfarin Sodium Antitrust Litigation*,
    214 F.3d 395 (3d Cir. 2000)..........................................................................24

*Woodard v. Fidelity National Title Insurance Co.*,
    No. CIV 06-1170 RB/WDS, 2007 WL 5173415 (D.N.M. Dec. 4, 2007) .......28

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International*,
    493 U.S. 400 (1990) .......................................................................................10

*In re Zantac (Ranitidine) Products Liability Litigation*,
    No. 21-10335, 2022 WL 16729170 (11th Cir. Nov. 7, 2022) .........................28

## OTHER AUTHORITIES

Brief of the United States as Amicus Curiae Supporting Affirmance
*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, No. 09-20084, 2010 WL 6606883 (5th Cir. Aug. 16, 2010) ........................................................................................................9

## PRELIMINARY STATEMENT

Plaintiffs' opposition (ECF No. 156 ("Opp.")) confirms that their complaint should be dismissed for the multiple reasons set forth in defendants' moving brief (ECF No. 129 ("Br.")).[1]

First, this Court should not countenance plaintiffs' blatant disavowal of their own allegations regarding OPEC's central role in their complaint—and should dismiss this action for lack of subject matter jurisdiction under the political question and act of state doctrines. Plaintiffs make over 330 allegations regarding OPEC's central, indispensable role in a world-wide conspiracy, in which OPEC's sovereign nation members were pleaded as "unnamed co-conspirators." (Compl. ¶ 85.) Plaintiffs allege that OPEC controls the global crude oil market, has worked to stabilize worldwide oil prices, and "started a years-long campaign" to convince U.S. shale oil producers to join its alleged cartel. (Id. ¶¶ 10-11, 93-96, 110.) The complaint asserts that beginning in or around January 2021, defendants have "coordinat[ed] their output in conjunction with each other and with OPEC." (Id. ¶ 136 (emphasis added).) Remarkably, despite the complaint's singular focus on an alleged global conspiracy OPEC orchestrated, plaintiffs now suggest that OPEC had no involvement in what they speciously label a "purely domestic cartel" to restrict production "in the domestic shale markets." (Opp. at 14-15.) The Court should reject plaintiffs' tactical mischaracterization of their own complaint and dismiss this action for lack of subject matter jurisdiction.

Second, plaintiffs' opposition confirms that they fail to plead facts plausibly suggesting that defendants conspired to increase prices by restricting shale oil production. Plaintiffs concede that they plead no direct evidence of any such conspiracy. While plaintiffs purport to have pleaded circumstantial evidence, their failure to allege that defendants engaged in parallel

---

[1] Defined terms used herein have the same meaning as in defendants' moving brief.

conduct is dispositive. Although the object of the alleged conspiracy was to restrict shale oil production, the complaint alleges that six of the eight defendants did the exact opposite and actually expanded their production—at vastly different rates—during the alleged conspiracy period. (Compl. ¶ 160 table 1.) Pivoting, plaintiffs now posit the freshly-minted theory that the parallel conduct they attack is defendants' supposed failure to invest in new "drilling opportunities" (Opp. at 3, 23), but the complaint pleads no facts supporting this new theory.

Because plaintiffs fail to plead parallel conduct, their alleged "plus factors" are irrelevant as a matter of law. In any event, those purported plus factors do not render a conspiracy more plausible, but instead suggest alternative, non-conspiratorial reasons for defendants' conduct— and easily explain comments defendants' executives allegedly independently made to investors about the risks of increasing shale oil production. Those non-conspiratorial reasons for cautionary statements include the COVID-19 pandemic that collapsed global oil markets, market volatility following Russia's invasion of Ukraine, and the threat of another OPEC price war. Contrary to plaintiffs' argument, controlling precedent directs this Court to consider non-conspiratorial reasons for defendants' allegedly parallel conduct—like independent responses to common market stimuli—especially when they are pleaded on the face of the complaint.

<u>Third</u>, plaintiffs' opposition does not identify factual allegations establishing that they have antitrust standing. Plaintiffs do not dispute that the complaint identifies no basis for injunctive relief against ongoing misconduct, particularly given its allegations that two defendants (Pioneer and Hess) are subject to acquisitions by major oil producers (Exxon Mobil and Chevron) that have or will expand shale oil production. Because injunctive relief is the only remedy plaintiffs seek under the Sherman Act, that claim should be dismissed for this reason alone. Moreover, plaintiffs lack antitrust standing under *AGC* because they cannot trace any

purported artificial price increase in the refined petroleum products that they purchased from third-party retailers to any alleged reduction in defendants' shale oil production—production that, in any event, makes up a tiny fraction of the market.  Plaintiffs argue that they need not plead any such connection, but the case law they cite does not support their position.

Finally, plaintiffs' state law claims fail for the same reasons that their Sherman Act claim fails, i.e., for lack of subject matter jurisdiction, failure to allege facts supporting a plausible conspiracy, and lack of standing—as well as for additional state-specific reasons.

## ARGUMENT

## I.    PLAINTIFFS CANNOT DISAVOW THEIR COMPLAINT TO AVOID THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES

Antitrust claims alleging price-fixing among domestic oil producers and OPEC member states are not justiciable pursuant to the political question and act of state doctrines.  (Br. at 10-18); *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094 (9th Cir. 2024), *cert. denied*, 604 U.S. ___ (Mar. 31, 2025); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011).  Plaintiffs try to avoid both doctrines by recasting their claims as challenging only a domestic conspiracy among eight independent U.S. producers wholly unconnected to OPEC's global efforts to restrict oil production worldwide.  (Opp. at 4-15.)  Plaintiffs' own complaint belies this argument.

### A.    Plaintiffs Allege That OPEC Initiated and Led a Global Conspiracy to Stabilize Worldwide Crude Oil Prices by Restricting Global Production

Plaintiffs' complaint alleges that OPEC, an "international cartel of large oil producing nations" (Compl. ¶ 10), sought to retain its control over global oil prices by engaging in a "years-long campaign" to coerce the eight shale oil producer defendants to join the OPEC cartel (*id.* ¶ 110).  Plaintiffs claim that "[b]eginning [i]n or around January 2021," defendants have "collectively agreed not to increase their U.S. shale oil production" and to "cooperat[e] and

3

collud[e] with" OPEC to "coordinate their collective oil output." (*Id.* ¶¶ 9-11, 139, 153, 172-73.) According to the complaint, the sovereign OPEC members are "unnamed co-conspirators" in the challenged conspiracy. (*Id.* ¶ 85.) The complaint pleads that OPEC initiated its relationship with defendants (*id.* ¶ 133) and that OPEC spoke with defendants at the annual CERAWeek conferences in Houston in 2017, 2018, and 2019 (*id.* ¶¶ 112-25, 132-35), in forums in Vienna and Davos (*id.* ¶¶ 126-31), and into 2022 and 2023 (*id.* ¶ 152).

Having pleaded a complaint focused principally on OPEC's attempts to cajole defendants to join OPEC's efforts to stabilize global oil prices, plaintiffs cannot now disingenuously reframe their allegations as challenging merely an agreement among eight U.S. shale oil producers to limit U.S. shale oil production, wholly unconnected to OPEC and its efforts to reduce global oil production. Nor can they avoid the political question and act of state doctrines by ignoring the alleged acts of the sovereign OPEC members that their own complaint alleges. Any trial of plaintiffs' claims would necessarily include a judgment on the lawfulness of OPEC's alleged conduct—a judgment this Court lacks subject matter jurisdiction to render.

To evaluate the applicability of the political question or act of state doctrine, the court "must 'analyze [the] claim as it would be tried.'" *Spectrum Stores*, 632 F.3d at 951 (citation omitted). As in *Spectrum Stores*, a trial on plaintiffs' claims here would require "an inquiry into whether [defendants] entered into an agreement with OPEC member nations to fix prices." *Id.* The court in *Spectrum Stores* well explained the problem with such a trial:

> A pronouncement either way on the legality of other sovereigns' actions falls within the realm of delicate foreign policy questions committed to the political branches. By adjudicating this case, the [court] would be reexamining critical foreign policy decisions, including the Executive Branch's longstanding approach of managing relations with foreign oil-producing states through diplomacy rather than private litigation.

