Exhibit 1

297 F.Supp.3d 816
United States District Court, N.D. Illinois, Eastern Division.

Shlomo LEIBOVITCH, et al., Plaintiffs,
v.
ISLAMIC REPUBLIC OF IRAN, et al., Defendants.

No. 08 C 1939
|
Signed 02/27/2018

**Synopsis**

**Background:** Family members and estate of deceased child brought action against Islamic Republic of Iran seeking damages for providing support to terrorist organization that carried out terrorist attack against family while in Jerusalem. Following entry of default judgment of $67 million against Iran, family members served non-party corporation, an aircraft manufacturer headquartered in Chicago, with citation to discover assets as well as discovery requests seeking information regarding any Iranian assets held by company, in particular, details of alleged contract under which company was to sell 80 commercial airplanes to Iranian airline over a number of years. When company failed to produce any documents or to designate a corporate representative, plaintiffs moved to compel discovery, company filed cross-motion to quash subpoenas and dismiss citation, and United States government, in response to court's request, filed statement of interest.

**Holdings:** The District Court, Rubén Castillo, Chief Judge, held that:

[1] the political question doctrine did not bar the court from resolving the parties' discovery dispute;

[2] principles of international comity did not warrant "abstention" from deciding the discovery motion;

[3] plaintiffs' discovery requests would not be denied as irrelevant or disproportionate to the needs of the case;

[4] company's objections to the citation to discover assets were premature; and

[5] plaintiffs' broad discovery requests would be narrowed as specified.

Motion to compel granted in part and denied in part; cross-motion denied.

**Procedural Posture(s):** Motion to Compel Discovery; Motion to Quash or Vacate a Subpoena.

West Headnotes (35)

[1]    **International Law**  ⚷ Claims Assertable Against Foreign Sovereigns; Foreign Sovereign Immunity

Foreign sovereign immunity is a matter of grace and comity on the part of the United States.

[2]    **International Law**  ⚷ Purpose and construction in general

Foreign Sovereign Immunities Act (FSIA) was enacted by Congress in an effort to codify the careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions. 28 U.S.C.A. § 1602 et seq.

[3]    **International Law**  ⚷ Terrorism and Related Activity

Under the Foreign Sovereign Immunities Act (FSIA), terror victims can seek money damages against a foreign state for personal injury or death caused by an act of terrorism, including torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support to terrorist activities. 28 U.S.C.A. § 1605A(a)(1).

[4]    **International Law**  ⚷ Persons and Property Subject; Immunity and Exceptions Thereto

Subject to a few narrow exceptions, the Foreign Sovereign Immunities Act (FSIA) shields foreign-state property from execution. 28 U.S.C.A. § 1602 et seq.

**[5]**    **Creditors' Remedies** 🔑 **Jurisdiction and authority to issue and control**

Courts in the United States generally lack authority to execute against property in other countries.

**[6]**    **International Law** 🔑 **Commercial activity**

When a plaintiff has obtained a judgment against a foreign state under the Foreign Sovereign Immunities Act (FSIA), potentially attachable assets include foreign-state property located in the United States that is used for a commercial activity. 28 U.S.C.A. § 1602 et seq.

**[7]**    **Creditors' Remedies** 🔑 **Persons Against Whom Discovery May Be Sought**

**Creditors' Remedies** 🔑 **Scope of inquiry**

Federal Rules of Civil Procedure governing post-judgment discovery are "quite permissive," generally allowing a judgment creditor to obtain discovery from any person, including the judgment debtor, as provided in the federal rules or by the procedure of the state in which the court is located. Fed. R. Civ. P. 69.

**[8]**    **Creditors' Remedies** 🔑 **Injunction against disposition of property; restraining notice**

"Restraining provision" of Illinois statute governing supplementary proceedings available to judgment creditors is intended to forestall the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets. 735 Ill. Comp. Stat. Ann. 5/2-1402(m).

**[9]**    **Federal Courts** 🔑 **Right to Decline Jurisdiction; Abstention**

In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid.

**[10]**    **Constitutional Law** 🔑 **Political Questions**

One "narrow exception" to the general rule that the Judiciary has a responsibility to decide cases properly before it is the "political question doctrine," which identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh, or have been committed by the Constitution to the exclusive, unreviewable discretion of the "political," that is, the executive and/or legislative, branches of the federal government.

More cases on this issue

**[11]**    **Constitutional Law** 🔑 **Political Questions**

Political question doctrine embodies a recognition that courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.

1 Case that cites this headnote
More cases on this issue

**[12]**    **Constitutional Law** 🔑 **Political Questions**

Case is not barred by the political question doctrine unless one of the following formulations is inextricable from the case: a textually demonstrable constitutional commitment of the issue to a coordinate political department, a lack of judicially discoverable and manageable standards for resolving the issue, the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion, the impossibility of a court's undertaking independent resolution of the issue without expressing lack of the respect due coordinate branches of government, an unusual need for unquestioning adherence to a political decision already made, or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

1 Case that cites this headnote
More cases on this issue

**[13]**  **Constitutional Law** 🔑 **Foreign policy and national defense**

In general, matters relating to the conduct of foreign relations are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

**[14]**  **Constitutional Law** 🔑 **Political Questions**

**Constitutional Law** 🔑 **Foreign policy and national defense**

Court must make a careful inquiry when deciding if the political question doctrine applies in a case, because there is a distinction between "political questions" and "political cases," and not every case or controversy which touches foreign relations lies beyond judicial cognizance.

1 Case that cites this headnote

More cases on this issue

**[15]**  **Constitutional Law** 🔑 **Political Questions**

For purposes of deciding if the political question doctrine applies in a case, it is emphatically the province and duty of the judicial department to say what the law is, and the court cannot shirk this responsibility merely because its decision may have significant political overtones.

More cases on this issue

**[16]**  **Constitutional Law** 🔑 **Political Questions**

Because the political question doctrine is largely driven by separation-of-powers concerns, the court must employ additional scrutiny when the doctrine is invoked by a private party rather than a coordinate branch of the United States government.

More cases on this issue

**[17]**  **Constitutional Law** 🔑 **Foreign policy and national defense**

Political question doctrine did not bar court from resolving post-judgment discovery dispute

between judgment creditors, who had obtained a valid terrorism-related judgment under the Foreign Sovereign Immunities Act (FSIA) against the Islamic Republic of Iran, and non-party corporation, an Illinois aircraft manufacturer that allegedly had contracted to sell airplanes to Iranian airline after commercial sanctions against Iran were lifted pursuant to the Joint Comprehensive Plan of Action (JCPOA), or the "Iran Nuclear Deal"; although the discovery sought by judgment creditors had "political overtones," court was being called upon to decide a discovery dispute, not the wisdom of the FSIA or the Iran Nuclear Deal, and not an issue committed to some other branch of the government or for which there were no judicially manageable standards for resolving, and, in its statement of interest, the Executive Branch had not objected to the discovery requests. 28 U.S.C.A. § 1605A; 735 Ill. Comp. Stat. Ann. 5/2-1402(a); Fed. R. Civ. P. 26, 30, 45, 69.

**[18]**  **Constitutional Law** 🔑 **Political Questions**

In deciding if the political question doctrine applies in a case, courts attach significance to the government's own view of whether a case raises a non-justiciable political question.

More cases on this issue

**[19]**  **International Law** 🔑 **Legislative or executive construction**

Under the Restatement (Third) of Foreign Relations Law, "great weight" is to be given to the Executive Branch's interpretation of an international agreement. Restatement (Third) of Foreign Relations Law § 326.

**[20]**  **Courts** 🔑 **Comity between courts of different countries**

**International Law** 🔑 **International comity in general**

"International comity" refers to the spirit of cooperation in which a domestic tribunal

approaches the resolution of cases touching the laws and interests of other sovereign states.

**[21]    Courts** 🔑 Comity between courts of different countries

**International Law** 🔑 International comity in general

**Judgment** 🔑 Judgments of Courts of Foreign Countries

"International comity" is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

More cases on this issue

**[22]    International Law** 🔑 International comity in general

International comity principles require that American courts demonstrate due respect for any special problem confronted by a foreign litigant on account of its nationality or the location of its operations.

**[23]    Courts** 🔑 Comity between courts of different countries

International comity requires the courts of one nation to avoid, where possible, interfering with the courts of another.

More cases on this issue

**[24]    International Law** 🔑 Postjudgment discovery

Principles of international comity did not warrant court's "abstention" from deciding post-judgment motion to compel discovery brought by judgment creditors, who had obtained a valid terrorism-related judgment against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act (FSIA), against non-party corporation, an Illinois aircraft manufacturer

that allegedly had contracted to sell airplanes to Iranian airline after commercial sanctions against Iran were lifted pursuant to the Joint Comprehensive Plan of Action (JCPOA), or the "Iran Nuclear Deal"; in resolving the discovery dispute, court would be applying well-settled American law, not the law of some other nation, court would not be interfering in any way in ongoing proceedings in foreign court, and, if discovery requests were granted, company, which was not a foreign litigant but an American entity headquartered within court's territorial jurisdiction, would be the only party subject to court's order. 28 U.S.C.A. § 1605A.

More cases on this issue

**[25]    Federal Civil Procedure** 🔑 Discovery and Production of Documents and Other Tangible Things

Factors for court to consider in deciding whether to order discovery that implicates international concerns include the importance to the investigation or litigation of the documents or other information requested, the degree of specificity of the request, whether the information originated in the United States, the availability of alternative means of securing the information, and the extent to which noncompliance with the request would undermine important interests of the U.S. or compliance with the request would undermine important interests of the state where the information is located. Restatement (Third) of Foreign Relations Law § 442(1)(c).

1 Case that cites this headnote

**[26]    International Law** 🔑 Postjudgment discovery

Post-judgment discovery requests made by judgment creditors, who had obtained a valid terrorism-related judgment against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act (FSIA), seeking information regarding any Iranian assets held by non-party corporation, an Illinois aircraft manufacturer that allegedly had contracted to sell airplanes

to Iranian airline after commercial sanctions against Iran were lifted pursuant to the Joint Comprehensive Plan of Action (JCPOA), or the "Iran Nuclear Deal," would not be denied as irrelevant or disproportionate to needs of case, even if, as company asserted, it would be difficult or impossible for judgment creditors to actually collect any money as result of requests; judgment creditors were not now actually attaching any assets, but were only seeking to discover information about potential assets of Iran, such as any arising from the subject contract, that could be attachable, and they should be given opportunity to do so. 28 U.S.C.A. § 1605A; 735 Ill. Comp. Stat. Ann. 5/2-1402(a); Fed. R. Civ. P. 45, 69.

More cases on this issue

[27] **International Law** Postjudgment discovery

Under Illinois law, objections to citation to discover assets served on non-party corporation, an aircraft manufacturer headquartered in Chicago, by judgment creditors who had obtained a valid terrorism-related judgment against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act (FSIA), and who sought information regarding any Iranian assets held by company, in particular, details of company's alleged contract to sell commercial airplanes to Iranian airline, were premature; court was not deciding whether judgment creditors could execute on any particular assets, but only whether they were entitled to conduct discovery reasonably calculated to locating assets that might be subject to attachment, property of Iranian airline might have been subject to attachment as property of an "instrumentality" of Iran, and at present no assets of Iran had even been identified by judgment creditors. 28 U.S.C.A. §§ 1603(b), 1605A, 1610(b); 735 Ill. Comp. Stat. Ann. 5/2-1402(a).

More cases on this issue

[28] **Creditors' Remedies** Lien or other rights acquired by proceedings

Under Illinois law, a citation to discover assets generally serves to restrain tangible property of the debtor located within Illinois and intangible property located anywhere, as long as the Illinois court has personal jurisdiction over the owner of the debt. 735 Ill. Comp. Stat. Ann. 5/2-1402.

2 Cases that cite this headnote

[29] **International Law** Attachment, arrest, and execution in general

Under the Foreign Sovereign Immunities Act (FSIA), court can only restrain assets of a foreign sovereign that are within court's territorial jurisdiction. 28 U.S.C.A. § 1602 et seq.

[30] **Creditors' Remedies** Lien or other rights acquired by proceedings

Under Illinois law, unless and until the court orders turnover of a particular piece of property, the restraint imposed by the Illinois statute governing citations to discover assets remains subject to attack and modification. 735 Ill. Comp. Stat. Ann. 5/2-1402.

