**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| IN RE: SHALE OIL/WTI CRUDE OIL FUTURES & DERIVATIVES LITIGATION | Case No.: 1:25-cv-00447<br><br>Judge Matthew L. Garcia<br><br>Magistrate Judge Laura Fashing<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ..... 1

PARTIES ..... 6

I. Plaintiffs ..... 6

II. Defendants ..... 7

III. Agents and Co-Conspirators ..... 12

JURISDICTION AND VENUE ..... 13

FACTUAL ALLEGATIONS ..... 14

I. Glossary of Key Terms ..... 14

II. WTI Physical Crude Oil, WTI Crude Oil Futures Contracts, and Other Closely Related Derivative Products ..... 16

A. Overview of Shale Oil ..... 16

B. Crude Oil Derivatives ..... 17

III. The Rise of U.S. Shale Oil and the OPEC Price War ..... 21

A. OPEC ..... 21

B. U.S. Independents Alter Supply Dynamics ..... 22

C. OPEC Reacts to Shale Oil Production ..... 23

D. OPEC Changes Tactics and Looks to Bring U.S. Shale to "the Table on Pricing" ..... 25

IV. 2021: Defendants Form Their Agreement ..... 33

V. During 2022-2023, Prices Exceed $120 Per Barrel as Defendants Continued to Restrain Output ..... 38

VI. Defendants' "Restraint" Is Economically Irrational, Absent Agreement ..... 51

VII. Defendants Caused Artificial Prices in the WTI Crude Oil Futures Market, Which Harmed Plaintiffs and the Class ..... 56

VIII. Plus Factors Indicative of Defendants' Conspiracy to Manipulate the Price of WTI and Related Derivative Products ....61

A. Actions Against Self-Interest .... 61

B. Evidence of Interfirm Communications and Opportunities to Conspire .... 63

C. Defendants' Common Ownership .... 66

D. Market Conditions and Inelastic Demand .... 69

IX. As Global Marginal Producers, Defendants' Shale Oil Production Decisions Impact Global Crude Oil Prices ....70

X. Regulatory Investigations Support the Existence of the Conspiracy ....71

A. Exxon-Pioneer Merger .... 72

B. Chevron-Hess Merger .... 76

CLASS ALLEGATIONS ....78

FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ....80

CAUSES OF ACTION ....81

COUNT I: VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, *et seq*. ....81

COUNT II: MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§ 1, *et seq*. and 17 C.F.R. § 180.2 ....82

COUNT III: PRINCIPAL-AGENT LIABILITY UNDER THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 13c(b) ....83

COUNT IV: AIDING AND ABETTING UNDER THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 13c(a) ....83

COUNT V: UNJUST ENRICHMENT AND DISGORGEMENT ....84

PRAYER FOR RELIEF ....84

DEMAND FOR A JURY TRIAL ....85

Plaintiffs 3Red Partners LLC ("3Red"), Geneva Trading USA, LLC ("Geneva"), and William Basinski ("Basinski") (collectively, "Plaintiffs"), on behalf of themselves and all other similarly situated persons and entities, bring claims against the following Defendants for their violations of law from no later than January 1, 2021 through the present (the "Class Period"): Permian Resources Corporation f/k/a Centennial Resource Development, Inc.; Expand Energy Corporation f/k/a Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; Pioneer Natural Resources Company; Scott D. Sheffield; and John B. Hess (collectively "Defendants"). Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production. Defendants: (a) fixed, raised, and maintained the price of oil and crude oil futures contracts throughout the United States in violation of the Sherman Act; and (b) manipulated the price of West Texas Intermediate ("WTI") crude oil futures contracts and the commodity underlying the contracts in violation of the Commodity Exchange Act ("CEA").

2. Crude oil is the reference commodity for some of the largest and most important futures and derivative markets in today's economy, including the market for WTI crude oil futures contracts traded on the Chicago Mercantile Exchange ("CME").

3. Globally, crude oil has three main pricing benchmarks: WTI, Brent, and Dubai crude. WTI delivered to the hub in Cushing, Oklahoma serves as the main futures and physical pricing benchmark in the United States domestic crude oil market.

4. Shale oil, also called "tight oil," is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, and other commercial products sold in the U.S.

5. U.S. independent shale producers ("Independents"), including Defendants, are companies that primarily focus on the exploration, development, and production of domestic shale oil. These companies are distinct from large vertically integrated energy companies like Chevron Corporation ("Chevron") and ExxonMobil Corporation ("ExxonMobil"), also known as "supermajors," which have diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources.

6. Defendants are among the largest Independents. Independents collectively grew into an important "swing producer" role for oil markets, with the ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.[1] These swings are directly reflected in the price of WTI derivatives.

7. The CME offers WTI crude oil futures contracts as a price discovery tool to "provide direct crude oil exposure," to traders seeking "the most efficient way to trade oil after a sharp rise in US crude oil production" and "hedge against adverse oil price moves." Pricing of WTI crude oil futures incorporates supply and demand dynamics in physical markets, such that prices of WTI crude oil futures contracts are directly linked to the price of crude oil at the Cushing hub. Shale oil from the Permian shale region (among others) is directly connected via pipeline and delivery mechanisms to the delivery point for WTI crude oil futures in Cushing, Oklahoma.

---

[1] The Organization of the Petroleum Exporting Countries ("OPEC") has historically acted as another "swing" producer within oil markets. Its members are able to leverage spare production capacity to respond to market fluctuations.

8. The direct connection between the WTI crude oil futures at delivery (*i.e.*, when futures prices become spot) and the physical spot market provides a clear mechanism such that market components move towards price convergence *by design*. Although all futures prices are related to spot prices, price convergence happens near contract expiration and product settlement.

9. Other WTI crude oil derivatives, such as forwards and swaps, trade over the counter ("OTC") and directly incorporate the prices of WTI crude oil futures.

10. The price signal from the WTI crude oil futures market is particularly important because it is the deepest and most liquid market in the U.S. and provides futures price and contract mechanics relied upon by suppliers, refiners, and end users of crude oil products for important decision making and risk management over the short, medium, and long term. This includes Defendants here, as an increase in the price of WTI crude oil futures means an increase in the price of their oil.

11. Market activity related to the COVID-19 pandemic illustrates how futures markets are impacted by and ultimately converge with physical markets. In 2020, market signals in gasoline, or reformulated gasoline blend-stock for oxygenate blending ("RBOB"), began to reflect demand destruction from COVID-19. As a result, WTI crude oil futures prices, and cash prices for crude oil, began to fall, while oil storage began to fill. Physical crude oil and WTI crude oil futures both traded lower in the extremes, and storage resources for physical WTI crude oil filled to capacity.

12. Coming out of COVID-19, these signals reversed with the return of demand, and Defendants colluded to withhold domestic production to maintain and inflate prices. The conspiracy directly increased WTI crude oil futures prices because much of Cushing's inbound

pipeline infrastructure comes from shale oil production areas where Defendants are major "swing" producers.

13. During the Class Period, Defendants produced up to one quarter of all crude oil produced in the continental United States. A significant portion of this production is concentrated in "tight oil" production areas such as the Permian Basin, the Niobrara, and the Bakken. Over fifty percent of the inbound pipeline capacity into the WTI, Cushing settlement area is from these three production areas. As significant producers in these areas, Defendants had the ability, and did in fact influence, WTI crude oil physical and futures prices.

14. Pricing dynamics at Cushing are also impacted by global markets. Beginning in the early 2000s, significant offshore imports were included in midcontinent sweet crude runs, driven by demand expressed through Cushing WTI crude oil price signals. By 2016 OPEC imports into the domestic U.S. market were at a high-water mark of over three million barrels per day. However, starting in 2017, OPEC imports declined by two thirds to less than one million barrels per day, and imports stayed at these lower levels despite significant price increases.

15. Defendants' collusive orchestration of "disciplined and managed production" through joint dinners at industry conferences, Defendant CEO pronouncements, and coordination with OPEC's activities has directly impacted WTI crude oil futures prices.

16. The U.S. experienced record-high crude oil prices beginning around January 2021, with high prices continuing through the present. Basic supply and demand principles dictate that, in their role as competitive swing producers, but for their agreement, Defendants would have capitalized on the price increase by selling more barrels of oil at higher prices. Instead, Defendants collusively decided not to increase their U.S. shale oil production. Defendants' agreement was

complemented by their collusion with OPEC, who also sought to raise oil prices by limiting oil production during the Class Period.

17. Defendants met and communicated regularly with each other, including at meetings with OPEC officials, to coordinate their collective oil output in response to market conditions. Following these meetings, representatives from Defendants consistently made public statements confirming these discussions and the exchange of confidential information. Defendants confirmed that they discussed with each other and with OPEC their production strategies, future investment plans, and price targets. When publicly discussing their meetings with Defendants, OPEC officials praised the cooperative nature of their developing relationship with Defendants. Beginning in or around 2021, Defendants' conduct violated U.S. legal prohibitions on price-fixing and market manipulation.

18. From the time when the meetings between U.S. shale producers and OPEC began in 2017 until the onset of the COVID-19 pandemic, worldwide oil prices and supply remained relatively stable. In the COVID-19 pandemic's early days, gasoline demand dropped precipitously, sending a shock through the oil supply chain.

19. Demand for refined products, such as gasoline, and thereby oil prices, recovered and ultimately increased at a rapid rate in 2021. The crude oil price increase following COVID-19 was exacerbated by the Russian invasion of Ukraine in late February 2022, which led to sanctions that largely sequestered Russian oil from the global market. This extended run of historically high crude oil prices provided prime market conditions for swing producers like Defendants to increase production.

20. Defendants did not take advantage of this market opportunity. Departing from their historical practice and rational independent self-interest, each Defendant limited their domestic

shale production growth. No Defendant would do this on its own, as competitors would take advantage of the ability to sell more oil at higher prices. Instead, Defendants, in collusion with each other, and in collusion with OPEC, agreed to constrain supply and raise prices, which would lead to higher profit margins.

21. Defendants' agreement to limit their respective shale production volumes has fixed and/or stabilized at an artificially high level U.S. crude oil prices, which includes the price of key commodities futures contracts (*e.g.*, WTI crude oil futures contracts).

22. Defendants' cartel is a *per se* unlawful restraint. Plaintiffs and Class members were active participants in futures markets and suffered substantial harm from the supracompetitive and artificial prices they paid, which were directly distorted by the cartel's efforts to constrain domestic production of shale oil in the United States. Plaintiffs bring this suit to recover that loss.

## PARTIES

### I. Plaintiffs

23. Plaintiff 3Red is a limited liability corporation with its principal place of business in Chicago, Illinois. During the Class Period, 3Red traded WTI crude oil futures and options contracts, the prices of which are directly linked to WTI crude oil. 3Red traded thousands of contracts each week during the Class Period. 3Red traded these contracts at artificial prices directly and proximately caused by the Defendants' price-fixing and manipulation. As a direct result, 3Red was deprived of transacting in a lawful, non-manipulated market in WTI crude oil futures, and suffered actual damages by transacting in WTI crude oil futures at artificial prices caused by Defendants.

24. Plaintiff Geneva is a limited liability corporation with its principal place of business in Chicago, Illinois. During the Class Period, Geneva traded WTI crude oil futures and options contracts, the prices of which are directly linked to WTI crude oil. Geneva traded thousands of

contracts each week during the Class Period. Geneva traded these contracts at artificial prices directly and proximately caused by the Defendants' price-fixing and manipulation. As a direct result, Geneva was deprived of transacting in a lawful, non-manipulated market in WTI crude oil futures, and suffered actual damages by transacting in WTI crude oil futures at artificial prices caused by Defendants.