*Id.*

Plaintiffs' assertion that the factfinder would only need to weigh evidence regarding disputed facts involving defendants (Opp. at 5) is simply wrong. OPEC officials, according to the complaint, are involved in the conspiracy at every step—from its purported initiation to its final execution. As a result, and as the following chart shows, to answer the five questions that plaintiffs themselves pose in their brief—not to mention several others the complaint raises—the factfinder would need to examine and consider the import of the conduct and decisions of OPEC and its sovereign members. Specifically, the factfinder would need to decide whether OPEC entered into an agreement with defendants, what they agreed to do, where the alleged agreement was effectuated, whether the scope was global and the conspiracy continues today (as the complaint alleges), and how it was implemented. Plaintiffs cannot write the words "OPEC" and "global" out of their complaint, as they attempt to do in their opposition.

| **Plaintiffs' Question** | **Purported Answer From Plaintiffs' Opposition Brief** | **Answer From Plaintiffs' Complaint** |
|---|---|---|
| 1.  Who entered the agreement? | Defendants, who are domestic shale producers | OPEC and defendants (Compl. ¶¶ 10-11, 85, 115, 121, 131, 136, 139, 144-45, 153-55, 158, 172-73, 177, 187-88, 194, 198-99, 201-05) |
| 2.  What did they agree to do? | Artificially restrict domestic shale oil production | Stabilize global oil prices (*id.* ¶¶ 10-11, 85, 115, 121, 131, 139, 144-45, 152-55, 158, 172-73, 177, 187-88, 194, 198-99, 201-02, 205) |
| 3.  When was the agreement active? | At least 2021-2024 | "2021: Defendants Actualize Their Agreement with OPEC" (*id.* at p. 45) |
| 4.  Where was the agreement effectuated? | U.S. shale fields | Worldwide (*id.* ¶¶ 10-11, 85, 115, 121, 131, 136, 139, 144-45, 153-55, 158, 172-73, 177, 187-88, 194, 198-99, 201-05) |

| 5. How was the agreement implemented? | Curtailing domestic production | Curtailing global oil production (*id.* ¶¶ 10-11, 115, 121, 136, 139, 144-45, 152, 154-55, 158, 173, 177, 187-88, 194, 198-99, 201-02, 205) |
|---|---|---|

Additional questions on which a factfinder would need to weigh evidence include:

| **Additional Questions** | **Answer from Complaint** |
|---|---|
| 6. Who initiated the agreement? | OPEC (Compl. ¶¶ 110, 133) |
| 7. Why was the agreement initiated? | To reduce oil production worldwide in an effort to stabilize global oil prices (*id.* ¶¶ 10-11, 85, 115, 121, 131, 139, 144-45, 152-55, 158, 172-73, 177, 187-88, 194, 198-99, 201-02, 205) |
| 8. How was the agreement initiated? | By OPEC's "years-long campaign," involving annual meetings at CERAWeek and at forums in Vienna and Davos, to convince defendants (*id.* ¶¶ 10-12, 85, 93-110, 112-35, 194, 202, 205) |

Any trial of the purported conspiracy challenged in the complaint clearly would require adjudicating the lawfulness of the alleged conduct of OPEC and its sovereign member nations. As defendants previously established (Br. at 10-18), this Court lacks subject matter jurisdiction to do so under both the political question and act of state doctrines.

**B.    The Political Question Doctrine Bars Plaintiffs' Claims**

Plaintiffs concede (Opp. at 7) that for the political question doctrine to preclude the Court from exercising subject matter jurisdiction, defendants need show only that the questions to be tried satisfy at least one of the six factors set forth in *Baker v. Carr*, 369 U.S. 186 (1962). Contrary to plaintiffs' assertions, the questions to be tried implicate all six *Baker* factors.

First, the text of the Constitution commits the questions that a trial of this case would present to the Executive Branch (first *Baker* factor). As the court in *Spectrum Stores* made clear, "matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry.'" 632 F.3d at

950 (citation omitted).  "[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; . . . the propriety of the exercise of that power is not open to judicial inquiry." *Id.* (citation omitted).  Plaintiffs argue that not every case or controversy that touches foreign relations constitutes a political question.  But where, as here, the case involves an "alleged . . . price-fixing conspiracy involving OPEC member nations," the adjudication of this case amounts to a judicial "reexamin[ation]" of "the Executive Branch's longstanding approach of managing relations with foreign oil-producing states through diplomacy rather than private litigation[.]" *Id.* at 951.  "Any merits ruling in this case, whether it vindicates or condemns the acts of OPEC member nations, would reflect a value judgment on their decisions and actions—a diplomatic determination textually committed to the political branches." *Id.*  Such a ruling would threaten U.S. relations with OPEC nations on issues of national security—such as counterterrorism, military readiness, and nuclear nonproliferation— and frustrate other national priorities, like foreign investment in the United States by nations like Saudi Arabia or diplomatic negotiations with nations like Russia.  *Id.* at 952.

Second, there are no judicially discoverable and manageable standards for resolving the questions presented in this case (second *Baker* factor).  As in *Spectrum Stores*, a merits decision here "would require a court to recast what are foreign policy and national security questions of great import in antitrust law terms." *Id.*  Contrary to plaintiffs' argument, "[t]he Sherman and Clayton Acts are decidedly inadequate to provide judicially manageable standards for resolving such momentous foreign policy questions." *Id.*  The court in *Spectrum Stores* thus agreed "with those courts that have held that merely 'recasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments.'" *Id.* at 953 (citation omitted); *see also D'Augusta*, 117 F.4th at 1102 (The Sherman and Clayton Acts

"are poorly suited . . . to handle such difficult questions on areas of statecraft.").

Third, it would be impossible to decide the questions presented in this case without an initial policy decision of the kind clearly intended for nonjudicial discretion (third *Baker* factor). As the complaint makes clear, defendants could not raise oil prices acting alone; they needed OPEC's collaboration. Indeed, plaintiffs concede that "global oil prices cannot be explained without some reference to OPEC" because it "control[s] over 50% of the world's oil production." (Opp. at 6.) Thus, a ruling here would require this Court to declare that OPEC officials—while visiting the United States—openly flouted this country's laws against the United States' interest. But the executive branch's diplomacy, not the "far blunter instrument of antitrust litigation," manages this country's foreign relations. *Spectrum Stores*, 632 F.3d at 953. A ruling on the merits here "would by its very nature involve a policy determination at odds with this longstanding policy of diplomatic engagement." *Id.*

Fourth, because a ruling on the merits of this case would supplant decades of diplomatic engagement with the blunt instrument of antitrust litigation, it would express "a lack of the respect owed to the Executive Branch, which [as previously explained] is constitutionally responsible for the conduct of foreign affairs." *Id.* (fourth *Baker* factor).

Fifth, as *Spectrum Stores* explained, such "profound foreign policy questions" as U.S. diplomatic relations with oil-producing nations "uniquely demand a single-voiced statement of the Government's views." *Id.* (citation omitted). Accordingly, the questions presented by plaintiffs' complaint require "an unusual need for adherence to the political decision already made." *Id.* (fifth *Baker* factor).

Sixth, a merits decision—especially in plaintiffs' favor—would "inevitably result in embarrassment from the Judicial Branch's conflicting pronouncement about the United States'

mode of engagement with foreign nations that control a critical resource on which this country depends." *Id.* (sixth *Baker* factor).[2]

In sum, although satisfying only a single *Baker* factor is sufficient to invoke the political question doctrine and divest the Court of subject matter jurisdiction, the questions presented here satisfy all six *Baker* factors. This Court therefore lacks subject matter jurisdiction to adjudicate plaintiffs' claims and should dismiss the complaint on that basis.