2 Cases that cite this headnote

[31] **International Law** Postjudgment discovery

Judgment creditors who had obtained a valid terrorism-related judgment against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act (FSIA), and who sought, from non-party corporation headquartered in Chicago that allegedly had contracted to sell airplanes to Iranian airline, information regarding any Iranian assets held by company, could not be required to simply accept company's assertions that no such assets existed or that all available assets were exempt from attachment; instead, judgment creditors would be permitted to examine available documents for themselves and to inquire of an appropriate company employee under oath, to learn details of airplane deal

and potential whereabouts of any Iranian assets linked to the deal. 28 U.S.C.A. § 1605A; 735 Ill. Comp. Stat. Ann. 5/2-1402.

More cases on this issue

**[32]**    **International Law** 🔑 Postjudgment discovery

Where judgment creditors who had obtained valid terrorism-related judgment against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act (FSIA) sought information regarding Iranian assets held by non-party corporation, in particular, details of company's alleged multi-million dollar contract to sell commercial airplanes to Iranian airline, which was executed after commercial sanctions against Iran were lifted, judgment creditors' broad discovery requests, which included any and all communications between company and airline, and between company and federal agencies, would be narrowed as specified by court; given sensitivity of requests, court would proceed cautiously and limit discovery to, inter alia, the contract itself and other documents revealing existence of any escrow accounts, payment and delivery details, and other matters that could potentially lead to Iranian assets, and would order company to designate a witness to address corresponding matters. 28 U.S.C.A. § 1605A; Fed. R. Civ. P. 26(b)(1), 30(b)(6), 45, 69.

More cases on this issue

**[33]**    **Federal Civil Procedure** 🔑 Scope

Although the federal discovery rules are permissive, they are not a ticket to an unlimited exploration of every conceivable matter that captures an attorney's interest. Fed. R. Civ. P. 26, 30, 45, 69.

2 Cases that cite this headnote

**[34]**    **Federal Civil Procedure** 🔑 Depositions and Discovery

**Federal Civil Procedure** 🔑 Scope

Under the federal discovery rules, all discovery must be relevant and proportional to the needs

of the case, and judges should not hesitate to exercise appropriate control over the discovery process. Fed. R. Civ. P. 26, 30, 45, 69.

4 Cases that cite this headnote

**[35]**    **Federal Civil Procedure** 🔑 Officers and employees of corporations

Under federal civil procedure rule governing depositions, corporation has duty to designate an individual, who has knowledge responsive to the subjects requested in the notice, to testify about information known or reasonably available to the organization; if necessary, corporation must designate multiple witnesses to cover the topics listed. Fed. R. Civ. P. 30(b)(6).

**Attorneys and Law Firms**

**\*821** Robert Joseph Tolchin, Berkman Law Office, LLC, Brooklyn, NY, Daniel A. Shmikler, Robert David Cheifetz, Sperling & Slater, P.C., Chicago, IL, for Plaintiffs.

**MEMORANDUM OPINION AND ORDER**

Chief Judge Rubén Castillo, United States District Court

In this long-running case, Shlomo Leibovitch and several of his family members ("Plaintiffs") seek to recover for injuries they suffered as a result of an act of terrorism committed with the support of the Islamic Republic of Iran and the Iranian Ministry of Information ("Defendants"). Presently before the Court is Plaintiffs' motion to compel discovery from non-party The Boeing Company ("Boeing"), as well as Boeing's cross-motion to quash Plaintiffs' discovery requests.[1] (R. 232, Pls.' **\*822** Mot.; R. 245, Boeing's Mot.) For the reasons stated below, Plaintiffs' motion to compel is granted in part and denied in part, and Boeing's cross-motion is denied.

**BACKGROUND**

The facts of this case have been fully set forth in several prior opinions of this Court and the U.S. Court of Appeals for the Seventh Circuit. *See Leibovitch v. Islamic Republic*

*of Iran*, 852 F.3d 687 (7th Cir. 2017); *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012); *Leibovitch v. Islamic Republic of Iran*, 188 F.Supp.3d 734 (N.D. Ill. 2016); *Leibovitch v. Syrian Arab Republic*, 25 F.Supp.3d 1071 (N.D. Ill. 2014). In brief, the tragic facts underlying the case began in 2003, when the Leibovitch family was driving on a highway in Jerusalem and their minivan "was shot up by members of Palestine Islamic Jihad, a terrorist group supported by the government of Iran." *Leibovitch*, 852 F.3d at 688–89. Seven-year-old Noam Leibovitch was killed and her three-year-old sister Shira Leibovitch (an American citizen) was permanently injured. *Id.* The surviving family members, as well as Noam's estate, filed this action for damages against Defendants pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, and the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. *Id.* at 689. Defendants were served through diplomatic channels in Tehran but never answered or otherwise appeared. *Leibovitch*, 188 F.Supp.3d at 741, 753. After "protracted proceedings" in both the district and appellate courts, the Court entered a default judgment of $67 million against Defendants. *Leibovitch*, 852 F.3d at 689.

Since that time, Plaintiffs have been engaged in the arduous task of trying to collect on their judgment. *See id.* at 689–90. To that end, in December 2016 they served Boeing, a corporation headquartered in Chicago, with a citation to discover assets pursuant to Federal Rule of Civil Procedure 69 and 735 ILL. COMP. STAT. 5/2–1402, as well as discovery requests under Rule 45 seeking to identify Iranian assets "which are or may be held by Boeing." (R. 233, Pls.' Mem. at 2.) Specifically, Plaintiffs seek information about a contract —which has been widely reported in the media—between Boeing and the Airline of the Islamic Republic of Iran ("Iran Air"), under which Boeing is to provide Iran Air with 80 commercial airplanes worth approximately $16 billion over a period of years. (*See, e.g.*, R. 234–7, News Article.) This deal was made possible by the Joint Comprehensive Plan of Action ("JCPOA"), commonly referred to as the "Iran Nuclear Deal," which was brokered in July 2015 among the E3/EU+3 nations[2] and Iran. (R. 245–3, Iran Nuclear Deal at 4.) The goal of the Iran Nuclear Deal was to ensure that Iran's nuclear program is "exclusively peaceful." (*Id.*) As part of the deal, the United States (through former President Barack Obama) agreed to lift various commercial sanctions against Iran and to "allow for the sale of commercial passenger aircraft and related parts and services to Iran[.]" (*Id.* at 13.) Consistent with this **\*823** obligation, in September 2016 the U.S. Office of Foreign Asset Control ("OFAC") licensed

Boeing's future sale of commercial airplanes to Iran Air. (R. 245–1, Boeing's Mem. at 7; R. 247–1, Larson Decl. ¶ 12.) Boeing thereafter entered into an agreement with Iran Air, dated December 11, 2016, to sell 80 commercial airplanes to Iran Air. (R. 245–1, Boeing's Mem. at 8; R. 247–1, Larson Decl. ¶¶ 2–3.) This deal was the first major commercial transaction between American and Iranian companies in four decades. (R. 245–1, Boeing's Mem. at 8; R. 247–2, Bentrott Decl. ¶ 6.)

The present motions stem from Plaintiffs' efforts to learn the details of the airplane deal. Plaintiffs seek "information about assets of the judgment debtors against which they can enforce their judgments, either in the United States or elsewhere." (R. 233, Pls.' Mem. at 4–5.) Their Rule 45 document subpoena contains eight separate document requests. They ask for a copy of the contract itself, as well as all "ancillary documents ... that would identify [ ] the parties and their obligations as well as documents concerning the financial institutions involved in the transaction, the financing arrangements, [and the manner of] payment and delivery." (*Id.* at 5; *see also* R. 234–3, Doc. Subpoena.) Plaintiffs further request "all correspondence, notices, written inquiries, letters, or writings of any nature ... between Boeing, Iran Air and/or the Islamic Republic of Iran, in respect to the Contract and the parties' respective obligations and payments under the Contract." (R. 243–4, Doc. Subpoena ¶ 6.) They also seek production of "[a]ny and all correspondence" between Boeing and OFAC, or any other department or agency of the U.S. government, "relating to assets or property of the Islamic Republic of Iran, including without limitation the Contract." (*Id.* ¶ 7.) Plaintiffs also served Boeing with a Rule 45 deposition subpoena, requiring Boeing to designate a corporate representative pursuant to Rule 30(b)(6) to testify on a variety of matters, including the details of the contract and the details of any communications between Boeing and Iran Air, or Boeing and the U.S. government, broadly relating to the contract or any asset of Iran. (R. 234–4, Dep. Subpoena ¶¶ 1–7.)

In response, Boeing has not produced any documents or designated a corporate representative pursuant to Rule 30(b)(6).[3] Instead, Boeing moves to quash the subpoenas and dismiss the citation in its entirety. (R. 245, Boeing's Mot.) In Boeing's view, ordering the requested relief would require the Court to resolve "nonjusticiable political questions" and violate principles of international comity; Boeing believes that granting these discovery requests would cause "significant harm to the goals of the United States and

Leibovitch v. Islamic Republic of Iran, 297 F.Supp.3d 816 (2018)

its European allies" and "risk destabilizing the purpose of the JCPOA to provide for regional and international peace and security." (R. 245–1, Boeing's Mem. at 12–13 (internal quotation marks omitted) ). Boeing also argues that Plaintiffs' discovery requests "seek irrelevant information and are disproportionate to the needs of the case," because the contract, as currently drafted, will not result in any Iranian assets being subject to attachment in the United States. (*Id.* at 16–17.)

Plaintiffs argue in reply that their discovery requests do not raise any non-justiciable political questions or trigger international comity concerns. (R. 252, Pls.' Reply at 2–6.) In their view, Boeing is essentially asking this Court "to afford Iran and Iran Air, and by extension their business partner Boeing, protections and immunities that are not mentioned in either [the Iran Nuclear Deal] or the [FSIA]." **\*824** (*Id.* at 3.) Plaintiffs believe that the Iran Nuclear Deal "did nothing to prohibit the victims of terror from continuing to exercise their rights under the FSIA." (*Id.* at 5.) In response to Boeing's relevancy and proportionality argument, Plaintiffs argue that Boeing has skewed the inquiry by suggesting that Plaintiffs must demonstrate that they are able to execute on specific assets before they are permitted any discovery related to those assets. (*Id.* at 8–9.)

After reviewing the parties' submissions, the Court found it prudent to obtain a statement from the U.S. government as to whether, in its view, "permitting the discovery sought by Plaintiffs will, as Boeing argues, interfere with U.S. foreign policy toward Iran by obstructing a key component of the international nuclear deal." (R. 258, Min. Entry (citation and internal quotation marks omitted).) The government, through the U.S. Department of Justice on behalf of the Executive Branch, has now filed a statement of interest, and represents that "the United States does not take a position on whether the Court should order the requested discovery." (R. 265, Gov't's Statement at 3.) According to the statement, the United States is "implementing its JCPOA commitments," and "those commitments do not require the Executive Branch to take any specific action with respect to efforts by judgment creditors of Iran to pursue post-judgment discovery or other enforcement proceedings." [4] (*Id.*) The government urges only that if discovery is ordered, the Court "supervise such discovery carefully, taking into account the sensitive nature of discovery into the property of foreign states and their agencies and instrumentalities." [5] (*Id.* at 4.)

## ANALYSIS

[1]  [2]  [3]  "[F]oreign sovereign immunity is a matter of grace and comity on the part of the United States." *Rubin v. Islamic Republic of Iran,* No. 16-534, ––– U.S. ––––, 138 S.Ct. 816, 821, ––– L.Ed.2d ––––, 2018 WL 987348, at \*4 (U.S. Feb. 21, 2018) (citation omitted). For much of our nation's history, courts "deferred to the decisions of the political branches" regarding whether immunity applied in a given situation. *Id.* (citation omitted). In the 1970s, "Congress enacted the FSIA in an effort to codify th[e] careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." *Id.* One such exception to foreign sovereign immunity is Section 1605A of the FSIA, under which "American nationals may file suit against state sponsors of terrorism in the courts of the United States." [6] **\*825** *Bank Markazi v. Peterson,* ––– U.S. ––––, 136 S.Ct. 1310, 1317, 194 L.Ed.2d 463 (2016). Specifically, terror victims can seek money damages against a foreign state for personal injury or death caused by an act of terrorism, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support" to terrorist activities. *Id.* (quoting 28 U.S.C. § 1605A(a)(1) ).