25. Plaintiff Basinski is a resident of Seattle, Washington and a citizen of the United States. During the Class Period, Basinski traded WTI crude oil futures and options contracts, the prices of which are directly linked to WTI crude oil. Basinski traded these contracts at artificial prices directly and proximately caused by the Defendants' price-fixing and manipulation. As a direct result, Basinski was deprived of transacting in a lawful, non-manipulated market in WTI crude oil futures, and suffered actual damages by transacting in WTI crude oil futures at artificial prices caused by Defendants.

**II. Defendants**

26. **Defendant Permian Resources Corporation** ("Permian Resources"), formerly known as Centennial Resource Development, Inc. ("Centennial"), is a Delaware corporation headquartered in Midland, Texas. Permian Resources' common stock is listed and traded on the New York Stock Exchange under the trading symbol PR. Permian Resources is an oil and gas production company that acquires and processes shale oil in Texas and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. During the Class Period, Defendant Permian Resources had significant exposure to WTI pricing. Specifically, Defendant Permian Resources traded significant numbers of NYMEX crude oil swaps, options, collars, basis protection, and differentials, creating a direct benefit to Defendant from higher WTI, Cushing prices as swap counterparties rely on publicly available benchmark pricing information as well as futures and options liquidity available on the NYMEX

exchange to establish WTI swap pricing. Supracompetitive prices on NYMEX and at WTI, Cushing directly benefited Defendant Permian Resources' hedging strategy using swaps as a result of the ongoing manipulation during the Class Period.

27. **Defendant Expand Energy Corporation** ("Expand Energy"), formerly known as Chesapeake Energy Corporation ("Chesapeake"), is the product of a merger between Chesapeake and Southwestern Energy Company finalized on October 1, 2024. Expand Energy is an Oklahoma corporation headquartered in Spring, Texas. Expand Energy's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol EXE. During the Class Period, Chesapeake produced shale oil in Louisiana, Pennsylvania, and Texas for sale in the U.S. During the Class Period, Chesapeake had significant exposure to WTI pricing. Specifically, Chesapeake traded significant numbers of NYMEX crude oil swaps, options, basis protection, and differentials, creating a direct benefit to Defendant from higher WTI, Cushing prices. Currently, Defendant Expand Energy continues to produce shale oil, which it sells into wholesale energy markets. In 2025, Defendant Expand produced an average of 16,000 barrels of oil per day.

28. **Defendant Continental Resources Inc.** ("Continental") is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma. Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc. Continental is an oil and gas company that acquires and processes shale oil in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the U.S. domestic market. During the Class Period, Defendant Continental had significant exposure to WTI pricing. Specifically, Defendant Continental traded significant

numbers of NYMEX crude oil swaps, creating a direct benefit to Defendant from higher WTI, Cushing prices.

29. **Defendant Diamondback Energy, Inc.** ("Diamondback") is a Delaware corporation headquartered in Midland, Texas. Diamondback's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol FANG. Diamondback is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market. During the Class Period, Defendant Diamondback had significant exposure to WTI pricing. Specifically, Defendant Diamondback traded significant numbers of NYMEX crude oil swaps, creating a direct benefit to Defendant from higher WTI, Cushing prices.

30. **Defendant EOG Resources, Inc.** ("EOG") is a Delaware Corporation headquartered in Houston, Texas. EOG's common stock is listed and traded on the New York Stock Exchange under the trading symbol EOG. EOG is an oil and gas production company that acquires and processes shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. During the Class Period, Defendant EOG had significant exposure to WTI pricing. Specifically, Defendant EOG traded significant numbers of NYMEX crude oil swaps, creating a direct benefit to Defendant from higher WTI, Cushing prices.

31. **Defendant Hess Corporation** ("Hess") is a Delaware corporation headquartered in New York, New York. Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES. Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the U.S. domestic

market where it is refined and disseminated across the country. Hess also sells refined consumer gasoline across the United States. On October 23, 2023, Chevron Corporation announced that it had entered into a definitive agreement to purchase all outstanding shares of Hess. The close of the agreement was delayed due to an arbitration challenge from Exxon and CNOOC Ltd. During the Class Period, Defendant Hess had significant exposure to WTI pricing. Specifically, Defendant Hess traded significant numbers of futures, forwards, options and swaps, individually or in combination, creating a direct benefit to Defendant from higher WTI, Cushing prices.

32. **Defendant Occidental Petroleum Corporation** ("Occidental") is a Delaware corporation headquartered in Houston, Texas. Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively. Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. During the Class Period, Defendant Occidental had significant exposure to WTI pricing, including futures and swaps.

33. **Defendant Pioneer Natural Resources Company** ("Pioneer") is a Delaware corporation headquartered in Irving, Texas. Pioneer's common stock was listed and traded on the New York Stock Exchange under the trading symbol PXD prior to its acquisition by ExxonMobil in 2024. Pioneer is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. Pioneer's SEC annual report filings during the Class Period note that the Company's oil production is tied directly to, or is highly correlated with, NYMEX WTI oil prices and that the Company uses derivative contracts to manage oil price volatility and basis

swap contracts to reduce basis risks. During the Class Period, Defendant Pioneer had significant exposure to WTI pricing, including futures and swaps. Specifically, Defendant Pioneer traded significant numbers of NYMEX crude oil swaps, options, collars, basis protection, and differentials, creating a direct benefit to Defendant from higher WTI, Cushing prices. Pioneer was purchased by ExxonMobil in a transaction that closed on May 3, 2024 and is now a wholly owned subsidiary of ExxonMobil.

34. **Defendant Scott D. Sheffield** ("Sheffield") is a resident of Texas and the founder of Defendant Pioneer. Defendant Sheffield was the Chief Executive Officer ("CEO") of Defendant Pioneer during all times relevant to this Complaint, until his retirement at the end of 2023. Defendant Sheffield remained on Pioneer's Board of Directors until at least the merger between Defendant Pioneer and ExxonMobil announced in October 2023, discussed further below.

35. **Defendant John B. Hess** ("John Hess") is a New York resident and has been the CEO of Defendant Hess since 1995 and has served as CEO during all times relevant to this Complaint.

36. "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents. "Individual Defendants," as used herein, refers to Defendants Sheffield and John Hess.

37. **John Doe Defendants Nos. 1-60** ("John Doe Defendants") are other unknown corporations, individuals, and entities that willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein.

38. Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

39. During the Class Period, each Defendant profited from the sale of shale oil drilled and sold in the United States, or in the case of the Individual Defendants, from their employer's sale of shale oil drilled and sold in the United States.

40. During the Class Period, at least Defendants Permian Resources, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer, aided and abetted by Individual Defendants Sheffield and John Hess, exploited their position as global marginal producers by agreeing to curtail their respective crude oil production to keep U.S. and global crude oil prices, including WTI crude oil futures prices, artificially high.

41. Where Plaintiffs ascribe an action to "Defendants," unless stated otherwise, the action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer, aided and abetted by Individual Defendants Sheffield and John Hess.

**III. Agents and Co-Conspirators**

42. Various other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators in the acts complained of and performed acts and aided and abetted the unlawful conduct alleged herein. Plaintiffs reserve the right to identify other co-conspirators and to name subsequently some or all co-conspirators, whether identified here or not, as defendants.

43. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint. Each Defendant acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein in the United States and in this District.

44. Defendants are also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

45. Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

**JURISDICTION AND VENUE**

46. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and Sections 2(a), 6(c) and 22 of the Commodity Exchange Act (7 U.S.C. § 2(a), *et seq.*), and Regulation 180.2, 17 C.F.R. § 180.2. The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

47. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337(a) and 1367, Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), and Section 22 of the Commodity Exchange Act (7 U.S.C. § 25).

48. This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one Class member are domiciled in different states.

49. Venue is proper in this District under Section 22 of the CEA, 7 U.S.C. § 25(c), the Clayton Act, 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through

subsidiaries or agents present in this District; (b) Defendants manufactured, sold, shipped, and/or delivered substantial quantities of shale oil throughout the United States, including in this District; (c) Defendants have substantial contacts with the United States, including this District; (d) Defendants engaged in an antitrust conspiracy and manipulation that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District; and (e) a substantial portion of the conduct alleged in this Complaint occurred in, or directly affected shale oil production in, the Permian Basin, which spans Southeastern New Mexico and West Texas.

50. During the Class Period, all Defendants (domestic and foreign) engaged in conduct within the United States that is directly related to Plaintiffs' allegations. Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect crude oil, WTI crude oil futures, and WTI-based derivative prices in the United States. Defendants' acts were acts in furtherance of the conspiracy. Because they occurred in the United States, including by Defendants' domestic entities, specific personal jurisdiction exists over all Defendants and their conspirators.

51. The conspiracy and the overt acts taken in furtherance of the conspiracy, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## FACTUAL ALLEGATIONS

### I. Glossary of Key Terms

52. "Backwardation" refers to market conditions in which the price of a commodity for nearby delivery is higher than for the more deferred deliveries.

53. "Collar" refers to a trading strategy consisting of a long futures contract, a short call, and a long put. The call and put are different strikes but have the same expiration and the same underlying futures contract. Traders use collars to protect against downside risk of the futures contract. The long-put leg provides protection against downside market movements while the premium received from shorting the call helps finance the purchase of the put.

54. "Contango" refers to market conditions where the price of a commodity for nearby delivery is lower than for more deferred deliveries.

55. "Differential" refers to the discount or premium between a given WTI market price and the flat or spot WTI physical price.

56. "Options" refer to contracts that give the bearer the right, but not the obligation, to be long or short a futures contract at a specified price within a specified time period. The specified price is called the "strike price." A "call option" means that the purchaser pays a premium and acquires the right, but not the obligation, to purchase a specified futures contract at the strike price on or prior to expiration, while a "put option" provides the purchaser the right, but not the obligation, to sell a futures contract at the strike price at any time during the life of the option.

57. "Swaps" are customized, over-the-counter derivative agreements allowing two parties to exchange cash flows based on the price of WTI, especially WTI physical prices, frequently employed as a tool for hedging price risk. A common structure is the fixed-for-floating swap, where one party agrees to pay a fixed price, and the other pays a variable price tied to a WTI benchmark.

58. "WTI physical" or "physical crude oil" refers to crude oil eligible for physical delivery under the New York Mercantile Exchange ("NYMEX") Light Sweet Crude Oil futures contract as defined in NYMEX Rulebook Chapter 200.

59. "WTI crude oil futures" means the CME Group West Texas Intermediate Light Sweet Crude Oil futures traded on NYMEX or Intercontinental Exchange ("ICE"). As WTI crude oil futures contracts approach expiration, the WTI futures prices become WTI spot physical prices.

## II. WTI Physical Crude Oil, WTI Crude Oil Futures Contracts, and Other Closely Related Derivative Products

### A. Overview of Shale Oil

60. Crude oil is a naturally occurring mixture of hydrocarbons formed from the remains of animals and plants after exposure to heat and pressure under the earth over millions of years. Crude oil is refined into finished petroleum products, including gasoline, diesel fuel, jet fuel, asphalt, and other products.

61. Shale oil is produced by fracturing the rock formations that contain layers of oil in a process known as hydraulic fracturing, or "fracking." Today, shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.

62. Shale oil, along with other crude oil, is sold to refineries. Refineries co-mingle shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods, then refine the crude oil into gasoline and other petroleum-based products. The resulting refined products, including gasoline, diesel, and jet fuels, are then transported to storage terminals, where they are stored and blended prior to sale to gas stations or "rack" fuel suppliers for onward sale to end users.

63. Crude oil supply is measured by the number of barrels (abbreviated as "bbl") produced. Each barrel contains 42 gallons of crude oil. Daily oil production is measured in barrels per day (abbreviated as "bpd," "b/d," or "B/D"). Production over longer periods is often measured in millions of barrels (abbreviated as "MMbbl").