## C.    The Act of State Doctrine Also Bars Plaintiffs' Claims

Under the act of state doctrine, "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). Plaintiffs argue that the act of state doctrine should not apply because all defendants are private U.S. companies, and they are not challenging any act of a foreign sovereign state. (Opp. at 12-14.) Again, their complaint belies their argument. No less than the plaintiffs in *D'Augusta*, plaintiffs here allege that OPEC countries are "indispensable co-conspirators in the scheme to reduce oil production." *D'Augusta*, 117 F.4th at 1103. Without OPEC's alleged actions, defendants could not stabilize prices or affect global supply. Thus, plaintiffs' claims would require the parties to litigate "the petroleum polic[ies] of foreign nations," including which OPEC officials initiated the agreement, when, and by how much they demanded the alleged conspirators reduce supply. *Id.* Because the "exploitation of natural resources is an inherently sovereign function," adjudicating these questions would "call into

---

[2] In an amicus brief filed in *Spectrum Stores*, the U.S. government stated that a judicial ruling on the lawfulness of OPEC's conduct would constitute "a formal and public contradiction" of the Executive Branch's decades-old policy of "managing the complex U.S. relationships with foreign oil-producing states" through diplomacy instead "of antitrust litigation." Br. of the United States as Amicus Curiae Supporting Affirmance, *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, No. 09-20084, 2010 WL 6606883, at *42, *45 (5th Cir. Aug. 16, 2010).

question the acts of foreign governments with respect to exploitation of their natural resources." *Spectrum Stores*, 632 F.3d at 954 (citation omitted).  The act of state doctrine deprives a court of subject matter jurisdiction to preside over such sensitive issues.  *D'Augusta*, 117 F.4th at 1103.

Further, as Plaintiffs admit in their opposition, the "[a]ct of state issues only arise when a court <u>must decide</u>—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."  *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp.*, 493 U.S. 400, 406-07 (1990).  Here, the allegations focus on and "turn upon" OPEC inducing defendants to form an agreement with OPEC to limit oil production.  Therefore, to find a conspiracy, the factfinder must decide the effects of official actions by OPEC—i.e., acts of inducement, communications, meetings, and more.  As shown above (*supra* Section I.A), without the allegations involving OPEC, there is no alleged conspiracy, making OPEC's actions central to the outcome of the case.

*         *         *

Finally, contrary to plaintiffs' assertion (Opp. at 13-14), the political question and act of state doctrines apply when plaintiffs have not named OPEC members or U.S. government officials as defendants.  Although OPEC and its members were not defendants in *D'Augusta*, the political question doctrine nevertheless deprived the court of subject matter jurisdiction. *D'Augusta*, 117 F.4th at 1103.  And even though no U.S. government officials or OPEC member states were defendants in *Spectrum Stores*, the court was "simply unable to ignore the involvement of foreign nations in the [alleged] conspiracy," and the political question doctrine divested the court of subject matter jurisdiction.  *Spectrum Stores*, 632 F.3d at 947.[3]

---

[3] While plaintiffs attempt to distinguish *D'Augusta* because the complaint there alleged that "then-President Trump engineered an antitrust conspiracy among the United States, Saudi Arabia, Russia, and Defendants," the Ninth Circuit noted that this allegation only established that

*(cont'd)*

## II.    PLAINTIFFS' OPPOSITION CONFIRMS THAT THEY HAVE NOT <u>ALLEGED A PLAUSIBLE CONSPIRACY INVOLVING DEFENDANTS</u>

Plaintiffs have not alleged facts—direct or circumstantial—that plausibly suggest defendants conspired to raise oil prices by restricting shale oil production, either with OPEC or among themselves.  For this independent reason, the complaint should be dismissed.

### A.    Plaintiffs Concede That They Have Pleaded <u>No Direct Evidence of the Alleged Conspiracy</u>

Plaintiffs concede that none of the allegations in the complaint constitute direct evidence of the purported conspiracy.  Instead, they contend only that statements by some defendants' CEOs "are analogous to" direct evidence of an unlawful conspiracy.  Plaintiffs are wrong because they allege no factual basis for claiming that "[e]ach of these CEOs purport[ed] to speak to and on behalf of U.S. shale oil producers as a whole (i.e., all Defendants)."  (Opp. at 19.) None of the statements, which certain defendants allegedly made in earnings calls with shareholders, refers to (or even suggests) any <u>agreement</u> among defendants, and none purports to reflect the views of anyone but the speaker; therefore, these statements do not come close to constituting direct evidence.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010) (direct evidence must amount to a "smoking gun," like a "document or conversation <u>explicitly manifesting</u> the existence of the agreement" (emphasis added)).[4]  At

---

"Plaintiffs' claims here are more clearly barred from judicial review than the claims in *Spectrum Stores*," not that the Fifth Circuit decided *Spectrum Stores* wrongly.  *D'Augusta*, 117 F.4th at 1103 (observing with approval that, in *Spectrum Stores*, the Fifth Circuit "relied on the political question doctrine to reject more generalized allegations of collusion between American oil companies and OPEC—with no Presidential or executive action").

[4] Plaintiffs' cited authorities (Opp. at 19-20) are inapposite because the alleged direct evidence in those cases expressly referenced an agreement or collective action involving the defendants.  *See Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 211 (3d Cir. 2008) (dealer defendants allegedly stated "that 'dealers don't compete on price'" and referenced "a 'gentlemen's agreement' among [defendant] truck dealers that they would sell only in their own

*(cont'd)*

most, these statements reflect each speaker's observations about the marketplace following the

OPEC Price War and the COVID-19 pandemic and the speaker's intentions for his or her

company's production in the short-term future.  But executives' "public statements" about

market conditions and predictions "particularly in response to investor and analyst questions" do

not provide evidence of a conspiracy, much less direct evidence.  *In re Dynamic Random Access*

*Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F. 4th 42, 50 (9th Cir. 2022).

Plaintiffs also refer to in-person meetings and communications, which they neglect to

mention allegedly involved OPEC (Compl. ¶¶ 115, 139, 152, 177-79), as "analogous to" direct

evidence of a conspiracy (Opp. at 20).  But, like the earnings calls, these meetings and

communications do not evidence or suggest an agreement to restrict production.  Indeed, at the

2017 CERAWeek meeting to which plaintiffs refer, plaintiffs allege that "shale producers

signaled they weren't ready to give up on the growth they see ahead."  (Compl. ¶ 115.)  And in

the July 2020 communication plaintiffs reference, the OPEC Secretary General expressed

OPEC's appreciation for "the support and the cooperation we are getting from the U.S. both at

the level of policymakers as well as from industry" during the disastrous market collapse

inflicted by the COVID-19 pandemic.  (*Id.* ¶ 139 (emphasis added) (citation omitted).)

---

areas of responsibility"); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (alleged "statement indicate[d] an agreement among service center[] [defendants] to take collective action"); *United States v. Taubman*, 297 F.3d 161, 165 (2d Cir. 2002) (witness "explicitly testified that she was directed by [defendant] to meet with [a competitor] and work out the specifics of the price-fixing agreement"); *B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 WL 5725010, at *6 (N.D. Cal. Sept. 30, 2016) (credit card executive allegedly spoke "on behalf of all [credit card] networks" and another stated that the alleged anticompetitive decision was made by "getting everyone 'in a room' to 'work together'"); *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 318 (S.D.N.Y. 2018) (alleged statements referencing a "general agreement" among defendants and that two defendants "agreed" they "need[] to 'get a hold of this thing'").

### B. Plaintiffs Fail to Plausibly Allege Circumstantial Evidence of the Alleged Conspiracy

#### 1. Plaintiffs' Failure to Plead Facts Showing Parallel Conduct Dooms Their Effort to Plead Circumstantial Evidence

Plaintiffs' failure to plead parallel conduct prevents them from stating a conspiracy claim based on circumstantial evidence. (Br. at 22-24.) Despite asserting that the objective of the alleged conspiracy was to restrict output, plaintiffs concede—as they must—that they have not alleged that defendants "executed parallel cuts to existing production levels." (Opp. at 23.) Plaintiffs insist that even if "Defendants may have implemented differing levels of production restraint," "Plaintiffs have plausibly alleged that each [defendant] participated in coordinated supply restrictions." (*Id.*) But conclusory statements are not substitutes for factual allegations. And the complaint's allegations show that during the alleged conspiracy, six of the eight defendants increased U.S. production at vastly different rates that do not suggest any coordination (e.g., Centennial increased by 56% and EOG by 6%), with only two defendants allegedly decreasing U.S. production rates—again, at vastly different rates (Chesapeake by 63% and Hess by 6%). (Compl. ¶ 160 table 1; *see also* Br. at 8-9, 22-24.)[5]

Recognizing that their own complaint spotlights defendants' diverging production numbers, plaintiffs instead argue that defendants' "differing levels of production restraint" nevertheless show a parallel "coordinated supply restriction[]." (Opp. at 23.) But plaintiffs' own authorities belie their argument.[6] For example, plaintiffs cite *In re Broiler Chicken Antitrust*

---

[5] While plaintiffs argue that allegations regarding "variations in each Defendants' [sic] production growth during the Class Period . . . [are] found nowhere in the [complaint]" (Opp. at 22), those varied production growth rates are depicted in Table 1 of the complaint.