[4]  [5]  [6]  Yet terror victims who prevail under the FSIA "have often faced practical and legal difficulties at the enforcement stage." *Id.* at 1317–18 (citation omitted). Several legal principles limit the ability of a prevailing plaintiff from attaching assets of a foreign state. *Id.* at 1318. Subject to a few narrow exceptions, "the FSIA shields foreign-state property from execution." *Id.; see also Rubin,* 138 S.Ct. at 822, 2018 WL 987348, at \*5 (observing that the FSIA "provides as a default that the property in the United States of a foreign state shall be immune from attachment arrest and execution" (citation and internal quotation marks omitted) ). Courts in the United States also "generally lack authority ... to execute against property in other countries[.]" *Republic of Argentina v. NML Capital, Ltd.,* ––– U.S. ––––, 134 S.Ct. 2250, 2257, 189 L.Ed.2d 234 (2014). But other foreign-state property is potentially available to plaintiffs who obtain a judgment under the FSIA. *Bank Markazi,* 136 S.Ct. at 1318. Attachable assets include "foreign-state property located in the United States" that is "used for a commercial activity." *Id.* (citation omitted). Additionally, the Terrorism Risk Insurance Act of 2002 ("TRIA") authorizes execution of judgments obtained under the FSIA's state-sponsored terrorism exception against "the blocked assets" of a terrorist

party, its agencies, or its instrumentalities. *Id.* A "blocked asset" is defined as "any asset seized by the Executive Branch pursuant to either the Trading with the Enemy Act (TWEA), or the International Emergency Economic Powers Act (IEEPA)." *Id.* (citations omitted).

**[7]** **[8]** The FSIA does not specifically address what post-judgment discovery procedures are available to plaintiffs seeking execution of a judgment obtained against a foreign state. *NML Capital*, 134 S.Ct. at 2256 ("There is no ... provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets."). However, the Federal Rules of Civil Procedure apply to such proceedings, and the rules governing post-judgment discovery are "quite permissive." *Id.* at 2254. Specifically, Federal Rule of Civil Procedure 69 provides that "[i]n aid of the judgment or execution," a judgment creditor "may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." FED. R. CIV. P. 69(a)(2). Plaintiffs here are invoking Federal Rule of Civil Procedure 45, pertaining to third-party discovery, and 735 ILL. COMP. STAT. 5/2–1402(a), which "enables a judgment creditor to discover assets or income of the debtor[.]" *Shales v. T. Manning Concrete, Inc.*, 847 F.Supp.2d 1102, 1111 (N.D. Ill. 2012) (citation and internal quotation marks omitted); *see also* 735 ILL. COMP. STAT. 5/2–1402(a) (providing that "[a] judgment creditor ... is entitled to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor not exempt from the enforcement of the judgment"). A citation served under the Illinois statute can also be used to compel "the application of non-exempt assets or income" of the debtor in the hands of a third party to be paid toward the judgment. **\*826** 735 ILL. COMP. STAT. 5/2–1402(a). Service of a citation has the effect of creating a lien on all "nonexempt personal property, including money, choses in action, and effects of the judgment debtor ... in the possession or control of the third party[.]" 735 ILL. COMP. STAT. 5/2–1402(m). This "restraining provision is "intended to forestall the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets." *Shales*, 847 F.Supp.2d at 1111 (citation, internal quotation marks, and alteration omitted). With this background in mind, the Court turns to Boeing's arguments.

## I. Political Question Doctrine

Boeing first argues that Plaintiffs' motion to compel should be denied because "enforcing Plaintiffs' [discovery] requests would require the Court to resolve nonjusticiable political questions." (R. 245–1, Boeing's Mem. at 12.) Specifically, Boeing argues that "[i]n committing the United States to the JCPOA, the President (with congressional acquiescence) made a political judgment to undertake certain obligations, including allowing Iran to acquire commercial airplanes from U.S. companies, in exchange for securing a diplomatic solution to the problem posed by Iran's nuclear program." (*Id.*) In Boeing's view, "Plaintiffs ... seek to use this Court to substitute their own policy judgments of the President and Congress" by "frustrating a central element of the JCPOA and undermining the finality of the United States' foreign policy choices[.]" *Id.* at 13.

**[9]** **[10]** **[11]** **[12]** "In general, the Judiciary has a responsibility to decide cases properly before it, even though it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (citation omitted). One "narrow exception" to that rule is the "political question doctrine." *Id.* at 195, 132 S.Ct. 1421. "The political-question doctrine identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh, ... or have been committed to the Constitution to the exclusive, unreviewable discretion of the executive and/or legislative—the so-called 'political'—branches of the federal government." *Judge v. Quinn*, 624 F.3d 352, 358 (7th Cir. 2010) (citations and internal quotation marks omitted); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."). The doctrine embodies a recognition that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling*, 478 U.S. at 230, 106 S.Ct. 2860 (citation omitted). The Supreme Court has set forth several factors to guide courts in identifying a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue

Leibovitch v. Islamic Republic of Iran, 297 F.Supp.3d 816 (2018)

to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

**\*827** *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). A case is not barred by the political question doctrine "[u]nless one of these formulations is inextricable from the case[.]" *Id.*

**[13] [14] [15] [16]** In general, "matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (citation and internal quotation marks omitted); *see also United States v. Pink*, 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) ("[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; ... the propriety of the exercise of that power is not open to judicial inquiry[.]"). However, the Court must make a careful inquiry when deciding if the doctrine applies, because there is a distinction between "political questions" and "political *cases*," and not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211, 217, 82 S.Ct. 691 (emphasis added). Put simply, "it is emphatically the province and duty of the judicial department to say what the law is," *Zivotofsky*, 566 U.S. at 196, 132 S.Ct. 1421 (citation and internal alteration omitted), and the Court "cannot shirk this responsibility merely because [its] decision may have significant political overtones." *Japan Whaling Ass'n*, 478 U.S. at 230, 106 S.Ct. 2860. Because the doctrine is largely driven by separation of powers concerns, the Court must employ additional scrutiny when the doctrine is invoked by a private party rather than a "coordinate branch of the United

States government." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359–60 (11th Cir. 2007).

**[17]** In considering these principles, the Court agrees with Plaintiffs that Boeing's reliance on the political question doctrine is misplaced. This Court is being called to decide a discovery dispute, plain and simple. Although the discovery sought certainly has "political overtones," *Japan Whaling Ass'n*, 478 U.S. at 230, 106 S.Ct. 2860, the Court is not deciding any issue at this juncture that is committed to some other branch of the government or for which there are no judicially manageable standards for resolving.[7] *Compare Zivotofsky*, 566 U.S. at 194–96, 132 S.Ct. 1421 (concluding that action by parents seeking permanent injunction requiring Secretary **\*828** of State to identify child's place of birth as "Jerusalem, Israel" was not barred under political question doctrine, even though the Executive Branch has the sole power to determine the political status of Jerusalem) *and Japan Whaling Ass'n*, 478 U.S. at 230, 106 S.Ct. 2860 (concluding that political question doctrine did not bar judicial resolution of controversy over whether federal statute required Executive Branch to make certification in accordance with international treaty) *with Bentzlin v. Hughes Aircraft Co.*, 833 F.Supp. 1486, 1497 (C.D. Cal. 1993) (case presented a political question where resolving plaintiff's claims would "necessarily require inquiry into military strategy").

**[18]** To the contrary, there are applicable rules and cases addressing the circumstances under which post-judgment discovery may be granted, even when that discovery implicates the interests of a foreign state. *See* FED. R. CIV. P. 26, 30, and 69; *NML Capital*, 134 S.Ct. at 2256 ("There is no [ ] provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets."). Nothing decided in this case will demonstrate a lack of respect for a coordinate branch of government, nor is there any potential for "multifarious pronouncements" by different branches of government on the same question. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. Notably, the Court proactively sought the input of the Executive Branch, and it has declined to raise any objection to the discovery requests on grounds of the political question doctrine or similar reason.[8] (*See* R. 265, Gov't's Statement.)

**[19]** The Court must also consider that Plaintiffs are trying to collect on a valid judgment obtained under FSIA, a statute enacted by another coordinate branch of government —Congress—to provide a mechanism for terrorism victims

to recover from foreign states. *See Flatow v. Islamic Rep. of Iran*, 999 F.Supp. 1, 25 (D.D.C. 1998) ("The state-sponsored terrorism exception ... was enacted explicitly ... to alter the conduct of foreign states... [The author of the bill] was convinced that the only way to accomplish this goal was to impose massive civil liability on foreign state sponsors of terrorism[.]"), *abrogated on other grounds as recognized in Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 71 n. 2 (D.D.C. 2006). By its very nature, litigation against a foreign state under the FSIA certainly has significant political overtones. But the present dispute does not require the Court to consider the wisdom of the FSIA or the Iran Nuclear Deal, [9] nor is there any conflict **\*829** between the two for the Court to resolve. In the view of the Executive Branch, the Iran Nuclear Deal does not expressly address the rights of creditors holding a judgment against Iran under the FSIA. [10] (*See* R. 265, Gov't's Statement at 5.) In short, although this case certainly "touches foreign relations," *Baker*, 369 U.S. at 217, 82 S.Ct. 691, the Court finds that it does not raise any non-justiciable political question.

## II. International Comity

Boeing next argues that even if the case does not involve a non-justiciable political question, the Court should nevertheless "abstain" from deciding the discovery motion under principles of international comity. (R. 245–1, Boeing's Mem. at 15.) Boeing's argument on this point is somewhat unclear, but as best as can be discerned, Boeing believes that adjudicating this discovery dispute will "frustrate the purpose" of the Iran Nuclear Deal and offend the other sovereign-nation signatories to the agreement by potentially hindering the airplane deal. (*Id.* at 15–16.)

 **[20]** **[21]** **[22]** **[23]** International comity refers to the "spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987). "[I]t is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id.* (citation omitted). International comity principles require that "American courts ... demonstrate due respect for any special problem confronted by [a] foreign litigant on account of its nationality or the location of its operations[.]" *Id.* at 546, 107

S.Ct. 2542. Additionally, the doctrine "requires the courts of one nation to avoid, where possible, interfering with the courts of another." *H–D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 848 (7th Cir. 2012).

 **[24]** The Court agrees with Plaintiff that international comity principles do not warrant abstention in this case. In resolving this dispute, the Court will be applying well-settled American law governing discovery disputes, not the law of some other nation. *See Volodarskiy v. Delta Airlines, Inc.*, 784 F.3d 349, 356 (7th Cir. 2015) (observing that "asking a U.S. court to wade into an area of [European] law that is fraught with uncertainty risks offending principles of international comity"). Nor is the Court interfering in any way in an ongoing proceeding in a foreign court. *See H–D Mich., LLC*, 694 F.3d at 848; *see also Volodarskiy v. Delta Air Lines, Inc.*, 987 F.Supp.2d 784, 795 (N.D. Ill. 2013) ("Comity concerns are particularly relevant when there are parallel proceedings in domestic and foreign courts."). If the discovery requests are granted, Boeing would be the only party subject to the Court's order, and Boeing is not a foreign litigant, let alone a foreign sovereign. Instead, Boeing is an American corporation headquartered within the territorial jurisdiction of this Court. Boeing has not argued that the **\*830** documents sought are located abroad, or that producing them would cause Boeing to violate the laws of some foreign state. These are the usual concerns that would trigger abstention in a discovery dispute, and none of them are present in this case. [11] *See, e.g., Reinsurance Co. of Am. v. Adminstratia Asigurarilor de Stat*, 902 F.2d 1275, 1281–83 (7th Cir. 1990) (concluding that district court properly declined to order Romanian company to produce information that was protected by Romanian law under international comity principles); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2017 WL 4287205, at *1 (N.D. Ill. Sept. 27, 2017) (observing that a "potential conflict with French law" required the court to consider principles of international comity before compelling production of documents located in France).

 **[25]** Assuming the Court must conduct any further inquiry under these circumstances, it would look to the Restatement (Third) of Foreign Relations Law ("Restatement"), which provides the following factors for a court to consider in deciding whether to order discovery that implicates international concerns:

[T]he importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement § 442(1)(c); *see also Aerospatiale*, 482 U.S. at 544 n.28, 107 S.Ct. 2542 (considering Restatement factors); *Reinsurance Co. of Am.*, 902 F.2d at 1281–82 (same); *Republic Techs.*, 2017 WL 4287205, at *4 (same).