64. Crude oil comes in light or heavy varieties, which refer to the oil's gravity based on the American Petroleum Institute ("API") gravity measurement scale. Crude oil also comes in sweet or sour varieties, which refer to the oil's sulfur content. Sweet crude has a lower sulfur level, usually defined as less than 1%, while sour crude has a higher sulfur level, usually 1-2%.

65. Heavy oil evaporates slowly and contains material that can be used to make heavy products such as asphalt, while light oil requires less processing and produces a greater percentage of gasoline and diesel.

66. Shale oil production accounts for 64% of total U.S. crude oil production.

67. Crude oil produced in the United States has varying gravities, but U.S. oil production tends to produce mostly light crude oil, leading the U.S. to import heavier crude oil. Nearly all U.S. light crude oil is produced domestically.

**B. Crude Oil Derivatives**

68. Futures contracts are standardized, exchange-traded, derivative contracts. WTI crude oil futures contracts have traded on the NYMEX, now part of CME Group, since 1983. WTI crude oil futures are also traded on ICE. The WTI crude oil futures contract plays a vital role in price discovery. Trading in futures allows users and suppliers of crude oil or commodities with crude oil linkages to hedge against physical crude oil price fluctuations. The NYMEX WTI crude oil futures contract is the most liquid oil contract traded globally, with over one million contracts traded daily and approximately four million contracts of open interest.

69. In 1983, Cushing was selected as the location for physical settlement of WTI crude oil futures. It was already a vibrant hub for cash market trading of crude oil due to a network of pipelines, refineries, and storage terminals. Today, Cushing is a key nexus of market fundamentals for the global crude oil market with nearly two dozen pipelines and 20 storage terminals. Cushing's in-bound pipelines deliver crude oil streams produced in Canada and the U.S. shale oil areas,

including the Bakken, Niobrara, and Permian producing areas. Cushing's out-bound pipelines supply crude oil to the main refining centers in Petroleum Administration for Defense ("PADD") Districts 2 and 3. While Cushing has significant storage capacity, second only to the Gulf Coast, it is also concentrated geographically, facilitating physical markets and providing ready access to multiple storage options to facilitate physical trading of oil. The physically concentrated nature of tankage within Cushing ensures that the price of a barrel at Cushing is consistent across the hub.

70. WTI's importance has also extended far beyond its U.S. heartland. A major buildout of pipeline and port infrastructure has linked WTI's delivery point of Cushing, Oklahoma to the world via the export terminals of the U.S. Gulf Coast.

71. A commercial company that elects to take delivery after the expiration of the WTI crude oil futures contract must have storage and/or pipeline capacity connected to one of the NYMEX delivery locations in Cushing. From there, the firm can elect to take the oil into storage or into a pipeline with connectivity to PADD District 2 refineries and to the Gulf Coast market. The physical-delivery requirement of WTI crude oil futures means there is a direct link between WTI crude oil futures and the underlying physical market, and WTI crude oil futures also provide the security of a financially guaranteed clearinghouse for buyers and sellers.

72. Prices of Cushing WTI physical oil and WTI crude oil futures contracts, particularly the front month futures contract price, are highly correlated. The front, prompt, or lead month contract provides the highest degree of price discovery and price certainty within the overall WTI market ecosystem because the contract is transparent, liquid (highest numbers of observable trades matching sellers and buyers), and very responsive to current and future market supply and demand signals. As a result, the price of WTI crude oil futures contracts at expiration *is* the price of physical crude oil in Cushing. Stated differently, because of delivery and convergence, the price of physical

crude oil at Cushing and the prices of the expiring WTI crude oil futures contracts are directly and inextricably linked.

73. Manipulation of physical prices directly impacts WTI crude oil futures because futures prices "reflect the fundamentals in the physical crude oil market, declining in price and increasing in contango when global supply outstrips demand, and rising in price and backwardation when global supply is tight. WTI crude oil futures perform its critical function as the central clearing mechanism for buyers and sellers in the crude oil market, and provide a transparent, fair, and robust benchmark price."

74. The WTI Cushing convergence mechanism underscores the fundamental link between the paper trading of futures contracts and crude oil as a physical commodity. The alleged coordinated reduction in volumes provided Defendants with the fulcrum to move the WTI complex in their favor. When WTI prices increase and remain elevated, Defendants benefit by being able to sell their product at a higher price either at the point of physical delivery, often at a differential priced using WTI, or to lock in a future price for their product using a WTI related hedge product such as a swap, option, or futures contract.

75. WTI OTC physical transactions and WTI OTC swaps are also important components of the market for WTI crude oil. Swaps represent a substitute for the futures contracts but rely on NYMEX pricing to establish the financial arrangement for the swap contract. During the Relevant Period, Defendants used swaps, among other derivatives.

76. WTI OTC swaps often reference WTI crude oil futures pricing for settlement, particularly the prompt or lead month contract, as WTI-Cushing is the fundamental crude oil price benchmark providing both observability, standardization, and liquidity. OTC swap providers and dealers (the other leg of a swap contract) often turn to the more liquid futures market to hedge their

own exposure to WTI price risk. The deep liquidity and the continuous price discovery process of the futures market, flowing outward from high volume lead month trading activity, provides a reliable and widely accepted foundation for transactions occurring in the less transparent OTC market.

77. WTI also plays an important role in related exchange traded products such as, for instance, the RBOB (Reformulated Blendstock for Oxygenate Blending) gasoline product traded on the CME. Since RBOB gasoline is produced from oil, the pricing dynamics of WTI directly impact RBOB futures.

78. One or more Defendants confirm in their SEC filings that the value of their oil production is directly linked to, or highly correlated with, WTI pricing. Collectively, Defendants' production decisions impact WTI benchmark futures and spot prices.

79. As a result of the direct connection between the physical and futures markets, refiners, airlines, haulers, commodity traders, shippers, and other commodity market participants, as well as investors, utilize WTI crude oil futures and derivatives dependent on WTI (*e.g.*, swaps and differentials), as well as other instruments such as Brent futures and options on futures to manage crude oil price risk. A general trend toward greater awareness of risk management has also contributed to the growth in the popularity of the WTI contract with firms using a futures position as a form of "price insurance" to avoid downside risks if they are a producer, or upside risks (cost exposure) if they are a consumer.

80. Since crude oil is the commodity underlying WTI crude oil futures, any price changes in one instrument are very quickly transmitted and imputed to the other. Accordingly, as detailed further in Section VII, *infra*, Defendants' agreement to control U.S. shale oil output

increased and maintained artificially high prices and manipulated both the price of physical crude oil and WTI crude oil futures and Options.

## III. The Rise of U.S. Shale Oil and the OPEC Price War

### A. OPEC

81. OPEC is an intergovernmental organization of member nations who purport to benefit from sovereign immunity from the Sherman Act. OPEC controls approximately 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices by coordinating its members' respective production levels. Non-member nations historically keyed their oil production levels off OPEC guidance to benefit from the oil prices targeted by OPEC; a classic "umbrella pricing" situation.

82. Historically, Saudi Arabia acted as OPEC's "swing producer," leveraging its status as the member with the largest production capacity to become OPEC's de facto leader.

83. From 2000 to 2013, OPEC exerted its influence to control international oil prices by supporting the oil sector, reducing inventory levels, and stabilizing both the oil sector and the energy market.

84. In 2014, OPEC lost its ability to exert complete control over global oil prices due to the rise of North American shale oil producers. OPEC, aided by its Russian ally, sought to limit the influence of North American shale by flooding world markets with crude in a bid to re-establish OPEC's dominance. However, by implementing new technologies and cost-cutting measures and focusing on the most productive shale moves to remain competitive, U.S. shale producers were able to remain competitive despite OPEC's price drop. This time period (2014-2016) became known as the ***"OPEC Price War."***

85. In December 2016, largely in response to dramatically falling oil prices driven by significant increases in the U.S. shale output, OPEC expanded its cartel, signing an agreement with

ten other oil-producing countries (most notably Russia, whose production rivaled that of Saudi Arabia) and thereby forming what is now known as OPEC+.

86. This new, aggressive competition arrived as forward-looking demand projections for crude oil were softening. Worldwide recognition of the link between global temperature and climate change and carbon emissions was driving governments around the world to discuss and implement long-term policies designed to curb those emissions. Demand for electric vehicles surged during this time. In 2010, the share of new automobiles that were either fully battery powered or plug-in hybrids was less than 1%. In 2018, it was 2%. In 2023, that percentage had increased to 18%.

**B. U.S. Independents Alter Supply Dynamics**

87. Fracking dramatically increased U.S. crude oil production and altered the global crude oil markets. Within eight years of the first commercial shale operation coming online in Texas in 2002, U.S. shale oil producers were producing enough shale oil to reverse a thirty-five-year trend of declining domestic crude oil production. The seven years starting from 2008 represented the fastest increase in domestic crude oil production in U.S. history and is sometimes referred to as the "Shale Revolution."

88. Shale production disrupted the status quo of global oil production. The traditional supermajors typically invest in decades-long drilling projects that require substantial lead time and infrastructure construction before production begins and thus expect consistent production thereafter. By contrast, shale oil wells: (a) require smaller capital commitments; (b) can be drilled in two to four weeks; (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded. As a result, shale well producers can be more responsive to changing prices and real-time market conditions than the traditional supermajors. According to market analysts, "the shale sector's ability to boost production—and to scale back—relatively quickly is

its calling card," which makes U.S. shale oil "as close to inventory-on-demand as oil ever comes." This unique ability to respond to price signals allowed Defendants to raise prices through production cuts, particularly when colluding with each other.

89. Independents are like the supermajors in one important respect that is problematic for OPEC: they are subject to the Sherman Act. This means that while U.S. shale producers would come to produce as much oil as the largest OPEC and OPEC+ nations, they did not constitute a monolith capable of making industry-wide production decisions. Rather, U.S. shale producers were a group of relatively smaller producers, bound by law to compete with each other, and with OPEC.

90. U.S. shale's arrival on the global oil scene in the early-to-mid-2010s was a challenge to OPEC. The U.S. shale movement was dubbed "Cowboyistan" for Independents' "drill-first, ask-questions-later" business model. A "new oil order" had emerged. The aggressive competition of U.S. shale producers began to usurp the Saudi swing producer role, and U.S. domestic production began to erode OPEC-set cartel price premiums.

**C. OPEC Reacts to Shale Oil Production**

91. As sovereign nation-states with GDPs (and, in some cases, currencies) heavily reliant on crude oil prices, OPEC was not willing to cede the pricing power it had held over global oil prices for a half-century to the U.S. tight oil producers.

92. At some point in 2014, OPEC determined it was in its best interests to reduce the impact of shale oil.

93. Consequently, despite a global oversupply of crude oil, in mid-2014 OPEC made a deliberate long-term choice to maintain, rather than reduce, its production levels to win back the market share it had lost to Independents, and to push oil prices to a level that would render U.S. shale oil no longer economically viable. This two-year period of open global competition, from

2014 through 2016, dubbed within the industry as the "OPEC Price War," had begun. The daily spot prices of crude oil between 2014 and 2016 are depicted in Figure 1 below.

**Figure 1. Daily Crude Oil Spot Prices (2010-2016)**




94. The OPEC Price War dragged on for years for two reasons. First, shale production was a brand-new industry where technological advancements and accumulating experience were driving breakeven points lower, allowing Independents to exploit less productive shale fields profitably.[2] Second, the U.S. legal structure (including corporate and bankruptcy law) encourages business formation and risk-taking, making business failure less economically devastating to the individuals involved.