[6] Plaintiffs' cited authorities (Opp. at 23-24) are inapposite because the defendants in those cases allegedly engaged in similar conduct, rather than the disparate production rates alleged in the complaint here. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1002 (N.D.

*(cont'd)*

13

*Litigation*, 290 F. Supp. 3d 772 (N.D. Ill. 2017), for the proposition that parallel conduct does

not require that "production decreased in absolute numbers." (Opp. at 23.) But that court

emphasized that "at some point the difference in production cut or market share reductions

would be so great that agreement becomes implausible." *Broiler Chicken*, 290 F. Supp. 3d at

795. According to that court, while a 6% production difference between competitors may not be

implausible, a conspiracy becomes implausible when two defendants' "market shares increased

20% and 50%" while "two other defendants' market shares declined 25% and 19%." *See id.*

Yet, according to the complaint here, the divergence among defendants is even more

pronounced, with Chesapeake decreasing production by 63% and Centennial increasing

production by 56%—a 119% difference. In the Tenth Circuit's words, a conspiracy that so

greatly "locks in substantial advantages" for one rival, at the expense of another, is

"implausible." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019).

      To evade defendants' diverging production numbers, plaintiffs now pivot and argue that

defendants engaged in parallel conduct when they allegedly agreed not to spend funds to exploit

new "drilling opportunities." (Opp. at 3, 23.) But the complaint pleads no facts about "drilling

opportunities" that defendants—individually or collectively—either exploited or forewent, or

any facts of agreements or discussions concerning such activities. At most, the complaint

includes a chart that purportedly shows all U.S. oil producers' "reinvestment rate" between 2012

and 2022. (*Id.* at 23 (citing Compl. ¶ 161 & fig. 3).) But this chart does not suggest parallel

---

Ill. 2023) (defendants' "challenged actions [we]re similar" as they "proposed fee structures
[plaintiff] claims were cost prohibitive"); *Crownalytics, LLC v. SPINS LLC*, No. 22-CV-01275-
NYW-JPO, 2024 WL 2111570, at *6 (D. Colo. May 10, 2024) (plaintiff alleged that "around the
same time, [defendants] changed their established practices and worked to preclude [plaintiff's]
access to their data"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348,
1361 (N.D. Ga. 2010) ("Defendants made changes to their business practices, including reducing
capacity and imposing a first-bag fee.").

behavior among <u>defendants</u> to refrain from exploiting drilling opportunities. Instead, it reflects average quarterly reinvestment rates for <u>all</u> U.S. oil producers—including shale oil and other crude oil sources held by non-defendants. As a matter of law, these averages cannot establish parallel conduct. First, courts reject averages that "do not distinguish at all between defendant[s] and non-defendant[s]." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 400 (2d Cir. 2024) (citation omitted); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) (rejecting statistics "alleg[ing] an increase in the average retail price of <u>all</u> guitars and guitar amplifiers sold").[7] Second, contrary to plaintiffs' argument that they have alleged defendants' "sudden shift away from growth to production restraint" (Opp. at 24), averages across multiple years do not reveal "'sudden shifts in behavior'" because they can "'flatten or hide trends that might tell a different story,' and they can be finessed by shifting the time periods being averaged." *City of Pontiac*, 92 F.4th at 400 (citation omitted); *see also Oliver v. SD-3C LLC*, No. 11-CV-01260-JSW, 2016 WL 5950345, at *7 (N.D. Cal. Sept. 30, 2016) (statistics that are "aggregated by year . . . do[ ] not show whether changes in prices occurred simultaneously or at different times"). (*See also* Br. at 23.)

Moreover, even if this Court were to indulge plaintiffs' unsupported, highly implausible assumption that each defendant's reinvestment rate equaled the average reinvestment rate for all U.S. oil producers, the complaint's Figures 4 to 10—showing defendants' increasing revenue—then establish that defendants' reinvestment in new drilling <u>increased</u> substantially in absolute

---

[7] Plaintiffs misplace reliance (Opp. at 23-24) on *In re Domestic Airline Travel Antitrust Litigation*, 221 F. Supp. 3d 46 (D.D.C. 2016), where plaintiffs presented economic evidence allegedly showing that during the purported conspiracy, "airfares on routes which [a] Defendant [airline] was the largest carrier gr[ew] at a much higher rate than airfares on routes which a non-Defendant airline was the largest carrier." *Id.* at 64. Here, plaintiffs do not compare defendants' growth or investment rates to those of non-defendants.

dollars following the COVID-19 pandemic.  Comparing the quarterly average reinvestment rates

from Figure 3 to each defendant's annual revenue as reflected in Figures 4-10 would show that,

in each case, reinvestment expenditures increased dramatically (and though plaintiffs

inexplicably did not include a chart of Hess's annual revenues in the complaint, the same would

be true for Hess):

| Defendant | 2020 Revenue | Q1 2020 Reinvestment (80% of Revenue) | 2022 Revenue | Q3 2022 Reinvestment (40% of Revenue) | % Increase in Reinvestment Expenditures |
|---|---|---|---|---|---|
| Pioneer (Compl. fig. 4) | $6B | $4.8B | $24B | $9.6B | 100% |
| Centennial (Compl. fig. 5) | $500M | $400M | $2B | $800M | 100% |
| Chesapeake (Compl. fig. 6) | $500M | $400M | $11B | $4.4B | 1000% |
| Continental (Compl. fig. 7) | $2.5B | $2B | $9B | $3.6B | 80% |
| Diamondback (Compl. fig. 8) | $3B | $2.4B | $10B | $4B | 67% |
| EOG (Compl. fig. 9) | $10B | $8B | $26B | $10.4B | 30% |
| Occidental (Compl. fig. 10) | $16B | $12.8B | $37B | $14.8B | 16% |

Finally, plaintiffs erroneously argue that this Court can ignore that their factual

allegations are entirely consistent with defendants independently responding to common market

stimuli.  (Opp. at 20-21.)  As a matter of law, the Court may consider such "obvious alternative

explanations"—especially when they are pleaded in the complaint.  *In re Ins. Brokerage

Antitrust Litig.*, 618 F.3d at 322-23; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566

(2007) ("[N]othing in the complaint intimates that the [defendants'] resistance to the [new

market entrants] was anything more than the natural, unilateral reaction of each [defendant]

intent on keeping its regional dominance.").  Indeed, a complaint that identifies "obvious

alternative explanation[s]" for challenged behavior <u>must</u> be dismissed.  *Twombly*, 550 U.S. at

567.  Here, plaintiffs have pleaded all the facts necessary to identify such obvious alternative

explanations.  (Compl. ¶¶ 103-08 (OPEC Price War), 138 (COVID-19 oil market collapse),

143(d) (perceived threat of another OPEC price war), 146-47 (Russian invasion of Ukraine).)

In sum, the complaint pleads no facts suggesting that defendants engaged in parallel

behavior with respect to their shale oil production or investment in new "drilling opportunities."

To the contrary, plaintiffs' factual allegations suggest that many defendants expanded—by

various amounts and percentages—both their production levels and their reinvestment activities,

while one defendant, Expand Energy, which publicly announced that it was exiting the oil

business altogether (Br. at 8), decreased production by 63%.  Because plaintiffs do not plead

parallel conduct, they cannot state a conspiracy claim based on circumstantial evidence.  *See,*

*e.g.*, *City of Pontiac*, 92 F.4th at 401 (affirming dismissal of conspiracy claims for failure to

allege parallel conduct).

### 2.     Plaintiffs' "Plus Factors" Are Irrelevant<br>And Do Not Plausibly Suggest the Alleged Conspiracy

Plaintiffs do not dispute that absent parallel conduct, the complaint's alleged "plus

factors" are irrelevant as a matter of law.  (Br. at 25.)