These factors weigh against abstention.[12] There is no doubt that the documents at issue are important to Plaintiffs, as they present a rare opportunity to gain information about a commercial deal between an American company and an Iranian entity that could potentially lead to executable assets. There is also no doubt that the United States has an interest in providing a post-judgment remedy for victims of terrorism, like Plaintiffs, holding a valid judgment obtained under the FSIA. The request for information is specific, and any concerns about overbreadth can be addressed by the Court in tailoring the order. There is nothing to suggest that Plaintiffs have some other remedy available outside the United States to obtain **831** this information, which seems unlikely given that Boeing is an American corporation and the other party to the contract, Iran Air, is an instrumentality of a country with no formal diplomatic ties to the United States. The Court also considers that the government has filed a statement of interest in this case and, although it urges caution, it has not identified any international comity concerns that would warrant abstention. (*See* R. 265, Gov't's Statement at 5–6.) Under these circumstances, the Court declines to abstain from deciding Plaintiffs' discovery motions on grounds of international comity.

## III. Relevance and Proportionality

**[26]** Boeing next argues that the discovery requests should be quashed in their entirety because they are "irrelevant to [Plaintiffs'] efforts to satisfy their judgment and disproportionate to the needs of the case." (R. 245–1, Boeing's Mem. at 16.) Without revealing too much about the contract, Boeing believes the discovery requests are improper —or at least premature—because at present it is unclear if the contract will result in any Iranian assets being located in the United States (or some other jurisdiction) where they would be subject to attachment by Plaintiffs. (R. 245–1, Boeing's Mem. at 16–17.) In support, Boeing provides extensive documentation describing the legal difficulties posed by attaching the assets of Iran, particularly an airplane as it travels in international airspace. (*See, e.g.*, R. 247–3, Affāi Decl.; R. 247–5, Hess Decl.; R. 247–7, Layton Decl.; R. 247–9, Stephan Decl.) At bottom, Boeing's argument appears to be that, because it will be difficult or impossible for Plaintiffs to actually collect any money as a result of these discovery requests, the Court should simply deny them as futile.

Boeing misunderstands the nature of this proceeding. It is true that there are limitations on attaching the property of a foreign state. *See Rubin*, 138 S.Ct. at 822–23, 2018 WL 987348, at *5; *Bank Markazi*, 136 S.Ct. at 1318. But Plaintiffs are not actually *attaching* any assets at present; they are only seeking to discover information about potential assets of Iran that *may be* attachable. In *NML Capital*, the defendant, Argentina, raised an argument similar to Boeing's that "if a judgment creditor could not ultimately execute a judgment against certain property, then it has no business pursuing discovery of information pertaining to that property." 134 S.Ct. at 2257. The Supreme Court expressly rejected this argument, explaining as follows:

[T]he reason for these subpoenas is that NML *does not yet know* what property Argentina has and where it is, let alone whether it is executable under the relevant jurisdiction's law. If, bizarrely, NML's subpoenas had sought only information that could not lead to executable assets in the United States or abroad, then Argentina likely would be correct to say that the subpoenas were unenforceable—*not* because information about nonexecutable assets enjoys a penumbral discovery

immunity under the Act, but because information that could not possibly lead to executable assets is simply not relevant to execution in the first place[.] But of course that is not what the subpoenas seek. They ask for information about Argentina's worldwide assets generally, so that NML can identify where Argentina may be holding property that *is* subject to execution. To be sure, that request is bound to turn up information about property that Argentina regards as immune. But NML may think the same property *not* immune. In which case, Argentina's self-serving legal assertion will not automatically prevail; the District Court will have to settle the matter.

**\*832** *Id.* at 2257–58 (emphasis in original) (internal citations and quotation marks omitted).

The same reasoning applies here. Plaintiffs should be given the opportunity to obtain information about Iran's "assets generally, so that [they] can identify where [Iran] may be holding property that is subject to execution." *Id.* at 2258. Proceedings to actually attach those assets will come later and, depending on where the assets are located, may not even occur in this Court. [13] *See Rubin v. Islamic Republic of Iran,* 830 F.3d 470, 475 (7th Cir. 2016) (observing that to attach property of foreign state, such property "must be within the territorial jurisdiction of the district court"). But Plaintiffs' discovery requests cannot be denied outright simply because Plaintiffs may have difficulty collecting on their judgment at a later stage. In short, the Court is unpersuaded by Boeing's arguments.

## IV. Citation Proceedings

 [27] Boeing also raises a number of objections that are specific to the citation to discover assets. (R. 245–1, Boeing's Mem. at 21–25.) As a preliminary matter, Boeing argues that a citation can only be used to obtain information about assets and income of "the debtor," and neither Boeing nor Iran Air is the "debtor" in this case. (R. 247–1, Boeing's Mem. at 21.) The Court is unpersuaded by this argument. Boeing's own submission suggests that Iran Air has a very

direct link to the government of Iran. (*See* R. 247–3, Affaki Decl. ¶ 10.) Thus, its property may be subject to attachment as an "instrumentality" of Iran. *See* 28 U.S.C. § 1610(b) (providing that "any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution" if certain circumstances are met); 28 U.S.C. § 1603(b) (defining "agency or instrumentality" of a foreign state as a separate legal entity, "corporate or otherwise, ... which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof"); *see also Comet Enter. Ltd. v. Air–A–Plane Corp.,* 128 F.3d 855, 859 (4th Cir. 1997) (noting that Iran Air is "an entity substantially owned or controlled by the Government of Iran"). Again, the Court is not deciding whether Plaintiffs can execute on any particular asset at this stage, but only that Plaintiffs are entitled to conduct discovery reasonably calculated to locating assets that may be subject to attachment. *See NML Capital,* 134 S.Ct. at 2257–58. They have met that standard.

 [28]  [29] Boeing also argues that the Illinois citation statute cannot be used to restrain property outside of Illinois. (R. 245–1, Boeing's Mem. at 21.) Boeing is correct that there are specific rules regarding what property is subject to attachment under the Illinois statute. A citation generally serves to restrain tangible property of the debtor located within Illinois and intangible property located anywhere, as long as the Illinois court has personal jurisdiction over the owner of the debt. *See Park v. Townson & Alexander, Inc.,* 287 Ill.App.3d 772, 223 Ill.Dec. 163, 679 N.E.2d 107, 109 (1997); *see also Gates v. Syrian Arab Republic,* No. 11 C 8715, 2013 WL 1337214, at \*2–3 (N.D. Ill. Mar. 29, 2013) **\*833** (observing that under Illinois law, intangible property is generally considered to be "located" in the domicile of its owner). There is an added wrinkle here because under the FSIA, this Court can only restrain assets of a foreign sovereign that are "within [its] territorial jurisdiction." *Rubin,* 830 F.3d at 475. Thus, as a practical matter, the citation could not restrain—for example—real property belonging to Iran that is located in Iran. *See Autotech Techs. LP v. Integral Research & Dev. Corp.,* 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world.").

 [30] But Boeing's concerns are again premature, because at present no assets of Iran have even been identified by

Plaintiffs. If and when Plaintiffs do discover such assets, they will have to litigate whether such assets are subject to attachment. The restraining provision of the citation is merely intended to preserve the status quo until the debtor's assets can be discovered. *Shales*, 847 F.Supp.2d at 1111. Unless and until the Court orders turnover of a particular piece of property, the restraint imposed by the Illinois statute remains "subject to attack and modification." *In re Marino*, 201 B.R. 234, 248 (Bankr. N.D. Ill. 1996). But without knowing what property exists and where it is located, this Court cannot determine whether such property is subject to attachment, or whether it is exempt under the FSIA. *See Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011), *as corrected* (Apr. 1, 2011) ("Under the FSIA the only way the court can decide whether it is proper to issue the writ of attachment or execution is if it knows which property is targeted." (citations, internal quotation marks, and alteration omitted) ).

[31] The Court also disagrees that Plaintiffs can be required to simply accept Boeing's assertions that no such assets exist or that all available assets are exempt from attachment. [14] *See NML Capital*, 134 S.Ct. at 2257. Instead, Plaintiffs should be permitted to examine the available documents for themselves, and to inquire of an appropriate Boeing employee under oath, to learn the details of the airplane deal and the potential whereabouts of any Iranian assets linked to the deal. *Id.* If Plaintiffs are able to locate any such assets, they will still have to convince this Court—or some other court of competent jurisdiction—that the asset is attachable under the FSIA. But this is not a reason to dismiss the citation outright.

Boeing further argues that using a state statute to "restrain[ ]the sale of aircraft" to Iran violates "basic principles of federalism" and the Dormant Commerce Clause. (R. 245–1, Boeing's Mem. at 22–24.) This argument appears to be based on Boeing's interpretation of the JCPOA as requiring the U.S. government to actively prevent terror victims holding judgments against Iran from hindering the airplane deal in any manner. (*See* R. 253, Boeing's Reply at 18.) Notably, the Executive Branch does not share this reading of the JCPOA. (*See* R. 265, Gov't's Statement at 5 ("[T]he JCPOA does not require the United States to take any specific action with respect to efforts by judgment creditors of Iran to pursue post-judgment discovery or other enforcement proceedings[.]"). **\*834** But regardless, this Court is not restraining the sale of an aircraft or ordering the turnover of any asset in this order. The Court is only ordering discovery. If and when the case proceeds to the

execution stage, Boeing is free to renew its arguments about the propriety of restraining any particular asset identified by Plaintiffs. However, to the extent Boeing is arguing that a state statute must yield whenever a foreign sovereign is involved, the Seventh Circuit recently held to the contrary. *See Baylay v. Etihad Airways P.J.S.C.*, 881 F.3d 1032, 1038 (7th Cir. 2018) ("[T]he [FSIA] preempts any other state or federal law that accords immunity from suit. But it is not intended—and has not been construed—to affect the governing substantive law. Instead, the Act imposes liability on the foreign state in the same manner and to the same extent as a private individual under like circumstances." (citations, internal quotation marks, and emphasis omitted) ). For these reasons, Boeing's arguments do not warrant dismissal of the citation.

## V. Scope of Discovery Granted

[32] With all that said, the Court does agree with Boeing that Plaintiffs' discovery requests are very broad. (*See* R. 234–6, Boeing's Disc. Objs.) In their document subpoena, for instance, Plaintiffs broadly seek turnover of any and all communications between Boeing and Iran Air "in respect to the Contract." (R. 234–3, Doc. Subpoena ¶ 6.) They also seek any and all "correspondence, notices, written inquires, letters of direction, reports to monitor compliance with reporting requirements, legal processes or writings of any nature and kind whatsoever" between Boeing and OFAC or other agencies of the federal government broadly relating to the contract or other Iranian assets. (*Id.* ¶ 7.) Plaintiffs also request that they be allowed to ask questions of a Rule 30(b)(6) witness designated by Boeing on these same broadly defined subjects. (R. 234–4, Dep. Subpoena ¶¶ 1–7.)

[33] [34] These requests must be viewed in context: Plaintiffs are seeking information about a multi-million dollar agreement between two sophisticated companies. Their requests, as drafted, are likely to encompass a vast array of information beyond what is needed for them to trace potential assets of Iran. *See NML Capital*, 134 S.Ct. at 2258. Although the federal discovery rules are permissive, they are not "a ticket to an unlimited ... exploration of every conceivable matter that captures an attorney's interest." *Sapia v. Bd. of Educ. of the City of Chi.*, No. 14 C 7946, 2017 WL 2060344, at \*2 (N.D. Ill. May 15, 2017). All discovery must be relevant and proportional to the needs of the case, FED. R. CIV. P. 26(b)(1), and "judges should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115

(1979). Given the sensitivity of these particular discovery requests, the Court finds it necessary to proceed cautiously. [15]

Weighing the competing interests at stake, the Court will order the production of documents responsive to Paragraphs 1–5 of Schedule A to Plaintiffs' document subpoena. (R. 234–3, Doc. Subpoena ¶¶ 1–5.) This includes the contract itself and other documents that will reveal the existence of any escrow accounts, the details of payment and delivery, and other matters that could potentially lead Plaintiffs to Iranian assets. (*Id.*) The Court makes one minor alteration to Paragraph 1, in which **\*835** Plaintiffs request "[a] copy of the final signed contract *and all ancillary or supporting documents.*" (*Id.* ¶ 1 (emphasis added).) The Court finds the highlighted language unduly vague. Instead, Boeing will be ordered to produce the final signed contract and *all exhibits or appendices thereto, if any.* As to Paragraph 7, the Court finds the request as drafted extremely broad in subject matter and temporal scope and will limit it as follows: Boeing is ordered to produce any and all written communications between Boeing and OFAC relating to the airplane contract with Iran Air. The Court declines to order production of the documents listed in Paragraph 8 as unduly broad, disproportionate to the needs of this case, and duplicative of other requests that are more narrowly tailored to tracing Iran's assets.