[2] A shale oil "play" refers to a specific geographic area or region where shale formations contain significant amounts of oil that can be economically extracted. The top three shale oil plays in the U.S. are the Permian Basin in Texas and New Mexico (40% of all U.S. crude production in 2022), the Bakken Formation in North Dakota and Montana, and Eagle Ford in Texas. Technological advancements have made more shale oil plays economically viable over time.

95. As a result, by implementing cost-cutting measures and focusing on the most productive shale plays to remain competitive in the lower-price environment, many U.S. shale producers, including Defendants, continued to drill at consistent levels despite the price drop caused by OPEC's Price War.

96. The OPEC Price War facilitated the consolidation of the U.S. shale industry, causing dozens of smaller Independents to fail and larger Independents, like Defendants, to rally together in the face of a shared adversary.

### D. OPEC Changes Tactics and Looks to Bring U.S. Shale to "the Table on Pricing"

97. Weary after years of low prices, OPEC changed tactics. First, as noted above, in December 2016, it struck a deal with ten non-OPEC oil producing nations to form OPEC+. Having brought one enormous potential competitor (Russia) into the fold, OPEC turned its attention to U.S. "swing" production.

98. Unable to beat U.S. shale producers in the free market during this period of lower prices and competition, OPEC started a years-long campaign to add them to the cartel. As part of these efforts, OPEC began hosting regular dinners and events "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial."

99. Independents, too, were weary of the price war. As reported by MarketWatch on September 8, 2016, "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later." Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to slide in crude oil prices." Hamm and Defendants had gained leverage and the respect of OPEC during the price war.

Now, Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball with OPEC.

100. Shortly thereafter, in early 2017, Defendants and members of OPEC began meeting and sharing dinners together. Many of these meetings took place on the sidelines of the CERAWeek Conference, a global energy conference held annually in Houston, Texas.

101. During the CERAWeek Conference running from March 6 to March 10, 2017, former Nigerian politician and then-OPEC General Secretary Mohammed Barkindo "dined with about two dozen[] U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including [Defendant] Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., [Defendant] John Hess of [Defendant] Hess Corp., [Robert] Douglas Lawler of [Defendant] Chesapeake Energy Corp. and Tim Leach of Concho Resources Inc." OPEC had purportedly never before met with U.S. shale producers, leading to reporters describing the meeting as "unusual." Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries." Defendant Sheffield of Defendant Pioneer stated, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with U.S. independents than I've seen over my entire career."

102. Indeed, CERAWeek 2017 served as a channel for OPEC's Secretary General to "garner views and opinions from other senior oil industry executives" in "bilateral" meetings with shale executives. Following a dinner with OPEC officials, Defendant John Hess said to *Bloomberg*, "It was a very good exchange of information and views about oil . . . . I really commend the OPEC Secretary General for outreach. It was a good talk." Barkindo confirmed everyone was on the same page regarding the need to collectively work to achieve price stability following the meeting, because "no-one wants to see a repeat of 2015 and 2016."

103. During CERAWeek 2017, OPEC and the Independents "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet. Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih warned U.S. shale producers that if they wanted to collaborate, there would be no "free rides" on OPEC production cuts, and they must be ready to pull their weight when the time comes. In other words, OPEC told U.S. shale producers that OPEC expected Independents to work together and coordinate their production cuts alongside OPEC.

104. Later that year, Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner." Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."

105. In February 2018, in discussing plans to meet with U.S. shale executives for the second year in a row at the upcoming March 2018 CERAWeek conference in Houston, Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek." Barkindo explained that OPEC and the U.S. shale industry agreed at their first meeting in 2017 that they had a "shared responsibility" towards the oil markets. The 2018 CERAWeek dinner between OPEC members and U.S. shale producers, including Defendants, was organized to "further explore the mechanic of achieving our common objective" of stable production volumes and prices, per Barkindo.

106. On March 5, 2018, OPEC officials met with U.S. shale executives at Houston's "The Grove" restaurant, during which Secretary General Barkindo gave a speech to dinner attendees. Afterwards, Defendant Pioneer's then-CEO Tim Dove summarized Barkindo's speech to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth." Defendant Centennial's CEO, Mark Papa, described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."

107. OPEC representatives, including Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, described the meeting between OPEC and U.S. shale executives as more than just general discussions, with the key takeaway being a shared commitment to the exchange of confidential production information: "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics." Lima explained that, by sharing this information, "[w]hat we are doing is avoiding volatility," or put differently, rather than allowing market forces to dictate outcome, Defendants agreed to share confidential information with one another to coordinate production decisions in order to maintain artificially high crude oil prices.

108. Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu agreed that it was time for U.S. shale to "take some responsibilities in terms of stability of oil prices." Indeed, Secretary General Barkindo confirmed that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward. I was very

surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue." Barkindo explained that OPEC and Defendants "compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious."

109. As one shale executive who insisted on remaining anonymous described it to *Reuters*, shale oil producers had parlayed a successful price-war resistance into a seat at OPEC's "table on pricing." In other words, after successfully competing with OPEC with expanded shale opportunities and technological advances, Defendants understood that if they agreed with one another to limit crude oil production and maintain artificially high crude oil prices they could profit handsomely even without added exploration and drilling.

110. The chart below illustrates what it looked like when Defendants continued to compete on the global stage without agreeing to suppress supply:

**Figure 2.**



111. In the wake of the 2018 conference, Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, even "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."

112. Following the CERAWeek 2018 dinner, Barkindo invited U.S. shale officials to join him at an OPEC summit in Vienna in June 2018. Defendants' executives Scott Sheffield (Pioneer) and John Hess (Hess) attended the June 2018 OPEC International Seminar in Vienna, Austria. At the event, Defendant Sheffield spoke for all Defendants when he said, "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80." Defendant Sheffield urged, "OPEC needs to fulfil its duty."

113. Critically, the 2018 OPEC summit in Austria was the first time Defendants admitted publicly to more than listening to OPEC during these meetings. Defendant Sheffield admitted speaking to the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference . . . . If they don't we are going to see $100 oil or higher."

114. Sheffield's "premonition" became a reality. Two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to *Bloomberg* OPEC's production change.

115. Specifically, Defendant Sheffield said "[t]he soft number will be around 5-600,000 [bpd], they may announce a million . . . and that will be phased in over the next few months," which came to pass two days later. Reporting on OPEC's announcement, *Reuters* stated: "Saudi Arabia said the move [to increase production] would translate into a nominal output rise of around 1

million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]"

116. In January 2019, at the Davos World Economic Forum in Switzerland, OPEC's Secretary General sat on a panel with Defendant John Hess, CEO of Defendant Hess Corporation, Vicki Hollub, CEO of Defendant Occidental, and Dan Yergin, Vice Chairman of IHS Markit.[3] According to *Reuters*, Hess and Hollub both "said that [the] growth of U.S. shale oil output would slow" in the near future.

117. OPEC's Secretary General addressed the current oil market dynamics at Davos, highlighting the importance of OPEC+ in helping stabilize the oil market over the past two years following the price war. He also underscored that market uncertainties and volatility are detrimental to industry investments, and that continuing joint and collaborative efforts among producers were crucial to ensure timely investments.

118. These comments were praised by Hess, who said that "the Secretary General of OPEC, as well as OPEC Members, play a very important role in stabilizing markets for oil, so those efforts are to be recognized." Referencing OPEC's relationships with Defendants, Barkindo emphasized, "[w]e have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views."

119. During the CERAWeek Conference running from March 11 through March 15, 2019, U.S. shale executives met with OPEC members for the third consecutive year. *Bloomberg* reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers." Discussing his upcoming meeting with U.S. shale executives,

[3] IHS performs market analyses on behalf of OPEC member nations.

Secretary General Barkindo shared, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers . . . It is essential we continue the conversation with U.S. shale industry."

120. Barkindo reported that a Monday night dinner attended by CEOs Defendant John Hess, Vicki Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and Diamondback, respectively, included a "friendly conversation on current industry issues and the immediate prospects and challenges for all." Diamondback CEO Stice spoke with reporters directly after what he called "a very good session" between OPEC and Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry." Figure 3 below is a photograph that shows Defendant John Hess (left) with OPEC Secretary General Mohammed Barkindo (center) in Houston on March 11, 2019.

**Figure 3.**
**OPEC Official and Defendants' Officers**



121. In early 2019, OPEC and its allies began new production cuts, agreeing to reduce supply by 1.2 million bpd over the next six months. After the cuts were announced, *Reuters* reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing." At CERAWeek 2019, Barkindo indicated that OPEC and allies will continue supply adjustments through 2019.

## IV. 2021: Defendants Form Their Agreement

122. Prior to the start of the Defendants' conspiracy, Defendants did not let the COVID-19 crisis go to waste. Rather they took steps, during and in the aftermath of the crisis, to manage production and more closely coordinate their output to achieve price objectives in conjunction with OPEC. The groundwork for actualization of this coordinated and programmatic approach to production was put in place prior to 2020 so that through the end of 2018, it at least appeared to the outside world that OPEC's pleas were falling on deaf ears, as depicted in Figure 2 above.

123. Indeed, analysts predicted that 2019 would be the start of "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."

124. However, this "second wave" never occurred. In 2020, the COVID-19 pandemic cratered gasoline demand, which significantly impacted world oil markets. Worldwide oil production fell, and the U.S. shale oil industry consolidated and suffered as production fell and smaller Independents went bankrupt.

125. During this economic turmoil, Defendants and OPEC signaled to each other their willingness to end their price war and market share competition and collaborate on their respective production levels and crude oil prices. In July 2020, OPEC's Secretary General made it clear that OPEC could inflate and sustain high crude prices if Defendants cooperated: "We were able to reach out to the U.S. [I]ndependents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. . . . Everybody has a role to play. . . . We are very much appreciative

of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry."

126. On November 28, 2020, Defendant EOG's CEO Bill Thomas signaled Defendants' willingness, as a group, to follow OPEC's lead on pricing: "In the future, certainly we believe OPEC will be the swing producer—really, totally in control of oil prices. . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."

127. When the world began to emerge from the pandemic in early 2021, gasoline demand surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021. As OPEC and OPEC+ countries emerged from the pandemic, they collectively withheld production to push prices up further. Defendants also responded to rising prices by withholding production, suddenly (and in near unison) preaching supply "discipline" for the first time in the history of U.S. shale.

128. The combined impact of OPEC and "Tight Oil" coordinated supply decisions suppressed production and increased prices with coordination creating a "positive feedback" loop for the industry and supracompetitive and distorted WTI prices over time.

**Figure 4. Combined Impact of Coordinated OPEC and "Tight Oil" Industry Decisions Increase and Distort WTI Market**




129. Over the course of 2021, Defendants would continue to signal to each other and the market that they were no longer competing for market share or willing to act as swing producers:

a. In a February 2021 interview, Chesapeake CEO Doug Lawler explained that U.S. shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility." Defendant Pioneer CEO Defendant Sheffield agreed, predicting that small companies would increase output but in the aggregate U.S. output would remain flat, even if crude prices go above $60, as the large U.S. Independents would jointly practice discipline.

b. In March 2021, on the same day OPEC announced supply restrictions, Defendant Occidental CEO Vicki Hollub said that despite a "healthier supply and demand environment" and "a V-shaped" post-pandemic recovery, U.S. oil production would not return to pre-pandemic heights because Defendants and other U.S. shale producers were "committed to value growth, rather than production growth."

c. In April 2021, Defendant Pioneer CEO Defendant Sheffield said that U.S. shale producers risked another price war with OPEC and its allies if they resumed the

breakneck production growth of the last decade. He also balked at the federal government's forecasts that predicted an increase in domestic oil production and instead declared he was "totally against" any production increase as "producers now know the stakes and will stick to their mantra of capital discipline."

d. In a June 2021 interview with *Reuters*, Defendant Sheffield said he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns." According to *Reuters*, "[i]n the United States, closely held companies have contributed substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."

e. On an August 5, 2021 earnings call, Defendant EOG President and CEO Bill Thomas, echoing Lawler's February 2021 language, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started. I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."

f. On October 3, 2021, Defendant Pioneer CEO Defendant Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control," reflecting Defendants' production restraint agreement. Defendant Sheffield reaffirmed Defendant Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year no matter the price of crude oil, explaining "everybody's going to be disciplined, regardless whether it's $75 Brent, $80 Brent, or $100 Brent."