Moreover, even when parallel conduct has been alleged (unlike here), a court can only

infer a conspiracy from plus factors when they suggest circumstances so unusual that they create

the inference that the "parallel behavior . . . would probably not result from chance, coincidence,

independent responses to common stimuli, or mere interdependence unaided by an advance

understanding."  *Twombly*, 550 U.S. at 556 n.4 (citation omitted).  Plaintiffs' putative "plus

factors" do not create such an inference.  Rather, they are entirely consistent with unilateral,

economically rational conduct.

First, plaintiffs wrongly argue that meetings with OPEC ministers at which the participants allegedly shared "forward-looking production information" were somehow irrational and thus evidence a conspiracy. (Opp. at 25-26.) Plaintiffs also assert that "the FTC uncovered evidence of interfirm communications that support an inference of a traditional conspiracy." (*Id.* at 25.) The complaint does not allege any facts about these meetings and communications from which to infer that each defendant's production decisions were not made independently in response to common market conditions. And plaintiffs do not plead that the FTC identified any communication between defendants. Tellingly, plaintiffs argue that the FTC "uncovered evidence" that defendant John Hess "'communicated publicly and privately with OPEC representatives and oil ministers of OPEC member states about global output and other dimensions of crude oil market competition' and 'encouraged high-level OPEC representatives in their stated mission to stabilize global oil markets.'" (*Id.* at 26 (quoting Compl. ¶ 185).) That allegation, which affirms the central role of OPEC in the complaint (*see supra* Section I.A), does not suggest a conspiracy among defendants. Plaintiffs do not—and cannot—point to any FTC finding involving any communication between Hess or Scott Sheffield and any other defendant.

Second, plaintiffs implausibly insist that defendants' expansion restraint was against each defendant's self-interest. (Opp. at 26-28.) But as the Ninth Circuit recently emphasized in affirming the dismissal of similar conspiracy allegations, the "global Covid-19 pandemic" that caused "the price for a barrel of oil" to go "negative!"—not to mention the OPEC Price War and the Russian invasion of Ukraine—are exactly the type of "obvious alternative explanation[s]" for why defendants may have chosen expansion restraint. *D'Augusta*, 117 F.4th at 1104.

Third, plaintiffs erroneously contend that a conspiracy is plausible because the domestic shale oil market is "concentrated at the top but fragmented with many small producers at the

bottom," and defendants supposedly possess "market power" because they are "responsible for 16.2% of total U.S. crude oil production." (Opp. at 28, 36.)  In fact, the complaint unequivocally alleges that the relevant market for crude oil production is global (not U.S.-only) (Compl. ¶¶ 8, 13, 82, 93-94, 96-97, 103, 131, 207, 226-27) and that the OPEC member states "control over 50% of the world's oil production" (Opp. at 6), with defendants collectively accounting for only 1.9% of the world's crude oil production (Br. at 9).  Under no circumstances could this tiny share grant defendants—even when treated collectively—market power.  *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[M]arket share of less than 50 percent is presumptively insufficient to establish market power.").

Plaintiffs also argue that six investment firms allegedly own shares of some defendants, but disregard defendants' point that common ownership cannot constitute a plus factor when, as here, the complaint does not plead facts suggesting that individuals at the investment firms conspired.  (Br. at 28.)  Plaintiffs misleadingly argue that "these common shareholders met in New York 'to discuss a common goal': 'how to make frackers pump less and profit more.'" (Opp. at 29 n.14 (quoting Compl. ¶ 117).)  But the alleged "common investors" identified in the complaint (Compl. ¶ 197 (BlackRock, Capital World Investors, Fidelity, T. Rowe Price, Vanguard)) are entirely different from the investors named in the article describing the shareholder meeting in New York, *see Wall Street Tells Frackers to Stop Counting Barrels, Start Making Profits*, THE WALL STREET JOURNAL (Dec. 13, 2017) (cited in Compl. ¶ 117 n.45) (Invesco, Sailing Stone Capital Partners, Macquarie Group, Neuberger Berman Group).[8]

---

[8] The Court can consider the content of this article under the incorporation by reference doctrine. *See, e.g.*, *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1292, n.6 (10th Cir. 2023) ("[I]n evaluating whether Plaintiffs have stated a claim under Rule 12(b)(6), courts may properly rely on materials referenced in Plaintiffs' complaint[.]" (citation omitted)).

\*      \*      \*

In sum, plaintiffs have not sufficiently alleged parallel conduct to state a conspiracy claim based on circumstantial evidence, and absent parallel conduct, their alleged plus factors are irrelevant. But even if the court were to consider the alleged plus factors, they do not support (indeed, they undermine) a plausible inference that defendants conspired to restrict production. The complaint should therefore be dismissed.

### III.    PLAINTIFFS FAIL TO PLEAD FACTS SHOWING THAT THEY HAVE ANTITRUST STANDING

Plaintiffs lack standing to seek injunctive relief—the only remedy available to them under the Sherman Act—because the complaint does not plead facts suggesting an ongoing antitrust violation. (Br. at 31-32.) Nor did plaintiffs plead facts supporting antitrust standing under *AGC* because they do not—and cannot—trace any connection between the prices that plaintiffs paid to third-party retailers for refined petroleum products and defendants' alleged production restraint. (*Id.* at 32-37.)

Plaintiffs' arguments in opposition are unavailing. <u>First</u>, plaintiffs contend that "the *AGC* analysis for determining Sherman Act injunctive relief standing is different—more permissive— than for damages" (Opp. at 30), but this argument simply ignores the reason their injunctive claim fails. To obtain injunctive relief, plaintiffs must plead ongoing misconduct. (Br. at 31.) Plaintiffs have not. Instead, plaintiffs allege that Exxon Mobil acquired defendant Pioneer and Chevron is in the process of acquiring defendant Hess, and that both Exxon and Chevron have committed to expand shale oil production. (Compl. ¶ 165.) These allegations belie any continuing conspiracy. And plaintiffs do not dispute that courts consistently dismiss injunctive relief claims when, as here, plaintiffs plead only historical conduct to support their claims of an ongoing antitrust violation. (Br. at 31-32.) Because plaintiffs' Sherman Act claim seeks only

injunctive relief that plaintiffs lack standing to seek, their claim should be dismissed.

Second, plaintiffs argue that "[t]he *AGC* factors do not apply to most of Plaintiffs' state law antitrust claims." (Opp. at 30.) That argument is erroneous for the reasons set forth below. (*See infra* pp. 25-27.)

Third, plaintiffs assert that they have satisfied the *AGC* factors (Opp. at 32-40), but an analysis of each factor confirms they cannot meet their burden as to any factor.

**Causal Connection Between Alleged Violation and Plaintiffs' Injury.** Plaintiffs concede they cannot trace any purported overcharge they paid to third-party retailers for refined petroleum products to defendants' alleged agreement to refrain from further expanding their shale oil production, arguing such tracing would be "absurd." (Opp. at 33.) Plaintiffs' rhetorical question—"How does one trace Defendants' foregone production through the supply chain?" (*id.*)—ignores the Supreme Court's admonition that a plaintiff lacks standing when there are only "vaguely defined links" between defendants' alleged conduct and plaintiffs' alleged injury. *AGC*, 459 U.S. at 540.

Plaintiffs wrongly contend they satisfy this *AGC* factor because defendants' purported conspiracy allegedly "resulted in an increase in U.S. oil prices . . . and that this overcharge was passed along the distribution chain and absorbed by Plaintiffs in the form of supra-competitive prices for gasoline, distillate fuels, marine fuel, and jet fuel." (Opp. at 36.) Plaintiffs, however, plead no facts showing how defendants—accounting <u>for less than 2%</u> of global crude oil production—could have impacted prices in the global market, let alone how purportedly elevated prices for crude oil impacted the pricing decisions of the many independent, non-conspirators along the global supply chain from the extraction of crude oil to the retail sale of refined petroleum products. (Br. at 32-34.)