 [35]  The Court further orders Boeing to designate a Rule 30(b)(6) witness to address the matters designated in Paragraphs 1–5 of Schedule A to Plaintiffs' deposition subpoena, which correspond to the documents the Court has ordered Boeing to disclose. [16] (R. 234–4, Dep. Subpoena ¶¶ 1–5.) The Court finds Paragraph 6 overly broad, disproportionate to the needs of the case, and duplicative of other requests that are more narrowly tailored to tracing potential assets of Iran. As to Paragraph 7, consistent with the modification made above, Plaintiffs shall only be permitted to inquire into the details of communications between Boeing and OFAC relating to the airplane contract with Iran Air. Any other relief requested in Plaintiffs' motion to compel is denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel (R. 232) is GRANTED in part and DENIED in part as stated herein. The Boeing Company's cross-motion to quash and to dismiss the citation to discover assets (R. 245) is DENIED. Boeing shall disclose all responsive documents as outlined in this order on or before April 2, 2018, and shall submit to a Rule 30(b)(6) deposition on or before May 2, 2018. The citation to discover assets shall remain in effect until further order of the Court. The parties shall appear for a status hearing on May 10, 2018, at 9:45 a.m. They are directed to reconsider their respective positions in light of this order and to exhaust all efforts to reach an agreed resolution of any remaining discovery disputes.

**All Citations**

297 F.Supp.3d 816

## Footnotes

1    With the Court's permission, a number of documents related to the present dispute have been filed under seal. (*See* R. 246, Order; R. 251, Min. Entry.) Although Boeing submitted a number of supporting declarations under seal, (*see* R. 247), it referenced and quoted from those sealed declarations in its publicly filed memorandum. (*See, e.g.*, R. 245–1, Boeing's Mem. at 7 (citing R. 247–1, Larson Decl.); *id.* at 8 (citing R. 247–2, Bentrott Decl.).) Where that occurred, the Court has referenced the information contained in the declarations. Additionally, Plaintiffs filed their entire reply brief under seal without submitting a public, redacted version as required by the Local Rules. *See* N.D. ILL. L.R. 26.2. Much of the material contained in Plaintiffs' reply brief is not sensitive or has already been disclosed in other publicly filed documents. Throughout this opinion, the Court has taken pains to keep sensitive information out of the public record while also bearing in mind that "[w]hat happens in the halls of government is presumptively open to public scrutiny." *In Re Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992).

2      The E3/EU+3 nations are China, France, Germany, the Russian Federation, the United Kingdom, and the
       United States, along with the High Representative of the European Union for Foreign Affairs and Security
       Policy. (R. 245–3, Iran Nuclear Deal at 4.)

3      Boeing has provided certain basic information about the contract in a declaration filed under seal by one of
       its directors. (*See* R. 247–1, Larson Decl.)

4      The government's statement makes no mention of the fact that in October 2017, President Trump announced
       that he "cannot and will not make [the] certification," as required by the Iran Nuclear Agreement Review Act, 42
       U.S.C. § 2160e, that "suspension of sanctions under the deal is appropriate and proportionate to ... measures
       taken by Iran to terminate its illicit nuclear program." *See* Press Release, Remarks by President Donald
       J. Trump on Iran Strategy (Oct. 13, 2017), *available at* https://www.whitehouse.gov/briefmgs-statements/
       remarks-president-trump-iran-strategy. The parties' briefs were filed before this announcement was made,
       and so they have not weighed in on the matter either. Without guidance from the government or the parties,
       this Court declines to speculate how this pronouncement might impact the airplane deal.

5      The government further states that it "will continue to monitor this proceeding and if necessary may file a
       further Statement of Interest at a later stage." (R. 265, Gov't's Statement at 6.)

6      The statute leaves to the Executive Branch to determine which countries should be designated as a "state
       sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). At present, only four countries are so designated: North
       Korea, Iran, Syria, and Sudan. 31 C.F.R. § 596.201; *see also* Dep't of State, *State Sponsors of Terrorism,*
       *available at* https://www.state.gov/j/ct/list/c14151.htm (last visited Feb. 26, 2018).

7      In its briefs, Boeing relies heavily on *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 951 (5th
       Cir. 2011), to argue that this case presents a non-justiciable political question. (*See* R. 245–1, Boeing's Mem.
       at 13–14; R. 253, Boeing's Reply at 9.) The Court finds that case distinguishable. *Spectrum* was a class action
       alleging antitrust violations against various oil production companies, most of whom were member nations of
       the Organization of Petroleum Exporting Countries ("OPEC"). *Id.* at 942–43. In their complaint, the plaintiffs
       "effectively challenge[d] the structure of OPEC and its relation to the worldwide production of petroleum." *Id.*
       at 943. The *Spectrum* court observed the district court was "asked essentially to reprimand foreign nations
       and command them to dismantle their international agreements," which it found wholly inappropriate under
       the political question and act of state doctrines. *Id.* at 943, 951. Plaintiffs here are not challenging the structure
       of the JCPOA, nor is this Court being called to reprimand a foreign nation or command another nation to
       dismantle an international agreement. The Court is merely deciding whether Plaintiffs should be permitted
       to conduct post-judgment discovery into a commercial transaction between an American company and an
       Iranian company affiliated with the Iranian government. As the *Spectrum* court itself noted, "it cannot of course
       be thought that every case or controversy which touches foreign relations lies beyond judicial cognizance."
       *Id.* at 950 (citation and internal quotation marks omitted).

8      Courts attach significance to the government's own view of whether a case raises a non-justiciable political
       question. *See McMahon,* 502 F.3d at 1365 ("The apparent lack of interest from the United States to this
       point fortifies our conclusion that the case does not yet present a political question."); *Occidental of Umm al
       Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis,* 577 F.2d
       1196, 1204 n.14 (5th Cir. 1978) (observing that "whether the state department believes that judicial action
       would interfere with its foreign relations is germane" to the court's determination of whether a case presents
       a political question).

9      Boeing makes a significant effort to impugn the motives of Plaintiffs' attorneys, suggesting that their purpose
       in pursuing these discovery requests is to derail the Iran Nuclear Deal for political reasons. (*See, e.g.,* R. 245–
       1, Boeing's Mem. at 13–15; R. 245–6, Shurat HaDin Press Release; R. 245–7, Letter to Boeing Chairman;

R. 245–8, *Times of Israel* Article.) The Court is unpersuaded by this argument. If Plaintiffs are entitled to the discovery they seek, the subjective motivations of their counsel are irrelevant. Additionally, by signing the discovery requests, Plaintiffs' lead counsel implicitly certified that the requests were not made "for any improper purpose," such as to "harass" or "cause unnecessary delay." FED. R. CIV. P. 26(g). The Court has no reason to doubt that counsel is complying with his obligations as a member of the bar. The Court must consider additionally that although Boeing purports to be advocating in support of such goals as international comity and respect among coordinate branches of government, it also has a strong financial motivation for ensuring that the airplane deal is consummated.

10 Under the Restatement (Third) of Foreign Relations Law, "great weight" is to be given to the Executive Branch's interpretation of an international agreement. Restatement (Third) of Foreign Relations Law § 326 (1987).

11 It also must be recognized that Plaintiffs are trying to collect a valid judgment they obtained under the FSIA, a statute that itself "embodies basic principles of international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, ——— U.S. ———, 137 S.Ct. 1312, 1319, 197 L.Ed.2d 663 (2017); *see also NML Capital*, 134 S.Ct. at 2258 (rejecting argument that international comity concerns precluded court from requiring foreign sovereign to submit to post-judgment discovery, since the FSIA contained no such limitation).

12 The Court is not persuaded by Boeing's reliance on a prior opinion issued in this case addressing a different discovery dispute. (*See* R. 245–1, Boeing's Mem. at 16; R. 253, Boeing's Reply at 12.) International comity was of great concern there because the subpoenas were directed at foreign banks—over whom the Court lacked personal jurisdiction—and sought documents that were located abroad, the disclosure of which would have caused the banks to violate the confidentiality laws of their home countries. *See Leibovitch v. Islamic Republic of Iran*, 188 F.Supp.3d 734, 758 (N.D. Ill. 2016), *aff'd*, 852 F.3d 687 (7th Cir. 2017). None of these concerns are present here.

13 As Plaintiffs point out, the information they seek could lead them to other Iranian assets besides airplanes, and even to other assets besides those directly linked to the contract. (*See* R. 252, Pls.' Reply at 11–12.) For example, the discovery sought could lead Plaintiffs to information about where Iran and/or its instrumentalities conduct banking or hold escrow accounts abroad.

14 Boeing offers a rather circular argument that Plaintiffs have "failed to provide any basis for doubting the accuracy or completeness of Boeing's extensive submissions establishing that this transaction will not result in any executable assets[.]" (*See* R. 253, Boeing's Reply at 15–16.) It is unclear to the Court how Plaintiffs could do that without examining the contract and other source documents.

15 The Court notes that it has already approved an agreed protective order that the parties can invoke to shield confidential or sensitive information from public disclosure, (*See* R. 226, Stipulated Protective Order.)

16 Boeing makes a rather cryptic objection that it "does not employ any person who is suitable to serve as a Rule 30(b)(6) representative within 100 miles of the district." (R. 234–5, Boeing's Disc. Objs. at 7.) Boeing does not elaborate on this objection in its briefs, and the objection may have been obviated by the Court's limitation on the scope of the deposition. But Boeing is reminded that under Rule 30(b)(6), "a corporation has a duty ... to designate an individual to testify who has knowledge responsive to the subjects requested in the Rule 30(b) (6) notice." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 1:14-CV-05096, 2018 WL 505089, at *6 (N.D. Ill. Jan. 22, 2018) (citation and internal quotation marks omitted). "The persons designated must testify about information known or reasonably available *to the organization*." *Id.* (emphasis in original) (citing FED. R. CIV. P. 30(b)(6) ); *see also Fed. Deposit Ins., Corp. v. Giancola*, No. 13 C 3230, 2015 WL 5559804, at *2 (N.D. Ill. Sept. 18, 2015) ("The designating party has a duty to prepare the witness

to testify on matters not only known by the deponent, but also as to those that should be reasonably known by the designating party."). If necessary, Boeing must designate multiple witnesses to cover the topics listed. *In re Fluidmaster*, 2018 WL 505089, at *6. The Court trusts that a large, sophisticated corporation like Boeing will comply with its discovery obligations under the Federal Rules.

---

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 2

Case 1:24-md-03119-MLG-LF    Document 214-1    Filed 05/27/25    Page 21 of 31
World Wide Minerals Ltd. v. Republic of Kazakhstahn, 116 F.Supp.2d 98 (2000)
2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

🚩 KeyCite Yellow Flag

Affirmed in Part, Remanded in Part by   World Wide Minerals, Ltd. v.
Republic of Kazakhstan,   D.C.Cir.,   August 2, 2002

116 F.Supp.2d 98
United States District Court,
District of Columbia.

WORLD WIDE MINERALS LTD., World Wide
Resource Finance Inc., Kazuran Corporation, and
Nuclear Fuel Resources Corporation, Plaintiffs,

v.

The REPUBLIC OF KAZAKHSTAHN, The State
Committee of the Republic of Kazakhstan on the
Management of State Property, The National Atomic
Company Kazatomprom, and Nukem, Inc., Defendants.

No. 98 CV 1199–RCL.
|
Sept. 27, 2000.

**Synopsis**

Canadian company that had assumed management of uranium
mines in Kazakhstan pursuant to management agreement
brought action against Republic of Kazakhstan and its
instrumentalities and against New York company that held
exclusive marketing rights for Kazakhstan uranium, asserting
claims for breach of contract, conspiracy, and violations
of Racketeer Influenced and Corrupt Organizations Act
(RICO). Defendants moved to dismiss. The District Court,
Lamberth, J., held that: (1) act of state doctrine precluded
district court's consideration of Canadian company's claims
for damages against Kazakhstan and its instrumentalities; (2)
government contacts exception precluded consideration of
certain contacts between New York company and District of
Columbia for personal jurisdiction purposes; (3) requirements
for exercising personal jurisdiction over New York company
under District of Columbia's long-arm statute were not
satisfied; (4) personal jurisdiction did not exist over New
York corporation under national service provisions of Clayton
Act; (5) RICO's service provision did not support personal
jurisdiction over New York corporation; and (6) conspiracy
jurisdiction did not exist over New York corporation.