130. This public insistence on discipline signaled that Defendants were trying to hold production down, instead of competing for market share.

131. Given that Defendants' breakeven prices at the time were around $40/barrel, Defendants' newly discovered restraint came as a surprise to some oil industry observers. At a breakeven price of $40/barrel, Defendants could have put *much* more oil to market at a profit but declined to do so. Absent the conspiracy, this would be contrary to each Defendant's individual profit motive. As industry observers noted:

a. In June 2021, *Reuters* reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."

b. In June 2021, another *Reuters* columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel." 2021's "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom." However, the author observed that Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. . . . Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors." The author noted that "there is a broad consensus among OPEC+ countries and the U.S. shale industry on the need for slower output growth, higher prices, and wider profit margins."

c. On Chesapeake's Q4 2021 earnings call, a Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new strategy, telling

Chesapeake CEO that their plans to slow production would be "the easiest way to destroy value" for the company in the long term.

132. OPEC, however, was not surprised. In early 2021, OPEC estimated that U.S. shale production would see a significant annual drop. *Reuters* reported that anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market." OPEC also signaled that the price war was over. Secretary General Barkindo told *Reuters* that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Independents and OPEC "have a shared responsibility in this regard."

## V. During 2022-2023, Prices Exceed $120 Per Barrel as Defendants Continued to Restrain Output

133. In 2022, U.S. shale oil production increased by only 500,000 barrels, which was 50% short of some estimates.

134. In 2022, after Russia invaded Ukraine, crude oil prices spiked. Unlike the steep fall in demand during the early days of COVID-19, this was a supply-side shock that resulted in a decrease in the volume of oil available in the U.S. market, both from increased strain on supply chains and, more importantly, the separation of Russia's oil production from the world market.

135. By mid-2022, oil crossed $120 a barrel. At this price, oil cost more than at any point during the five-year runup to the OPEC Price War and nearly quadruple the 2016 price war low water mark.

136. OPEC responded to the possibility that the high prices might recede with further production restraint, including cuts in October 2022 of "two million barrels per day." These amounts were announced as crude prices began to normalize from their near-record highs.

137. Despite record prices in 2022 and consistently high prices in 2023, in a break from their prior behavior, Defendants refused to increase production in an independently economically

rational manner, even though increasing oil sales would have been immensely profitable to Defendants at the market prices in 2022-2023:

a. In February of 2022, as Russian troops staged on the Ukrainian border in advance of the invasion, Defendant Sheffield again made comments that support the existence of an agreement between and among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line" and "I'm confident they will continue to stay in line." Indeed, following the massive oil price spike during which oil prices increased 20% between just January and February 2022, Defendant Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"This refusal to alter strategy regardless of prevailing market conditions would be irrational absent the alleged conspiracy.

b. Later in February, other Defendants signaled their alignment. During an earnings call, Defendant Continental's CEO Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years. . . ."

c. Defendant Diamondback's executive Stice explained on February 22, 2023, "we have no reason to put growth before returns . . . we will continue to be disciplined."

d. *Bloomberg* reported on February 24, 2022 that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers . . . . [l]ike [Defendant] Pioneer Natural Resources Co. and [Defendant] Continental Resources Inc.[, who] are also limiting increases to less than 5% this year."

e. In March 2022, Occidental's CEO Vicki Hollub stated that Occidental had a "huge inventory of high-quality investments" available around the world, especially in U.S. shale, but was not acting on those opportunities to expand production, instead focused on maintaining high profits.

f. In March 2022, the *New York Times* reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices."

g. On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to "low single digits" in 2023 and it was "committed to remaining disciplined" despite ideal economic conditions for production increases. In 2022, EOG increased production by only 4% and said it was targeting the same increase in 2023.

h. In January 2023, Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."

i. When asked in a March 2023 interview why Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's President, Vicki Hollub responded that "prices are in a good place right now," "gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand and lower U.S. consumer gas prices, despite having the ability to profitably increase production.

138. Knowing Independents' breakeven prices were continuing to fall, oil industry observers expressed disbelief at Defendants' refusal to compete for market share:

a. In the words of *Bloomberg*, the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."

b. A February 2022 *Bloomberg* article questioned why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields." The article said that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."

c. In March 2022, a *CNBC* anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."

d. In March 2023, the *Financial Times* published an article titled, "Oil executives warn of higher prices now that OPEC is back 'in charge.'"

e. A March 2023 *CNBC* article was titled, "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO."

f. On April 3, 2023, after OPEC made further cuts, *Bloomberg* reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high gas prices, despite being "flush with cash after record profits." According to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides," which "really puts a floor under the price of oil long term."

139. Defendants continued meeting with OPEC officials in 2022 and 2023:

a. **2022**: Once again, Defendants met with OPEC officials during the 2022 CERAWeek Conference in Houston, Texas between March 7 and 11, 2022. *Reuters* reported that at the time of this conference, "[i]t was at least the fourth time since 2017 that U.S. shale oil producers and OPEC officials have held such meetings to discuss energy concerns." In Houston, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Mohammad Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy." As *Reuters* noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production." Chesapeake CEO Domenic Dell'Osso confirmed that were shale to ramp up output only to have prices fall, "we have destroyed a lot of value for shareholders and haven't helped the problem."

b. **2023:** In March, 2023, the *Financial Times* reported that "about two dozen [U.S. shale executives] including [Defendants' executives:] [Scott] Sheffield [of Pioneer], . . . Nick Dell'Osso of Chesapeake Energy, Travis Stice of Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais for a private dinner in a downtown Houston steakhouse" to reaffirm their agreement to restrict production, "[d]espite recent record profits." During this dinner, it was reported that "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could

deploy, and offered their own assessment of how much extra output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner." In the article, Defendant Sheffield doubled down on his support of OPEC, "I think the people that are in charge now are three countries – and they'll be in charge the next 25 years. Saudi first, UAE second, Kuwait third."

140. On January 5, 2023, Defendant Pioneer's CEO Defendant Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to change. If [the price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut . . . . [W]e'll see what happens in the next 90 days."

141. Eighty-seven (87) days later, OPEC "shocked traders around the world" when it announced a "surprise" production cut, when OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."

142. In between Sheffield's prediction and the reveal, on March 27, 2023, news emerged that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements. This left Defendants "suddenly vulnerable" and exposed to massive economic risk if oil prices went down.

143. Indeed, Defendant Pioneer's CEO, Defendant Sheffield, defended the extraordinarily risky move, stating "we're not going to hedge," and that he was still "optimistic that we'll see $100 a barrel before the end of the year."

144. On April 2, 2023, less than a week after news emerged of Defendants' exposed positions, OPEC announced its "surprise" production cut, slashing 1.15 million barrels of oil

production per day. Defendants' failure to hedge was profitable in this context because prices were going up.

145. In April 2023, an energy analyst succinctly summarized the effects of Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up. That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects. Today, shale is as responsive as in the past. But there's a difference. ***The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share***. Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.

146. Even though Independents had the ability to increase production and gain market share, they collectively chose to pursue restrained production instead, as reflected in Table 1.

**Table 1: Defendants' U.S. Oil Production Growth Rates Slow as Multi-Party Agreement Takes Root**

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| Centennial/Permian Resources | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |

147. Defendants' production restraint agreement significantly impacted volumes as the multi-party agreement had a particularly strong impact beginning no later than January 2021, as reflected in Figure 5.

**Figure 5. Reduced U.S. Tight Oil Production and Slower Production Growth Rates Drove WTI Price Increases Post COVID-19**




148. Defendants' production restraint was designed to and did significantly increase WTI pricing over the Class Period. As Defendant Centennial Resources stated in their annual report for 2020, "in late 2020 and early 2021, commitments made by OPEC and other oil producing countries to reduce their crude oil production, taken together with U.S. producers substantially reducing drilling and producing activities, resulted in higher commodity prices, but commodity prices remain volatile."

149. During the period, and particularly during the post-COVID recovery period, the change in indexed WTI crude oil prices significantly outstripped other consumer price indexed items.

**Figure 6. Reduced U.S. Tight Oil Production and Slower Production Growth Rates Drove WTI Price Increases Post COVID-19**




150. Defendants are reaping the rewards in the form of massive revenue increases, while not reinvesting that additional revenue and increased cash flow into new production. *Compare* Figures 5 and 6 *with* Figures 7-14 (recording Defendants' revenue growth after 2020).

**Figure 7. U.S. Shale Producer's Reinvestment Rate (Capital Expenditure as a Percentage of Operational Cash Flow)**




**Figure 8. Pioneer's Annual Revenue (USD)**



**Figure 9. Permian Resources/Centennial's Annual Revenue (USD)**




**Figure 10. Chesapeake's Annual Revenue (USD)**



**Figure 11. Continental's Annual Revenue (USD)**




**Figure 12. Diamondback's Annual Revenue (USD)**



**Figure 13. EOG's Annual Revenue (USD)**




**Figure 14. Occidental's Annual Revenue (USD)**




## VI. Defendants' "Restraint" Is Economically Irrational, Absent Agreement

151. Defendants' strategic use of the words "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns" were all code for each Defendant's agreement to coordinate and restrain domestic shale oil production. Further,

Defendants' repeated public confirmation of their production discipline was an admission that they each had spare productive capacity that they chose not to utilize.

152. In a competitive market for arguably the most important commodity on earth—crude oil—expanding production to take advantage of prices above your breakeven is the economically rational response. If you do not, your competitor will, taking margin share and reinvesting their additional profits into further productive capacity and/or efficiency gains. Defendants taught OPEC this lesson during the Shale Revolution.

153. In a competitive market, no single Defendant would restrain production unless they ***knew*** their competitors would also restrain their production. No business in a competitive market would turn down opportunities to make three times marginal cost (*i.e.*, breakeven) to focus on "shareholder returns." In a competitive market, if you are not drilling that oil, someone else is.

154. Others did drill some of that oil. Notoriously conservative and well-known to view fracking as a waste of time (in part because their overhead structure made small-scale operations relatively more expensive), the supermajors started investing in shale in 2021 and 2022 at rates previously unseen, in direct response to U.S. shale producers "underinvesting as an industry":

a. ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25% in response to record high crude oil prices.

b. Similarly, Chevron planned on a 10% increase in the same region in 2022 "from an even larger production base."

c. Midway through 2022, Chevron anticipated a "15% year-over-year increase" in shale oil production from 2021 and promised to continue "bolstering production."

d. In June 2023, ExxonMobil Chief Executive Darren Woods said that Exxon is hoping to double the amount of oil produced from its U.S. shale holdings over a five-year period using new technologies.

e. Smaller, non-public shale companies drilled some of that oil too. In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead." Due to the gap in production left by Defendants, these smaller private producers "[led] output gains during the highest [crude oil] prices in seven years." For example, *Reuters* reported that, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.