Plaintiffs argue that "[t]hese same traceability arguments have been roundly rejected by courts considering indirect purchaser claims involving price-fixed components or ingredients." (Opp. at 37.)  But the decisions they cite are inapposite because those cases—unlike here—were brought by plaintiffs that transacted <u>directly</u> with the defendants.  *See In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 16 (3d Cir. 1978) (plaintiffs allegedly purchased directly from defendants); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002) (same); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988-90 (9th Cir. 2000) (plaintiffs sold directly to defendants).  Here, plaintiffs do not—and cannot—allege that they bought anything from defendants.

Plaintiffs also suggest that the Court can assume that defendants' alleged conspiracy impacted market-wide prices because defendants "collectively possess market power," given their "16.2% [share] of total U.S. crude oil production."  (Opp. at 36.)  But plaintiffs' alleged market is global (not U.S.-only), and defendants' collective share of that market is less than 2%. For this reason, plaintiffs misplace reliance on *In re Fragrance Direct Purchaser Antitrust Litigation*, where the court held that the causal connection factor of the *AGC* test "weigh[ed] in [p]laintiffs' favor" because "Defendants controlled roughly two-thirds of the global fragrance market."  No. 2:23-02174, 2025 WL 579639, at *14 (D.N.J. Feb. 21, 2025) (cited at Opp. 35).

**Defendants' Intent**.  Plaintiffs wrongly assert that they "sufficiently plead intent and motivation" because the alleged conspiracy "had the direct and foreseeable result of causing artificially higher prices for oil derivative fuel products" that plaintiffs purchased.  (Opp. at 38-39.)  As an initial matter, the complaint does not contain any facts at all regarding defendants' "intent and motivation."  Nor does it allege factual support for the conclusory assertion that defendants' alleged upstream conduct, related solely to crude oil, had any effect on the prices of

22

refined petroleum products at the bottom of the multi-tiered refining and distribution chain.

**Antitrust Injury**. Plaintiffs fail to plead antitrust injury because they cannot trace the retail prices they paid for refined products to defendants' alleged agreement to restrict production of crude oil. (Br. at 35-36.) According to the complaint, crude oil producers from around the world sell their crude oil to refineries (also located around the world) that "co-mingle" the crude oil of multiple producers and, using chemical separation and reaction processes, convert the crude oil into gasoline, heating oil, diesel fuel, marine fuel, jet fuel, and other petroleum-based feedstocks, which are then combined in refinery storage facilities and shipped through pipelines, by water-borne barges, and railway to bulk terminal storage and blending facilities. Once there, they are blended and combined with other similar domestic and imported refined products to be shipped across the country for eventual sale to wholesalers, then retailers, and finally—at the end of a long supply chain—to consumers like plaintiffs. (Compl. ¶¶ 5-6, 234 & fig. 16.) Plaintiffs do not—and cannot—allege that they bought anything directly or indirectly from defendants—or that they purchased any refined petroleum product derived (in whole or even in part) from defendants' crude oil. (Br. at 34.)

Plaintiffs rely on "[t]he general rule . . . that customers and competitors in the affected market have antitrust standing." (Opp. at 33 (citing *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020)).) But that rule bars plaintiffs' claims: plaintiffs <u>are not</u> customers or competitors in the global crude oil market where defendants allegedly compete.

Plaintiffs also wrongly argue that they need not trace their injury to "oil Defendants produced" and that "countless . . . authorities permit indirect purchasers of finished products that contain the allegedly restrained products to bring suit under [*Illinois Brick*] repealer statutes." (*Id.*) But again, plaintiffs rely on authorities that undercut their position because in those cases,

unlike here, the products at issue were "identifiable, discrete physical objects" like TVs and auto parts that could be "physically traced through the supply chain," including by part numbers and tracking IDs. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 855 (E.D. Mich. 2014).[9]  There is nothing identifiable about defendants' crude oil that is co-mingled with oil from many other producers before being stripped of its identifiable features through "chemical separation and reaction processes" as it is converted into gasoline, heating oil, diesel fuel, and other petroleum-based products.  (Br. at 32.)  On the question of traceability, fungible crude oil is not at all akin to identifiable flatscreens.

**Directness of the Connection**.  Plaintiffs fail to satisfy this factor because they admit they rely "on the same facts highlighted in relation to antitrust injury and causal connection" (Opp. at 39), which are deficient for the reasons set forth above.

**Speculative and Complex Damages**.  Plaintiffs cannot satisfy these factors because, contrary to their argument (*id.* at 39-40), they do not plead facts showing that defendants' conduct resulted in any overcharge paid by crude oil refiners—let alone that any such overcharge was passed through the multi-tiered distribution chain to plaintiffs.

*             *             *

In sum, plaintiffs' entire action must be dismissed for lack of antitrust standing because plaintiffs cannot trace any purported overcharge to defendants' alleged conduct, and because their allegations about acquisitions in the industry moot their injunctive relief claim.

---

[9] *See also In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 997-98 (E.D. Mich. 2014) ("Each Complaint details how Fuel Senders follow a traceable path through the distribution chain[.]"); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (class members were "purchasers . . . who [had] no choice in which warfarin sodium they purchased").

IV.    **PLAINTIFFS' STATE LAW CLAIMS FAIL FOR THE SAME
       REASONS AS THEIR FEDERAL CLAIM AND FOR ADDITIONAL REASONS**

    A.    **All of Plaintiffs' State Law Claims Fail With Their Sherman Act Claim**

Plaintiffs' state law claims, which are predicated on the same factual allegations as their

federal claim, fail for the same reasons:  the political question and act of state doctrines deprive

this Court of subject matter jurisdiction, and plaintiffs have not pleaded facts sufficient to

establish a plausible conspiracy involving defendants.  (Br. at 38-39 & n.14.)  Plaintiffs do not

disagree.  (Opp. at 41.)  Thus, plaintiffs' state law claims should be dismissed in their entirety.

    B.    **Plaintiffs Lack Standing to Bring Their State Law Claims**

        1.    **Plaintiffs Lack Antitrust Standing to Bring Their State Law Claims**

The Supreme Court's decision in *AGC*, requiring more than "vaguely defined links"

between plaintiffs' alleged injuries and defendants' alleged conduct, applies equally to plaintiffs'

state antitrust law claims here.  (*See supra* pp. 20-24.)  Plaintiffs are incorrect that "federal courts

have generally adopted the presumption that, absent a binding decision to the contrary, 'any state

with an *Illinois Brick* repealer would reject application of *AGC*.'"  (Opp. at 31.)

"[T]he *Illinois Brick* doctrine is only one of several obstacles to . . . recovery on an

antitrust claim.  The direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of

*Associated General Contractors* are analytically distinct."  *Int'l Bhd. of Teamsters, Loc. 734*

*Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 828 (7th Cir. 1999).  Both the

Second and Ninth Circuits have concluded that the *AGC* factors apply to state antitrust law

claims even in *Illinois Brick* repealer states—including California.  *See, e.g.*, *Schwab Short-Term*

*Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 120 (2d Cir. 2021) (applying *AGC*

to claims under California's Cartwright Act and holding that plaintiff lacked antitrust standing

because it purchased from third parties); *Knevelbaard*, 232 F.3d at 987 (acknowledging that

despite California's *Illinois Brick* repealer statute "afford[ing] standing more liberally than does

federal law[,] . . . [a]ntitrust standing is required under the Cartwright Act"). And the Seventh

Circuit has expressly rejected plaintiffs' argument that any state with an *Illinois Brick* repealer

would not follow *AGC*. *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735,

743-44 (7th Cir. 2018). There, the plaintiffs brought claims under the antitrust laws of nearly

two dozen states and argued, as plaintiffs do here, that *Illinois Brick* repealer laws implicitly

reject *AGC*'s direct injury standing requirement. The court refused to "read these state laws so

expansively," noting that "[i]t is one thing to say that a state is willing to allow someone other

than a direct purchaser to have the opportunity to shoulder the burden of showing proximate

causation; it is quite another thing to say that the state has thrown both the direct-purchaser rule

and proximate causation out the window." *Id.* at 744.[10]

　　　Plaintiffs' state-law citations do not refute that *AGC* applies equally under state law. For

California, plaintiffs rely on *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal.