Ordered accordingly.

**Procedural Posture(s):** Motion to Dismiss; Motion to
Dismiss for Lack of Personal Jurisdiction.

West Headnotes (29)

**[1]**     **Federal Civil Procedure** 🔑 Liberality in
allowing amendment

Leave to amend pleading should be given when
justice so requires.

**[2]**     **Federal Civil Procedure** 🔑 Discretion of
Court

Decision to allow or deny amendment of
pleading is firmly within the court's discretion.

**[3]**     **Federal Civil Procedure** 🔑 Form and
sufficiency of amendment;  futility

It is proper to deny leave for amendment of
pleading if the amendment would be futile, and
futility is determined by whether or not the
amended complaint would survive a motion to
dismiss.

**[4]**     **International Law** 🔑 Exclusive and
concurrent laws and remedies

Foreign Sovereign Immunities Act (FSIA) is the
sole basis for federal jurisdiction over foreign
nations. 28 U.S.C.A. § 1602 et seq.

**[5]**     **International Law** 🔑 Exceptions to
immunity in general

In deciding whether Republic of Kazakhstan
and its instrumentalities were subject to district
court's jurisdiction, no minimum contacts
analysis was required; rather, jurisdictional
analysis depended on presence or absence of
one of exceptions to sovereign immunity under
Foreign Sovereign Immunities Act (FSIA). 28
U.S.C.A. § 1602 et seq.

**[6]**     **International Law** 🔑 Waiver of Immunity by
Foreign Sovereign

Waiver provision of Foreign Sovereign Immunities Act (FSIA) is to be interpreted narrowly, and it must be clear the foreign state intended to waive its immunity. 28 U.S.C.A. § 1605(a)(1).

**[7]    International Law**  👉 Waiver of Immunity by Foreign Sovereign

Provision in contract between British Virgin Islands corporation and Republic of Kazakhstan in which Kazakhstan waived its immunity pursuant to Foreign Sovereign Immunities Act (FSIA) was valid waiver, notwithstanding Kazakhstan's contention that it was not on notice that it would be sued in United States, inasmuch as language of waiver made United States only possible jurisdiction to which it could apply, establishing Kazakhstan's intent to waive immunity to suit. 28 U.S.C.A. § 1605(a)(1).

**[8]    International Law**  👉 Act-of-state doctrine

"Act of state doctrine" bars consideration of claims when the resolution of a case turns on the legality or illegality of official action taken by a foreign sovereign in its own territory.

**[9]    International Law**  👉 Act-of-state doctrine

Under "act of state doctrine," act within its own boundaries of sovereign state becomes a rule of decision for the courts of United States.

**[10]    International Law**  👉 Act-of-state doctrine

Party raising the act of state doctrine as defense has the burden of establishing the facts required under the doctrine.

1 Case that cites this headnote

**[11]    Federal Courts**  👉 Right to Decline Jurisdiction;  Abstention
**International Law**  👉 Act-of-state doctrine

Act of state doctrine does not demonstrate a lack of jurisdiction, but rather functions as a doctrine of abstention.

**[12]    International Law**  👉 Property and Confiscation Thereof
**International Law**  👉 Nationalization of property

Act of state doctrine precluded district court's consideration of Canadian company's claims for damages allegedly caused by its inability to obtain export license for uranium from Kazakhstan and Kazakhstan's nationalization of property, and by alleged conspiracy between Kazakhstan and United States company that held exclusive marketing rights for Kazakhstan uranium, inasmuch as judgment against Kazakhstan would implicate legality of Kazakhstan's governmental actions and validity of its contracts with United States company.

**[13]    International Law**  👉 Property and Confiscation Thereof

Act of state doctrine would not apply to bar Canadian corporation's conspiracy claims against United States company that held exclusive marketing rights for Kazakhstan uranium; although ruling in Canadian corporation's favor could suggest that contract between Kazakhstan and United States company was invalid, Kazakhstan's governmental decrees would not be directly implicated.

**[14]    Federal Courts**  👉 Manufacture, Distribution, and Sale of Products

Pursuant to government contacts exception, any meetings held by New York corporation in District of Columbia with federal officials and its signing of bi-lateral agreement on uranium could not be considered in determining whether corporation had sufficient contacts with District of Columbia to permit district court to exercise personal jurisdiction over it.

1 Case that cites this headnote

[15]   **Federal Courts** 🔗 Nature, number,
frequency, and extent of contacts and activities

The government contacts exception excludes
from consideration in personal jurisdiction
analysis defendant's contacts with federal
instrumentalities.

2 Cases that cite this headnote

[16]   **Federal Courts** 🔗 Corporations and business
organizations

Government contacts exception to personal
jurisdiction analysis did not apply to preclude
consideration of New York corporation's alleged
meetings at Republic of Kazakhstan embassy
in determining whether corporation's contacts
with District of Columbia supported exercise of
personal jurisdiction over it.

1 Case that cites this headnote

[17]   **Federal Courts** 🔗 Corporations and business
organizations

New York corporation's membership in a trade
organization qualified as "government contact"
that could not be considered, pursuant to
government contacts exception, in determining
whether personal jurisdiction could be exercised
over corporation in District of Columbia.

3 Cases that cite this headnote

[18]   **Constitutional Law** 🔗 Business, business
organizations, and corporations in general

**Federal Courts** 🔗 Related contacts and
activities; specific jurisdiction

**Federal Courts** 🔗 Business contacts and
activities; transacting or doing business

To obtain personal jurisdiction over a
nonresident defendant under "transacting
business" clause of District of Columbia's
long-arm statute, plaintiff must assert three
requirements with specificity: that non-resident
defendant transacted business within District

of Columbia, that that contact gave rise to
claim, and that assertion of personal jurisdiction
was consistent with due process considerations.
D.C.Code 1981, § 13–423(b).

6 Cases that cite this headnote

[19]   **Federal Courts** 🔗 Corporations and business
organizations

New York corporation's involvement in
nonprofit organization encouraging international
trade with central Asia did not satisfy
"transacting business" requirement for personal
jurisdiction under "transacting business" clause
of District of Columbia's long-arm statute,
given absence of showing that organization was
contact of substantial character for corporation.
D.C.Code 1981, § 13–423(b).

[20]   **Federal Courts** 🔗 Corporations and business
organizations

Under "transacting business" clause of District
of Columbia's long-arm statute, corporation
transacts business within the District only if the
business is of a substantial character. D.C.Code
1981, § 13–423(b).

1 Case that cites this headnote

[21]   **Federal Courts** 🔗 Conspiracy and co-
conspirators

"Arising under" element of "transacting
business" clause of District of Columbia's long-
arm statute was not satisfied by meetings which
allegedly contributed to conspiracy between
New York corporation and Kazakhstan and
allegedly occurred at Kazakhstan embassy,
given that meetings occurred after Canadian
corporation that allegedly was denied uranium
export license by Kazakhstan due to conspiracy
suffered such injury. D.C.Code 1981, § 13–
423(b).

[22]   **Federal Courts** 🔗 Business contacts and
activities; transacting or doing business

Case 1:24-md-03119-MLG-LF    Document 214-1    Filed 05/27/25    Page 24 of 31

World Wide Minerals Ltd. v. Republic of Kazakhstan, 116 F.Supp.2d 98 (2000)
2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

District court closely adheres to requirement under "transacting business" clause of District of Columbia's long-arm statute that there be significant connection between claim and alleged contact with forum. D.C.Code 1981, § 13–423(b).

2 Cases that cite this headnote

[23] **Federal Courts** 👈 Conspiracy and co-conspirators

New York corporation's acts of publishing advertising in District of Columbia and mailing trade magazines there were not related to alleged conspiracy with Kazakhstan to breach contract between Kazakhstan and Canadian corporation, as required for such contacts to satisfy requirement, under "transacting business" clause of District of Columbia long-arm statute, that alleged injury arise out of forum contacts. D.C.Code 1981, § 13–423(b).

[24] **Federal Courts** 👈 Fraud, racketeering, and deceptive practices

Personal jurisdiction did not exist over New York corporation under national service provisions of Clayton Act, given that corporation lacked sufficient contacts with District of Columbia to establish venue, as required. Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

2 Cases that cite this headnote

[25] **Antitrust and Trade Regulation** 👈 Venue

Venue analysis under Clayton Act requires that court to perform the local contacts test under the applicable long-arm statute. Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

1 Case that cites this headnote

[26] **Federal Courts** 👈 Fraud, racketeering, and deceptive practices

Service provision of Racketeer Influenced and Corrupt Organizations Act (RICO) did not allow district court in District of Columbia to exercise personal jurisdiction over New York corporation

when none of defendants in action were subject to personal jurisdiction in District of Columbia. 18 U.S.C.A. § 1965.

1 Case that cites this headnote

[27] **Federal Courts** 👈 Conspiracy and co-conspirators

Conspiracy jurisdiction did not exist in district court of District of Columbia when only overt act alleged with particularity was meeting that allegedly took place between coconspirators at Kazakhstan embassy and purported victim of conspiracy did not explain how meeting, which took place after crucial incidents had occurred, was used to plan conspiracy.

[28] **Federal Courts** 👈 Conspiracy and co-conspirators

For conspiracy jurisdiction to function, there must be a substantial act within the forum.

[29] **Federal Civil Procedure** 👈 Form and sufficiency of amendment; futility

Proposed amended complaint would not survive motion to dismiss, given absence of jurisdiction over defendants, and therefore proposed amendment was futile.

**Attorneys and Law Firms**

**\*101** Marshall Lee Miller, Baise Miller & Freer, P.C., Washington, D.C., for plaintiffs.

Carolyn B. Lamm, Frank Panopoulos, Francis A. Vasquez, Jocelyn A. Aqua, Judd C. Lawler, White & Case, LLP, Washington, D.C., for Nukem Inc.

Steven M. Colangelo, McGuire, Woods, Battle & Boothe, LLP, McLean, VA, for Republic of Kazakhstan, Committee of State Property and Privatization of the Ministry of Finance of the Republic of Kazakhstan.

Thomas B. Wilner, Sherman & Sterling, Washington, D.C., for Kazataomprom.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

Plaintiffs World Wide Minerals Ltd., World Wide Resources Finance Inc., Kazuran Corporation, and Nuclear Fuel Resources Corporation (hereinafter "World Wide") brought suit over a contract dispute with the Republic of Kazakhstan concerning the mining and export of uranium. After the filing of the Complaint and First Amended Complaint numerous motions to dismiss were filed by the defendants. Most recently, the plaintiffs have requested Leave to File Second Amended Complaint. The defendants, the Republic of Kazakhstan, the State Committee of the Republic of Kazakhstan on the Management of State Property, the National Atomic Company Kazatomprom, and Nukem Inc., have opposed this motion and moved to dismiss. Upon consideration of these motions, the corresponding replies, the entire record herein, and the relevant law, the Court has determined that:

1. Plaintiff World Wide's Motion for Leave to File Second Amended Complaint is denied for futility.

2. As to defendants the Republic of Kazakhstan, the State Committee on the management of State Property, and Kazuran Corporation (hereinafter 'Kazakhstan') the claims of plaintiff World Wide are barred by the act of state doctrine. Therefore Kazakhstan's motion to dismiss is granted.

3. As to defendant Nukem, the Court lacks personal jurisdiction, and therefore grants defendant Nukem's motion to dismiss.

BACKGROUND

After gaining independence from the Soviet Union in 1991, Kazakhstan began to seek foreign investment. Among the areas of interest to foreign companies were the northern and southern uranium mines of Kazakhstan. In June of 1996, World Wide Minerals Ltd., a Canadian corporation, submitted a proposal for the management of the northern mines complex in Kazakhstan. World Wide was simultaneously negotiating with the Kazakhstan Joint Stock Company of Atomic Power, Engineering, and Industry (KATEP) for the right to export and sell uranium from Kazakhstan.

On July 2, 1996, World Wide and KATEP agreed on the points of negotiation. They called for good faith negotiations on the issue of marketing the uranium. No final agreement to market the uranium was ever reached.