155. Small shale oil producers going from one rig to two is not enough to meaningfully move U.S. production when Defendants control 18% of the total active oil rigs in the U.S., including conventional oil rigs and rigs owned by supermajors. With those rigs, in 2023 Defendants were responsible for approximately 16.2% of U.S. total crude oil production (including conventional crude oil). Defendants are able to leverage their collective market share because of how fragmented the long tail of the domestic oil market is: of the 247 companies operating oil rigs in the U.S., 162 companies are running just one rig. Only ten companies own fifteen or more rigs—five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are supermajors (Exxon, Chevron, and ConocoPhillips).

156. Moreover, Defendants' market power is exacerbated by the fact that conventional oil production in the U.S. is largely fixed and cannot quickly add or remove production volume in response to price changes.

157. Defendants' production restraint had a demonstrable effect on the number of wells finished and rigs employed in the Permian, Eagle Ford, and Bakken Basins, the three largest shale oil plays in the United States. Figure 15 below charts crude oil prices and Permian Basin rig counts, which have been sluggish in recovering from 2020 as a result of Defendants' agreement notwithstanding strong oil prices.

**Figure 15. WTI Crude Oil Prices vs Permian Basin Rig Counts**




158. Figure 16 below charts crude oil prices and Eagle Ford finished well counts, which have not recovered since 2020 as a result of Defendants' agreement notwithstanding strong oil prices.

**Figure 16. Eagle Ford Completed Wells vs WTI Crude Oil Prices**




159. Figure 17 below charts crude oil prices and Bakken rig counts, which have bottomed out since 2020 as a result of Defendants' agreement notwithstanding strong oil prices.

**Figure 17. Bakken Rig Counts vs WTI Crude Oil Prices**



160. OPEC believes itself to be outside the reach of the Sherman Act, so it does not use code words when describing its coordination with, and the coordination amongst, Defendants: OPEC and Defendants "collaborate," "compare[] notes," "work together to exchange views," discuss "how [OPEC and Defendants] should proceed going forward," "further explore the mechanic of achieving [OPEC's and Defendants'] common objective," and discuss OPEC's and Defendants' "shared responsibility" for global oil markets.

161. Whether expressed in code words or frank terms, Defendants' agreement by and between themselves to coordinate U.S. domestic shale oil production is *per se* illegal under the Sherman Act.

## VII. Defendants Caused Artificial Prices in the WTI Crude Oil Futures Market, Which Harmed Plaintiffs and the Class

162. The WTI crude oil futures contract is settled with reference to prices of oil at terminals located in Cushing. Prices of physical crude oil at Cushing and WTI crude oil futures are highly correlated, meaning those who control physical deliveries into Cushing, such as Defendants, are able to control the futures price. As a result, manipulation of physical prices directly impacts WTI crude oil futures. Figure 18 below shows the direct relationship between physical oil and WTI crude oil futures prices.

**Figure 18. Relationship Between Physical and Financially Settled Oil (USD)**




163. Price signals from global benchmarks like WTI at Cushing are central to the functioning of oil markets. The alleged collusive agreement among the Defendants and OPEC aimed to move global prices to a higher equilibrium and sustain that price equilibrium. Inbound oil from "tight" oil fields, such as Niobrara, Bakken, and the Permian, is a key supply factor at Cushing. Over sixty percent of the inbound pipeline capacity into Cushing comes from the Niobrara, Bakken, and the Permian basins, where the Independents represent a significant percentage of overall production as well as key "swing" oil production. Figure 19 below shows these key production areas that feed into the Cushing hub, as well as Cushing's outbound capabilities.

**Figure 19. Importance of "Tight Oil" Supply from the Niobrara, Bakken, and Permian to the WTI Crude Oil Futures Market**




164. Defendants' actions in the market for physical crude oil have a direct and corresponding impact on the price of WTI crude oil futures, and the prices of physical crude oil and WTI crude oil futures converge at contract expiration.

165. By colluding to manipulate supply as described *supra*, Defendants distorted price discovery in the WTI crude oil futures market during the Class Period.

166. Defendants colluded amongst themselves to substantially influence, control, and artificially inflate WTI crude oil futures prices. Plaintiffs and the Class incurred actual damages as a result.

167. Defendants manipulated WTI crude oil futures, as discussed above, by conspiring to suppress production and thus raise the price of physical oil throughout the Class Period. This anticompetitive suppression had a direct and corresponding price impact on WTI crude oil futures

prices due to the close relationship between WTI crude oil futures and production and pricing of the commodity.

168. As the following figures from the EIA show, non-OPEC supply dynamics are a key input driving WTI and other oil benchmarks.

**Figure 20. Key Drivers of Oil Prices**



**Figure 21. Key Drivers of Oil Prices**




169. WTI is one of the world's most traded commodities, and the price of WTI is the basis for a long line of other less-traded benchmarks that discount their oil relative to how WTI is trading.

170. Defendants' tight oil production feeds directly into the pipelines leading to the Cushing physical settlement location. Defendants account for a significant percentage of the domestic production into Cushing from tight oil production areas with in-bound pipeline capacity to Cushing. Therefore, Defendants had the ability to influence the prices of crude oil at the Cushing settlement, the commodity underlying the WTI crude oil futures contract.

171. In addition to the WTI crude oil futures contracts, a number of other CME and ICE Futures contracts are tied to the price of crude oil at the Cushing terminal.

## VIII. Plus Factors Indicative of Defendants' Conspiracy to Manipulate the Price of WTI and Related Derivative Products

172. The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the U.S. shale oil industry highly conducive to collusion. Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action, and therefore support an inference of collusion. "Super plus factors" are actions or outcomes that would almost never be observed in the absence of collusion, such that it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures.

173. The following plus and super plus factors alleged herein support an inference that Defendants' actions constituted a *per se* unlawful price-fixing conspiracy, not merely parallel conduct:

### A. Actions Against Self-Interest

174. Defendants' actions were against their independent self-interests, absent the existence of an agreement. As alleged herein, Defendants repeatedly met with each other to discuss confidential business plans, including forward-looking production and capacity information. No rational business would divulge this proprietary and sensitive information with a direct competitor, absent collusion. Furthermore, following these mutual exchanges, Defendants did not increase their respective production volumes when that would have been in their individual rational best interests given rising prices. Instead, Defendants withheld production in a way that would only be in their individual rational best interests if they had an agreement among themselves to coordinate

production levels to maintain crude oil prices at artificially high levels. Defendants repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational absent an agreement. Indeed, "firms restrict[ing] production when prices and profits are relatively high or increasing" is a "super plus factor."

175. As discussed more fully above, during the Class Period Defendants openly admitted that they were not operating at full drilling capacity and affirmatively argued that operating at less than full capacity was a strategy decision to increase profits.

176. OPEC representatives described the years-long discussions with U.S. shale producers, including Defendants, using words like "collaborate" and "shared responsibility" for the health of the global oil market.[4]

177. No rational business would work to "collaborate" with its direct competitors in furtherance of a "shared responsibility" for market-wide prosperity, absent collusion.

178. Some Defendants also appeared to withdraw downside hedging pricing protection consistent with conviction of artificially constrained supply.

179. Defendants had excess capacity, but each Defendant adhered to a self-imposed restraint on production growth. Individual Defendant Sheffield claimed in February 2022 that Defendants would not increase production at any price.[5]

180. Refusing to increase production in an environment of excess capacity and profitable market prices is irrational, absent supplier collusion.

---

[4] *See supra* ¶¶ 103, 105, 118, 132, 160.

[5] *See supra* ¶ 137.

181. Each Defendant's individual production restraint would not have held unless a critical mass of Defendants had an agreement to restrain production. Continuing production restraint in the face of extremely high prices would only be in each Defendant's individual rational economic best interests if Defendants had an agreement between themselves and OPEC to coordinate production levels to maintain crude oil prices at artificially high levels.

182. Finally, Defendants repeatedly communicated forward-looking production data to the press and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.[6]

**B. Evidence of Interfirm Communications and Opportunities to Conspire**

183. As described herein, industry trade associations Defendants regularly participate in provided them with ample opportunity to coordinate supply restraints and curtail cheating on the conspiracy. As alleged above, Defendants met during trade association gatherings and several CERAWeek Conferences in Houston, Texas to discuss their internal cooperation and overall cooperation with OPEC by all Defendants to maintain that excess capacity.

184. In addition to the CERAWeek gatherings, several of Defendants' executives attended multiple other industry events, including the Evercore ISI Elite Energy Summit; the World Petroleum Congress; the American Energy Security Summit, sponsored by the Hamm Institute for American Energy; the Barclays CEO Energy-Power Conference; the Goldman Sachs Global Energy and Clean Technology Conference; the SUPER DUG Conference & Expo, hosted by Hart Energy, "the largest shale event of 2024" and a "once-a-year opportunity to be in the room with over 2,000+ of influential industry professionals!"; and the BofA Global Energy Conference.

---

[6] *See, e.g.*, *id*.

185. Defendants also had opportunities to collude at the meetings and social events of the many trade associations they belong to, and in which key executives serve in leadership roles. These organizations include but are not limited to:

a. The All-American Wildcatters Association, "an informal oil industry fraternity that meets one weekend a year to hear a speaker and swap industry gossip." At least Travis Stice (former Diamondback CEO and current Executive Chairman), Vicki Hollub (Occidental CEO), and Bill Thomas (former EOG CEO) are members of this exclusive group.

b. The American Exploration & Production Council ("AXPC"), the "voice of the leading independent US energy producers." AXPC's current and former leadership includes several of Defendants' top executives.

c. The Houston Producers Forum ("HPF"), a "forum for networking and the exchange of ideas between [energy] industry leaders and peers." The HPF hosts multiple events each year, including fireside chats, annual golf tournaments, fall and spring socials, annual crawfish boils, poker tournaments, and other events. Many of these events take place at the prestigious Petroleum Club of Houston, "one of the nation's finest and most distinctive private clubs," which offers "social events for members and their families as well as business networking opportunities throughout the year." The HPF's current and former leadership includes several of Defendants' top executives, and several Defendant employees have been speakers at HPF gatherings.

d. The American Petroleum Institute ("API"), an organization with the mission "to promote safety across the industry globally and to influence public policy in support of a strong, viable U.S. oil and natural gas industry." Occidental, Diamondback, and Hess executives have served in API leadership roles.

e. The Domestic Energy Producers Alliance, a "nationwide collaboration of 39 coalition associations—from California to West Virginia, Texas to Montana—representing individuals and companies engaged in domestic onshore oil and natural gas exploration and production."

f. The Independent Petroleum Association of America ("IPAA"), "serves as an informed voice for the exploration and production segment of the industry, and advocates its members' views before the United States Congress, The White House, and federal agencies." Executives from Continental, Permian, Diamondback, and Occidental serve as At-Large Directors of the IPAA.

g. The National Petroleum Council, which holds meetings in Washington, D.C. at least once a year. Executives of at least EOG, Hess, and Occidental are members.

h. The Permian Basin Petroleum Association ("PBPA"), which hosts several events, including an annual meeting, a banquet to honor its "Top Hand" award recipient (of which Defendant Sheffield is a recipient), member luncheons, a spring golf tournament, and an annual clay shoot and barbeque competition. Many PBPA events take place at the Petroleum Club of

Midland, a "vibrant hub for oil industry leaders and a welcoming venue for esteemed guests" which provides "unlimited opportunities" to "build relationships by networking or socializing." Multiple of Defendants' executives have served or currently serve in PBPA leadership roles.

i. State oil and gas associations, including the Colorado Oil and Gas Association, the New Mexico Oil & Gas Association, the North Dakota Petroleum Council, the Oklahoma Energy Resources Board, the Petroleum Alliance of Oklahoma, the Petroleum Association of Wyoming, the Texas Oil & Gas Association, the Texas Alliance of Energy Producers, and the Texas Independent Producers & Royalty Owners' Association.