---

[10] This Court should reject plaintiffs' invitation to disregard decisions from lower state courts, federal court decisions, and harmonization laws on whether *AGC* should apply to state claims. (Opp. at 31.) Courts routinely rely on these sources, particularly when a state's highest court has not yet addressed the issue. *See Schwab*, 22 F.4th at 120-21 (acknowledging conflicting federal precedent and analyzing intermediate state appellate court decisions and legislative intent regarding harmonization); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *8 (N.D. Cal. Oct. 2, 2014) ("Where the state high court has not so decided, however, the matter becomes more difficult . . . . In performing this task, the Court should consider the available reliable evidence, which may include 'intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements.'" (citations omitted)). Indeed, plaintiffs themselves invite this Court to consider authorities beyond a state's highest court; their Appendix 1 relies heavily on them. Significantly, most of the state supreme and intermediate appellate court decisions on which plaintiffs rely merely uphold the right of indirect purchasers to bring suit and do not address *AGC* or other factors for determining antitrust standing. *See, e.g.*, *In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668, 679 (S.D. 2003); *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004); *Romero v. Philip Morris Inc.*, 109 P.3d 768, 770 (N.M. Ct. App. 2005); *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

2003).  (ECF No. 156-1 at 2.)  But *Korea Supply* was not an antitrust case, nor did the majority opinion reject *AGC* but instead advocated an *AGC*-like remoteness standard for tortious interference claims.  29 Cal. 4th at 1185-86.

Plaintiffs also misread *Lorix v. Crompton Corp.* to claim that Minnesota law excludes *AGC.*  736 N.W.2d 619 (Minn. 2007).  While the court in *Lorix* declined to apply some of the *AGC* factors to Minnesota antitrust claims, the court recognized (much like the Supreme Court did in *AGC*) that "[s]tanding under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law; otherwise, almost any antitrust violation would provide almost any citizen with a cause of action arising from the resulting ripples of harm throughout the state's economy."  *Id.* at 630-31.

In short, the weight of authority, collected in defendants' Appendix B (ECF No. 129-2), correctly holds that *AGC* applies to plaintiffs' state antitrust claims.  For this reason, those state law claims should be dismissed in their entirety.

## 2.    Plaintiffs Lack Article III Standing Under Various State Laws

Many of the named plaintiffs lack standing under various state laws, and plaintiffs' argument that the Court should defer a standing analysis until class certification is incorrect.  As defendants demonstrated (Br. at 39), "[p]rior to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole."  *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1159 (10th Cir. 2011).  Plaintiffs themselves acknowledge that the general rule requires that standing be established by every plaintiff as to every cause of action at the outset of the case.  (Opp. at 41.)

Plaintiffs wrongly argue that the general rule should not apply in this case and that defendants' standing arguments should await class certification because the "logical antecedent

27

exception" first recognized in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997), should apply.  But that is a "limited exception applicable <u>only</u> when a case's class action nature creates the standing question," as, for instance, when there is a question as to whether a named plaintiff has standing to "assert the rights of absent class members."  *Woodard v. Fid. Nat'l Title Ins. Co.*, No. CIV 06-1170 RB/WDS, 2007 WL 5173415, at *3 (D.N.M. Dec. 4, 2007).  It does not apply to the question of whether "a named plaintiff meets individual standing requirements." *Id.*  Individual named plaintiffs must establish their standing to bring their own claims at the outset of the case.  *See, e.g.*, *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2012 WL 2917365, at *5 (E.D. Mich. July 17, 2012) ("In cases such as the instant case, where the putative plaintiffs' injury is in doubt, Article III standing issues should be resolved in the first instance." (quoting *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 656 (E.D. Mich. 2011))).  Several cases on which plaintiffs rely (Opp. at 42 n.25) confirm these principles.  *See, e.g.*, *Abraham v. WPX Prods., LLC*, 184 F. Supp. 3d 1150, 1200 (D.N.M. 2016) ("The Court agrees with the Defendants that named plaintiffs must have standing and that the Court should analyze that issue before certifying a class."); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92-93 (2d Cir. 2018) (analyzing whether plaintiff had standing to bring a class action on behalf of unnamed, yet-to-be-identified class members from other states under those states' consumer protection laws); *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) ("In the present case, Defendants do not dispute that the individually named plaintiffs . . . had individual standing to bring their own claims."); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 21-10335, 2022 WL 16729170, at *6 (11th Cir. Nov. 7, 2022) (analyzing plaintiff's standing to bring claims on behalf of class members who purchased in other states).

      Several plaintiffs cannot make this showing.  Defendants demonstrated that plaintiffs

28

who made purchases for business or commercial purposes under various consumer protection statutes and plaintiffs who assert Nevada consumer protection claims and are not elderly lack standing to pursue claims under those statutes.  (Br. at 43-45, 50.)  And plaintiffs concede that no named plaintiff has standing to bring a claim under West Virginia law.  (Opp. at 42.)  The logical antecedent exception simply does not apply to the question of the named plaintiffs' individual standing to assert their claims.  *See Thomas*, 631 F.3d at 1159 (holding that named plaintiffs' lack of standing is fatal to the case).

### C.    State Bars on Indirect Purchaser Actions Apply to Plaintiffs' Claims

#### 1.    Indirect Purchaser Claims Are Barred in Part In New Jersey and Colorado (Counts 8 and 36)

Plaintiffs do not dispute that the statutory amendments in Colorado and New Jersey repealing *Illinois Brick* do not apply retroactively.  (Opp. at 46.)  Courts routinely dismiss claims that predate the effective date of state antitrust statutes.  *See, e.g.*, *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 393 (D.N.J. 2018) (dismissing claims that arose before enactment of Rhode Island's *Illinois Brick* repealer statute); *In re Vitamins Antitrust Litig.*, No. MISC 99-197 (TFH), 2000 WL 1475705, at *15 (D.D.C. May 9, 2000) (dismissing claims for damages for indirect purchases that predated Donnelly Act amendment permitting indirect purchaser actions).  The decision in *In re Hard Disk Drive Suspension Assemblies Antitrust Litigation*, No. 19-md-02918-MMC, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021), on which plaintiffs rely (Opp. at 46), is inapplicable because the defendants in that case, unlike defendants here, sought dismissal of claims for conduct that occurred after the effective date of the relevant statute.  Here, this Court should dismiss plaintiffs' Colorado and New Jersey antitrust claims to the extent they seek recovery for conduct before June 7, 2023, and August 5, 2022, respectively.  (Br. at 40-41.)

### 2.  State Class Action Bars Apply in
### <u>Federal Court (Counts 15, 16, 29, and 47)</u>

Contrary to plaintiffs' arguments, class action bars in Illinois, Montana, and South Carolina preclude plaintiffs from bringing antitrust or consumer class action suits under the laws of those states.  Those state class action bars are substantive and thus enforceable in federal court because they are "so intertwined with a state right or remedy that [they] function[] to define the scope of the state-created right."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 423 (2010) (Stevens, J., concurring); *see also In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) (applying indirect purchaser class action bar in federal court and dismissing indirect purchaser plaintiffs' claims under Illinois law); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (same); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 844 (E.D. Pa. 2019) (holding that plaintiffs could not pursue South Carolina and Montana consumer protection claims because statutory class action bars were a "substantive policy choice" that precluded plaintiffs from bringing class claims).

### D.    <u>Plaintiffs' State Law Claims Fail for Additional Reasons</u>

Plaintiffs concede that the Maryland Consumer Protection Act does not apply to their claims. (Opp. at 48.)  Plaintiffs' state law claims fail for the additional reasons set forth in Appendix E accompanying this memorandum.

### <u>CONCLUSION</u>

For all the foregoing reasons, defendants respectfully request that this Court dismiss plaintiffs' complaint in its entirety with prejudice.