On October 7, 1996, Kazakhstan and World Wide entered into the Management Agreement. Under this agreement, World Wide took over the state controlled holding company for the northern mines complex. **\*102** World Wide committed to paying the debt of the holding company, some 5 million dollars. This agreement indicated that an export license would be required for World Wide to sell the uranium. *See* Proposed Second Am.Compl., Ex. 1, Management Agreement, Schedule 2, ¶ 2.3. World Wide was entitled to terminate the agreement if the license was not received by December 16, 1996. This deadline was extended to March 16, 1997. World Wide never received the export license, but did not suspend activities until April 1997.

On March 25, 1997 World Wide, through its wholly owned subsidiary World Wide Resource Finance Inc., entered into the Pledge Agreement with the State Committee of Kazakhstan. This agreement secured the loans of the Management Agreement. Under Article 19 of the Pledge Agreement, the parties indicated that any disputes would be addressed first by negotiations, and then by arbitration under UNCITRAL. Paragraph 19.5 provided that the parties would not be restricted in their right to settle disputes in court. That paragraph also provides that Kazakhstan waives immunity "for the purposes of the United States Foreign Sovereign Immunities Act of 1976 in any action or proceedings to which such Act applies."

On January 15, 1997, World Wide contracted with Nuclear Fuel Resources Inc., (NFR) of Colorado to market uranium from the northern mines. NFR and World Wide then entered into an agreement to provide uranium to Consumer's Energy, a Michigan corporation, on March 27, 1997. When the export license was not issued World Wide could not perform its duties under the contract. As a result of the failure to obtain the export license, World Wide suspended operations at the Northern Mines. Kazakhstan informed World Wide that it would not be able to grant an export license because of an earlier agreement with Nukem Inc., a U.S. company, for exclusive marketing of the uranium. This agreement had been kept confidential. In July of 1997, Nukem

2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

took over the failed contract with Consumer's Energy. On August 1, 1997, Kazakhstan terminated the northern mines management agreement. Plaintiffs filed suit, alleging breach of contract, conspiracy, violations of the RICO statute and, in the proposed second amended complaint violations of the Sherman Act.

ANALYSIS

[1]    [2]    [3]    The Plaintiff requested leave to file a second amended complaint. Leave to amend pleading should be given when justice so requires. *See Firestone v. Firestone, 76 F.3d 1205 (D.C.Cir.1996).* The decision to allow or deny amendment is firmly within the court's discretion. *Id.* It is proper to deny leave for amendment if the amendment would be futile. *See Graves v. United States, 961 F.Supp. 314 (D.D.C.1997).* Futility is determined by whether or not the amended complaint would survive a motion to dismiss. *Id.* For reasons explained more fully below, the second amended complaint would be futile.

## I. Kazakhstan

### A. FSIA and Minimum Contacts

[4]    [5]    The Republic of Kazakhstan is a foreign sovereign nation. Foreign sovereigns traditionally have enjoyed immunity from suit in courts of the United States. The Foreign Sovereign Immunities Act ("FSIA") of 1976 lays out the conditions of immunity. FSIA is the sole basis for jurisdiction over foreign nations. *See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).* Instrumentalities of the State also have immunity from suit under FSIA. Both the State Committee of the Republic of Kazakhstan on the Management of State Property and the National Atomic Company Kazatomprom, meet the definition of instrumentalities of state under 28 U.S.C. § 1603(b)(2). The defendants maintain that the exceptions to FSIA do not apply and argue that a minimum contacts test is necessary.

**\*103**    In *Flatow v. Islamic Republic of Iran, 999 F.Supp. 1 (D.D.C.1998),* this court concluded that the minimum contacts test was not required when deciding jurisdictional issues concerning foreign sovereigns. *See Flatow, 999 F.Supp. at 21.* In *Flatow,* this court stated that the traditional minimum contacts test was subsumed in the exceptions to FSIA. *Id.* This ruling drew on the Supreme Court's suggestion that a foreign state might not be a "person" for due process

considerations. *See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992)* (citing *South Carolina v. Katzenbach, 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)).* Since *Flatow,* this circuit has raised the issue but not decided it. *See Creighton Limited v. Government of the State of Qatar, 181 F.3d 118, 124 (D.C.Cir.1999).* Consistent with the decision in *Flatow,* we find that no minimum contacts analysis is required concerning defendants the Republic of Kazakhstan, the State Committee of the Republic of Kazakhstan on the Management of State Property, and the National Atomic Company Kazatomprom. *See Flatow, 999 F.Supp. at 21.* The jurisdictional analysis instead depends on the presence or absence of one of the exceptions to FSIA. *Id.*

In this case, World Wide alleges that Kazakhstan waived its immunity in the "Pledge Agreement." In the alternative, World Wide argues that the acts of Kazakhstan qualify for the commercial activities exception to the FSIA. 28 U.S.C. § 1605(a)(2). Kazakhstan disputes these points and, in addition, argues that the act of state doctrine applies. These issues are discussed in turn below.

### B. Waiver of Immunity under FSIA

[6]    FSIA provides that a sovereign may be sued if it has "waived its immunity either explicitly or by implication[.]" 28 U.S.C. § 1605(a)(1). World Wide claims that Kazakhstan explicitly waived its immunity in the "Pledge Agreement." The waiver provision of FSIA is to be interpreted narrowly, and it must be clear the foreign state intended to waive its immunity. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444 (D.C.Cir.1990).*

#### 1. The Pledge Agreement

[7]    The parties entered into the "Pledge Agreement" to secure various loans required under the management agreement. Article 19 of the "Pledge Agreement" provides for dispute resolution mechanisms. If negotiations fail, the parties have the option to arbitrate but are not required to do so. *See* Proposed Second Am.Compl., Ex. 2, art. 19.5. The waiver clause specifically indicates that the waiver is to apply to FSIA. *Id.* The dispute at hand involves all of the contracts between the parties and therefore dispute resolution requirements of the "Pledge Agreement" are applicable here.

Defendant Kazakhstan argues that the waiver is void since the agreement is between Kazakhstan and World Wide Financial Resources, a British Virgin Islands corporation. Kazakhstan

World Wide Minerals Ltd. v. Republic of Kazakhstan, 116 F.Supp.2d 98 (2000)

2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

claims that since article 19.5 allows that the parties may sue in their jurisdictions, it was not on notice that it would be sued in the United States. Article 19.5 does allow that the parties may bring suit in the court of the jurisdiction of each party, but goes on to waive immunity in any jurisdiction. *See* Proposed Second Am.Comp., Ex. 2, art. 19.5. Article 19.5 concludes by stating that the waiver is intended specifically for jurisdictions in which FSIA is applicable. *Id.*

The fact that World Wide Fincorp is a British Virgin Islands company is not determinative in this case. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (holding that FSIA did not bar actions brought by foreign plaintiffs). The language of the waiver makes the United States the only possible jurisdiction to which it could apply. Therefore, this court holds that Kazakhstan intended to waive immunity to suit.

The finding that Kazakhstan waived its immunity to suit renders irrelevant discussion **\*104** of whether or not the activities of Kazakhstan qualify as commercial activity under FSIA. However, Kazakhstan has also raised the act of state doctrine as a defense and this requires further examination.

## C. Act of State Doctrine

 **[8]    [9]    [10]    [11]    [12]**    The act of state doctrine bars consideration of claims when the resolution of a case turns on the legality or illegality of official action taken by a foreign sovereign in its own territory. *See W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.,* 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). The rule is connected to the domestic separation of powers and intended to avoid burdening the conduct of foreign affairs. *See W.S. Kirkpatrick & Co., Inc.,* 493 U.S. at 404, 110 S.Ct. 701. Under the doctrine, "the act within its own boundaries of one sovereign State ... becomes ... a rule of decision for the courts of this country." *Id.* at 406, 110 S.Ct. 701 (quoting *Ricaud v. American Metal Co.,* 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918)). The party raising the act of state defense has the burden of establishing the facts required under the doctrine. *See Riggs Nat'l Corp. & Subsidiaries v. Commissioner of the I.R.S.,* 163 F.3d 1363, 1367 & n. 5 (D.C.Cir.1999) (citing *Lamb v. Phillip Morris, Inc.,* 915 F.2d 1024, 1026 & n. 4 (6th Cir.1990)). The doctrine does not demonstrate a lack of jurisdiction but rather functions as a doctrine of abstention. *Id.* (citing *In re Minister Papandreou,* 139 F.3d 247, 256 (D.C.Cir.1998)).

Kazakhstan has raised the act of state doctrine as a defense. The defendants claim that in order to give relief this court must find invalid the denial of the export license and other governmental enactments.

Kazakhstan has demonstrated that granting World Wide relief would require a judgment on the acts of a sovereign state. World Wide repeatedly indicates that its damages were caused by the inability to obtain an export license for uranium and the nationalization of property, *See* Proposed Second Am.Compl., ¶¶ 65, 66, 76, 82. The regulations regarding the issuance of export licenses were specifically enacted by Kazakhstan in the interests of international and national security. *See* Republic of Kazakhstan's Motion to Dismiss The Am.Compl., Ex. 10. If liability were attributed to Kazakhstan for the alleged damages suffered by World Wide, Kazakhstan would be faced with a judgment that designated its denial of the export license as invalid. *See Mol, Inc. v. Peoples Republic of Bangladesh,* 572 F.Supp. 79, 85 (D.Or.1983) (holding that denial of an export license cannot be examined under the act of state doctrine). The same is true of a judgement concerning the alleged nationalization of property. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 433, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (holding that the seizure of privately owned property could not be examined because of the act of state doctrine).

World Wide claims that it only seeks investigation into the conspiracy against it. World Wide maintains that the facts here are similar to those in *W.S. Kirkpatrick,* and therefore the ruling in that case should guide the decision.

In *W.S. Kirkpatrick,* the Supreme Court considered the application of the act of state doctrine to a claim for damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961. *See W.S. Kirkpatrick,* 493 U.S. at 402, 110 S.Ct. 701. The plaintiff claimed that the defendant, a private corporation, had bribed Nigerian officials in order to obtain a contract. *Id.* The Court in *W.S. Kirkpatrick* held that the act of state doctrine did not apply because the validity of the contract was not at issue. *Id.* at 409, 110 S.Ct. 701.

In contrast, the validity of the contract is at issue in this case. Unlike the facts in *W.S. Kirkpatrick* the defendant here is a foreign sovereign, not a private company. To investigate the conspiracy we must examine the contracts with Nukem, since these led to the denial of World Wide's **\*105** export license. These contracts were based on the internal laws and decrees of the Republic of Kazakhstan. Kazakhstan would be faced

Case 1:24-md-03119-MLG-LF    Document 214-1    Filed 05/27/25    Page 28 of 31

World Wide Minerals Ltd. v. Republic of Kazakhstan, 116 F.Supp.2d 98 (2000)
2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

with an investigation directly concerning its governmental acts. Investigation of the claims against Kazakhstan would be in direct conflict with the ruling in *W.S. Kirkpatrick. See W.S. Kirkpatrick*, 493 U.S. at 406, 110 S.Ct. 701.

[13] By way of comparison the act of state doctrine would not bar claims against Nukem because the situation would be analogous to *W.S. Kirkpatrick*. If the court allowed such damages its findings might suggest that the contract was invalid, but Kazakhstan's governmental decrees would not be directly implicated. Here however, the claim for damages is against Kazakhstan, thus involving the legality of the governmental actions. As such, this court cannot consider any of the claims against Kazakhstan or its instrumentalities due to the act of state doctrine.

## II. *Nukem*

[14] The jurisdictional allegations against defendant Nukem, raise issues separate from the jurisdictional questions involving the other defendants. Defendant Nukem is a New York corporation with its principal place of business in Connecticut. Plaintiff World Wide asserts several grounds of jurisdiction. First, that Nukem satisfies the D.C. long arm statute and meets the requirements of due process. Second, that the Court has jurisdiction under the Clayton Act, 28 U.S.C. § 1391. Third, that jurisdiction is proper under the Federal Rico Statute, 18 U.S.C. § 1965, and finally that the court has conspiracy jurisdiction. The court finds these arguments without merit.

As an initial matter, plaintiff World Wide raises few allegations in the amended complaint specifically against defendant Nukem. *See* Amended Complaint ¶ 6 (alleging personal jurisdiction over Nukem due to meetings at the Republic of Kazakhstan Embassy), ¶ 13 (alleging that Nukem conducts business in the District of Columbia by meeting with various officials of the U.S. and Kazakhstan). In various responses filed by World Wide, and the proposed Second Am.Comp., World Wide has repeated these allegations and added five new contacts with the District of Columbia. World Wide alleges that:

1. Nukem publishes advertising in the district.

2. Subscribers to Nukem's trade publication reside in the district.

3. Nukem is a member of various trade organizations which hold conferences in the District of Columbia.

4. The American Uzbekistan Chamber of Commerce was incorporated by Nukem and Nukem serves on the board of directors for the Chamber of Commerce in the district.