186. Each of these get-togethers among Defendants provided additional opportunities to collude.

**C. Defendants' Common Ownership**

187. The Defendants' core shareholders overlapped substantially at times during the Class Period (with Continental, which founder Harold Hamm took private in 2022, the lone exception):

**Table 2: Defendants' Common Ownership**

| Defendant | Shareholder | | | | | |
|---|---|---|---|---|---|---|
| | BlackRock, Inc. | Capital Group | FMR LLC (Fidelity) | State Street Corp. | T. Rowe Price | Vanguard Group Inc. |
| Permian Resources | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Chesapeake | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Diamondback | ✓ | ✓ | ✓ | ✓ | | ✓ |
| EOG | ✓ | ✓ | | ✓ | | ✓ |
| Hess | ✓ | | ✓ | ✓ | ✓ | ✓ |
| Occidental | ✓ | | | ✓ | | ✓ |
| Pioneer | ✓ | ✓ | | ✓ | ✓ | ✓ |

188. Defendants' common investor ownership creates an additional factor enabling and facilitating the Defendants' agreed output restrictions.

189. First, because the Defendants were largely owned by many of the same shareholders, OPEC's direct communications with these shareholders supplemented OPEC's

direct communications with the Defendants and facilitated the Defendants' coordinated output restriction.

190. Second, the shareholders' participation in Defendants' relationships with each other, and with OPEC, served as an enforcement mechanism for the agreement to restrict output. The shareholders' expressed concerns about output—or "capital discipline," in Wall Street-speak—became a stick used to ensure that the Defendants adhered to their agreement and its goals.

191. Third, the Defendants' common shareholders incentivized Defendants not to compete amongst themselves. When competitors in an industry share common owners, "[e]conomic theory has long shown that horizontal shareholdings can reduce the incentives of horizontal competitors to compete with each other." That literature explains that a profit maximizing producer will seek to expand its market share through production increases when the additional revenue obtained outweighs its interest in keeping market-wide prices high. When ownership is separate, economic models prove that firms have incentives to undercut rivals' prices, including through expanding production, because the profits those firms gain from the additional sales exceed the reduction in the market price caused by their own conduct.

192. The premise on which these models rest is "that when a firm takes away sales by undercutting its rivals' prices, the firm's owners gain the profits from those sales but lose no profit on the sales taken away from their rivals."

193. But where the industry involves common ownership, a firm that expands its production and/or cuts its price "simply moves their owners' money from one pocket to another," with the result being that "the net effect of the price cut for those owners is that the prices charged by both firms are lower, thus lowering those owners' profits across both firms."

194. Defendants' common shareholders—some of the largest financial firms in the world—had no interest in any particular Defendant winning market share from any other Defendant by increasing output. Instead, these shareholders' interests were served by Defendants keeping market-wide crude oil and crude oil derivative fuel product prices high by restricting output in coordination with OPEC.

**D. Market Conditions and Inelastic Demand**

195. "Elasticity" describes the sensitivity of supply and demand to changes in one another. Demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. Customers have nowhere to turn for alternative, cheaper services of similar quality, and continue to purchase it despite rising prices.

196. The demand for crude oil and light sweet crude oil in the U.S. is inelastic. Market conditions for crude oil, and light sweet crude oil, sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand. For example, many people need gasoline for their vehicles, and consumers cannot easily switch to another fuel source as prices rise. This reinforces the inelasticity of upstream demand for crude oil.

197. As discussed above, the U.S. shale oil industry is highly fragmented at the bottom but consolidated at the top, with a small number of large producers and hundreds of smaller producers.

## IX. As Global Marginal Producers, Defendants' Shale Oil Production Decisions Impact Global Crude Oil Prices

198. Defendants' agreement to constrain shale oil production has inflated the price of crude oil and WTI-based crude oil derivatives throughout the Class Period. Historically, global crude oil demand was primarily met by oil obtained from conventional drilling. Following the Shale Revolution, the influence of U.S. shale production on crude oil prices (and gasoline prices) is undeniable, a fact recognized by market analysts and economists.

199. A *Forbes* article from 2019 claims that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because since 2008, "U.S. oil production increased by 8.5 million bpd–equal to 73.2% of the global increase in production."

200. In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, U.S. shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.

201. In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors declared that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.

202. In 2020, economists from the Federal Reserve Bank of Dallas found that without the shale oil revolution, oil prices would have been 36% higher in 2018.

203. In 2023, an article in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."

204. As noted above, U.S. Independents' output decisions have a disproportionate impact on the price of crude oil and crude oil derivatives because they are swing producers for the global market. When competing with each other (and OPEC), as the largest Independents in a very fractured production landscape, Defendants have sufficient market power to dictate whether the U.S. can produce enough shale oil in response to high crude prices to "swing" the market and push prices down.

205. Defendants acknowledge that they have this power and are choosing not to use it. On March 2, 2022, the *New York Times* reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices."

206. Since at least 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

207. Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total U.S. shale production. In 2022, U.S. shale oil production increased by only 500,000 barrels, which was 50% short of some market analysts' yearly estimates.

## X. Regulatory Investigations Support the Existence of the Conspiracy

208. U.S. regulators have uncovered evidence supporting the allegations described above while conducting reviews of proposed mergers involving Defendants.

**A. Exxon-Pioneer Merger**

209. On May 2, 2024, the Federal Trade Commission ("FTC") announced that it had reached a consent decree with ExxonMobil in connection with ExxonMobil's then-pending acquisition of Defendant Pioneer (the merger, the "Exxon-Pioneer Merger").

210. This decree forbade Defendant Pioneer's former CEO, Defendant Sheffield, from joining Exxon's Board of Directors based on FTC's evidence of Sheffield's years-long efforts to fix the price of crude oil.

211. The decree follows from an FTC administrative complaint, which was released in redacted form on May 1, 2024. The FTC Exxon Complaint states:

> Through public statements and private communications, Pioneer founder and former CEO Scott D. Sheffield has campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including the Organization of Petroleum Exporting Countries ("OPEC"), and a related cartel of other oil-producing countries known as OPEC+. Mr. Sheffield's communications were designed to pad Pioneer's bottom line—as well as those of oil companies in OPEC and OPEC+ member states—at the expense of U.S. households and businesses.

FTC Exxon Complaint ¶ 1.

212. The FTC Exxon Complaint references documents, including Defendant Sheffield's WhatsApp and text messages, that Defendant Pioneer produced to the FTC as part of the FTC's review of the Exxon-Pioneer Merger. *See id.* ¶¶ 5-6.

213. Specifically, the FTC alleged that documents produced by Defendant Pioneer as part of the FTC's Exxon-Pioneer Merger investigation revealed:

a. In 2020, Defendant Sheffield's "close communications with high-ranking OPEC officials [] during the early days of the COVID pandemic [] focused on [] Sheffield's efforts to limit Permian oil production in the face of falling oil prices globally." *Id.* ¶ 38;

b. Even after the economy and oil prices recovered from the COVID pandemic, "[Defendant] Sheffield did, in fact, stay in regular contact" with OPEC officials, *id.* ¶¶ 39-40, and has "exchanged information on oil pricing and output with OPEC representatives." *Id.* ¶ 41;

c. Over the past few years, Defendant Sheffield has, through "text messages," "in-person meetings," and other means of communication, "discuss[ed] crude oil market dynamics, pricing, and output" with Pioneer's U.S. competitors. *Id.* ¶¶ 6, 36;

d. Defendant Sheffield served as a "conduit" between Defendants and OPEC, *id.*, ¶ 41; and "also worked to facilitate communications between his competitors in the Permian Basin and OPEC." *Id.* ¶¶ 41-42; and

e. Defendant Sheffield, through "WhatsApp" messages and other means of communication, "held repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low," *id.* ¶ 5, "and to discuss U.S. producers' efforts to maintain capital discipline in order to increase Pioneer's profits." *Id.* ¶ 34.

214. Among other facts, Defendant Sheffield recently admitted that he exchanged WhatsApp messages with a government minister and acknowledged that those messages were referenced in the FTC complaint. *See* Comment on Behalf of Scott Sheffield, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (F.T.C. May 28, 2024), at 21 (claiming that the messages referred to in the FTC Complaint "were entirely innocuous").

215. FTC Chair Lina Khan summarized the Exxon-Pioneer Merger investigation findings:

> A core principle that should underpin the Commission's antitrust analysis is examining and understanding commercial realities. Sometimes the evidence that is most probative of commercial realities is how market participants act. Staff's investigation here uncovered troubling evidence of Pioneer CEO Scott Sheffield's actions and communications, which make clear that he believed and acted as if he could persuade his rivals to join him in colluding to restrict output and raise prices. When market actors speak and act as if they can collude, we should not ignore this direct evidence[.]

216. Contemporaneous public reporting suggests that Defendant Pioneer submitted "millions of documents" to the FTC—hundreds of which were communications between Defendant Sheffield, Pioneer's competitors, and/or OPEC—as part of the agency's second-level review into the Exxon-Pioneer Merger's possible anticompetitive effects.

217. On May 2, 2024, it was also reported that the FTC had uncovered hundreds of text messages between Defendant Pioneer's then-CEO, Defendant Sheffield, and other individuals that reflected efforts to collude with the other Defendants, and with OPEC, to inflate crude oil prices. "Mr. Sheffield did not limit himself to public signaling to US counterparts—he has also held repeated, private conversations with high-ranking OPEC representatives assuring them that Pioneer and its Permian Basin rivals [*i.e.*, Defendants] were working hard to keep oil output artificially low."

218. The FTC's Exxon Complaint applies redactions to the contents and contacts involved in the text messages, and the text messages are not attached as an exhibit to the complaint and are not made publicly available.

219. While the FTC's Exxon Complaint did not include information on the text messages, Defendant Sheffield responded to the FTC Order in a letter on May 28, 2024. This letter included snippets of text messages including one text sent to his son, the CEO of Parsley Energy,

in June 2020 that reads, "Just got off phone with UAE oil minister. OPEC plus is upset with Parsley and EOG public statements about bringing on production."

220. On July 19, 2024, it was reported that the FTC had begun investigating collusion among U.S. domestic crude oil producers—including Defendants—and OPEC. The focus of the investigation was on entities that produce crude oil from tight oil production areas, including the Permian Basin, which feed directly into the Cushing physical settlement area. Among other entities, the FTC was investigating Defendants Hess, Occidental, and Diamondback.

221. On June 26, 2024, Sheldon Whitehouse, the Chairman of the Senate Committee on the Budget, sent a document and information request to Defendant John Hess noting that the FTC's findings indicate that Defendants Sheffield and Pioneer may not have been the only individual or entity engaging in such collusive activities. The FTC's Complaint stated that "[t]hrough public statements, text messages, in-person meetings, WhatsApp conversations and other communications while at Pioneer, Sheffield sought to *align oil production across the Permian Basin in West Texas and New Mexico with OPEC+*." Similarly, the FTC also indicated that Defendant Sheffield had discussed with OPEC representatives and officials "his efforts to coordinate with *Texas producers* under a production cut mandated by the Railroad Commission of Texas." Communications with OPEC and other oil producers were requested from Defendant John Hess. The same demand letter was sent to Defendants Diamondback and Occidental on June 26, 2024.

222. On July 9, 2024, the U.S. House Committee on Natural Resources sent the U.S. Department of Interior a letter regarding the alleged conspiracy among Defendants and with OPEC and OPEC+ nations to reduce output. The letter states "[s]uch market manipulation would have enormous impacts on the price of gas . . . ." The letter further states that "[Defendant] Pioneer was

not the only U.S. oil company that was colluding with OPEC and OPEC+." Defendant Pioneer's CEO Defendant Sheffield "publicly told competitors," *i.e.*, the Defendants, "that they should be 'disciplined' about capacity growth and 'stay[] in line.'" In private conversations with OPEC leaders, Defendant Sheffield stated that "Defendant Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low."