Dated: May 12, 2025                                  Respectfully submitted,

                                                     */s/ Boris Bershteyn*
                                                     Boris Bershteyn
                                                     Karen M. Lent
                                                     Michael H. Menitove
                                                     Zachary C. Siegler
                                                     SKADDEN, ARPS, SLATE,
                                                       MEAGHER & FLOM LLP
                                                     One Manhattan West
                                                     New York, New York 10001-8602
                                                     Telephone: (212) 735-3000
                                                     boris.bershteyn@skadden.com
                                                     karen.lent@skadden.com
                                                     michael.menitove@skadden.com
                                                     zachary.siegler@skadden.com

                                                     Kenneth A. Gallo
                                                     PAUL, WEISS, RIFKIND,
                                                       WHARTON & GARRISON LLP
                                                     2001 K Street, NW
                                                     Washington, DC 20006-1047
                                                     Telephone: (202) 223-7300
                                                     kgallo@paulweiss.com

                                                     William B. Michael
                                                     PAUL, WEISS, RIFKIND,
                                                       WHARTON & GARRISON LLP
                                                     1285 Avenue of the Americas
                                                     New York, NY 10019-6064
                                                     Telephone: (212) 373-3000
                                                     wmichael@paulweiss.com

                                                     Samuel G. Liversidge
                                                     Jay P. Srinivasan
                                                     S. Christopher Whittaker
                                                     GIBSON, DUNN & CRUTCHER
                                                       LLP
                                                     333 South Grand Avenue
                                                     Los Angeles, CA 90071-3197
                                                     Telephone: (213) 229-7000
                                                     sliversidge@gibsondunn.com
                                                     jsrinivasan@gibsondunn.com
                                                     cwhittaker@gibsondunn.com

31

Eric R. Burris
BROWNSTEIN HYATT
  FARBER SCHRECK, LLP
201 Third Street NW, Suite 1800
Albuquerque, NM 87102-4386
Telephone: (505) 244-0770
eburris@bhfs.com

*Attorneys for Defendant*
*Pioneer Natural Resources Company*


By:  */s/ John M. Taladay*
John M. Taladay
Christopher Wilson
Kelsey Paine
Megan Tankel
Fran Jennings
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001-5692
Tel: (202) 639-7909
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
kelsey.paine@bakerbotts.com
megan.tankel@bakerbotts.com
fran.jennings@bakerbotts.com

Benjamin F. Feuchter
Thomas C. Bird
JENNINGS HAUG KELEHER
  MCLEOD
201 Third Street NW, Suite 1200
Albuquerque, NM 87102
Tel: (505) 346-4646
bf@jhkmlaw.com
tcb@jhkmlaw.com

*Attorneys for Defendant*
*EOG Resources, Inc.*


By:  */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
Jeffrey J. Amato
WINSTON & STRAWN LLP

32

200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
jkessler@winston.com
jamato@winston.com

Thomas M. Melsheimer
Thomas B. Walsh, IV
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Tel: (212) 294-6700
tmelsheimer@winston.com
twalsh@winston.com

Benjamin Allison
Billy Trabaudo
BARDACKE ALLISON MILLER
  LLP
P.O. Box 1808
141 E. Palace Avenue
Santa Fe, NM 87501
Tel: (505) 995-8000
ben@bardackeallison.com
billy@bardackeallison.com

*Attorneys for Defendant*
*Diamondback Energy, Inc.*

By: */s/ Marguerite M. Sullivan*
Marguerite M. Sullivan
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Marguerite.Sullivan@lw.com

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Lawrence.Buterman@lw.com

*Attorneys for Defendant*
*Expand Energy Corporation*

33

*(F/K/A Chesapeake Energy
Corporation)*

By: */s/ Kevin S. Schwartz*
Kevin S. Schwartz
David A. Papirnik
WACHTELL, LIPTON, ROSEN &
  KATZ
51 West 52nd Street
New York, NY 10019
Tel: (212) 403-1062
kschwartz@wlrk.com

Benjamin E. Thomas
RODEY, DICKASON, SLOAN,
  AKIN & ROBB, P.A.
201 3rd Street NW, Suite 2200
Albuquerque, New Mexico 87102
Tel: (505) 765-5900
bthomas@rodey.com

*Attorneys for Defendants
Hess Corporation and John Hess*

By: */s/ Jeffrey J. Zeiger*
Jeffrey J. Zeiger
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Tel: 312-862-3237
jzeiger@kirkland.com

Devora W. Allon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: 212-446-5967
devora.allon@kirkland.com

Earl E. DeBrine, Jr.
MODRALL SPERLING
500 4th St. NW, Suite 1000
Albuquerque, NM 87102
Tel: (505) 848-1800

earl.debrine@modrall.com

*Attorneys for Defendant*
*Occidental Petroleum Corporation*


By:  */s/ Christopher E. Ondeck*
Christopher E. Ondeck
Stephen R. Chuk
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW
Suite 600 South
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com

Kyle A. Casazza
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 284-5677
kcasazza@proskauer.com

Jared DuBosar
PROSKAUER ROSE LLP
2255 Glades Road, Suite 421 Atrium
Boca Raton, FL 33431
Telephone: (561) 995-4702
jdubosar@proskauer.com

Hannah Silverman
Henrique Carneiro
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3193
Facsimile: (212) 969-2900
hsilverman@proskauer.com
hcarneiro@proskauer.com

Michael Burrage
WHITTEN BURRAGE
512 North Broadway Avenue, Ste 300
Oklahoma City, OK 73102

35

Tel: (888) 783-0351
mburrage@whittenburragelaw.com

H. Brook Laskey
MCCOY LEAVITT LASKEY LLC
317 Commercial St. NE, Suite 200
Albuquerque, NM 87102
Telephone: (505) 246-0455
blaskey@MLLlaw.com

*Attorneys for Defendant*
*Continental Resources, Inc.*


By: */s/ Michael W. Scarborough*
Michael W. Scarborough
Dylan I. Ballard
VINSON & ELKINS LLP
555 Mission Street, Suite 2000
San Francisco, CA 94105
Tel: (415) 979–6900
mscarborough@velaw.com
dballard@velaw.com

Craig P. Seebald
Stephen M. Medlock
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW, Suite
500 West
Washington, DC 20037
Tel: (202) 639-6500
cseebald@velaw.com
smedlock@velaw.com

*Attorneys for Defendant*
*Permian Resources Corporation*

By:  */s/ David I. Gelfand*
David I. Gelfand
Jeremy J. Calsyn
Joseph M. Kay
CLEARY GOTTLIEB STEEN &
   HAMILTON LLP
2112 Pennsylvania Avenue NW
Ste 1000

36

Washington, DC 20037
Tel: (202) 974-1690
dgelfand@cgsh.com
jcalsyn@cgsh.com
jkay@cgsh.com


Kurt A. Sommer
SOMMER, UDALL, SUTIN,
  HARDWICK & HYATT, PA
PO Box 1984
Santa Fe, NM 87504
Tel: (505) 982-4676
kas@sommerudall.com
*Attorneys for Defendant*
*Scott D. Sheffield*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 12, 2025, a true and correct copy of Defendants'

Reply Memorandum of Law in Support of Their Joint Motion to Dismiss was filed electronically

pursuant to CM/ECF procedure for the District of New Mexico, which caused the parties to be

served via electronic means.

Dated:  May 12, 2025

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:  /s/ Boris Bershteyn
    Boris Bershteyn
    Karen M. Lent
    Michael H. Menitove
    Zachary C. Siegler
    SKADDEN, ARPS, SLATE,
      MEAGHER & FLOM LLP
    One Manhattan West
    New York, New York 10001-8602
    Telephone: (212) 735-3000
    boris.bershteyn@skadden.com
    karen.lent@skadden.com
    michael.menitove@skadden.com
    zachary.siegler@skadden.com

    Kenneth A. Gallo
    PAUL, WEISS, RIFKIND,
      WHARTON & GARRISON LLP
    2001 K Street, NW
    Washington, DC 20006-1047
    Telephone: (202) 223-7300
    kgallo@paulweiss.com

    William B. Michael
    PAUL, WEISS, RIFKIND,
      WHARTON & GARRISON LLP
    1285 Avenue of the Americas
    New York, NY 10019-6064
    Telephone: (212) 373-3000

wmichael@paulweiss.com

Samuel G. Liversidge
Jay P. Srinivasan
S. Christopher Whittaker
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
sliversidge@gibsondunn.com
jsrinivasan@gibsondunn.com
cwhittaker@gibsondunn.com

Eric R. Burris
BROWNSTEIN HYATT FARBER SCHRECK, LLP
201 Third Street NW, Suite 1800
Albuquerque, NM 87102-4386
Telephone: (505) 244-0770
eburris@bhfs.com

*Attorneys for Defendant*
*Pioneer Natural Resources Company*