5. Nukem, represented by Mr. James C. Cornell, signed the U.S.—Russia Highly Enriched Uranium agreement.

For the reasons discussed below, these contacts do not give this court jurisdiction over Nukem.

### A. *The "Government Contacts" Exception to Personal Jurisdiction*

[15] The "government contacts" exception excludes from jurisdictional consideration a defendant's contacts with federal instrumentalities. *See Mallinckrodt Med. Inc. v. Sonus Pharm., Corp.*, 989 F.Supp. 265, 271 (D.D.C.1998). This exception has arisen from the District of Columbia's unique character as the home of the federal government. *Id*. Courts have construed the exception to extend to non-resident contact with trade associations located with the District of Columbia. *See Investment Co. Inst. v. United States*, 550 F.Supp. 1213 (D.D.C.1982).

[16] Application of this exception to Nukem ends consideration of several jurisdictional allegations. Any of the meetings with governmental officials would be excluded under the doctrine. *See Mallinckrodt*, 989 F.Supp. at 271. Courts have refused to extend this exception to embassy meetings when the non-resident defendant *106 was pursuing a proprietary interest. *See Dooley v. United Technologies Corp.*, 786 F.Supp. 65, 74–76 (D.D.C.1992). Therefore, under the government contacts exception, this Court excludes from consideration meetings with governmental officials in the District of Columbia, and the signing of the bi-lateral agreement on uranium. However, the alleged meetings at the Republic of Kazakhstan Embassy will be considered.

[17] Nukem's membership in a trade organization also qualifies as "government contacts", under *Investment Co. Institute v. United States*, 550 F.Supp. 1213 (D.D.C.1982). The Court in that case noted, "[I]t would surely come as a surprise to the members of the many trade associations having offices here that their membership counted as intrastate business for jurisdictional purposes." *Investment Co. Institute v. U.S.*, 550 F.Supp. 1213, 1217 & n. 6 (D.D.C.1982). The same applies here.

2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

### B. D.C. Long Arm Statute

**[18]** World Wide has invoked the "transacting business" clause of the D.C. Long Arm statute, D.C.Code § 13–423(b). To obtain personal jurisdiction over a non-resident defendant under § 13–423(b), a plaintiff must assert three requirements with specificity. First, the non-resident defendant must have "transacted business" within the district. Second, the contact must give rise to the claim. Third, the assertion must be consistent with due process considerations.

#### 1. Transacting Business

**[19]** **[20]** A corporation transacts business within the District only if the business is of a "substantial character". *See Armco Steel Co., L.P. v. CSX Corp.,* 790 F.Supp. 311, 320 (D.D.C.1991) (citing *Chrysler Corp. v. General Motors Corp.,* 589 F.Supp. 1182, 1195 (D.D.C.1984)). Trade organizations representing business interests have been found to lack the required level of involvement. *See Armco,* 790 F.Supp. at 320. Lacking a showing that the contact was "integral to the conduct of ... business," the contact failed to establish that the defendant had transacted business within the district. *Id.*

The American Uzbekistan Chamber of Commerce seems to be the type of trade organization considered in *Armco.* World Wide alleges that the Chamber of Commerce is a "non-profit encouraging international trade with Central Asia." *See* proposed Second Am.Compl. ¶ 10e. This generalized statement does not indicate that the organization is a contact of "substantial character" for Nukem. *Id.* The involvement of Nukem in the Chamber of Commerce, therefore, fails to satisfy the transacting business requirement.

#### 2. "Arising From"

**[21]** **[22]** D.C.Code Ann. § 13–423(b) requires a significant connection between the claim and alleged contact with the forum. This court will closely adhere to this "arising from" requirement. *See Coalition on Sensible Transp., Inc. v. Dole,* 631 F.Supp. 1382 (D.D.C.1986).

The remaining World Wide allegations fail to demonstrate a sufficient connection between the injury and the contacts to meet the "arising from" requirement.

World Wide alleges that meetings contributing to the conspiracy took place at the Kazakhstan Embassy. World Wide simply states that there were several such meetings without giving specific dates. *See* Proposed Second Am.Compl., ¶ 10. In earlier pleadings, World Wide had alleged that meetings took place in December 1997. World Wide claims that the injury occurred either on April 30, 1997 or May 6, 1997, when Kazakhstan indicated that no export license would be granted. The contact therefore took place after the alleged injury occurred. The Long Arm statute, D.C.Code § 13–423(b), requires that the claim arise from the contacts alleged. It would be impossible for the injury to arise from a contact occurring months later. Therefore, this court cannot exercise personal jurisdiction over Nukem on the basis of the alleged meetings at the embassy.

**\*107** **[23]** The other contacts alleged by World Wide also fail the "arising from" test. Publishing advertisements or mailing trade magazines in the forum might not even provide the needed minimum contacts. *See Volkswagen De Mexico v. Germanischer Lloyd,* 768 F.Supp. 1023, (S.D.N.Y.1991) (holding that advertisements that reach the district do not establish personal jurisdiction). Even granting that these contacts meet the requirements of due process they cannot meet the requirements under § 13–423(b). The presence of subscribers to a trade magazine cannot be connected to the creation of a conspiracy to breach a contract that was signed and performed in Kazakhstan. The same is true of advertisements in area newspapers. The alleged injury therefore cannot arise from these contacts.

For the reasons above this court lacks personal jurisdiction over Nukem under the D.C. Long Arm Statute.

### C. Anti-trust Claims as an Alternative Basis of Jurisdiction

**[24]** The claims under the Sherman and Clayton Acts are new additions to World Wide's allegations, appearing for the first time in the Proposed Second Amended Complaint. World Wide cites these acts as an alternative grounds for jurisdiction. Presumably, although it is not expressly indicated, World Wide hopes that the national service provisions of the Clayton Act will give this court jurisdiction over Nukem. This approach has been expressly rejected in recent decisions. *See GTE New Media Serv. Inc. v. BellSouth Corp.,* 199 F.3d 1343 (D.C.2000). In *GTE,* the defendant argued that the nation-wide service provisions of the Clayton Act provided a basis for personal jurisdiction in every district of the United States. *See GTE,* 199 F.3d at 1350. The court found that the Clayton act required proper venue in order to satisfy jurisdictional requirements. *Id.*

[25] The venue analysis requires that this court perform the local contacts test under the applicable long-arm statute. *See In re Vitamins Antitrust Litigation,* 94 F.Supp.2d 26, 31 (D.D.C.2000). As shown above, the allegations by World Wide do not satisfy the requirements of the long-arm provision, and therefore, this court does not have jurisdiction under the Clayton Act.

### D. RICO as an alternative basis of Jurisdiction

[26] Plaintiffs also contend that jurisdiction may be based on the Federal RICO statute, 18 U.S.C. § 1965. A court in this jurisdiction has held that the RICO service provision does provide for jurisdiction based on a national contacts test as opposed to a local contacts test. *See Dooley v. United Technologies Corp.,* 786 F.Supp. 65, 71 (D.D.C.1992). This ruling recognized that other jurisdictions have used a national contacts test. *See Omni Video Games, Inc. v. Wing Co., Ltd.,* 754 F.Supp. 261, 263 (D.R.I.1991); *University Savings Assn. v. Bank of New Haven,* 765 F.Supp. 35, 36 (D.Conn.1991); *American Trade Partners L.P. v. A–1 Int'l Importing Enter. Ltd.,* 755 F.Supp. 1292, 1302 (E.D.Pa.1990). The Court in *Dooley* also recognized that this circuit has not directly addressed the issue. *See Dooley,* 786 F.Supp. at 71.

This court declines to follow *Dooley.* In *United States v. Dyncorp, Inc.,* 924 F.Supp. 292, 297 (D.D.C.1996), the court conducted a minimum contacts due process analysis despite the nationwide service provision in the False Claims Act. It is true that each statute must be interpreted separately. *See Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 120 S.Ct. 1331, 1339, 146 L.Ed.2d 171 (2000) ("analysis of special venue provisions must be specific to the statute"). However, a comparison of the Clayton Act service provisions and the RICO statute provisions does show a substantial similarity. *Compare* 18 U.S.C. § 1965(a), (d) *with* 28 U.S.C. § 1391(b), (c). The ruling in this circuit in *GTE New Media Services,* 199 F.3d 1343 (D.C.Cir.2000), on the Clayton **\*108** Act postdates *Dooley,* and suggests that a national contacts test might not apply. In addition, there is strong support to reject nationwide jurisdiction in the Second Circuit. *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 70–71 (2nd Cir.1998).

As the Second Circuit noted, the service provisions of the RICO statute must be read together in order to be coherent. *See PT United Can Co., supra,* 138 F.3d at 70. First, 1965(a) gives personal jurisdiction over defendants when they reside, have an agent, or transact affairs in the district. This is analogous to having minimum contacts within the

district. Then 1965(b) provides for nationwide jurisdiction over *other parties* not residing in the district. 1965(c) provides for service of subpoenas. Finally, 1965(d) provides for nationwide service of "all other process". This clause should not invalidate the division in (a) and (b) between resident and non-resident defendants. The statute seems to provide for nationwide jurisdiction only when one of the defendants has minimum contacts with the forum. This court rejects the notion that the federal RICO statute would provide a basis for nationwide jurisdiction. Since none of the defendants are subject to personal jurisdiction in the District of Columbia the RICO statute does not allow this court to assert jurisdiction.

### E. Conspiracy Jurisdiction

[27] [28] Finally, World Wide alleges that Nukem is amenable to the court's power under conspiracy jurisdiction. Most courts utilize conspiracy jurisdiction warily and require that a plaintiff "plead with particularity the conspiracy as well as the overt acts within the forum." *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1031 (D.C.Cir.1997). For conspiracy jurisdiction to function there must be a substantial act within the forum. *See Jungquist, supra,* 115 F.3d at 1031.

World Wide names as Nukem's co-conspirators the embassy officials. The only overt act alleged with particularity by World Wide involving the conspiracy is the meeting at the embassy. World Wide fails to explain how this meeting taking place after the crucial incidents had occurred could have been used to "plan" the conspiracy. All of the other acts of the conspiracy took place outside of the District of Columbia. Consequently, a denial of personal jurisdiction under this theory is warranted.

### III. Conclusion

[29] For the reasons set forth above the proposed second amended complaint would not survive a motion to dismiss. Therefore, the Proposed Second Amended Complaint is futile. Moreover, the defendants' motions to dismiss the Amended Complaint shall be granted in a separate order filed this date.

### ORDER

Upon consideration of the parties' motions, their oppositions and replies, and the entire record in this case, and for the

2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED that the plaintiff's motion for leave to File Second Amended Complaint [54–1] is DENIED, and

FURTHER ORDERED that Republic of Kazakhstan, State Committee for the Republic of Kazakhstan, and Kazatomprom's motion to dismiss under the act of state doctrine is GRANTED [21–1], and that defendant Nukem's motion to dismiss for lack of personal jurisdiction is GRANTED [27–1].

ORDERED that Kazakhstan's motion to dismiss for lack of personal jurisdiction [22–1] is DENIED as moot. Kazakhstan's motion to dismiss for failure to state a claim [23–1] is DENIED as moot.

Kazakhstan's motion to stay proceedings and compel arbitration [24–2] is DENIED.

Kazatomprom's motion for joinder of motions [25–1] is DENIED as moot.

**\*109** Kazatomprom's motion to dismiss [26–1] under F.R.C.P. 12(b)(1), (2) are DENIED as moot.

Nukem's motion to file confidential material under seal [29–1] is GRANTED.

Nuclear Fuel Resources motion to strike affidavit [33–1] is DENIED as moot.

World Wide Minerals motion for leave to take jurisdictional discovery [34–1] is DENIED.

Nukem's motion to seal confidential material [46–1] is GRANTED.

World Wide's motion [53–1] to remove from public record and place under seal the plaintiff's motion to strike submission is GRANTED.

This case now stands DISMISSED.

SO ORDERED.

**All Citations**

116 F.Supp.2d 98, 2000-2 Trade Cases P 73,114, RICO Bus.Disp.Guide 9973

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.