**B. Chevron-Hess Merger**

223. On September 30, 2024, the FTC announced that it had reached a consent decree with Chevron in connection with Chevron's pending acquisition of Defendant Hess (the "Chevron-Hess Merger").

224. The decree follows from an FTC administrative complaint (the "FTC Chevron Complaint") that was released in redacted form on September 30, 2024. The FTC Chevron Complaint states, in part:

> Hess Chief Executive Officer ("CEO") John B. Hess ("Mr. Hess") has communicated publicly and privately with OPEC representatives and oil ministers of OPEC member states about global output and other dimensions of crude oil market competition.
>
> Mr. Hess encouraged high-level OPEC representatives in their stated mission to stabilize global oil markets.

FTC Chevron Complaint ¶¶ 4-5.

225. The FTC Chevron Complaint further alleges that "Hess's ordinary course documents demonstrate that, as Hess's CEO and Director, Mr. Hess had access to and connections with OPEC Oil Producers, his market rivals" and that "Mr. Hess attended public meetings and maintained private communications with OPEC representatives during [his CEO tenure]." *See id.* ¶ 26.

226. Specifically, the FTC alleged that documents produced by Defendant Hess as part of the FTC's Chevron-Hess Merger investigation revealed continuous coordination:

a. A lengthy history of communications and meetings between Defendant John Hess and OPEC Secretary General Barkindo, including several of the communications and meetings described above. *Id.* ¶¶ 27-40;

b. Years-long communications and meetings between Defendant John Hess and subsequent OPEC Secretary General Al Ghais. *Id.* ¶¶ 41-43;

c. Extensive private communications with Saudi Arabian oil executives at Saudi Aramco, the national oil company of Saudi Arabia and fourth-largest company in the world by revenue. *Id.* ¶¶ 44-47;

d. Defendant John Hess's public statements regarding the interplay between U.S. shale producer and OPEC production levels, and the impact of those production levels on world crude oil prices, featured "repeated themes from his private communications about market stability and other business topics that he had with Messrs. Barkindo, Al Ghais, and [the Saudi Aramco executives]." *Id.* ¶ 48. Defendant John Hess's statements to investors about OPEC's role in influencing global crude oil prices while acting as CEO were "consistent with his private communications with OPEC representatives." *Id.* ¶ 49.

227. Importantly, FTC Chair Lina Khan explicitly linked the FTC's actions related to the Exxon-Pioneer Merger and the Chevron-Hess Merger—further reinforcing the allegations above that ***both*** Defendants Pioneer and Hess were coordinating with OPEC ***at the same time and in a similar manner***:

> The Commission's actions in Chevron-Hess and Exxon-Pioneer mark an important step towards ensuring that U.S. oil producers are serving as a competitive check on OPEC+ rather than subordinating their independent decision-making to the goals set by a cartel. . . . Rivals responding to one another by increasing production, rather than coordinating to hold it back, represents the type of competitive dynamic the antitrust laws were designed to protect.

## CLASS ALLEGATIONS

228. Plaintiffs bring this action on behalf of themselves, and, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of all members of the following class:

> All persons or entities that engaged in a U.S. based transaction of WTI-based derivatives during the period of at least January 1, 2021 through the present (the "Class Period"). A U.S. based transaction in WTI-based derivatives ("WTI Derivatives") includes: (a) a purchase or sale of a WTI crude oil futures (or options on futures) contract or other futures or options tied to the price of WTI crude oil on a futures exchange in the U.S.; and/or (b) a purchase or sale of a WTI crude oil swap, forward agreement, or other financial instrument benchmarked, priced, and/or settled to WTI entered into by a U.S. person or entity from a location within the U.S.

229. Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

230. Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of third parties. Members of the Class are readily identifiable from information and records in the possession of the CME, other digital exchange providers, or are capable of identification via third parties.

231. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

232. Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiffs are coincidental with, and not antagonistic to, those of members of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they transacted WTI Derivatives at artificial prices. Plaintiffs and all

members of the Class are similarly affected by Defendants' course of conduct in violation of the CEA.

233. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members, thereby making relief with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

a. whether Defendants conspired to fix, raise, and maintain the prices of WTI crude oil and WTI Derivatives prices;

b. whether Defendants' conduct had the impact of raising WTI crude oil and WTI Derivatives prices;

c. whether Defendants' conduct violated the Sherman Act;

d. whether Defendants are liable to the Class for treble damages under the Sherman Act and the Clayton Act;

e. whether Defendants manipulated the prices of WTI crude oil, the commodity underlying the WTI Derivatives, and the prices of WTI Derivatives;

f. whether Defendants intended to manipulate the prices of WTI crude oil;

g. whether Defendants intended to manipulate the prices of the WTI Derivatives;

h. whether Defendants had the ability to influence the prices of WTI crude oil;

i. whether Defendants had the ability to influence the prices of the WTI Derivatives;

j. whether the price of WTI crude oil was artificial;

k. whether WTI Derivatives prices were artificial;

l. whether Defendants caused artificial prices of WTI crude oil and WTI crude oil futures;

m. whether Defendants' conduct violated the CEA's anti-manipulation provisions;

n. whether Defendants aided and abetted violations of the CEA; and

o. the appropriate type and scope of injunctive and related equitable relief.

234. A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the Class who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

235. The Class is ascertainable because it is defined by objective criteria based on instruments traded.

236. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

237. Plaintiffs have defined members of the Class based on currently available information and hereby reserve the right to amend the definitions of members of the Class, including, without limitation, the length of the Class Period.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

238. By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

239. Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or facts that could or would have led to the discovery thereof, until April 2024.

240. Because Defendants affirmatively employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the proposed Class could not have discovered the existence of this unlawful conduct any earlier than April 2024. Such acts and techniques include, among other things, private and concealed conversations, non-public trading activity and nonpublic meetings. In fact, for the manipulation to be effective, no one outside Defendants would know Defendants' true plans.

241. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE SHERMAN ACT 15 U.S.C. §§ 1, *et seq.*

242. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

243. From at least January 1, 2021 and continuing to the present, Defendants, with each other, and with OPEC, entered into and engaged in a continuing agreement, understanding, and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, increase, or stabilize the price of WTI crude oil, WTI crude oil futures and options, swaps, and other financial instruments tied to WTI crude oil, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants' conspiracy is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

244. Defendants' conspiracy and the resulting impact on WTI crude oil, WTI Derivatives, and other financial products tied to WTI crude oil affected U.S. interstate commerce.

245. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property. These injuries include, but are not limited to, receiving artificial and non-competitive prices for WTI Derivatives. Plaintiffs were also deprived of the benefits of free and open competition in the market for the purchase of WTI Derivatives.

246. Plaintiffs and Class members are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

**COUNT II:**
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT**
**7 U.S.C. §§ 1, *et seq*. and 17 C.F.R. § 180.2**

247. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

248. From no later than January 1, 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

249. Defendants intended to affect or acted recklessly in affecting prices of WTI crude oil and WTI Derivatives and engaged in overt acts in furtherance of that intent.

250. Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

251. The manipulative and deceptive devices employed by Defendants and their conspirators and agents deprived Plaintiffs and the Class of a lawfully operating market during the

Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

252. Plaintiffs and Class members are entitled to actual damages and other relief from Defendants.

**COUNT III:**
**PRINCIPAL-AGENT LIABILITY**
**UNDER THE COMMODITY EXCHANGE ACT**
**7 U.S.C. § 13c(b)**

253. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

254. Defendants' traders, employees, and/or officers, and conspirators acted as agents for their principals, Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

255. Defendants are liable for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

256. The principal-agent violations by Defendants and their conspirators and agents deprived Plaintiffs and the Class of a lawfully operating market during the Class Period and caused them to transact WTI Derivatives at artificial prices which directly led to injury and economic damages.

257. Plaintiffs and the Class are entitled to actual damages and other relief from Defendants.

**COUNT IV:**
**AIDING AND ABETTING**
**UNDER THE COMMODITY EXCHANGE ACT**
**7 U.S.C. § 13c(a)**

258. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

259. Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein, including violations by the other Defendants.

260. Defendants did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in WTI crude oil and WTI Derivatives prices becoming artificial during the Class Period.

## COUNT V:
## UNJUST ENRICHMENT AND DISGORGEMENT

261. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

262. Defendants financially benefited from their acts.

263. In addition to being unlawful, Defendants' acts are also unfair and inequitable. For any of these reasons, Defendants' retention of the benefits is inconsistent with justice and violates the fundamental principles of equity and good conscience.

264. The inequitable acts alleged herein caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact WTI Derivatives at artificial prices.

265. Each Defendant should pay its own unjust enrichment to Plaintiffs and members of the Class.

266. Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

267. Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

a. Determine that this action may be maintained as a Class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

b. Decree that Defendants and their co-conspirators have unlawfully conspired to violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. Decree that Defendants violated the CEA and award appropriate damages;

d. Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs;

e. Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

f. Award the Class treble damages;

g. Award reasonable attorneys' fees and costs;

h. Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

i. Permanently enjoin Defendants from continuing their unlawful conduct; and

j. Order such other, further and general relief as is just and proper.

**DEMAND FOR A JURY TRIAL**

268. Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated: October 2, 2026

**THE WARD LAW FIRM**
/s/ Vincent J. Ward
Vincent J. Ward
P.O. Box 7940
Albuquerque, NM 87194
Phone: (505) 944-9454
vincent@wardlaw.com

**KIRBY McINERNEY LLP**
Sarah E. Flohr (*pro hac vice*)
David E. Kovel (*pro hac vice*)
James A. Isacks (*pro hac vice*)
250 Park Avenue, Suite 820
New York, NY 10177
Tel.: (212) 371-6600
dkovel@kmllp.com
sflohr@kmllp.com
jisacks@kmllp.com

Anthony F. Fata (*pro hac vice*)
Cormac H. Broeg (*pro hac vice*)
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Tel.: (312) 767-5180
afata@kmllp.com
cbroeg@kmllp.com

**LOWEY DANNENBERG, P.C.**
Vincent Briganti (*pro hac vice forthcoming*)
Raymond Girnys (*pro hac vice*)
Nicole A. Veno (*pro hac vice*)
Noelle Forde (*pro hac vice*)
44 South Broadway, Suite 1100
White Plains, NY 10601
Phone: (914) 997-0500
vbriganti@lowey.com
rgirnys@lowey.com
nveno@lowey.com
nforde@lowey.com

**BURKE LLP**
Christopher Burke (*pro hac vice*)
Yifan (Kate) Lv (*pro hac vice forthcoming*)
402 W. Broadway, Suite 1890
San Diego, CA 92101
Phone: (619) 369-8244
cburke@burke.law
klv@burke.law

*Counsel for Plaintiffs and the Putative Class*

**PEIFER, HANSON, MULLINS & BAKER, P.A.**
Matthew M. Beck
20 First Plaza Center, Suite 725
Albuquerque, NM 87102
Tel.: (505) 247-4800
mbeck@peiferlaw.com

**DIMOND KAPLAN & ROTHSTEIN, P.A.**
Jeffrey B. Kaplan
2665 South Bayshore Drive, PH-2B
Miami, Florida 33133
Phone: (305) 374-1920
jkaplan@dkrpa.com

**CRIDEN & LOVE, P.A.**
Michael E. Criden
Lindsey C. Grossman
2020 Salzedo Street, Suite 302
Coral Gables, FL 33134
Phone: (305) 357-9000
MCriden@cridenlove.com
lgrossman@cridenlove.com

*Additional Counsel for Plaintiffs and the Proposed Class*